# **Exhibit A**

*Application for the Issuance of an Initial Order*
as filed in the Canadian Proceeding

Court File No.:

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c.C-36 AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF LIGHTHOUSE IMMERSIVE INC. AND LIGHTHOUSE IMMERSIVE USA, INC.

**APPLICATION RECORD**
**(returnable July 27, 2023)**

July 27, 2023

**MILLER THOMSON LLP**
40 King Street West
Suite 5800
Toronto Ontario
M5H 3S1, Canada

**Kyla Mahar LSO#: 44182G**
kmahar@millerthomson.com
Tel: 416.597.4303

**Gina Rhodes LSO# 78849U**
grhodes@millerthomson.com
Tel: 416.597.4321

Lawyers for the Applicants

71335219.1

Court File No.:

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c.C-36 AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF LIGHTHOUSE IMMERSIVE INC. AND LIGHTHOUSE IMMERSIVE USA, INC.

INDEX

| TAB | DOCUMENT |
|---|---|
| 1. | Notice of Application, returnable July 27, 2023 |
| 2. | Affidavit of Corey Ross, sworn July 27, 2023 |
| **Exhibits to the Affidavit of Corey Ross, sworn July 27, 2023** | |
| Exhibit A | Immersive Art Exhibit Sample |
| Exhibit B | Lighthouse Corporate Profile Report |
| Exhibit C | Lighthouse USA Certificate of Incorporation |
| Exhibit D | LH 2022 Financial Statements |
| Exhibit E | LH May Interim Statements |
| Exhibit F | LHUSA 2022 Financial Statements |
| Exhibit G | LHUSA May Interim Statements |
| Exhibit H | General Security Agreement – Ross Productions |
| Exhibit I | General Security Agreement – Dvoretsky Holdings |
| Exhibit J | General Security Agreement – Show One Productions |
| Exhibit K | General Security Agreement – SZ HoldCo |
| Exhibit L | General Security Agreement – SCS Finance, Inc. |

| | |
|---|---|
| Exhibit M | Ontario Personal Property Security Registration System Enquiry Response Certificate in respect of Lighthouse Immersive Inc. |
| Exhibit N | Copy of the Uniform Commercial Code Financing Statement from the Delaware Department of State in respect of Lighthouse Immersive USA, Inc. |
| Exhibit O | Cash Flow Forecast |
| Exhibit P | DIP Term Sheet |
| 3. | Consent of B. Riley Farber Inc. |
| 4. | Draft Initial Order |
| 5. | Blackline against the Model Order |

71335219.1

# TAB 1

Court File No.:

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c.C-36 AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF LIGHTHOUSE IMMERSIVE INC. AND LIGHTHOUSE IMMERSIVE USA, INC.

**NOTICE OF APPLICATION**

TO THE RESPONDENT:

A LEGAL PROCEEDING HAS BEEN COMMENCED by the applicant. The claim made by the applicant appears on the following page.

THIS APPLICATION will come on for a hearing on

☐ In person

☐ By telephone conference

☒ By video conference

at the following location

Zoom link to be uploaded on Caselines.

IF YOU WISH TO OPPOSE THIS APPLICATION, to receive notice of any step in the application or to be served with any documents in the application, you or an Ontario lawyer acting for you must forthwith prepare a notice of appearance in Form 38A prescribed by the *Rules of Civil Procedure*, serve it on the applicant's lawyer or, where the applicant does not have a lawyer, serve it on the applicant, and file it, with proof of service, in this court office, and you or your lawyer must appear at the hearing.

IF YOU WISH TO PRESENT AFFIDAVIT OR OTHER DOCUMENTARY EVIDENCE TO THE COURT OR TO EXAMINE OR CROSS-EXAMINE WITNESSES ON THE APPLICATION, you or your lawyer must, in addition to serving your notice of appearance, serve a copy of the evidence on the applicant's lawyer or, where the applicant does not have a lawyer, serve it on the applicant, and file it, with proof of service, in the court office where the application is to be heard as soon as possible, but at least four days before the hearing.

- 2 -

IF YOU FAIL TO APPEAR AT THE HEARING, JUDGMENT MAY BE GIVEN IN YOUR ABSENCE AND WITHOUT FURTHER NOTICE TO YOU. IF YOU WISH TO OPPOSE THIS APPLICATION BUT ARE UNABLE TO PAY LEGAL FEES, LEGAL AID MAY BE AVAILABLE TO YOU BY CONTACTING A LOCAL LEGAL AID OFFICE.

Date:   July 26, 2023                    Issued by   _____
                                                              Local registrar

                                         Address of   330     University     Avenue,
                                         court office   8th Floor, Toronto, Ontario

**TO:**        **SERVICE LIST ATTACHED**

# APPLICATION

1.      The Applicants, Lighthouse Immersive Inc. ("**Lighthouse**") and Lighthouse Immersive USA, Inc. ("**Lighthouse USA**" and together with Lighthouse, the "**Applicants**") make an Application for an Initial Order substantially in the form attached at Tab 4 of the Application Record (the "**Initial Order**"), among other things:

(a)      declaring that the Applicants are parties to which the CCAA applies;

(b)      appointing B. Riley Farber Inc. ("**BRF**") as Monitor of the Applicants in these proceedings (the "**Proposed Monitor**" and, if appointed, the "**Monitor**");

(c)      granting an administration charge in the amount of US $275,000 (the "**Administration Charge**") in favour of counsel for the Applicants, the Monitor and its counsel;

(d)      approving a debtor-in-possession financing facility ("**DIP Financing**") made pursuant to an agreement dated July 26, 2023 (the "**DIP Term Sheet**") between the Applicants and the wholly-owned subsidiaries of the Applicants set out in Schedule "A" to the Initial Order (the "**Subsidiaries**"), as borrowers, and SCS Finance, Inc., as lender ("**SCS Finance**" or the "**DIP Lender**"), in an amount up to US $1,100,000 (plus interest, fees and expenses), and granting a charge in favour of the DIP Lender (the "**DIP Lender's Charge**");

(e)      granting a directors' charge in favour of the directors and officers of the Applicants in the amount of US $250,000 ("**Directors' Charge**" and together

with the Administration Charge and the DIP Lender's Charge, the "**Priority Charges**");

(f)      authorizing the Applicants to continue utilizing their cash management system (the "**Cash Management System**");

(g)      granting an initial stay of proceedings in respect of the Applicants, the Applicants' directors and officers, the Applicants' business and the Property (as defined in the Initial Order) up to and including August 6, 2023 (the "**Stay Period**"); and

(h)      authorizing Lighthouse to act as the foreign representative (the "**Foreign Representative**") in respect of these CCAA proceedings for the purpose of having these CCAA proceedings recognized in the United States of America (the "**US**" or the "**United States**") pursuant to Chapter 15 of Title 11 of the United States Code, 11 U.S.C. § 101-1532 (the "**US Bankruptcy Code**") and any other foreign legislation, as may be necessary or advisable;

**THE GROUNDS FOR THE APPLICATION ARE:**

A.       **Background and Business of the Applicants**

2.       The Applicants are in the business of producing immersive show exhibits in Canada, the United States, and various cities around the world, through their multiple affiliated entities and subsidiaries.

3.      Lighthouse was formed by Corey Ross, Svetlana Dvoretsky, and Slava Zheleznyakov, with the intention of combining their respective talents and passion for the arts to introduce a new form of art into North America – immersive exhibits. Immersive exhibits create an experience for ticket-goers where they walk through a venue (or during the Covid-19 pandemic drive through) and view enormous digital projections that highlight brushstrokes, colour, and detail to bring art "to life". These exhibits are paired with music to complete the immersive experience.

4.      Lighthouse announced its first immersive show in Toronto, Immersive Van Gogh in February 2020, which was set to open its doors in May 2020.

5.      Unable to open the doors as a walk-through exhibit due to the government restrictions put in place during the Covid-19, Lighthouse swiftly pivoted its business model to present a drive-in immersive show.

6.      The drive-in immersive art show was an instant success. As the only show "in town" being able to continue during the lock down restrictions of Covid-19, Lighthouse sold out shows seven days a week and months in advance for almost an entire year.

7.      Based on the success Lighthouse was having, Lighthouse decided to expand the immersive exhibits into the US market, through Lighthouse USA. Lighthouse USA planned to present Immersive Van Gogh first, and follow with other immersive content that was produced.

8.    The Applicants expanded their business at a rapid rate, entering into long-term leases of varying lengths mostly through wholly-owned subsidiaries of Lighthouse USA across over ten states in the US.

9.    Immersive Van Gogh received an initially similar overwhelming positive response in the US. For the calendar year 2021, the Applicants operated at a significant profit.

10.   During a short time-frame, the Applicants grew from one entity in one location producing a single show to over 30 entities, attempting to produce various shows in about 20 venues around the world.

11.   It is customary in the entertainment production industry to create a new entity for every new contract, new production or new show location. As part of the Applicants' rapid growth into different markets, the corporate structure became complex, comprising of over 30 entities. Lighthouse effectively operates as the Lighthouse group's head office and Lighthouse USA has 10 wholly owned subsidiaries that currently operate or previously operated an immersive show in a US location.

12.   As the government restrictions in place during the Covid-19 pandemic lifted, theatres, galleries, and museums resumed operations, and though still popular, the Applicants' immersive shows no longer had the same overwhelming success they once did. This caused strain to the financial situation.

13.   As well, competitors began entering the market with competitive prices, which further negatively impacted the Applicants' ticket sales.

14.     Although the Applicants' business grew rapidly, they were unable to keep up with the growth from a back-office standpoint.  In particular, they were met with internal business challenges of not having a solid, long-term Chief Financial Officer or a substantial financial department to keep up with the rapid expansion of the business.

15.     In an attempt to conserve cash for their business, the Owners stopped receiving management fees and did not take salaries, notwithstanding being heavily involved with the management of the business on a full-time basis.

16.     In October 2022, one of the Applicants' affiliates secured an exclusive partnership with a large multinational entertainment company ("**Entertainment Co.**") to create and produce a brand specific Immersive Animation show. The Immersive Animation show has proven successful, is operating currently in Lighthouse's venue in Toronto, among other venues in the US, and has allowed the Lighthouse group to recently enter international markets.

17.     However, the Applicants and their affiliates are not making sufficient revenue to fulfill their commitments with respect to their long-term lease agreements, license agreements, and vendor agreements with various entities, and are in default of certain obligations. The majority of the shows currently running are being wound down in an orderly manner.

**B.     Urgent Need for CCAA Proceedings**

18.     Despite its best efforts, the Applicants have been unable to successfully restructure and right size their business.

19.     The Applicants are insolvent and in breach of many of their obligations to creditors. Most imminently, as described below, Lighthouse USA is facing a confession of judgment in

the amount of US $16.6 million pursuant to the LHIM Settlement (as defined below), which set to be heard in the Superior Court of Delaware on July 28, 2023 at 10:00 a.m.

20.    In or around the beginning of 2021, Lighthouse USA entered into a joint venture with Impact Museums, Inc. a/k/a Impact Museums, LLC ("**Impact**") for the purpose of expanding the Applicants' business into certain US markets. Specifically, per the parties' agreement, Impact was responsible for delivering and managing seven venues and Lighthouse USA was responsible for programming and marketing.

21.    To facilitate the joint venture, Lighthouse and Impact became owners of LHIM Productions, LLC ("**LHIM**"), owning 49% and 47%, respectively.  The advertising agency, Twenty6Two International Inc. and its principal, that provide advertising for the Lighthouse group became the remaining 4% owner of LHIM Productions, LLC.

22.    Various issues arose during the partnership and in or around the fall of 2022, the parties attended arbitration to settle the dispute.  This resulted in a settlement agreement ("**LHIM Settlement Agreement**") being entered into among Impact, LHIM, Lighthouse USA, the Owners personally, and additional non-related entities effective on October 21, 2022.

23.    The LHIM Settlement Agreement contemplated that full ownership of LHIM would be transferred to Impact and that certain payments would be made to LHIM from Lighthouse USA over time.  Due to, among other things, the decrease in ticket sales and the underperformance of the Applicants' subsequent immersive shows, Lighthouse USA missed a payment scheduled for June 1, 2023.

24. As a result of the missed payment, LHIM/Impact took the following two steps against Lighthouse USA.

25. Impact/LHIM locked Lighthouse USA out of their Los Angeles, Dallas, and Atlanta venue locations, forcing the Applicants to cancel the Immersive Animation show. This caused the Lighthouse group to have to refund approximately $1.5 million in tickets sales and cancel all ongoing ticket sales. The Applicants are of the view that the terms of the Settlement Agreement did not allow Impact/LHIM to take this step and that it was improper and actionable. The lockout has led to significant issues with their relationship with Entertainment Co., which the Lighthouse group is trying to repair and has significantly negatively impacted the Lighthouse group's cash flow.

26. In addition, LHIM sought a confession of judgment in the amount of US $16.6 million in the Superior Court of Delaware under the LHIM Settlement. The Applicants have engaged US counsel and intend to dispute the amount sought and the circumstances leading to the confession to judgment.

27. The confession of judgment is set to be entered in the Superior Court of Delaware at a hearing scheduled for this Friday, July 28, 2023 at 10:00 a.m.

28. The Applicants require urgent protection under the CCAA to keep the *status quo* and prevent the entry of LHIM's confession of judgment.

### C.    Cash Flow Forecast

29. The Applicants, with the assistance of the Proposed Monitor, have prepared a projected 13-week cash flow forecast (the "**Cash Flow Forecast**") for the period ending October

22, 2023, which is premised on, among other things, the assumption that the Applicants will be granted CCAA protection and that the DIP Term Sheet and DIP Lender's Charge will be approved as part of the Initial Order. The Cash Flow Forecast is a reasonable forecast of the Applicants' restructuring during the CCAA proceedings.

30.     Pursuant to the Cash Flow Forecast, without interim financing, the Applicants will be unable to operate in the ordinary course and payroll obligations will not be met, to the detriment of their creditors and stakeholders.

### D.      Eligibility of CCAA Protection

31.     In consultation with their advisors, the Applicants have determined that the CCAA process is the most beneficial plan of action to maximize value for the Applicants' stakeholders.

32.     The Applicants are each debtor companies under the CCAA.

33.     Lighthouse is incorporated under the *Business Corporations Act* (Ontario) and all operations are undertaken in Canada.

34.     Lighthouse USA has assets and does business in Canada.  Specifically, Lighthouse USA has a place of business in Toronto, Ontario and all material decisions with respect to the business and operations are directed by management located in Canada. In addition, Lighthouse USA has retainers held by Miller Thomson LLP and BRF in respect of these CCAA proceedings.

35.     The Applicants have debt in excess of $5 million, are insolvent and are facing a liquidity crisis. As at as at May 31, 2023, Lighthouse had total liabilities of $59,432,100.45 and Lighthouse USA had total liabilities of US $100,220,408.13

36.     The Applicants have commenced these CCAA proceedings with the ultimate goal of protecting the interests of creditors and other stakeholders, with a view to having the business emerge from CCAA protection in a stronger form that preserves its enterprise value and employment for as many of their employees as is reasonably possible.

37.     As indicated in the Cash Flow Forecast, without interim financing, the Applicants will be unable to operate in the ordinary course and payroll obligations will not be met, to the detriment of their stakeholders.

### E.      Proposed Monitor

38.     The Applicants propose that BRF be appointed Monitor in these CCAA proceedings. BRF has consented to act as Monitor, subject to Court approval, and its written consent is included at **Tab 3** of the Application Record.

39.     BRF is a trustee within the meaning of section 2 of the *Bankruptcy and Insolvency Act* (Canada), and is not subject to any of the restrictions on who may be appointed as monitor set out in section 11.7(2) of the CCAA.

40.     In preparing for this filing, BRF has reviewed, and assisted in the preparation of, the Cash Flow Forecast, and has provided guidance and assistance in the commencement of these CCAA proceedings including, without limitation, to assist in quantifying the amount of the Priority Charges and DIP Financing.

41.     As a result, BRF has developed critical knowledge about the Applicants, the Lighthouse Group, their business operations, financial challenges, strategic initiatives, and restructuring efforts to date.

### F.        Administration Charge

42.     The Applicants seek a super-priority charge over the Applicants' Property in favour of the Monitor, counsel to the Monitor and counsel to the Applicants (collectively, the "**Professionals Group**"), to secure payment of their professional fees and disbursements, whether incurred before or after the date of the Initial Order (the "**Administration Charge**").

43.     The proposed Administration Charge being sought at the initial CCAA Application is for a maximum amount of US $275,000 in order to secure the payment of fees and expenses incurred in connection with moving for the within relief sought and for the initial ten (10) day protection period leading up to the first Comeback Hearing. The Administration Charge is proposed to rank as a first-priority charge on the Property.

### G.        DIP Loan and DIP Lender's Charge

44.     SCS Finance is wholly owned by the Owners and is an affiliate of the Applicants. As set out above, SCS Finance is the only secured creditor of Lighthouse USA.

45.     The Applicants and the Subsidiaries entered into the DIP Term Sheet with the DIP Lender dated July 26, 2023, to provide urgently required interim financing during these CCAA proceedings.

46.     The material terms of the DIP Term Sheet are as follows (all terms capitalized but not

defined below are as defined in the DIP Term Sheet):

(a)     the DIP Financing is in the amount of US $1,100,000;

(b)     the purpose of the DIP Loan is to fund:

> i.      the Applicants and the Subsidiaries' working capital requirements
>         and other general corporate purposes and capital expenditures in
>         accordance with the cash flow projections approved by the
>         Monitor and the DIP Lender;

> ii.     the DIP Lender's fees and expenses;

> iii.    professional fees and expenses incurred by the Applicants and the
>         Monitor in respect of the CCAA proceeding; and

> iv.     such other costs and expenses of the Applicants as may be agreed
>         to by the DIP Lender;

(c)     the DIP Loan shall be available in advances, as follows:

> i.      upon the issuance of the Initial Order, US $1,100,00, or such lesser
>         amount as may be approved by the Initial Order, shall be advanced
>         to the Applicants to finance working capital requirements for the
>         10-day period immediately following the date of the Initial Order;
>         and

ii.      upon the issuance of an ARIO at the Comeback Hearing, the balance of the DIP Loan, being up to US $3,500,000, shall be advanced to the Applicants in weekly draws upon request;

(d)      the interest rate is ten percent per annum, calculated daily on the outstanding balance owing under the DIP Loan, not in advance, and accruing and paid on the Maturity Date (as defined in the DIP Term Sheet);

(e)      the Applicants and the Subsidiaries shall pay all of the DIP Lender's fees and expenses incurred in connection with the DIP Loan;

(f)      the DIP Loan is to be secured by a court-ordered priority charge over all of the Applicants' and the Subsidiaries' their current and future assets, undertakings and properties of every nature and kind whatsoever, and wherever situate including all proceeds thereof, subject only to the Administration Charge; and

(g)      the initial advance under the DIP Loan will only be funded upon this Court approving the DIP Term Sheet, the DIP Loan, and granting the Initial Order including the DIP Lender's Charge.

## H.      Director's Charge

47.      The Applicants seek a charge on the Applicants' Property in favour of the Applicants' current officers and directors in priority to all other charges other than the Administration Charge, the DIP Lender's Charge up to a maximum amount of US $250,000.

48.     To ensure the ongoing stability of the Applicants' business during the CCAA proceeding, they require the continued participation of some of their officers and directors. The officers and directors have skills, knowledge and expertise, as well as established relationships with various stakeholders that will contribute to a successful restructuring.

49.     The quantum of the Directors' Charge was developed with the assistance and support of the Proposed Monitor.

### I.      Cash Management System

50.     The Applicants seek the Court's authority to continue to utilize their existing Cash Management System.

51.     The Applicants require use of the Cash Management System to continue operations during the CCAA proceedings.

52.     The Cash Management System will be monitored by the Proposed Monitor throughout the CCAA proceedings. If appointed, and as part of its monitoring procedures, the Proposed Monitor will, among other things:

(a)     monitor the Applicants' receipts and disbursements; and

(b)     monitor all payments, obligations and any transfers as between the Applicants and their subsidiaries, consistent with the Cash Management System.

### J.      Stay of Proceedings

53.     Given the challenges faced by the Applicants described herein, the Applicants require a stay of proceedings to maintain the *status quo* and to give the Applicants the breathing

space they require to develop a restructuring plan in consultation with their advisors and the Monitor including likely undertaking a SISP.

54. The Initial Order contemplates a Stay of Proceedings against the Applicants and their Property for an initial Stay Period of ten (10) days, in accordance with the CCAA.

### K. Foreign Representative Appointment

55. The Applicants seek an order authorizing Lighthouse to act as the Foreign Representative in respect of the within CCAA proceedings, and to apply for foreign recognition of these proceedings in the United States pursuant to Chapter 15 of the US Bankruptcy Code, as well as any other foreign jurisdiction as deemed necessary or advisable.

### GENERAL

56. The provisions of the CCAA including sections 2, 3, 11, 11.001, 11.02, 11.03, 11.2, 11.51, 11.52 and 11.7;

57. Rules 2.03, 3.02, 14.05, 16.04, and 38 of the *Rules of Civil Procedure*, R.R.O. 1990, Reg. 194, as amended; and

58. Such further and other grounds as counsel may advise and this Honourable Court may deem just.

### THE FOLLOWING DOCUMENTARY EVIDENCE WILL BE USED AT THE HEARING OF THE APPLICATION:

59. The Affidavit of Corey Ross, sworn July 26, 2023 and the exhibits annexed thereto;

60. The Consent of BRF to act as Monitor;

61.    The Pre-Filing Report of BRF, as proposed Monitor, to be filed; and

62.    Such further and other evidence as counsel may advise and as this Honourable Court may

admit.

July 26, 2023                              **MILLER THOMSON LLP**
                                          Scotia Plaza
                                          40 King Street West, Suite 5800
                                          P.O. Box 1011
                                          Toronto, ON Canada  M5H 3S1

                                          **Kyla Mahar LSO#: 44182G**
                                          kmahar@millerthomson.com
                                          Tel: 416.597.4303

                                          **Gina Rhodes LSO# 78849U**
                                          grhodes@millerthomson.com
                                          Tel: 416.597.4321

                                          Lawyers for the Applicants

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c.C-36 AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF LIGHTHOUSE IMMERSIVE INC. et al.

Court File No.:

---

***ONTARIO***
**SUPERIOR COURT OF JUSTICE - COMMERCIAL LIST**

Proceeding commenced at TORONTO

---

**NOTICE OF APPLICATION**

---

**MILLER THOMSON** LLP
Scotia Plaza
40 King Street West, Suite 5800
P.O. Box 1011
Toronto, ON Canada  M5H 3S1

**Kyla Mahar LSO#: 44182G**
kmahar@millerthomson.com
Tel: 416.597.4303

**Gina Rhodes LSO# 78849U**
grhodes@millerthomson.com
Tel: 416.597.4321

Lawyers for the Applicants

# TAB 2

Court File No.:

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c.C-36 AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF LIGHTHOUSE IMMERSIVE INC. AND LIGHTHOUSE IMMERSIVE USA, INC.

**AFFIDAVIT OF COREY ROSS**
**(Sworn July 26, 2023)**

**MILLER THOMSON LLP**
40 King Street West, Suite 5800
Toronto Ontario
M5H 3S1, Canada

**Kyla Mahar LSO#: 44182G**
kmahar@millerthomson.com
Tel: 416.597.4303

**Gina Rhodes LSO# 78849U**
grhodes@millerthomson.com
Tel: 416.597.4321

Lawyers for the Applicants

# CONTENTS

Page

PART I - INTRODUCTION ................................................................................2

    A.  Relief Sought ...............................................................................2

    B.  Overview of the Applicants' Business and Restructuring Efforts to Date .....................5

    C.  Urgent Need for CCAA Proceedings ...................................................10

    D.  Purpose of these CCAA Proceedings ..................................................13

PART II - OVERVIEW OF THE APPLICANTS ...................................................14

    A.  The Applicants' Corporate Structure ..................................................14

    B.  The Applicants' Business ...............................................................16

    C.  Leases .....................................................................................16

    D.  The Applicants' Directors and Officers ...............................................17

    E.  Employees and Payroll .................................................................17

    F.  Banking & Cash Management ..........................................................19

    G.  Chief Place of Business and Centre of Main Interest ................................20

PART III - FINANCIAL CIRCUMSTANCES AND CASH FLOW FORECAST .................22

    A.  Financial Performance ..................................................................22

    B.  Assets .....................................................................................23

    C.  Liabilities .................................................................................23

    D.  Cash Flow Forecast .....................................................................27

PART IV - CCAA PROCEEDINGS AND RELIEF SOUGHT ...................................28

    A.  Need for CCAA Proceedings and Eligibility .........................................28

    B.  Appointment of Monitor ...............................................................29

    C.  Administration Charge ..................................................................30

    D.  Approval of DIP Financing and DIP Lender's Charge ..............................31

    E.  Directors' Charge ........................................................................35

    F.  Cash Management System ..............................................................36

    G.  Stay of Proceedings in Favour of the Applicants ...................................36

    H.  Foreign Representative Appointment ..................................................37

    I.  Relief to be Sought at the Comeback Hearing .......................................37

PART V - CONCLUSION ................................................................................38

Court File No.:

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985,
c.C-36 AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
LIGHTHOUSE IMMERSIVE INC. AND LIGHTHOUSE IMMERSIVE USA, INC.

### AFFIDAVIT OF COREY ROSS
### (Sworn July 26, 2023)

**I, COREY ROSS**, of the City of Toronto in the Province of Ontario, **AFFIRM AND**

**SAY AS FOLLOWS**:

1.     I am a Director and the President of Lighthouse Immersive Inc. ("**Lighthouse**") and

Lighthouse Immersive USA, Inc. (formerly Light House Immersive USA, Corp.)

("**Lighthouse USA**" and together with Lighthouse, the "**Applicants**"). I have held these

positions since these entities were incorporated on October 1, 2019 and on October 21,

2020, respectively.

2.     The three founders of the Applicants are myself, Svetlana Dvoretsky ("**Svetlana**"), and

Slava Zheleznyakov ("**Slava**"). Together, we are the shareholders to the Applicants,

through our respective holding companies (collectively the "**Owners**"), having the

following holdings:

(a)    my holding company, Corey Ross Productions Inc. ("**Ross Productions**"), owns 50% of the common shares of each of the Applicants;

(b)    Svetlana's holding company, Dvoretsky Holdings Inc. ("**Dvoretsky Holdings**"), owns 25% of the common shares of each of the Applicants; and

(c)    Slava's holding company, Slava Z HoldCo Inc. ("**SZ HoldCo**"), owns 25% of the common shares of each of the Applicants.

3.    As such, I have personal knowledge of the matters to which I herein depose. Where I have obtained information from others, I have stated the source of my information and, in all such cases, believe such information to be true.

4.    All references to currency in this Affidavit are references to United States of America ("**US**" or "**United States**") dollars, unless otherwise indicated.

## PART I - INTRODUCTION

### A.    Relief Sought

5.    I swear this Affidavit in support of an application for an Initial Order (the "**Initial Order**") under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "**CCAA**"), substantially in the form attached as **Tab 4** to the Application Record, granting the Applicants protection from their creditors and certain ancillary relief including, among other things:

(a)     declaring that the Applicants are parties to which the CCAA applies;

(b)     appointing B. Riley Farber Inc. ("**BRF**") as Monitor of the Applicants in these proceedings (the "**Proposed Monitor**" and, if appointed, the "**Monitor**");

(c)     granting an administration charge in the amount of $275,000 (the "**Administration Charge**") in favour of counsel for the Applicants, the Monitor and its counsel over the Property (as defined in the Initial Order);

(d)     approving a debtor-in-possession financing facility ("**DIP Financing**") made pursuant to an agreement dated July 26, 2023 (the "**DIP Term Sheet**") between the Applicants, and the Subsidiaries (as defined below) as borrowers, and SCS Finance, Inc., as lender ("**SCS Finance**" or the "**DIP Lender**"), in an amount up to $1,100,000 (plus interest, fees and expenses), and granting a charge in favour of the DIP Lender (the "**DIP Lender's Charge**") over the Property and the Subsidiaries current and future assets, undertakings and properties of every nature and kind whatsoever, and wherever situate including all proceeds thereof;

(e)     granting a directors' charge in favour of the directors and officers of the Applicants in the amount of $250,000 ("**Directors' Charge**" and together with the Administration Charge and the DIP Lender's Charge, the "**Priority Charges**") over the Property;

3

(f)      authorizing the Applicants to continue utilizing their cash management system (the "**Cash Management System**");

(g)      granting an initial stay of proceedings in respect of the Applicants, the Applicants' directors and officers, the Applicants' business and the Property (as defined in the Initial Order) up to and including August 6, 2023 (the "**Stay Period**"); and

(h)      authorizing Lighthouse, to act as the foreign representative (the "**Foreign Representative**") in respect of these CCAA proceedings for the purpose of having these CCAA proceedings recognized in the United States of America ("**US**" or the "**United States**") pursuant to Chapter 15 of Title 11 of the United States Code, 11 U.S.C. § 101-1532 (the "**US Bankruptcy Code**") and any other foreign legislation, as may be necessary or advisable.

6.      If the proposed Initial Order is granted, the Applicants intend to return to Court on or before August 6, 2023 (the "**Comeback Hearing**") to seek an Amended and Restated Initial Order (the "**ARIO**"), which is expected to include this Court's approval of, among other things:

(a)      an extension of the Stay Period;

(b)      an increase in the authorized borrowings under the DIP Term Sheet to $3,500,000;

4

(c)     an increase in the amount of the Priority Charges as follows:

    (1)     the Administration Charge to $500,000; and

    (2)     the Directors' Charge to $500,000; and

(d)     an agreement with a third-party liquidator, or approval a process to select a third-party liquidator, to sell certain inventory and equipment not core to the ongoing business of the Applicants and their affiliates.

7.     In addition to the above, during these CCAA proceedings, if the proposed Initial Order is granted, the Applicants also anticipate returning to Court potentially to: (1) add certain affiliated entities and Subsidiaries to the within proceeding; and (2) seek approval of a sale and investment solicitation process (a "**SISP**") in respect of some of all of their assets, with a view towards to either finding an investor for the Applicants' business or selling same.

**B.     Overview of the Applicants' Business and Restructuring Efforts to Date**

8.     The Applicants are in the business of producing immersive show exhibits in Canada, the United States, and various cities around the world, through their multiple affiliated entities and the Subsidiaries (as defined below).

9.     Lighthouse was formed by myself, Svetlana, and Slava with the intention of combining our respective talents and passion for the arts to introduce a new form of art into North America – immersive exhibits. Immersive exhibitions use projection technology to create

an environment where the public can experience art.  In this way, immersive exhibits create an experience for ticket-goers where they walk through a venue (or during the Covid-19 pandemic drive through) and view enormous digital projections that highlight brushstrokes, colour, and detail in order to bring the art "to life". These exhibits are paired with music to complete the immersive experience.

10.     In February 2020, Lighthouse announced its first show, Immersive Van Gogh, in Toronto. Immersive Van Gogh, projects Van Gogh's artwork in 360 degrees on 500,000 cubic feet of surface, capturing the floors, walls, columns and other architecture of our gallery to created an animated world of art that the audience is enveloped in.

11.     Immersive Van Gogh is custom designed to the historic space that previously housed the Toronto Star's printing presses at 1 Yonge Street. Attached at **Exhibit "A"** is a sample of images from Immersive Van Gogh.

12.     Immersive Van Gogh was scheduled to open in Toronto in May 2020. However, in March 2020, the Covid-19 pandemic resulted in government-mandated shut downs and restrictions that prevented walk in exhibits.

13.     Lighthouse swiftly pivoted its business model to present a drive-in show of Immersive Van Gogh. This model was applied until Covid-19 restrictions eased and walk in exhibits were allowed.

6

14.    The drive-in immersive art show was an instant success and received accolades from the press and community. As the only show "in town" able to continue during the lock down Covid-19 restrictions, Lighthouse sold out shows seven days a week and months in advance for almost an entire year.

15.    Based on the success Lighthouse was having, Lighthouse decided to expand the immersive exhibits into the US market, through Lighthouse USA. Lighthouse USA planned to present Immersive Van Gogh first, and follow with other immersive content that was produced.

16.    The Covid-19 pandemic was still at its peak when Lighthouse USA was formed, and we were unable to physically cross into the US due to various government restrictions. As such, in certain circumstances, Lighthouse USA entered into local partnerships with entities across the US to build the required production sets for the shows.

17.    The Applicants' were anticipating similar success in the US as was achieved in Toronto, and began entering into various lease agreements in cities across the US. For each lease or license agreement, the Applicants' incorporated a separate entity to operate shows in the respective venues. The goal was to build production sets that could present not only Immersive Van Gogh, but also other shows in the future.

18.    Immersive Van Gogh received an initially similar overwhelming positive response in the US. For the calendar year 2021, the Applicants operated at a significant profit.

7

19.    The Applicants expanded their business at a rapid rate, entering into long-term leases of varying lengths mostly through wholly owned subsidiaries of Lighthouse USA across over ten states in the US. During the Covid-19 pandemic, most of the lease agreements and site visits were conducted over Zoom videoconference due to travel restrictions.

20.    During a short time-frame, the Applicants grew from one entity in one location producing a single show to over 30 entities, to attempting to produce various shows in about 20 venues around the world.

21.    It is customary in the entertainment production industry to create a new entity for every new contract, new production or new show location. As part of the Applicants' rapid growth into different markets, the corporate structure became complex, comprising of over 30 entities.

22.    Throughout 2022, the Lighthouse group entered into licensing agreements through the Applicants or their affiliates for new productions, including Immersive Frida Kahlo, Immersive Klimt, Immersive Monet, Immersive King Tut, Immersive Vatican, Immersive Mozart, and seasonally, Immersive Nutcracker, and presented at pop-up venues to broaden the opportunity of the Applicants beyond the set venues. Along with these shows, came the purchase of significant expensive equipment and inventory.

23.    Unfortunately, Immersive Frida Kahlo and Immersive Monet, and other subsequent shows, dramatically under-performed, causing millions of losses in revenue.

71335117.1

24.    Part of the Applicants' expansion included producing Immersive Van Gogh in the United States as well as presenting new immersive shows,.

25.    As the government restrictions in place during the Covid-19 pandemic lifted, theatres, galleries, and museums resumed operations; though still popular, the Applicants' immersive shows no longer had the same overwhelming success they once did as the form of art lost its novelty and patrons had other options.  This caused strain to the financial situation of the Applicants and the Lighthouse group.

26.    As well, multiple competitors began entering the market with competitive prices, which further negatively impacted the Applicants' ticket sales.

27.    Although the Applicants' business grew rapidly, they were unable to keep up with the growth from a back-office standpoint.  In particular, they were met with internal business challenges of not having a solid, long-term Chief Financial Officer or a substantial financial department to keep up with the rapid expansion of the business.

28.    The aggressive growth in a short period of time quickly became unsustainable for the Applicants' financial and accounting team, leading to tax filings being missed, and debts going unpaid.

29.    In an attempt to conserve cash for their business, the Owners stopped receiving management fees and did not take salaries, notwithstanding being heavily involved with the management of the business on a full-time basis.

71335117.1

30.    In October 2022, one of the Applicants' affiliates secured an exclusive partnership with a large multinational entertainment company ("**Entertainment Co.**") to create and produce a brand specific   Immersive Animation show. The Immersive Animation show has proven successful, is operating currently in Lighthouse's venue in Toronto, among other venues in the US, and has allowed the Lighthouse group to recently enter international markets.

31.    However, the Applicants and their affiliates are not making sufficient revenue to fulfill their commitments with respect to their long-term lease agreements, license agreements, and vendor agreements with various entities, and are in default of certain obligations. The majority of the shows currently running are being wound down in an orderly manner.

C.    **Urgent Need for CCAA Proceedings**

32.    Despite its best efforts, the Applicants have been unable to successfully restructure and right size their business without a formal process.

33.    The Applicants are insolvent and in breach of many of their obligations to creditors. Most imminently, as described below, Lighthouse USA is facing a confession of judgment in the amount of $16.6 million pursuant to the LHIM Settlement (as defined below), which set to be heard in the Superior Court of Delaware on July 28, 2023 at 10:00 a.m.

34.    In or around the beginning of 2021, Lighthouse USA entered into a joint venture with Impact Museums, Inc. a/k/a Impact Museums, LLC ("**Impact**") for the purpose of

71335117.1

expanding the Applicants' business into certain US markets. Specifically, per the parties' agreement, Impact was responsible for delivering and managing seven venues and Lighthouse USA was responsible for programming and marketing.

35.     To facilitate the joint venture, Lighthouse and Impact became owners of LHIM Productions, LLC ("**LHIM**"), owning 49% and 47%, respectively.   The advertising agency, Twenty6Two International Inc. and its principal, which provides advertising for the Lighthouse group became the remaining 4% owner of LHIM Productions, LLC.

36.     Unfortunately, the partnership did not work as planned from the outset. For example, Impact was late in delivering the agreed-upon venues, and did not deliver two of the venues at all. This forced Lighthouse USA to reschedule opening dates and refund millions of dollars in ticket sales to customers. In addition, the costs to build the various production sets were not properly estimated and this resulted in Lighthouse USA expending costs significantly above the amounts originally anticipated.

37.     A legal dispute arose with Impact surrounding Lighthouse USA's decision to close its show in Pittsburgh after incurring losses.   This ultimately led to an arbitration in or around the fall of 2022.   The arbitration resulted in a settlement agreement ("**LHIM Settlement Agreement**") being entered into among Impact, LHIM, Lighthouse USA, the Owners personally, and additional non-related entities effective on October 21, 2022.

71335117.1

38.     The LHIM Settlement Agreement contemplated that full ownership of LHIM would be transferred to Impact and that certain payments would be made to LHIM from Lighthouse USA over time.  Due to, among other things, the decrease in ticket sales and the underperformance of the Applicants' subsequent immersive shows, Lighthouse USA missed a payment scheduled for June 1, 2023.

39.     As a result of the missed payment, Impact took the following two steps against Lighthouse USA.

40.     Impact/LHIM locked Lighthouse USA out of their Los Angeles, Dallas, and Atlanta venue locations, forcing the Applicants to cancel the Immersive Animation show. This caused the Lighthouse group to have to refund approximately $1.5 million in tickets sales and cancel all ongoing ticket sales.  The Applicants are of the view that the terms of the Settlement Agreement did not allow Impact/LHIM to take this step and that it was improper and actionable. The lockout has led to significant issues with their relationship with Entertainment Co., which the Lighthouse group is trying to repair and has significantly negatively impacted the Lighthouse group's cash flow.

41.     In addition, Impact sought a confession of judgment in the amount of $16.6 million in the Superior Court of Delaware under the LHIM Settlement. The Applicants have engaged US counsel and intend to dispute the amount sought and the circumstances leading to the confession to judgment.

42.     The confession of judgment is set to be entered in the Superior Court of Delaware at a hearing scheduled for this Friday, July 28, 2023 at 10:00 a.m.

43.     The Applicants require urgent protection under the CCAA to keep the *status quo* and prevent the entry of LHIM's confession of judgment.

**D.      Purpose of these CCAA Proceedings**

44.     The Applicants have commenced these CCAA proceedings with the ultimate goal of protecting the interests of creditors and other stakeholders, with a view to having the business emerge from CCAA protection in a stronger form that preserves its enterprise value and employment for as many of its employees as is reasonably possible.

45.     If CCAA protection is granted to the Applicants, they intend to use the CCAA proceeding and Court protection to right-size the business, by, among other things, selling redundant and excess merchandise and equipment, and likely undertaking a sale and investment solicitation process (the "**SISP**"), with a view towards finding the right investor for the Applicants' business.

46.     For the reasons set out in this Affidavit, I do verily believe that the Applicants are insolvent companies to which the CCAA applies, and the relief sought under the proposed Initial Order is in the best interests of the Applicants, their creditors, and their stakeholders.

71335117.1

47.   As demonstrated in the Cash Flow Forecast (defined below), absent DIP Financing, the
      Applicants are unable to generally meet their obligations as they fall due.

48.   The Applicants are in urgent need of protection under the CCAA so they can stabilize
      their business, sell excess merchandise and equipment, and work towards right-sizing
      their business.

## PART II - OVERVIEW OF THE APPLICANTS

### A.    The Applicants' Corporate Structure

49.   Lighthouse was incorporated under the *Business Corporations Act* (Ontario) on October
      1, 2019. Attached as **Exhibit "B"** is a copy of the Corporate Profile Report for
      Lighthouse from the Ontario Ministry of Public and Business Service Delivery.

50.   Lighthouse USA was incorporated under the laws of the State of Delaware on October
      21, 2020. Attached as **Exhibit "C"** is a copy of the Certificate of Incorporation for
      Lighthouse USA from the Secretary of State of Delaware.

51.   Lighthouse USA wholly owns the following ten limited liability companies (the
      "**Subsidiaries**") incorporated in the United States:

      (a)      Lighthouse Immersive Las Vegas, LLC;

      (b)      Lighthouse Immersive Denver, LLC;

      (c)      Lighthouse Immersive Detroit, LLC;

14

(d)      Lighthouse Immersive Cleveland, LLC;

(e)      Lighthouse Immersive Columbus, LLC;

(f)      Lighthouse Immersive Nashville, LLC;

(g)      Lighthouse Immersive Kansas City, LLC;

(h)      Lighthouse Immersive San Antonio, LLC;

(i)      Lighthouse Immersive Madison, LLC; and

(j)      Lighthouse Immersive Orlando, LLC.

52.    Both the Orlando LLC and Madison LLC are inactive companies.  The Kansas City LLC recently closed down its show and is exiting its leased premises.

53.    The Subsidiaries are the tenants on the majority of lease agreements and produce the active shows in their respective locations under the direction of the Applicants or another member of the Lighthouse group depending on the show.

54.    In addition to the Subsidiaries, the Applicants have 15 affiliated companies, all of which are owned by the Owners, but none are applicants at this time.

55.    Lighthouse USA is also the majority owner of five additional limited liability companies and two limited partnerships that have or had operations in New York, Boston, and Chicago.

15

**B.      The Applicants' Business**

56.      As set out above, the Applicants are in the business of producing immersive show exhibits in Canada, the United States, and various cities around the world, through their multiple affiliated entities and the Subsidiaries.

57.      Lighthouse effectively operates as the Lighthouse group's head office and Lighthouse USA has 10 wholly owned Subsidiaries that currently operate or previously operated an immersive show in a US location.

58.      The Applicants, through the Subsidiaries and affiliates, currently produce shows in the following cities: Boston, Chicago, Cleveland, Columbus, Denver, Detroit, Las Vegas, London (Ontario), Minneapolis, Nashville, San Antonio, Tokyo, and Toronto.[1]

59.      The shows are winding down, and by the end of September 2023, only approximately four to five locations will be operating shows.

**C.      Leases**

60.      The Applicants, through their affiliates and the Subsidiaries, currently have leases with active shows in the following locations: Boston, Chicago, Cleveland, Columbus, Detroit, Las Vegas, Minneapolis, Nashville, San Antonio, and Toronto.

---

[1] The Applicants previously produced shows in Oklahoma, Wisconsin, and Florida.

16

71335117.1

61.    Lighthouse USA is the guarantor on four leases located in Cleveland, Columbus, Denver, and Minneapolis.

62.    The Toronto venue is operated by Lighthouse.

63.    Certain of the leases held by the affiliates and the Subsidiaries are in arrears and demands for payments have been received including by Lighthouse USA in respect of its guarantee obligations in respect of the leases in Denver and Minneapolis.

**D.    The Applicants' Directors and Officers**

64.    Svetlana and I are the sole directors and officers of the Applicants, with myself as President and Svetlana as Vice President of each Applicant and each of the Subsidiaries and affiliated companies in the Lighthouse group.

65.    Slava was a director and officer of the Applicants until he resigned on May 19, 2023 from these positions for Lighthouse and on June 1, 2023 from these positions for Lighthouse USA due to health challenges.

**E.    Employees and Payroll**

66.    The Applicants, their affiliates and the Subsidiaries have a total of 458 employees, comprised of 316 hourly and 133 salaried.

67.    Lighthouse has a total of 149 employees, comprised of 116 part-time, hourly employees, and 33 full-time, salaried employees. There are also 12 independent contractors.

17

68.     Payroll for Lighthouse is administered through Payworks, a third party payroll administrator on a biweekly basis. The last payroll occurred on July 14, 2023 and employees were paid for their time for the period June 26, 2023 to July 9, 2023. The next payroll will occur on July 28, 2023 and employees will be paid for their time for the period July 10, 2023 to July 23, 2023.

69.     Lighthouse USA has a total of 10 full-time, salaried employees. There are also 9 independent contractors.

70.     Payroll for Lighthouse USA is administered through Paylocity, a third party payroll administrator on a biweekly basis. The last payroll occurred on July 14, 2023 and employees were paid for their time for the period June 26, 2023 to July 9, 2023. The next payroll will occur on July 28, 2023 and employees will be paid for their time for the period July 10, 2023 to July 23, 2023.

71.     The Applicants have terminated a combined total of 32 employees in the last 60 days, in an attempt to right size their business.  The Subsidiaries are expected to terminate the employment of additional employees as various shows close across the US.

72.     The Applicants do not sponsor, administer, or otherwise have any registered or unregistered pension plans for their employees.

73.    To the best of my knowledge, the Applicants are current on payroll and source deduction remittances. In Canada, employees' vacation pay is attached to each payroll, so there are no balances.

**F.    Banking & Cash Management**

74.    The Applicants maintain six (6) bank accounts through which they deal with theirs cash management, collections, and disbursements.

75.    More particularly, Lighthouse and the Applicants' Canadian affiliated entities primarily bank with Royal Bank of Canada ("**RBC**") having two (2) operating accounts in the name of Lighthouse. Lighthouse also has two (2) bank accounts with the Bank of Montreal.

76.    Lighthouse USA and the Subsidiaries primarily bank with City National Bank ("**CNB**"). CNB is US Bank that I understand is owned by RBC. Lighthouse USA has two (2) bank accounts at CNB.  Some of the Subsidiaries have accounts with Chase Bank, in locations where CNB does not have branches.

77.    The Applicants' corporate credit cards are issued through CNB.

78.    The Applicants and the rest of the Lighthouse group operate, de facto, from a cashflow perspective, on a consolidated basis. Specifically, revenues flow into certain Lighthouse entities and expenses are paid by various Lighthouse entities, often on behalf of another Lighthouse entity. This results in money transfers occurring on a continuous basis

19

between the various Lighthouse entities that are reflected by way inter-company accounts.

79.     The Lighthouse group is self-financed with the exception certain loans it has received from the Owners.  Money advanced by the owners to the Applicants was advanced on an unsecured basis until approximately December 2022.  Thereafter, as described below, the Owners put security in place to secure go-forward advances required by the Applicants and the Lighthouse group to maintain their operations.

80.     The Applicants intend to continue operating its existing cash management system and inter-company transfers post-filing. I understand that the proposed Monitor will include relevant information with respect to material post-filing intercompany payments in its reports to the Court.

## G.  Chief Place of Business and Centre of Main Interest

81.     Toronto serves as the centre for the Applicants' business enterprise. Lighthouse's principal place of business is located in Toronto. Lighthouse USA, while having a registered office in Delaware, similarly has its principal place of business in Toronto, which it reports on its Annual Franchise Tax Report in Delaware.

82.     The Applicants, their affiliates and the Subsidiaries are all managed from Toronto by the Applicants' executive management team, being me (President) and Svetlana (Vice President) (the "**Executive Management Team**"). The Executive Management Team is

20

responsible for making corporate decisions about all aspects of the business, including marketing, new business initiatives, and financial decisions.

83.     The Applicants' banking and cash management systems are also all tied to Canada. As set out above, the Applicants' bank with the RBC and BMO. Lighthouse USA, the Subsidiaries and other affiliates in the US bank almost exclusively with CNB, which I understand is an affiliate of RBC.

84.     The most vital people assisting with the Applicants' business are located in Canada, including the their Financial Controller, Box Office Director, Head of Productions, Head of New Venue Development and Senior Production Manager, Marketing Director, Director of Sponsorship and Grants, Director of Retail, General Manager, and Associate Producers. These individuals are either directly employed by Lighthouse or contract directly or indirectly with Lighthouse to provide their services to the Applicants.

85.     In addition to the lead people mentioned above, the majority of their respective teams are located in Canada. For example, the majority of Lighthouse's production and installation teams under my direction are in Canada. When there is a new show, the production team builds most of the sets in Canada, including printing vinyls, and then travels to the location of the show to create the sets and the production. The Canadian team typically enlists local employees or contractors to assist with the production.

86.     Employee decisions for the Applicants and the Lighthouse group are made in Toronto by the Executive Management Team and Lighthouse's General Manager, Jessica Johnston. Training and support for employees of any of the Applicants' entities is facilitated in Toronto.

87.     The advertising agency that the Applicants use, Twenty6Two International Inc., is also located in Canada.   The Applicants' merchandise team, responsible for purchasing merchandise, products, and managing the stores are also based in Canada.

## PART III - FINANCIAL CIRCUMSTANCES AND CASH FLOW FORECAST

### A.      Financial Performance

88.     Lighthouse's and Lighthouse USA both have a fiscal year end of December 31st.  Neither entity has audited or review engagement financial statements.

89.     Lighthouse's internally prepared financial statements for year ended December 31, 2022 (the "**LH 2022 Financial Statements**") and for the five months ending May 31, 2023 (the "**LH May Interim Statements**") are attached hereto as **Exhibit "D"** and **"E"**, respectively. The LH 2022 Financial Statements and the LH May Interim Statements are reported in Canadian dollars.

90.     Lighthouse USA's internally prepared financial statements for year ended December 31, 2022 (the "**LHUSA 2022 Financial Statements**") and for the five months ending May 31, 2023 (the "**LHUSA May Interim Statements**") are attached hereto as **Exhibit "F"**

22

and **"G"**, respectively. The LHUSA 2022 Financial Statements and the LHUSA May Interim Statements are reported in US dollars.

**B.     Assets**

91.     According to the LH May Interim Statements, as at May 31, 2023, Lighthouse had total assets of $69,961,025.58 CAD, however, over $60 million CAD of this is amounts owing from related parties that do not have any ability to pay.

92.     According to the LHUSA May Interim Statements, as at May 31, 2023, Lighthouse USA had total assets of $53,116,614.01.  Of this amount over $38 million is amounts owing from related parties that do not have any ability to pay.

**C.     Liabilities**

93.     According to the LH May Interim Statements, as at May 31, 2023, Lighthouse had total liabilities of $59,432,100.45 CAD.

94.     According to the LHUSA May Interim Statements, as at May 31, 2023, Lighthouse USA had total liabilities of $100,220,408.13 including the litigation claim of LHIM discussed herein of $16.6 million which is included as a material subsequent event.

**i.     Secured Creditors of the Applicants**

95.     The Applicants have no third party secured financing.  Rather, the Owners have funded the Applicants' business since its inception.

23

71335117.1

*Lighthouse*

96.    In or about December 2022, the Owners obtained security from Lighthouse and have since made certain secured advances to Lighthouse under that security.

97.    Specifically, the Owners entered into grid promissory notes and obtained the following security from Lighthouse:

(a)    Lighthouse executed a general security agreement ("**GSA**") in favour of Ross Productions dated December 19, 2022. Attached as **Exhibit "H"** is a copy of the GSA in favour of Ross Productions;

(b)    Lighthouse executed a GSA in favour of Dvoretsky Holdings dated December 29, 2022 and a separate GSA in favour of Show One Productions Inc. ("**Show One**"), another entity owned by Svetlana.  Attached as **Exhibits "I"** and **"J"**, respectively, are copies of the GSA's in favour of Dvoretsky Holdings and Show One; and

(c)    Lighthouse executed a GSA in favour of SZ HoldCo dated December 29, 2022. Attached as **Exhibit "K"** is a copy of the GSA in favour of SZ HoldCo.

*Lighthouse USA*

98.    On or about January 10, 2023, the Owners incorporated SCS Finance under the laws of the State of Delaware on January 10, 2023. SCS Finance was incorporated in order to facilitate the Owners advancing funds to Lighthouse USA on a secured basis.

99.    Specifically, SCS Finance and Lighthouse USA entered into a Revolving Loan Agreement dated January 21, 2023 and a Promissory Note dated January 21, 2023.  To

24

secure advances thereunder, SCS Finance obtained a Security Agreement dated January 21, 2023.  Attached as **Exhibit "L"** is a copy of the Security Agreement in favour of SCS Finance.

ii.    **Ontario PPSA Registrations**

100.    Attached hereto as **Exhibit "M"**, is a certified copy of the Ontario Personal Property Security Registration System Enquiry Response Certificate in respect of Lighthouse Immersive Inc., current to July 17, 2023, which disclose the following registrations:

| Secured Party | Registration Date | Registration Number | Duration | Collateral |
|---|---|---|---|---|
| Corey Ross Productions | December 19, 2022 | 20221219 162 1590 3894 | 5 years | Inventory, Equipment, Accounts, Other, Motor Vehicles included |
| Slava Z HoldCo Inc. | December 29, 2022 | 20221229 1152 1590 4983 | 5 years | Inventory, Equipment, Accounts, Other, Motor Vehicles included |
| Dvoretsky Holding Inc. | December 29, 2022 | 20221229 1150 1590 4982 | 5 years | Inventory, Equipment, Accounts, Other, Motor Vehicles included |
| Show One Productions Inc. | December 29, 2022 | 20221229 1148 1590 4978 | 5 years | Inventory, Equipment, Accounts, Other, Motor Vehicles included |
| Royal Bank of Canada | July 5, 2023 | 20230705 0915 1532 5816 | 5 years | Inventory, Equipment, Accounts, Other, Motor Vehicles included |

71335117.1

101.    As indicated in the chart above, RBC registered under the PPSA on July 5, 2023.  To my

knowledge, no security agreements have been executed with RBC and no amounts are

owing.  I understand based on discussions with Lighthouse's controller, that Lighthouse

was in the process of obtaining overdraft protection on its RBC accounts but has not yet

executed the documentation.

### iii.  Delaware UCC Filings

102.    Attached hereto as **Exhibit "N"** is a certified copy of the Uniform Commercial Code

Financing Statement from the Delaware Department of State in respect of Lighthouse

Immersive USA, Inc., current to July 21, 2023, which discloses the following

registration:

| Secured Party | Date of Registration | UCC Initial Filing Number | Duration | Collateral |
|---|---|---|---|---|
| SCS Finance, Inc. | January 13, 2023 | 20230137121 | 5 years | All of the debtor's assets now existing and hereafter arising pursuant to a General Security Agreement |

### iv.  Unsecured Creditors of the Applicants

103.    As at May 31, 2023, Lighthouse and Lighthouse USA had accounts payable in the

amounts of $2,620,804.37 CAD and $3,673,111.60, respectively.

71335117.1

104.    The Applicants have contingent liabilities of approximately $30,000,000 related to litigation and potential litigation claims, including the claim by LHIM for the confession of judgment described above, and guarantee claims.

**v.   Other Liabilities**

105.    Priority Claims - The Applicants are in the process of assessing their priority claims liabilities, including certain tax obligations. The Applicants may seek Court approval to add some or all of the various US affiliates and subsidiaries as applicants to the within proceeding once these priority claims have been fully considered.

**D.    Cash Flow Forecast**

106.    The Applicants, with the assistance of the Proposed Monitor, has prepared a projected 13-week cash flow forecast (the "**Cash Flow Forecast**") for the period ending October 22, 2023, which is premised on, among other things, the assumption that the Applicants will be granted CCAA protection and that the DIP Term Sheet and DIP Lender's Charge will be approved as part of the Initial Order.   A copy of the Cash Flow Forecast is attached as **Exhibit "O"**.

107.    The Cash Flow Forecast is a reasonable forecast of the Applicants' restructuring during the CCAA proceedings.

71335117.1

108.    Pursuant to the Cash Flow Forecast, the Applicants will not have sufficient funds to get through the initial Stay Period absent interim financing being approved and the DIP Lender's Charge being granted by the Court.

## PART IV - CCAA PROCEEDINGS AND RELIEF SOUGHT

### A.    Need for CCAA Proceedings and Eligibility

109.    As indicated in the Cash Flow Forecast, without interim financing, the Applicants will be unable to operate in the ordinary course and payroll obligations will not be met, to the detriment of their stakeholders.

110.    In consultation with their advisors, the Applicants have determined that the CCAA process is the most beneficial plan of action to maximize value for the Applicants' stakeholders.

111.    The Applicants are each debtor companies under the CCAA.

112.    Lighthouse is incorporated under the *Business Corporations Act* (Ontario) and all operations are undertaken in Canada.

113.    As more particularly set out above, Lighthouse USA has assets and does business in Canada.  Specifically, Lighthouse USA has a place of business in Toronto, Ontario, all material decisions with respect to the business and operations are directed by management located in Canada including, without limitation, all decisions regarding

28

administration finances, human resources, strategic planning management, advertising, communication and accounting.

114.    In addition, Lighthouse USA has retainers held by Miller Thomson LLP and BRF in respect of these CCAA proceedings.

115.    The Applicants have debt in excess of $5 million, are insolvent and are facing a liquidity crisis.  Absent obtaining DIP Financing, the Applicants will run out of cash within the first week following the date of the Initial Order.

116.    The Applicants' liquidity position is deteriorating and additional funding will be needed by the Applicants in order to allow them sufficient liquidity to operate in the ordinary course of business and undertake their restructuring process including formulating an undertaking a SISP within the CCAA proceeding.

117.    The Applicants are seeking an Initial Order substantially in the form attached as **Tab 4** to Application Record.

**B.    Appointment of Monitor**

118.    The Applicants propose that BRF be appointed Monitor in these CCAA proceedings. BRF has consented to act as Monitor, subject to Court approval, and its written consent is included at **Tab 5** of the Application Record.

119.    BRF is a trustee within the meaning of section 2 of the *Bankruptcy and Insolvency Act* (Canada), and is not subject to any of the restrictions on who may be appointed as monitor set out in section 11.7(2) of the CCAA.

120.    In preparing for this filing, BRF has reviewed, and assisted in the preparation of, the Cash Flow Forecast, and has provided guidance and assistance in the commencement of these CCAA proceedings including, without limitation, to assist in quantifying the amount of the Priority Charges and DIP Financing.

121.    As a result, BRF has developed critical knowledge about the Applicants, the Lighthouse Group, their business operations, financial challenges, strategic initiatives, and restructuring efforts to date.

**C.      Administration Charge**

122.    The Applicants seek a super-priority charge over the Applicants' Property in favour of the Applicants counsel in Canada and the United States, the Monitor and counsel to the Monitor (collectively, the "**Professionals Group**"), to secure payment of their professional fees and disbursements, whether incurred before or after the date of the Initial Order (the "**Administration Charge**").

123.    The proposed Administration Charge being sought at the initial CCAA Application is for a maximum amount of $275,000 in order to secure the payment of fees and expenses incurred in connection with moving for the within relief sought and for the initial ten (10)

71335117.1

day protection period leading up to the first Comeback Hearing. The Administration Charge is proposed to rank as a first-priority charge on the Property.

124.   It is contemplated that the Professionals Group will have extensive involvement during the CCAA proceedings. The Professionals Group have contributed and will continue to contribute to the Applicants' restructuring efforts, and will ensure that there is no unnecessary duplication of roles among them.

125.   In preparation of the Cash Flow Forecast, the Applicants, in consultation with Canadian and US counsel and the Proposed Monitor, considered the professional fees forecasted to be incurred on a weekly basis during the cash flow period. The Applicants have forecast to incur significant professional fees in connection with the CCAA proceedings to the end of the week of the Comeback Hearing including, without limitation, preparing for the Comeback Hearing and recognition proceedings in the United States, communicating with employees and stakeholders following the initial filing, and complying with statutory notices, mailings and communications.

126.   Accordingly, I believe the quantum of the Administration Charge sought is reasonably necessary at this time to secure the professional fees of the Professionals Group.

**D.     Approval of DIP Financing and DIP Lender's Charge**

127.   SCS Finance is wholly owned by the Owners and is an affiliate of the Applicants. As set out above, SCS Finance is the only secured creditor of Lighthouse USA.

31

128.    In the past few weeks, as the Applicants realized that they were facing a looming liquidity crisis and that a potential filing under the CCAA may be necessary, SCS Finance engaged independent insolvency and restructuring counsel to negotiate the terms of DIP Financing for the Applicants and the Subsidiaries.

129.    The Applicants and the Subsidiaries entered into the DIP Term Sheet with the DIP Lender to provide urgently required interim financing during these CCAA proceedings.

130.    A copy of the DIP Term Sheet is attached as **Exhibit "P"**. The purpose of the DIP Financing is to fund the Company's and the Subsidiaries' working capital needs and professional fees and expenses during the CCAA proceedings. Based on my discussions with the Applicants' counsel and the Proposed Monitor, I believe the terms agreed to with the DIP Lender are reasonable and competitive and reflect the fact that the financing is being provided by a related party.

131.    The material terms of the DIP Term Sheet are as follows (all terms capitalized but not defined below are as defined in the DIP Term Sheet):

(a)      the Applicants and the Subsidiaries are each borrowers and guarantors;

(b)      the DIP Financing is in the amount of US $1,100,000;

(c)      the purpose of the DIP Loan is to fund:

(1)     the Applicants and the Subsidiaries working capital needs in accordance with the cash flow projections approved by the Monitor and the DIP Lender;

(2)     the DIP Lender's fees and expenses;

(3)     professional fees and expenses incurred by the Applicants and the Monitor in respect of the CCAA proceeding; and

(4)     such other costs and expenses of the Applicants as may be agreed to by the DIP Lender;

(d)     the DIP Loan shall be available in advances, as follows:

(1)     upon the issuance of the Initial Order, $1,100,000, or such lesser amount as may be approved by the Initial Order, shall be advanced to the Applicants to finance working capital requirements for the 10-day period immediately following the date of the Initial Order; and

(2)     upon the issuance of an ARIO at the Comeback Hearing, the balance of the DIP Loan, being up to $3,500,000, shall be advanced to the Applicants in weekly draws upon request;

33

(e)     the interest rate is 10% per annum, calculated daily on the outstanding balance owing under the DIP Loan, not in advance, and accruing and paid on the Maturity Date (as defined in the DIP Term Sheet);

(f)     the Applicants shall pay all of the DIP Lender's fees and expenses incurred in connection with the DIP Loan;

(g)     there are no additional fees under the total DIP Loan;

(h)     the DIP Loan is to be secured by a court-ordered priority charge over all of the Applicants' and the Subsidiaries' present and after acquired property, subject only to the Administration Charge; and

(i)     the initial advance under the DIP Loan will only be funded upon this Court approving the DIP Term Sheet, the DIP Loan, and granting the Initial Order including the DIP Lender's Charge.

132.    The proposed quantum of the DIP Financing authorized under the proposed Initial Order is limited to the amount which is necessary for the continued operations of the Applicants' and the Subsidiaries' business during the initial ten-day Stay Period.

133.    Based on, among other things, the Cash Flow Forecast, the Applicants believe that the DIP Loan is both reasonable and necessary for the Applicants to continue as a going concern and complete the contemplated restructuring under the CCAA.

34

E.      **Directors' Charge**

134.    The Applicants seek a Directors' Charge on the Applicants' Property in favour of the Applicants' current officers and directors in priority to all other charges other than the Administration Charge and the DIP Lender's Charge up to a maximum amount of $250,000.

135.    To ensure the ongoing stability of the Applicants' business during the CCAA proceeding, they require the continued participation of their officers and directors.  The officers and directors have skills, knowledge and expertise, as well as established relationships with various stakeholders that will contribute to a successful restructuring.

136.    The Applicants do not have a D&O policy.

137.    The Applicants' ordinary course operations give rise to potential director or officer liability, including for employee source deductions and sales tax.  The Directors' Charge is intended to address potential claims that may be brought against directors and officers.

138.    The quantum of the Directors' Charge was developed with the assistance and support of the Proposed Monitor. The Applicants are is of the view that the quantum of the Directors' Charge is reasonably necessary at this time to address circumstances that could lead to potential directors' liability prior to the Comeback Hearing.

71335117.1

**F.      Cash Management System**

139.    The Applicants seek the Court's authority to continue to utilize their existing Cash Management System.

140.    The Applicants require use of the Cash Management System to continue operations during the CCAA proceedings.

141.    The Cash Management System will be monitored by the Proposed Monitor throughout the CCAA proceedings. If appointed, and as part of its monitoring procedures, the Proposed Monitor will, among other things:

(a)      monitor the Applicants' receipts and disbursements; and

(b)      monitor all payments, obligations and any transfers as between the Applicants and their subsidiaries, consistent with the Cash Management System.

**G.  Stay of Proceedings in Favour of the Applicants**

142.    Given the challenges faced by the Applicants described herein, the Applicants require a stay of proceedings to maintain the *status quo* and to give the Applicants the breathing space they require to develop a restructuring plan in consultation with their advisors and the Monitor including likely undertaking a SISP.

143.    The Initial Order contemplates a stay of all proceedings against the Applicants and their Property for an initial period of ten (10) days, which I understand is the maximum that can be authorized by a Court at the initial Application under the CCAA.

36

**H.**     **Foreign Representative Appointment**

144.    The Applicants seek an order authorizing Lighthouse to act as the Foreign Representative in respect of the within CCAA proceedings, and to apply for foreign recognition of these proceedings in the United States pursuant to Chapter 15 of the US Bankruptcy Code, as well as any other foreign jurisdiction as deemed necessary or advisable.

145.    In my capacity as President of Lighthouse, and in furtherance of the requested foreign recognition, I believe that I am best positioned to act as an affiant on behalf of Lighthouse and provide the required evidence in any foreign recognition proceedings.

**I.**     **Relief to be Sought at the Comeback Hearing**

146.    If the Initial Order is granted, the Applicants propose to return to this Court for a Comeback Hearing on or before August 4, 2023.

147.    At the Comeback Hearing, the Applicants intend to seek the Court's approval of an ARIO. For the benefit of this Court and the Applicants' stakeholders, this section highlights critical relief that the Applicants intend to seek at the Comeback Hearing. The Applicants may seek additional relief if determined to be necessary or advisable.

**(i)**     **Extension of Stay of Proceedings**

148.    The Applicants intend to seek an extension of the Stay Period for a sufficient length of time to allow the Applicants to commence liquidation of its non core inventory and

equipment and formulation of its restructuring plan which will likely include commencing a SISP.

**(ii)      Increase Amount of Charges**

149.    The Applicants intend to seek to increase the quantum of the Administration Charge, the maximum amount authorized under the DIP Term Sheet and the amount of the Director's Charge to reflect the additional work to be undertaken done during the CCAA proceedings, the financing needed for the duration of the CCAA proceedings and the exposure of the officers and directors on a monthly basis, respectively.

**(iii)     To approve a Liquidator or a Liquidator Selection Process**

150.    The Applicants intend to seek approval of an agreement with a third party liquidator to undertake the marketing and sale of the Applicants' redundant inventory and equipment. The Applicants believe that engaging an experienced professional liquidator will produce a better sales result than an attempt by the Applicants to sell these assets without such professional assistance. The Applicants believe it is critical to seek approval of its liquidator as soon as possible to ensure maximum recovery for their stakeholders.

**PART V - CONCLUSION**

151.    I believe that the Applicants ought to be granted protection under the CCAA. I am confident that granting the draft Initial Order is in the best interests of the Applicants as well as their employees, creditors, and other stakeholders.

71335117.1

152.    As set out above, I believe that CCAA protection will enable the Applicants to sell redundant inventory and equipment in order to maximize proceeds available for distribution to creditors on a more timely and cost-effective basis than the available alternatives, and to consider its restructuring options right size the business with a view to its ongoing success including potentially undertaking a SISP.

153.    I swear this affidavit in support of an Application under the CCAA for an Initial Order in the form contained at **Tab 4** of the Application Record, and for no other or improper purpose.

SWORN before me at the City of Toronto,
in the Province of Ontario, this 26th  day of
July 2023, in accordance with O. Reg.
431/20 Administering Oath or Declaration
Remotely.

_____
Commissioner for Taking Affidavits

_____
**COREY ROSS**

39

**This is Exhibit "A" referred to in the affidavit**

**of** COREY ROSS, SWORN BEFORE ME
**this 27th day of July 2023**

_____

**A COMMISSIONER FOR TAKING AFFIDAVITS**

**ALINA STOICA**



**This is Exhibit "B" referred to in the affidavit**

**of** COREY ROSS, SWORN BEFORE ME
**this 27th day of July 2023**

_____

**A COMMISSIONER FOR TAKING AFFIDAVITS**

**ALINA STOICA**

Transaction Number: APP-A10217023193
Report Generated on June 27, 2023, 11:24



Ministry of Public and
Business Service Delivery

# Profile Report

LIGHTHOUSE IMMERSIVE INC. as of June 27, 2023

| | |
|---|---|
| Act | Business Corporations Act |
| Type | Ontario Business Corporation |
| Name | LIGHTHOUSE IMMERSIVE INC. |
| Ontario Corporation Number (OCN) | 2719411 |
| Governing Jurisdiction | Canada - Ontario |
| Status | Active |
| Date of Incorporation | October 01, 2019 |
| Registered or Head Office Address | 640 Briar Hill Avenue, Toronto, Ontario, Canada, M5N 1N2 |

Certified a true copy of the record of the Ministry of Public and Business Service Delivery.

*V. Quintanilla W.*

Director/Registrar

This report sets out the most recent information filed on or after June 27, 1992 in respect of corporations and April 1, 1994 in respect of Business Names Act and Limited Partnerships Act filings and recorded in the electronic records maintained by the Ministry as of the date and time the report is generated, unless the report is generated for a previous date. If this report is generated for a previous date, the report sets out the most recent information filed and recorded in the electronic records maintained by the Ministry up to the "as of" date indicated on the report. Additional historical information may exist in paper or microfiche format.

Transaction Number: APP-A10217023193
Report Generated on June 27, 2023, 11:24

## Active Director(s)

**Minimum Number of Directors**    1
**Maximum Number of Directors**    6

| | |
|---|---|
| **Name** | SVETLANA DVORETSKY |
| **Address for Service** | 10 Torresdale Ave, Suite 1606, Toronto, Ontario, Canada, M2R 3V8 |
| **Resident Canadian** | Yes |
| **Date Began** | October 01, 2019 |

| | |
|---|---|
| **Name** | COREY ROSS |
| **Address for Service** | 640 Briar Hill Avenue, Toronto, Ontario, Canada, M5N 1N2 |
| **Resident Canadian** | Yes |
| **Date Began** | October 01, 2019 |

Certified a true copy of the record of the Ministry of Public and Business Service Delivery.

*V. Quintanilla W.*

Director/Registrar
This report sets out the most recent information filed on or after June 27, 1992 in respect of corporations and April 1, 1994 in respect of Business Names Act and Limited Partnerships Act filings and recorded in the electronic records maintained by the Ministry as of the date and time the report is generated, unless the report is generated for a previous date. If this report is generated for a previous date, the report sets out the most recent information filed and recorded in the electronic records maintained by the Ministry up to the "as of" date indicated on the report. Additional historical information may exist in paper or microfiche format.

Transaction Number: APP-A10217023193
Report Generated on June 27, 2023, 11:24

**Active Officer(s)**

| | |
|---|---|
| **Name** | SVETLANA DVORETSKY |
| **Position** | Vice-President |
| **Address for Service** | 10 Torresdale Ave, Suite 1606, Toronto, Ontario, Canada, M2R 3V8 |
| **Date Began** | October 01, 2019 |

| | |
|---|---|
| **Name** | COREY ROSS |
| **Position** | President |
| **Address for Service** | 640 Briar Hill Avenue, Toronto, Ontario, Canada, M5N 1N2 |
| **Date Began** | October 01, 2019 |

Certified a true copy of the record of the Ministry of Public and Business Service Delivery.

*V. Quintanilla W.*

Director/Registrar

This report sets out the most recent information filed on or after June 27, 1992 in respect of corporations and April 1, 1994 in respect of Business Names Act and Limited Partnerships Act filings and recorded in the electronic records maintained by the Ministry as of the date and time the report is generated, unless the report is generated for a previous date. If this report is generated for a previous date, the report sets out the most recent information filed and recorded in the electronic records maintained by the Ministry up to the "as of" date indicated on the report. Additional historical information may exist in paper or microfiche format.

Transaction Number: APP-A10217023193
Report Generated on June 27, 2023, 11:24

## Corporate Name History

**Name**                                        LIGHTHOUSE IMMERSIVE INC.

**Effective Date**                              October 01, 2019

Certified a true copy of the record of the Ministry of Public and Business Service Delivery.

*V. Quintanilla W.*

Director/Registrar

This report sets out the most recent information filed on or after June 27, 1992 in respect of corporations and April 1, 1994 in respect of Business Names Act and Limited Partnerships Act filings and recorded in the electronic records maintained by the Ministry as of the date and time the report is generated, unless the report is generated for a previous date. If this report is generated for a previous date, the report sets out the most recent information filed and recorded in the electronic records maintained by the Ministry up to the "as of" date indicated on the report. Additional historical information may exist in paper or microfiche format.

Transaction Number: APP-A10217023193
Report Generated on June 27, 2023, 11:24

## Active Business Names

This corporation does not have any active business names registered under the Business Names Act in Ontario.

Certified a true copy of the record of the Ministry of Public and Business Service Delivery.

*V. Quintanilla W.*

Director/Registrar
This report sets out the most recent information filed on or after June 27, 1992 in respect of corporations and April 1, 1994 in respect of Business Names Act and Limited Partnerships Act filings and recorded in the electronic records maintained by the Ministry as of the date and time the report is generated, unless the report is generated for a previous date. If this report is generated for a previous date, the report sets out the most recent information filed and recorded in the electronic records maintained by the Ministry up to the "as of" date indicated on the report. Additional historical information may exist in paper or microfiche format.

Transaction Number: APP-A10217023193
Report Generated on June 27, 2023, 11:24

## Expired or Cancelled Business Names

This corporation does not have any expired or cancelled business names registered under the Business Names Act in Ontario.

Certified a true copy of the record of the Ministry of Public and Business Service Delivery.

*V. Quintanilla W.*

Director/Registrar

This report sets out the most recent information filed on or after June 27, 1992 in respect of corporations and April 1, 1994 in respect of Business Names Act and Limited Partnerships Act filings and recorded in the electronic records maintained by the Ministry as of the date and time the report is generated, unless the report is generated for a previous date. If this report is generated for a previous date, the report sets out the most recent information filed and recorded in the electronic records maintained by the Ministry up to the "as of" date indicated on the report. Additional historical information may exist in paper or microfiche format.

Transaction Number: APP-A10217023193
Report Generated on June 27, 2023, 11:24

## Document List

| Filing Name | Effective Date |
|---|---|
| CIA - Notice of Change<br>PAF: DERRICK CHUA | June 05, 2023 |
| CIA - Notice of Change<br>PAF: COREY ROSS - DIRECTOR | February 22, 2021 |
| CIA - Initial Return<br>PAF: DERRICK CHUA - OTHER | October 01, 2019 |
| BCA - Articles of Incorporation | October 01, 2019 |

All "PAF" (person authorizing filing) information is displayed exactly as recorded in the Ontario Business Registry. Where PAF is not shown against a document, the information has not been recorded in the Ontario Business Registry.

Certified a true copy of the record of the Ministry of Public and Business Service Delivery.

*V. Quintanilla W.*

Director/Registrar

This report sets out the most recent information filed on or after June 27, 1992 in respect of corporations and April 1, 1994 in respect of Business Names Act and Limited Partnerships Act filings and recorded in the electronic records maintained by the Ministry as of the date and time the report is generated, unless the report is generated for a previous date. If this report is generated for a previous date, the report sets out the most recent information filed and recorded in the electronic records maintained by the Ministry up to the "as of" date indicated on the report. Additional historical information may exist in paper or microfiche format.

**This is Exhibit "C" referred to in the affidavit**

**of** COREY ROSS, SWORN BEFORE ME
**this 27th day of July 2023**

_____

**A COMMISSIONER FOR TAKING AFFIDAVITS**

**ALINA STOICA**

# *Certificate of Incorporation*
Of
# Light House Immersive USA, Corp

The undersigned, a natural person, for the purpose of organizing a corporation for conducting the business and promoting the purposes hereinafter states, under the provisions and subject to the laws of the State of Delaware, particularly Chapter 1, Title 8 of the Delaware Code and the acts amendatory thereof and supplemental thereto (hereinafter the "General Corporation Law of Delaware"), hereby certifies that:

1.      The name of the corporation shall be: **Light House Immersive USA, Corp** (hereinafter the "corporation")

2.       The registered office of this corporation in the State of Delaware is 1201 N. Orange Street, Suite 762, Wilmington, New Castle County, DE 19801 and its registered agent at that address is AmeriChoice Incorporators Ltd.

3.      The purpose of the corporation is to engage in any lawful act for which corporation may be organized under the General Corporation Law of Delaware; and shall have perpetual existence.

4.      The amount of the authorized capital stock of this corporation is 1,500 shares of "no par value" stock, or stock without any fixed par value.  All of the said stock is common stock of one class.

5.      A director of the corporation shall not be liable to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except to the extent such exemption from liability or limitation thereof is not permitted under the General Corporation Law of the State of Delaware as the same exists or may hereafter be amended. Any amendment, modification or repeal of the foregoing sentence by the stockholders of the corporation shall not adversely affect any right or protection of a director of the corporation in respect of any act or omission occurring prior to the time of such amendment, modification or repeal.

6.      The stockholders and directors shall have the power to hold their meetings, to have an office or offices, to keep the books, documents and papers of the corporation outside of the State of Delaware at such places as might from time to time be designated by the by-laws or resolutions of the directors or stockholders, except as otherwise required by the laws of Delaware.

7.      The name and mailing address of the incorporator is Corey Ross, 640 Briar Hill Ave, Toronto, Ontario Canada M5N 1N2

**I, The Undersigned,** for the purpose of forming a corporation under the laws of the State of Delaware, do make, file and record this Certificate, and do certify that the facts herein stated are true, and I have accordingly hereunto set my hand this October 21, 2020

*/s/Corey Ross*
Corey Ross
Incorporator

State of Delaware
Secretary of State
Division of Corporations
Delivered  01:30 PM 10/21/2020
FILED  01:30 PM 10/21/2020
SR 20207952100  - File Number  3944906

State of Delaware
Secretary of State
Division of Corporations
Delivered 04:25 PM 02/10/2021
FILED 04:25 PM 02/10/2021
SR 20210407807 - File Number 3944906

# STATE OF DELAWARE
# CERTIFICATE OF AMENDMENT
# OF CERTIFICATE OF INCORPORATION

a corporation organized and existing under and by virtue of the General Corporation Law of the State of Delaware.

**DOES HEREBY CERTIFY:**

**FIRST:** That at a meeting of the Board of Directors of

## *LIGHT HOUSE IMMERSIVE USA, CORP*

resolutions were duly adopted setting forth a proposed amendment of the Certificate of Incorporation of said corporation, declaring said amendment to be advisable and calling a meeting of the stockholders of said corporation for consideration thereof.  The resolution setting forth the proposed amendment is as follows:

**RESOLVED**, that the Certificate of Incorporation  of this incorporation be amended by changing the Article thereof numbered " **1** " so that, as amended, said Article shall be and read as follows:

### *The name of the corporation is: LIGHTHOUSE IMMERSIVE USA, INC*

**SECOND**: That thereafter, pursuant to resolution of its Board of Directors, a special meeting of the stockholders of said corporation was duly called and held upon notice in accordance with Section 222 of the General Corporation Law of the State of Delaware at which meeting the necessary number of shares as required by statute were voted in favor of the amendment.

**THIRD**: That said amendment was duly adopted in accordance with the provisions of Section 242 of the General Corporation Law of the State of Delaware.

**FOURTH**: That the capital of said corporation shall not be reduced under or by reason of said amendment.

**IN WITNESS WHEREOF**, said corporation has caused this certificate to be signed by *Corey Ross*, an Authorized Officer, this Friday, 29 January 2021

*Corey Ross*   Verified by PDFfiller
02/09/2021

BY: Corey Ross

TITLE OF OFFICER:  PRESIDENT

**This is Exhibit "D" referred to in the affidavit**

**of** COREY ROSS, SWORN BEFORE ME
**this 27th day of July 2023**

_____

**A COMMISSIONER FOR TAKING AFFIDAVITS**

**ALINA STOICA**

**Lighthouse Immersive Inc**
**Balance Sheet**
**As of December 31, 2022**
**In CAD$**

Prepared by management

| | | Total |
|---|---|---|
| **Assets** | | |
| **Current Assets** | | |
| Cash and Cash Equivalent | $ | 527,074.52 |
| Accounts Receivable (A/R) | | 264,277.76 |
| Prepaid expenses | | 126,428.25 |
| Income tax installments paid | | 2,466,715.03 |
| Due from Related parties | | 60,320,124.09 |
| **Total Current Assets** | $ | **63,704,619.65** |
| **Non-current Assets** | | |
| Total Property, plant and equipment | | 3,138,412.44 |
| Design and pre-productions costs | | 1,919,776.33 |
| **Total Non Current Assets** | | 5,058,188.77 |
| **Total Assets** | $ | **68,762,808.42** |
| | | |
| **Liabilities** | | |
| **Current Liabilities** | | |
| Accounts Payable | $ | 4,605,365.34 |
| Other Current Liabilities | | 7,680,190.22 |
| Due to Related Parties | | 43,684,570.12 |
| **Total Liabilities** | $ | **55,970,125.68** |
| **Equity** | | |
| Common Shares | $ | 2,000.00 |
| Retained Earnings | | 27,685,882.35 |
| Net income (loss) for the year | | (14,895,199.61) |
| **Total Equity** | $ | **12,792,682.74** |
| **Total Liabilities and Equity** | $ | **68,762,808.42** |

**Lighthouse Immersive Inc.**
**Profit and Loss**
**January - December 2022**
**In CAD$**

Prepared by management

| | | Total |
|---|---|---|
| **REVENUE** | | |
| Ticket Sales | $ | 7,281,374.52 |
| Merchandise Sales | | 1,224,692.21 |
| Other Revenues | | 344,922.83 |
| Intercompany Rate Card Charges and Royalties | | 2,679,796.80 |
| **Revenue** | **$** | **11,530,786.36** |
| | | |
| **Cost of Goods Sold** | **$** | **6,490,817.28** |
| **Gross Profit** | **$** | **5,039,969.08** |
| | | |
| **EXPENSES** | | |
| Payroll expenses | $ | 6,521,337.34 |
| Marketing expenses | | 4,124,060.95 |
| Occupancy costs | | 1,362,504.89 |
| Overhead expenses | | 2,848,068.00 |
| Production Expenses | | 3,620,493.78 |
| **Total Expenses** | **$** | **18,476,464.96** |
| **Net income (loss) before the following** | **$** | **(13,436,495.88)** |
| **OTHER INCOME** | | |
| Grant Income | $ | 765,560.00 |
| Interest | | (481,712.88) |
| Foreign Exchange Loss | | (1,742,550.85) |
| **Other income / expense** | **$** | **(1,458,703.73)** |
| **Net income (loss)** | **$** | **(14,895,199.61)** |

**This is Exhibit "E" referred to in the affidavit**

**of** COREY ROSS, SWORN BEFORE ME
**this 27th day of July 2023**

_____
**A COMMISSIONER FOR TAKING AFFIDAVITS**

**ALINA STOICA**

**Lighthouse Immersive Inc.**
**Balance Sheet**
**As of May 31, 2023**
**In CAD$**

Prepared by management

|  | Total |
|---|---|
| **Assets** | |
| **Current Assets** | |
| Cash and Cash Equivalent | $ 692,092.55 |
| Accounts Receivable | 1,179,170.36 |
| Prepaid expenses | 126,428.25 |
| Income tax installments paid | 2,466,715.03 |
| Due from Related parties | 60,412,067.08 |
| **Total Current Assets** | **$ 64,876,473.27** |
| **Non-current Assets** | |
| Total Property, plant and equipment | $ 3,154,218.82 |
| Design and pre-productions costs | $ 1,930,333.49 |
| **Total Non Current Assets** | **$ 5,084,552.31** |
| **Total Assets** | **$ 69,961,025.58** |
| | |
| **Liabilities** | |
| **Current Liabilities** | |
| Accounts Payable | $ 2,620,804.37 |
| Other Current Liabilities | 7,844,657.72 |
| Due to Related Parties | 44,907,954.11 |
| Secured Indebtedness to Related Parties | 4,058,684.25 |
| **Total Liabilities** | **$ 59,432,100.45** |
| | |
| **Equity** | |
| Common Shares | $ 2,000.00 |
| Retained Earnings | 12,790,682.74 |
| Net income (loss) for the year | (2,263,757.61) |
| **Total Equity** | **$ 10,528,925.13** |
| **Total Liabilities and Equity** | **$ 69,961,025.58** |

**Lighthouse Immersive Inc.**
**Profit and Loss**
January - May, 2023
In CAD$

Prepared by management

| | Total |
|---|---|
| **REVENUE** | |
| Ticket Sales | $ 74,338.98 |
| Merchandise Sales | 3,692.73 |
| Other Revenues | 561,882.25 |
| Intercompany Rate Card Charges and Royalties | 1,607,543.50 |
| **Revenue** | $ 2,247,457.46 |
| | |
| **Cost of Goods Sold** | $ 154,704.09 |
| **Gross Profit** | $ 2,092,753.37 |
| | |
| **EXPENSES** | |
| Payroll expenses | $ 2,456,042.41 |
| Marketing expenses | 197,088.20 |
| Occupancy costs | 548,292.97 |
| Overhead expenses | 1,002,305.42 |
| Production Expenses | 245,376.15 |
| **Total Expenses** | $ 4,449,105.15 |
| **Net income (loss) before the following** | $ (2,356,351.78) |
| **OTHER INCOME / EXPENSE** | |
| Grant Income | 110,325.00 |
| Foreign Exchange Loss | (17,730.83) |
| **Other income / expense** | 92,594.17 |
| **Net income (loss)** | $ (2,263,757.61) |

**This is Exhibit "F" referred to in the affidavit**

**of** COREY ROSS, SWORN BEFORE ME
**this 27th day of July 2023**

_____
**A COMMISSIONER FOR TAKING AFFIDAVITS**

**ALINA STOICA**

**Lighthouse Immersive USA, Inc.**
**Balance Sheet**
As of December 31, 2022
In USD$

Prepared by management

| | | Total |
|---|---|---|
| **Assets** | | |
| **Current Assets** | | |
| Cash and Cash Equivalent | $ | 624,155.37 |
| Accounts Receivable | | 961,327.76 |
| Prepaid expenses | | 100,000.00 |
| Income tax installments paid | | 761,287.18 |
| Due from Related parties | | 35,510,413.39 |
| **Total Current Assets** | $ | **37,957,183.70** |
| **Non-current Assets** | | |
| Total Property, plant and equipment | $ | 3,880,575.47 |
| Design and pre-productions costs | | 3,600,972.70 |
| **Total Non Current Assets** | $ | **7,481,548.17** |
| **Total Assets** | $ | **45,438,731.87** |
| | | |
| **Liabilities** | | |
| **Current Liabilities** | | |
| Accounts Payable | $ | 1,126,258.27 |
| Other Current Liabilities | | 175,485.49 |
| Due to Related Parties | | 70,656,351.04 |
| **Total Liabilities** | $ | **71,958,094.80** |
| | | |
| **Equity** | | |
| Common Shares | $ | 1.00 |
| Retained Earnings | | (26,674,839.94) |
| Net income (loss) for the year | | 155,476.01 |
| **Total Equity** | $ | **(26,519,362.93)** |
| **Total Liabilities and Equity** | $ | **45,438,731.87** |

**Lighthouse Immersive USA, Inc.**
**Profit and Loss**
**January - December 2022**
**In USD$**

Prepared by management

|  | Total |
|---|---|
| **REVENUE** | |
| Ticket Sales | $ 325,064.90 |
| Merchandise Sales | 4,394,114.86 |
| Other Revenues | 2,696,636.51 |
| Intercompany Management fees and other revenues | 5,662,095.67 |
| **Revenue** | **$ 13,077,911.94** |
| | |
| **Cost of Goods Sold** | **$ 5,230,993.63** |
| **Gross Profit** | **$ 7,846,918.31** |
| | |
| **EXPENSES** | |
| Payroll expenses | $ 2,909,909.04 |
| Marketing expenses | 3,635,117.34 |
| Overhead expenses | 9,605,742.66 |
| Production Expenses | 125,931.53 |
| **Total Expenses** | **$ 16,276,700.57** |
| **Net income (loss) before the following** | **$ (8,429,782.26)** |
| **OTHER INCOME** | |
| Foreign Exchange Loss | $ (96,120.69) |
| Net Income from Joint Venture | 8,681,378.96 |
| **Other income / expense** | **$ 8,585,258.27** |
| **Net income (loss)** | **$ 155,476.01** |

**This is Exhibit "G" referred to in the affidavit**

**of** COREY ROSS, SWORN BEFORE ME
**this 27th day of July 2023**

_____
**A COMMISSIONER FOR TAKING AFFIDAVITS**

**ALINA STOICA**

**Lighthouse Immersive USA, Inc.**
**Balance Sheet**
**As of May 31, 2023**
**In USD$**

Prepared by management

| | | Total |
|---|---|---|
| **Assets** | | |
| **Current Assets** | | |
| Cash and Cash Equivalent | $ | 348,249.57 |
| Accounts Receivable | | 879,243.26 |
| Prepaid expenses and credit card expenses to be allocated | | 1,288,401.63 |
| Income tax installments paid | | 903,932.56 |
| Due from Related parties | | 38,702,753.03 |
| **Total Current Assets** | $ | **42,122,580.05** |
| **Non-current Assets** | | |
| Total Property, plant and equipment | $ | 3,924,801.17 |
| Design, pre-productions costs and rent security deposit | | 7,069,232.79 |
| **Total Non Current Assets** | $ | **10,994,033.96** |
| **Total Assets** | $ | **53,116,614.01** |
| | | |
| **Liabilities** | | |
| **Current Liabilities** | | |
| Accounts Payable | $ | 3,673,111.60 |
| Other Current Liabilities | | 1,004,589.57 |
| Litigation liability (Note 1) | | 16,600,000.00 |
| Secured Indebtedness to Related Party | | 4,199,850.00 |
| Due to Related Parties | | 74,742,857.16 |
| **Total Liabilities** | $ | **100,220,408.33** |
| | | |
| **Equity** | | |
| Common Shares | $ | 1.00 |
| Retained Earnings | | (26,519,363.93) |
| Net income (loss) for the year | | (20,584,431.39) |
| **Total Equity** | $ | **(47,103,794.32)** |
| **Total Liabilities and Equity** | $ | **53,116,614.01** |

**Note 1 - The financial statements have been adjusted to reflect the material subsequent event related to the litigation.**

**Lighthouse Immersive USA, Inc.**
**Profit and Loss**
January - May, 2023
In USD$

Prepared by management

| | | Total |
|---|---|---|
| **REVENUE** | | |
| Ticket Sales | $ | 68,216.05 |
| Merchandise Sales | | 317,573.97 |
| Other Revenues | | 190,042.85 |
| Intercompany Management fees | | 490,000.00 |
| **Revenue** | $ | **1,065,832.87** |
| | | |
| **Cost of Goods Sold** | $ | **436,431.63** |
| **Gross Profit** | $ | **629,401.24** |
| | | |
| **EXPENSES** | | |
| Payroll expenses | $ | 1,078,053.29 |
| Marketing expenses | | 700,463.07 |
| Overhead expenses | | 2,775,223.51 |
| Production Expenses | | 57,063.72 |
| **Total Expenses** | $ | **4,610,803.59** |
| **Net income (loss) before the following** | $ | **(3,981,402.35)** |
| **OTHER INCOME** | | |
| Foreign Exchange Loss | $ | (3,029.04) |
| Recognition of litigation liability (Note 1) | | (16,600,000.00) |
| **Other income / expense** | $ | **(16,603,029.04)** |
| **Net income (loss)** | $ | **(20,584,431.39)** |

**Note 1** - The financial statements have been adjusted to reflect the material subsequent event related to the litigation.

**This is Exhibit "H" referred to in the affidavit**

**of** COREY ROSS, SWORN BEFORE ME
**this 27th day of July 2023**

_____
**A COMMISSIONER FOR TAKING AFFIDAVITS**

**ALINA STOICA**

## GENERAL SECURITY AGREEMENT

This agreement made as of the **19th day of December, 2022** is entered into between **Lighthouse Immersive Inc.** an Ontario corporation with the address 640 Briar Hill Ave, Toronto, ON, M5N 1N2 (the "**Debtor**") and **Corey Ross Productions Inc,** an Ontario corporation with the address 640 Briar Hill Ave, Toronto, ON, M5N 1N2 (the "**Secured Party**").

**WHEREAS**, for valuable consideration now paid to the Debtor by the Secured Party and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the Debtor, the Debtor hereby agrees in favour of the Secured Party as follows:

1.    **Defined Terms**

Except as otherwise specifically provided herein, all terms used herein shall have the meanings ascribed thereto in the *Personal Property Security Act, (Ontario).* In this agreement or any amendment hereto or supplement hereof, unless the context otherwise requires, the following words and phrases shall have the meanings set forth below:

"**Collateral**" means all right, title and interest of the Debtor, whether alone or through a joint venture, in any present or future undertaking, property or asset, whether now or hereafter owned, acquired or held, whether real or personal, and wherever situate including, without limitation, all Documents and Instruments, Equipment, Inventory, Leases, Proceeds, Receivables, Copyrights, Technology Rights, Trade Mark Rights, Records and Securities.

"**Copyrights**" means all Canadian and foreign copyrights and works protectable by copyrights including all manuals, blueprints and other literary works, all computer and machinery software and programs, all computer data bases and computer-stored information, all Canadian and foreign copyright registrations and all renewals and extensions thereof; all rights to receive royalties and other compensation for the rights granted to others to exploit any of the Debtor's copyright registrations; all licences of copyright and the right to sue for past, present and future infringements on the foregoing.

"**Default**" has the meaning ascribed thereto in Section 8.

"**Documents and Instruments**" means all chattel paper, warehouse receipts, bills of lading and other documents of title, whether negotiable or otherwise and all securities, bills, notes, instruments, writings and other documents.

"**Equipment**" means all equipment in any form of the Debtor including, without limitation, all machinery, fixtures, furniture, plants, vehicles and all accessions installed in or affixed or attached or appertaining to any of the foregoing.

"**Inventory**" means all goods forming part of the inventory of the Debtor, wheresoever situate, including, without limitation, all goods held for sale or lease or resale or furnished under contracts of service and all raw materials and work in progress and materials used or consumed in the business or profession of the Debtor.

"**Leases**" means all property of which the Debtor is the lessee or sublessee, provided that the last day of the term of any lease of real property shall be excepted out of the security hereby created and the Debtor shall hold such last day in trust for the Secured Party.

**"Obligations"** means all present and future indebtedness, liabilities and obligations of any kind which the Debtor has from time to time incurred or may incur or be under to the Secured Party, including, without limitation, those that are direct or indirect, absolute or contingent, joint or several, due or to become due or that arise from dealings between the Debtor and the Secured Party, or that arise from dealings between the Debtor and other parties which are assigned to the Secured Party or whom the Secured Party represents and any unpaid balance thereof, and whether the liability of the Debtor is as principal, surety, guarantor, endorser or otherwise and includes, without limitation, such indebtedness of the Debtor to the Secured Party evidenced on the books of account of the Secured Party which, in the absence of manifest error, shall be conclusive evidence that such indebtedness so noted is a just debt to the Secured Party.

**"Proceeds"** means all personal property in any form (including fixtures) derived directly or indirectly from any dealing with any form of Collateral and any proceeds thereof and all proceeds and payments under policies of insurance (whether or not the Secured Party is loss payee thereof) that indemnify or compensate the Debtor for any form of Collateral or proceeds lost, damaged or destroyed, and any proceeds thereof.

**"Receivables"** means all debts, accounts, claims, moneys, currency, choses in action and contract rights which now are or which may at any time hereafter be due to, accruing to, owing to, or owed by, the Debtor, including any security therefor.

**"Records"** means all books, papers, records, documents and other papers and writings and all magnetic tapes or other electronic data recording devices and other information, however stored, which record, evidence or relate to any form of Collateral.

**"Securities"** means all shares, stocks, warrants, bonds, debentures, debenture stock or other securities issued by a corporation or other person, or a partnership, association or government, and all other securities or financial assets in any form, together with all renewals thereof, substitutions therefor, accretions thereto and all rights and claims in respect thereof.

**"Technology Rights"** means all new, useful and unobvious acts, processes, methods, manufactures, machines, compositions of matter and designs; all Canadian and foreign industrial design and patent applications, provided that no grant, assignment or transfer of any Canadian industrial design application shall be effective until it is registered; all Canadian and foreign letters patent and registered industrial designs; any divisions, reissues, continuations-in-part, renewals and extensions thereof; all trade secrets and know-how including but not limited to all customer lists, supplier information, data, plans, blueprints, specifications, designs, drawings, record knowledge, surveys, engineering reports, manuals, standards, catalogues, sales data, manufacturing data, storage and distributing data; the right to receive royalties and other compensation for the rights granted to others to make, use and sell the Debtor's inventions, patents, patent applications, trade secrets or know-how; all licences in inventions, patents, patent applications, trade secrets and know-how; and the right to sue for past, present and future infringements on the foregoing.

**"Trade Mark Rights"** means all trade marks, trade names, business names, trade styles, service marks, logos, design marks, certification marks, distinguishing guises; all Canadian and foregoing trade mark applications and registrations for the above and any renewals thereof; all rights to receive royalties and other compensation for the rights granted to others to exploit the above rights; all licences of trade marks and trade names; and the right to sue for past, present and future infringements on the foregoing.

2.    **Grant of Security Interest**

As a general and continuing collateral security for the payment and performance of all Obligations, the Debtor hereby grants, assigns, conveys, mortgages and charges as and by way of a fixed and specific mortgage and charge to, and in favour of, the Secured Party, its successors and assigns, all of the Collateral, and grants to the Secured Party, his successors and assigns, a continuing security interest in all of the Collateral. The parties hereto intend the security to attach on the date hereof in the case of Collateral in which the Debtor has an interest at such date and immediately upon the Debtor obtaining any interest in the case of Collateral hereafter acquired by the Debtor.

3.    **Ownership of Collateral**

The Debtor represents and warrants to the Secured Party that the Debtor is (or with respect to Collateral acquired after the date hereof, will be) the owner of the Collateral free from any mortgage, lien, charge, security interest, lease, trust or other encumbrance whatsoever other than that given to the Secured Party.

4.    **Insurance**

The Debtor shall keep the Collateral insured against loss or damage by fire and such other risks as the Secured Party may reasonably require to the full insurable value thereof. If the Debtor neglects to maintain such insurance, the Secured Party may (but is not obliged to) maintain such insurance, and any premiums paid by the Secured Party together with interest thereon at the highest rate applicable to any of the Obligations of the Debtor to the Secured Party shall be secured hereunder and shall be paid by the Debtor to the Secured Party upon demand. The Secured Party shall not be responsible for the character, adequacy, validity or genuineness of any insurance, the solvency of any insurer or any other risk connected with insurance. The Debtor shall promptly notify the Secured Party of any loss or damage to the Collateral or any part thereof.

5.    **Use and Possession of Collateral**

(a)    Until Default, the Debtor may, subject to the provisions of this agreement and any other agreement between the Debtor and the Secured Party, use the Collateral in any lawful manner not inconsistent with this agreement or any other agreement between the Debtor and the Secured Party or with the terms or conditions of any policy of insurance thereon and sell its Inventory in the ordinary course of its business. The Debtor agrees to do the following: make applications for unpatented but patentable inventions; make applications for unregistered trade marks; diligently prosecute such applications, use the proper notices in connection with its use of the Copyrights, Technology Rights and Trade Mark Rights; take all reasonable steps necessary to protect the secrecy of trade secrets and preserve and maintain all registrations of Copyrights, Technology Rights and Trade Mark Rights including any renewal thereof; and use the Trade Mark Rights in a manner that will not adversely affect the goodwill associated therewith or the validity or distinctiveness thereof. At the request of the Secured Party, the Debtor will deliver to the Secured Party at the time and place and in the manner specified by the Secured Party, any Collateral in which a security interest may be perfected by a secured party taking possession thereof, irrespective of any prior steps the Secured Party may have taken to perfect its security interests in such Collateral and whether or not Default has occurred. Until so requested the Debtor shall keep save and maintain the collateral at its registered office location or at such other place as the Secured Party may agree to in writing.

(b)    Upon Default, all payments received by the Debtor in connection with the Collateral shall be held by the Debtor in trust for the Secured Party, shall be segregated from other funds of the Debtor

and shall, immediately upon receipt by the Debtor, be turned over to the Secured Party in the same form as received by the Debtor (duly endorsed to the Secured Party, if required).

6.    **Negative Covenants**

The Debtor shall not change its name, registered head office or principal place of business, without giving the Secured Party at least 30 days prior written notice. The Debtor shall not transfer the Collateral or remove from Ontario any of the Collateral located therein, except as permitted in Section 5 hereof.

7.    **Information and Inspection**

The Debtor shall from time to time, promptly upon the request of the Secured Party:

(a)    furnish to the Secured Party in writing all information relating to the Collateral;

(b)    allow the Secured Party to inspect the tangible Collateral and to take custody thereof and for such purposes, the Debtor hereby grants access to the Secured Party and its representatives to all premises occupied by the Debtor; and

(c)    mark all tangible Collateral with a notation satisfactory to the Secured Party disclosing that such Collateral is subject to a security interest in favour of the Secured Party.

The Debtor also agrees to promptly advise the Secured Party in sufficient detail of any substantial change relating to the type, quality or quantity of the Collateral, or any event which would have a material adverse effect upon the value of the Collateral or on the security interests granted to the Secured Party herein.

8.    **Default**

Time is of the essence of this agreement. The Debtor shall be in Default hereunder in each of the following events:

(a)    the failure of the Debtor to pay or perform when due any Obligation including, without limitation, any Obligation arising hereunder;

(b)    the failure of the Debtor to perform, observe or comply with any covenant or other obligation to the Secured Party arising under this agreement or any other agreement between the Debtor and the Secured Party, or if any representation, warranty, certificate or statement furnished by or on behalf of the Debtor to the Secured Party is untrue or incorrect in any material respect at any time;

(c)    the occurrence of an event of default under any instrument or agreement delivered by the Debtor to the Secured Party or otherwise acquired by the Secured Party;

(d)    the seizure, confiscation, loss, destruction of, or substantial damage to, all or any material part of the Collateral and the failure to act with due speed and diligence to redeem, replace or repair such part of the Collateral;

(e)    the Debtor ceases or threatens to cease to carry on its business in the normal course or goes out of business or surrenders its charter or sells all or substantially all of its assets or enters into a sale in bulk within the meaning of the *Bulk Sales Act* (Ontario); or

(f)      the Debtor becomes insolvent, or makes an assignment for the benefit of its creditors, or is adjudged bankrupt, or makes a proposal to its creditors under the *Bankruptcy and Insolvency Act* (Canada) or otherwise, or a liquidator is appointed of any of the assets or property of the Debtor, or proceedings are taken for the appointment by a court of competent jurisdiction of such a liquidator, or an interim receiver, a receiver or a receiver and manager is appointed with respect to all or part of the assets or property of the Debtor, whether by a court or otherwise, or if an encumbrancer takes possession or control of all or a material part of the property of the Debtor, or if any distress or execution or similar process is enforced against such property.

(g)      Waiver by the Secured Party of any Default shall not be a waiver of any other or subsequent Default.

9.      **Rights on Default**

Upon Default, the Secured Party may, at its option, and without notice or demand to the Debtor, declare all or any part of the Obligations to be immediately due and payable whereupon such Obligations shall become immediately due and payable without any notice, presentment, protest, or demand of any kind, each of which is expressly waived by the Debtor, and the security constituted hereby shall immediately become enforceable. In addition to the rights and privileges provided to secured parties by the *Personal Property Security Act,* (Ontario), the Secured Party shall have the following rights and powers upon Default:

(a)      the Secured Party may, by an instrument in writing, appoint a receiver (which term shall include a receiver and manager) of all or any part of the Collateral and may remove or replace such receiver from time to time or may institute proceedings in any court of competent jurisdiction for the appointment of such receiver. Any such receiver so appointed shall have power to take possession of the Collateral or any part thereof and to carry on, or concur in carrying on, the business of the Debtor and to collect, sell, dispose of, realize upon, borrow money on the security of, release to third parties and otherwise deal with the Collateral or any part thereof as to it deems best. The receiver may also be vested with such other rights, discretions and powers as may be granted in the instrument of appointment and any supplement thereto. The receiver shall for all purposes be deemed to be the agent of the Debtor and not the Secured Party. The Secured Party may, from time to time, fix the remuneration of the receiver. Any moneys from time to time received by the Secured Party or the receiver may be applied by the Secured Party or the receiver in discharge of all rents, taxes, rates, insurance premiums and outgoings affecting the Collateral, in payment of the remuneration of the receiver, and in keeping in good standing all liens and charges on the Collateral prior to the security constituted hereby. The balance of such moneys shall be applied in or toward payment of all or such parts of the Obligations as to the Secured Party seems best, and any residue of such moneys so received shall be paid in accordance with applicable law;

(b)      the Secured Party may collect, realize upon, sell or otherwise deal with the Collateral or any part thereof in such manner, upon such terms and conditions and at such time or times as may seem to it advisable and without notice to the Debtor (except as otherwise required by law) and may charge on its own behalf and pay to others reasonable sums for expenses incurred and for services rendered (expressly including legal advice and services) in or in connection with collecting, realizing upon, selling or obtaining payment for the Collateral and such sums shall be deemed to form part of the Obligations and shall be secured hereby, provided that the Secured Party shall not be liable or accountable for any failure to collect, realize upon, sell or obtain payment for the Collateral; and

(c)    the Secured Party may carry on or concur in the carrying on of all or any part of the business of the Debtor and may, to the exclusion of others, including the Debtor, enter upon and occupy lands, premises, plants and undertakings of, or occupied by, the Debtor including those leased from third parties.

10.    **Receivables**

Upon Default, the Secured Party may collect, realize upon, sell or otherwise deal with the Receivables or any part thereof in such manner, upon such terms and conditions and at such time or times as may seem to it advisable and without notice to the Debtor (except as required by law). The Secured Party shall not be liable or accountable for any failure to collect, realize upon, sell or obtain payment of the Receivables or any part thereof and shall not be bound to institute proceedings for the purpose of collecting, realizing or obtaining payment of the same or for the purpose of preserving any rights of the Secured Party, the Debtor or any other person, firm or corporation in respect of the same.

11.    **Appropriation and Deficiency**

All amounts collected or received by the Secured Party in respect of the Collateral may be applied on account of such part of the Obligations as to the Secured Party seems best or, in the discretion of the Secured Party, may be held unappropriated or released to the Debtor, all without prejudice to the Secured Party's claims upon the Debtor and the Debtor shall remain liable for any deficiency outstanding after any such amounts are applied in payment of the Obligations.

12.    **Further Assurances**

The Debtor shall from time to time, promptly on the request of the Secured Party, do, make and execute all such further acts, documents, matters and things as may be required by the Secured Party in connection with the Collateral or any part thereof or as may be required to better assure and confirm to the Secured Party the validity, perfection and priority of the security interests granted hereby or to otherwise give effect to this agreement. The Debtor hereby irrevocably constitutes and appoints the Secured Party the true and lawful attorney of the Debtor with full power of substitution to do, make and execute from time to time all such further acts, documents, matters and things which may be required to give effect to this agreement or the rights and remedies available to the Secured Party hereunder, including without limitation, the power to transfer or register in the name of the Secured Party or his nominee any of the Collateral which may be in the possession of, or control of, the Secured Party, or any third party acting on behalf of the Secured Party and the right to use the name of the Debtor whenever and wherever it may be deemed necessary or expedient.

13.    **Dealings by the Secured Party**

The Secured Party may grant extensions of time and other indulgences, take and give up securities, accept compositions, grant releases and discharges and otherwise deal with the Debtor and any third party having dealings with the Debtor, and with the Collateral or any part thereof, and with other securities as the Secured Party may see fit, all without prejudice to the Obligations or to the rights of the Secured Party under this agreement. The rights and powers conferred on the Secured Party hereunder are solely to protect its interests in the Collateral and shall not impose any duty upon it to exercise any such powers. Except for accounting for moneys actually received and exercising the same degree of care in the custody and preservation of Collateral in its possession as the Secured Party would exercise for his own property, the Secured Party shall have no duty as to any of the Collateral or as to the taking of any steps to preserve rights against prior parties or any other rights pertaining to any of the Collateral.

14.   **Expenses**

The Debtor agrees to pay all expenses (including, without limitation, solicitor's fees and disbursements and the remuneration of any receiver appointed hereunder) incurred by the Secured Party in the enforcement of this agreement and the amount of all such expenses shall be deemed to form part of the Obligations and shall be secured hereunder.

15.   **Grant of Licence to Use Copyrights, Technology Rights and Trade Mark Rights**

To enable the Secured Party to exercise its rights and remedies under Section 8 hereof at such time as the Secured Party, without regard to this Section 15, shall be lawfully entitled to do so, and for no other purpose, the Debtor hereby grants to the Secured Party an irrevocable, non-exclusive licence (exercisable without payment of royalty or other compensation to the Debtor) to use, assign or sublicense any of the Copyrights, Technology Rights or Trade Mark Rights now owned or hereafter acquired by the Debtor and wherever the same may be located, including in such licence reasonable access to all media in which any of the Copyrights, Technology Rights or Trade Mark Rights may be recorded or stored and to all computer programs used for the compilation or printout thereof.

16.   **Non-Merger**

This agreement shall not operate by way of merger of any of the Obligations and no judgment recovered by the Secured Party shall operate by way of merger of, or in any way affect the security of, this agreement, which is in addition to and not in substitution for any other security now or hereafter held by the Secured Party.

17.   **General**

(a)   Governing Law. This agreement shall be a continuing agreement in every respect and shall be governed by and construed in accordance with the laws of the Province of Ontario.

(b)   Non-Exclusivity of Remedies. No remedy for the enforcement of the rights of the Secured Party hereunder shall be exclusive of or dependent on any other such remedy but any one or more of such remedies may from time to time be exercised independently or in combination.

(c)   Future Advances. For greater certainty, it is declared that any and all future advances or other value which the Secured Party may in his discretion make or extend to or for the account of the Debtor shall be secured by this agreement.

(d)     Reduction of Obligations. The Obligations may be reduced to zero from time to time without affecting the validity, perfection or enforceability of this agreement or the security interests constituted hereby.

(e)     Release of Information. The Debtor hereby authorizes the Secured Party to provide a copy of this agreement and such other information (including particulars of the Obligations) as may be requested of the Secured Party by persons entitled thereto pursuant to any applicable legislation and otherwise with the consent of the Debtor.

(f)     Successors. This agreement shall enure to the benefit of and be binding on the Debtor and the Secured Party and their respective heirs, executors, administrators, successors and assigns.

(g)     Sections and Headings. The division of this agreement into sections and the insertion of headings are for convenience of reference only and shall not affect the interpretation of this agreement. Any reference in this agreement to any act or statute or any section thereof shall be deemed to be a reference to such act, statute or section as amended or re-enacted from time to time. Words importing the singular number include the plural and vice versa. Any defined term used in the singular preceded by "any" shall be taken to indicate any number of the members of the relevant class. Any reference in this agreement to a Party to this agreement shall include the successors and permitted assigns of such party.

(h)     Acknowledgement of Receipt. The Debtor acknowledges receipt of an executed copy of this agreement.

(i)     Communication. All communications provided for or permitted hereunder shall be in writing, personally delivered to the addressee, sent by telecopier or other means of telecommunication, or sent by registered and receipted mail, charges prepaid, to the applicable address set forth on the first page of this agreement or to such other address as any party hereto may from time to time designate to the others in such manner. Any communication so personally delivered shall be deemed to have been validly and effectively given on the date of such delivery. Communications so sent by mail shall be deemed to have been validly and effectively given on the business day next following the day on which it is received, as evidenced by the postal receipt. Communications so sent by telecopier or other means of telecommunication shall be deemed to have been validly and effectively given on the business day next following the day on which it is sent.

(j)     Execution and Counterpart. This agreement may be executed in counterparts, which together will constitute one document. Electronic signatures including by PDF, DocuSign and the equivalent shall have the same legal effect as original signatures.

[*Remainder of page deliberately blank. Signatures follow.*]

DATED as of the date first above written.

**LIGHTHOUSE IMMERSIVE INC.**

Per: *Corey Ross*
878916D6FA48494...
  Name: Corey Ross
  Title: President and Co-Founder
  I have authority to bind the corporation

Per: *Svetlana Dvoretsky*
6044B2C9A70A4C2...
  Name: Svetlana Dvoretsky
  Title: Vice-President and Co-Founder
  I have authority to bind the corporation

Per: *Slava Zheleznyakov*
71622CFF492B4C9...
  Name: Vyacheslav Zheleznyakov
  Title: Treasurer and Co-Founder
  I have authority to bind the corporation

**COREY ROSS PRODUCTIONS INC.**

Per: *Corey Ross*
878916D6FA48494...
  Name: Corey Ross
  Title: President
  I have authority to bind the corporation

**This is Exhibit "I" referred to in the affidavit**

**of** COREY ROSS, SWORN BEFORE ME
**this 27th day of July 2023**

_____

**A COMMISSIONER FOR TAKING AFFIDAVIT**

**ALINA STOICA**

DocuSign Envelope ID: F6C7BB63-2FDD-4730-B55C-F1CF39151E7D

# **GENERAL SECURITY AGREEMENT**

This agreement made as of the **29th day of December, 2022** is entered into between **Lighthouse Immersive Inc.,** an Ontario corporation with the address 640 Briar Hill Ave, Toronto, ON, M5N 1N2 (the "**Debtor**") and **Dvoretsky Holding Inc.,** an Ontario corporation with the address 10 Torresdale Ave, Suite 1606, Toronto, ON, M2R 3V8 (the "**Secured Party**").

**WHEREAS**, for valuable consideration now paid to the Debtor by the Secured Party and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the Debtor, the Debtor hereby agrees in favour of the Secured Party as follows:

1.    **Defined Terms**

Except as otherwise specifically provided herein, all terms used herein shall have the meanings ascribed thereto in the *Personal Property Security Act, (Ontario)*. In this agreement or any amendment hereto or supplement hereof, unless the context otherwise requires, the following words and phrases shall have the meanings set forth below:

**"Collateral"** means all right, title and interest of the Debtor, whether alone or through a joint venture, in any present or future undertaking, property or asset, whether now or hereafter owned, acquired or held, whether real or personal, and wherever situate including, without limitation, all Documents and Instruments, Equipment, Inventory, Leases, Proceeds, Receivables, Copyrights, Technology Rights, Trade Mark Rights, Records and Securities.

**"Copyrights"** means all Canadian and foreign copyrights and works protectable by copyrights including all manuals, blueprints and other literary works, all computer and machinery software and programs, all computer data bases and computer-stored information, all Canadian and foreign copyright registrations and all renewals and extensions thereof; all rights to receive royalties and other compensation for the rights granted to others to exploit any of the Debtor's copyright registrations; all licences of copyright and the right to sue for past, present and future infringements on the foregoing.

**"Default"** has the meaning ascribed thereto in Section 8.

**"Documents and Instruments"** means all chattel paper, warehouse receipts, bills of lading and other documents of title, whether negotiable or otherwise and all securities, bills, notes, instruments, writings and other documents.

**"Equipment"** means all equipment in any form of the Debtor including, without limitation, all machinery, fixtures, furniture, plants, vehicles and all accessions installed in or affixed or attached or appertaining to any of the foregoing.

**"Inventory"** means all goods forming part of the inventory of the Debtor, wheresoever situate, including, without limitation, all goods held for sale or lease or resale or furnished under contracts of service and all raw materials and work in progress and materials used or consumed in the business or profession of the Debtor.

**"Leases"** means all property of which the Debtor is the lessee or sublessee, provided that the last day of the term of any lease of real property shall be excepted out of the security hereby created and the Debtor shall hold such last day in trust for the Secured Party.

DocuSign Envelope ID: F6C7BB63-2FDD-4739-B5FG-F10F39151F7D

**"Obligations"** means all present and future indebtedness, liabilities and obligations of any kind which the Debtor has from time to time incurred or may incur or be under to the Secured Party, including, without limitation, those that are direct or indirect, absolute or contingent, joint or several, due or to become due or that arise from dealings between the Debtor and the Secured Party, or that arise from dealings between the Debtor and other parties which are assigned to the Secured Party or whom the Secured Party represents and any unpaid balance thereof, and whether the liability of the Debtor is as principal, surety, guarantor, endorser or otherwise and includes, without limitation, such indebtedness of the Debtor to the Secured Party evidenced on the books of account of the Secured Party which, in the absence of manifest error, shall be conclusive evidence that such indebtedness so noted is a just debt to the Secured Party.

**"Proceeds"** means all personal property in any form (including fixtures) derived directly or indirectly from any dealing with any form of Collateral and any proceeds thereof and all proceeds and payments under policies of insurance (whether or not the Secured Party is loss payee thereof) that indemnify or compensate the Debtor for any form of Collateral or proceeds lost, damaged or destroyed, and any proceeds thereof.

**"Receivables"** means all debts, accounts, claims, moneys, currency, choses in action and contract rights which now are or which may at any time hereafter be due to, accruing to, owing to, or owed by, the Debtor, including any security therefor.

**"Records"** means all books, papers, records, documents and other papers and writings and all magnetic tapes or other electronic data recording devices and other information, however stored, which record, evidence or relate to any form of Collateral.

**"Securities"** means all shares, stocks, warrants, bonds, debentures, debenture stock or other securities issued by a corporation or other person, or a partnership, association or government, and all other securities or financial assets in any form, together with all renewals thereof, substitutions therefor, accretions thereto and all rights and claims in respect thereof.

**"Technology Rights"** means all new, useful and unobvious acts, processes, methods, manufactures, machines, compositions of matter and designs; all Canadian and foreign industrial design and patent applications, provided that no grant, assignment or transfer of any Canadian industrial design application shall be effective until it is registered; all Canadian and foreign letters patent and registered industrial designs; any divisions, reissues, continuations-in-part, renewals and extensions thereof; all trade secrets and know-how including but not limited to all customer lists, supplier information, data, plans, blueprints, specifications, designs, drawings, record knowledge, surveys, engineering reports, manuals, standards, catalogues, sales data, manufacturing data, storage and distributing data; the right to receive royalties and other compensation for the rights granted to others to make, use and sell the Debtor's inventions, patents, patent applications, trade secrets or know-how; all licences in inventions, patents, patent applications, trade secrets and know-how; and the right to sue for past, present and future infringements on the foregoing.

**"Trade Mark Rights"** means all trade marks, trade names, business names, trade styles, service marks, logos, design marks, certification marks, distinguishing guises; all Canadian and foregoing trade mark applications and registrations for the above and any renewals thereof; all rights to receive royalties and other compensation for the rights granted to others to exploit the above rights; all licences of trade marks and trade names; and the right to sue for past, present and future infringements on the foregoing.

DocuSign Envelope ID: F6C7BB63-2FDD-4730-B55G-F1GF39151570

2.    **Grant of Security Interest**

As a general and continuing collateral security for the payment and performance of all Obligations, the Debtor hereby grants, assigns, conveys, mortgages and charges as and by way of a fixed and specific mortgage and charge to, and in favour of, the Secured Party, its successors and assigns, all of the Collateral, and grants to the Secured Party, his successors and assigns, a continuing security interest in all of the Collateral. The parties hereto intend the security to attach on the date hereof in the case of Collateral in which the Debtor has an interest at such date and immediately upon the Debtor obtaining any interest in the case of Collateral hereafter acquired by the Debtor.

3.    **Ownership of Collateral**

The Debtor represents and warrants to the Secured Party that the Debtor is (or with respect to Collateral acquired after the date hereof, will be) the owner of the Collateral free from any mortgage, lien, charge, security interest, lease, trust or other encumbrance whatsoever other than that given to the Secured Party.

4.    **Insurance**

The Debtor shall keep the Collateral insured against loss or damage by fire and such other risks as the Secured Party may reasonably require to the full insurable value thereof. If the Debtor neglects to maintain such insurance, the Secured Party may (but is not obliged to) maintain such insurance, and any premiums paid by the Secured Party together with interest thereon at the highest rate applicable to any of the Obligations of the Debtor to the Secured Party shall be secured hereunder and shall be paid by the Debtor to the Secured Party upon demand. The Secured Party shall not be responsible for the character, adequacy, validity or genuineness of any insurance, the solvency of any insurer or any other risk connected with insurance. The Debtor shall promptly notify the Secured Party of any loss or damage to the Collateral or any part thereof.

5.    **Use and Possession of Collateral**

(a)    Until Default, the Debtor may, subject to the provisions of this agreement and any other agreement between the Debtor and the Secured Party, use the Collateral in any lawful manner not inconsistent with this agreement or any other agreement between the Debtor and the Secured Party or with the terms or conditions of any policy of insurance thereon and sell its Inventory in the ordinary course of its business. The Debtor agrees to do the following: make applications for unpatented but patentable inventions; make applications for unregistered trade marks; diligently prosecute such applications, use the proper notices in connection with its use of the Copyrights, Technology Rights and Trade Mark Rights; take all reasonable steps necessary to protect the secrecy of trade secrets and preserve and maintain all registrations of Copyrights, Technology Rights and Trade Mark Rights including any renewal thereof; and use the Trade Mark Rights in a manner that will not adversely affect the goodwill associated therewith or the validity or distinctiveness thereof. At the request of the Secured Party, the Debtor will deliver to the Secured Party at the time and place and in the manner specified by the Secured Party, any Collateral in which a security interest may be perfected by a secured party taking possession thereof, irrespective of any prior steps the Secured Party may have taken to perfect its security interests in such Collateral and whether or not Default has occurred. Until so requested the Debtor shall keep save and maintain the collateral at its registered office location or at such other place as the Secured Party may agree to in writing.

(b)      Upon Default, all payments received by the Debtor in connection with the Collateral shall be held by the Debtor in trust for the Secured Party, shall be segregated from other funds of the Debtor and shall, immediately upon receipt by the Debtor, be turned over to the Secured Party in the same form as received by the Debtor (duly endorsed to the Secured Party, if required).

6.      **Negative Covenants**

The Debtor shall not change its name, registered head office or principal place of business, without giving the Secured Party at least 30 days prior written notice. The Debtor shall not transfer the Collateral or remove from Ontario any of the Collateral located therein, except as permitted in Section 5 hereof.

7.      **Information and Inspection**

The Debtor shall from time to time, promptly upon the request of the Secured Party:

(a)      furnish to the Secured Party in writing all information relating to the Collateral;

(b)      allow the Secured Party to inspect the tangible Collateral and to take custody thereof and for such purposes, the Debtor hereby grants access to the Secured Party and its representatives to all premises occupied by the Debtor; and

(c)      mark all tangible Collateral with a notation satisfactory to the Secured Party disclosing that such Collateral is subject to a security interest in favour of the Secured Party.

The Debtor also agrees to promptly advise the Secured Party in sufficient detail of any substantial change relating to the type, quality or quantity of the Collateral, or any event which would have a material adverse effect upon the value of the Collateral or on the security interests granted to the Secured Party herein.

8.      **Default**

Time is of the essence of this agreement. The Debtor shall be in Default hereunder in each of the following events:

(a)      the failure of the Debtor to pay or perform when due any Obligation including, without limitation, any Obligation arising hereunder;

(b)      the failure of the Debtor to perform, observe or comply with any covenant or other obligation to the Secured Party arising under this agreement or any other agreement between the Debtor and the Secured Party, or if any representation, warranty, certificate or statement furnished by or on behalf of the Debtor to the Secured Party is untrue or incorrect in any material respect at any time;

(c)      the occurrence of an event of default under any instrument or agreement delivered by the Debtor to the Secured Party or otherwise acquired by the Secured Party;

(d)      the seizure, confiscation, loss, destruction of, or substantial damage to, all or any material part of the Collateral and the failure to act with due speed and diligence to redeem, replace or repair such part of the Collateral;

(e)    the Debtor ceases or threatens to cease to carry on its business in the normal course or goes out of business or surrenders its charter or sells all or substantially all of its assets or enters into a sale in bulk within the meaning of the *Bulk Sales Act* (Ontario); or

(f)    the Debtor becomes insolvent, or makes an assignment for the benefit of its creditors, or is adjudged bankrupt, or makes a proposal to its creditors under the *Bankruptcy and Insolvency Act* (Canada) or otherwise, or a liquidator is appointed of any of the assets or property of the Debtor, or proceedings are taken for the appointment by a court of competent jurisdiction of such a liquidator, or an interim receiver, a receiver or a receiver and manager is appointed with respect to all or part of the assets or property of the Debtor, whether by a court or otherwise, or if an encumbrancer takes possession or control of all or a material part of the property of the Debtor, or if any distress or execution or similar process is enforced against such property.

(g)    Waiver by the Secured Party of any Default shall not be a waiver of any other or subsequent Default.

## 9.    **Rights on Default**

Upon Default, the Secured Party may, at its option, and without notice or demand to the Debtor, declare all or any part of the Obligations to be immediately due and payable whereupon such Obligations shall become immediately due and payable without any notice, presentment, protest, or demand of any kind, each of which is expressly waived by the Debtor, and the security constituted hereby shall immediately become enforceable. In addition to the rights and privileges provided to secured parties by the *Personal Property Security Act,* (Ontario), the Secured Party shall have the following rights and powers upon Default:

(a)    the Secured Party may, by an instrument in writing, appoint a receiver (which term shall include a receiver and manager) of all or any part of the Collateral and may remove or replace such receiver from time to time or may institute proceedings in any court of competent jurisdiction for the appointment of such receiver. Any such receiver so appointed shall have power to take possession of the Collateral or any part thereof and to carry on, or concur in carrying on, the business of the Debtor and to collect, sell, dispose of, realize upon, borrow money on the security of, release to third parties and otherwise deal with the Collateral or any part thereof as to it deems best. The receiver may also be vested with such other rights, discretions and powers as may be granted in the instrument of appointment and any supplement thereto. The receiver shall for all purposes be deemed to be the agent of the Debtor and not the Secured Party. The Secured Party may, from time to time, fix the remuneration of the receiver. Any moneys from time to time received by the Secured Party or the receiver may be applied by the Secured Party or the receiver in discharge of all rents, taxes, rates, insurance premiums and outgoings affecting the Collateral, in payment of the remuneration of the receiver, and in keeping in good standing all liens and charges on the Collateral prior to the security constituted hereby. The balance of such moneys shall be applied in or toward payment of all or such parts of the Obligations as to the Secured Party seems best, and any residue of such moneys so received shall be paid in accordance with applicable law;

(b)    the Secured Party may collect, realize upon, sell or otherwise deal with the Collateral or any part thereof in such manner, upon such terms and conditions and at such time or times as may seem to it advisable and without notice to the Debtor (except as otherwise required by law) and may charge on its own behalf and pay to others reasonable sums for expenses incurred and for services rendered (expressly including legal advice and services) in or in connection with collecting, realizing upon, selling or obtaining payment for the Collateral and such sums shall be deemed to form part of

DocuSign Envelope ID: F6C7BB63-2FDD-4730-B55C-F10F39151570

the Obligations and shall be secured hereby, provided that the Secured Party shall not be liable or accountable for any failure to collect, realize upon, sell or obtain payment for the Collateral; and

(c)      the Secured Party may carry on or concur in the carrying on of all or any part of the business of the Debtor and may, to the exclusion of others, including the Debtor, enter upon and occupy lands, premises, plants and undertakings of, or occupied by, the Debtor including those leased from third parties.

10.    **Receivables**

Upon Default, the Secured Party may collect, realize upon, sell or otherwise deal with the Receivables or any part thereof in such manner, upon such terms and conditions and at such time or times as may seem to it advisable and without notice to the Debtor (except as required by law). The Secured Party shall not be liable or accountable for any failure to collect, realize upon, sell or obtain payment of the Receivables or any part thereof and shall not be bound to institute proceedings for the purpose of collecting, realizing or obtaining payment of the same or for the purpose of preserving any rights of the Secured Party, the Debtor or any other person, firm or corporation in respect of the same.

11.    **Appropriation and Deficiency**

All amounts collected or received by the Secured Party in respect of the Collateral may be applied on account of such part of the Obligations as to the Secured Party seems best or, in the discretion of the Secured Party, may be held unappropriated or released to the Debtor, all without prejudice to the Secured Party's claims upon the Debtor and the Debtor shall remain liable for any deficiency outstanding after any such amounts are applied in payment of the Obligations.

12.    **Further Assurances**

The Debtor shall from time to time, promptly on the request of the Secured Party, do, make and execute all such further acts, documents, matters and things as may be required by the Secured Party in connection with the Collateral or any part thereof or as may be required to better assure and confirm to the Secured Party the validity, perfection and priority of the security interests granted hereby or to otherwise give effect to this agreement. The Debtor hereby irrevocably constitutes and appoints the Secured Party the true and lawful attorney of the Debtor with full power of substitution to do, make and execute from time to time all such further acts, documents, matters and things which may be required to give effect to this agreement or the rights and remedies available to the Secured Party hereunder, including without limitation, the power to transfer or register in the name of the Secured Party or his nominee any of the Collateral which may be in the possession of, or control of, the Secured Party, or any third party acting on behalf of the Secured Party and the right to use the name of the Debtor whenever and wherever it may be deemed necessary or expedient.

13.    **Dealings by the Secured Party**

DocuSign Envelope ID: F6C7BB63-2FDD-4730-B55C-F10F39151570

The Secured Party may grant extensions of time and other indulgences, take and give up securities, accept compositions, grant releases and discharges and otherwise deal with the Debtor and any third party having dealings with the Debtor, and with the Collateral or any part thereof, and with other securities as the Secured Party may see fit, all without prejudice to the Obligations or to the rights of the Secured Party under this agreement. The rights and powers conferred on the Secured Party hereunder are solely to protect its interests in the Collateral and shall not impose any duty upon it to exercise any such powers. Except for accounting for moneys actually received and exercising the same degree of care in the custody and preservation of Collateral in its possession as the Secured Party would exercise for his own property, the Secured Party shall have no duty as to any of the Collateral or as to the taking of any steps to preserve rights against prior parties or any other rights pertaining to any of the Collateral.

14.   **Expenses**

The Debtor agrees to pay all expenses (including, without limitation, solicitor's fees and disbursements and the remuneration of any receiver appointed hereunder) incurred by the Secured Party in the enforcement of this agreement and the amount of all such expenses shall be deemed to form part of the Obligations and shall be secured hereunder.

15.   **Grant of Licence to Use Copyrights, Technology Rights and Trade Mark Rights**

To enable the Secured Party to exercise its rights and remedies under Section 8 hereof at such time as the Secured Party, without regard to this Section 15, shall be lawfully entitled to do so, and for no other purpose, the Debtor hereby grants to the Secured Party an irrevocable, non-exclusive licence (exercisable without payment of royalty or other compensation to the Debtor) to use, assign or sublicense any of the Copyrights, Technology Rights or Trade Mark Rights now owned or hereafter acquired by the Debtor and wherever the same may be located, including in such licence reasonable access to all media in which any of the Copyrights, Technology Rights or Trade Mark Rights may be recorded or stored and to all computer programs used for the compilation or printout thereof.

16.   **Non-Merger**

This agreement shall not operate by way of merger of any of the Obligations and no judgment recovered by the Secured Party shall operate by way of merger of, or in any way affect the security of, this agreement, which is in addition to and not in substitution for any other security now or hereafter held by the Secured Party.

17.   **General**

(a)     Governing Law. This agreement shall be a continuing agreement in every respect and shall be governed by and construed in accordance with the laws of the Province of Ontario.

(b)     Non-Exclusivity of Remedies. No remedy for the enforcement of the rights of the Secured Party hereunder shall be exclusive of or dependent on any other such remedy but any one or more of such remedies may from time to time be exercised independently or in combination.

(c)    <u>Future Advances</u>. For greater certainty, it is declared that any and all future advances or other value which the Secured Party may in his discretion make or extend to or for the account of the Debtor shall be secured by this agreement.

(d)    <u>Reduction of Obligations</u>. The Obligations may be reduced to zero from time to time without affecting the validity, perfection or enforceability of this agreement or the security interests constituted hereby.

(e)    <u>Release of Information</u>. The Debtor hereby authorizes the Secured Party to provide a copy of this agreement and such other information (including particulars of the Obligations) as may be requested of the Secured Party by persons entitled thereto pursuant to any applicable legislation and otherwise with the consent of the Debtor.

(f)    <u>Successors</u>. This agreement shall enure to the benefit of and be binding on the Debtor and the Secured Party and their respective heirs, executors, administrators, successors and assigns.

(g)    <u>Sections and Headings</u>. The division of this agreement into sections and the insertion of headings are for convenience of reference only and shall not affect the interpretation of this agreement. Any reference in this agreement to any act or statute or any section thereof shall be deemed to be a reference to such act, statute or section as amended or re-enacted from time to time. Words importing the singular number include the plural and vice versa. Any defined term used in the singular preceded by "any" shall be taken to indicate any number of the members of the relevant class. Any reference in this agreement to a Party to this agreement shall include the successors and permitted assigns of such party.

(h)    <u>Acknowledgement of Receipt</u>. The Debtor acknowledges receipt of an executed copy of this agreement.

(i)    <u>Communication</u>. All communications provided for or permitted hereunder shall be in writing, personally delivered to the addressee, sent by telecopier or other means of telecommunication, or sent by registered and receipted mail, charges prepaid, to the applicable address set forth on the first page of this agreement or to such other address as any party hereto may from time to time designate to the others in such manner. Any communication so personally delivered shall be deemed to have been validly and effectively given on the date of such delivery. Communications so sent by mail shall be deemed to have been validly and effectively given on the business day next following the day on which it is received, as evidenced by the postal receipt. Communications so sent by telecopier or other means of telecommunication shall be deemed to have been validly and effectively given on the business day next following the day on which it is sent.

(j)    <u>Execution and Counterpart</u>. This agreement may be executed in counterparts, which together will constitute one document. Electronic signatures including by PDF, DocuSign and the equivalent shall have the same legal effect as original signatures.

[*Remainder of page deliberately blank. Signatures follow.*]

DATED as of the date first above written.

**LIGHTHOUSE IMMERSIVE INC.**

Per: _Corey Ross_
878916D6FA48494...

Name:  Corey Ross
Title:    President and Co-Founder
I have authority to bind the corporation

Per: _Svetlana Dvoretsky_
6044B2C9A70A4C2...

Name:  Svetlana Dvoretsky
Title:    Vice-President and Co-Founder
I have authority to bind the corporation

Per: _Slava Zheleznyakov_
71622CFF492B4C9...

Name:  Vyacheslav Zheleznyakov
Title:    Treasurer and Co-Founder
I have authority to bind the corporation

**DVORETSKY HOLDING INC.**

Per: _Svetlana Dvoretsky_
6044B2C9A70A4C2...

Name:  Svetlana Dvoretsky
Title:    President
I have authority to bind the corporation

**This is Exhibit "J" referred to in the affidavit**

**of** COREY ROSS, SWORN BEFORE ME
**this 27th day of July 2023**

_____
**A COMMISSIONER FOR TAKING AFFIDAVIT**

**ALINA STOICA**

DocuSign Envelope ID: F6C7BB63-2FDD-473B-B55C-F1CF39151570

## GENERAL SECURITY AGREEMENT

This agreement made as of the **29th day of December, 2022** is entered into between **Lighthouse Immersive Inc.,** an Ontario corporation with the address 640 Briar Hill Ave, Toronto, ON, M5N 1N2 (the "**Debtor**") and **Show One Productions Inc.,** an Ontario corporation with the address 10 Torresdale Ave, Suite 1606, Toronto, ON, M2R 3V8 (the "**Secured Party**").

**WHEREAS**, for valuable consideration now paid to the Debtor by the Secured Party and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the Debtor, the Debtor hereby agrees in favour of the Secured Party as follows:

1.     **Defined Terms**

Except as otherwise specifically provided herein, all terms used herein shall have the meanings ascribed thereto in the *Personal Property Security Act, (Ontario).* In this agreement or any amendment hereto or supplement hereof, unless the context otherwise requires, the following words and phrases shall have the meanings set forth below:

**"Collateral"** means all right, title and interest of the Debtor, whether alone or through a joint venture, in any present or future undertaking, property or asset, whether now or hereafter owned, acquired or held, whether real or personal, and wherever situate including, without limitation, all Documents and Instruments, Equipment, Inventory, Leases, Proceeds, Receivables, Copyrights, Technology Rights, Trade Mark Rights, Records and Securities.

**"Copyrights"** means all Canadian and foreign copyrights and works protectable by copyrights including all manuals, blueprints and other literary works, all computer and machinery software and programs, all computer data bases and computer-stored information, all Canadian and foreign copyright registrations and all renewals and extensions thereof; all rights to receive royalties and other compensation for the rights granted to others to exploit any of the Debtor's copyright registrations; all licences of copyright and the right to sue for past, present and future infringements on the foregoing.

**"Default"** has the meaning ascribed thereto in Section 8.

**"Documents and Instruments"** means all chattel paper, warehouse receipts, bills of lading and other documents of title, whether negotiable or otherwise and all securities, bills, notes, instruments, writings and other documents.

**"Equipment"** means all equipment in any form of the Debtor including, without limitation, all machinery, fixtures, furniture, plants, vehicles and all accessions installed in or affixed or attached or appertaining to any of the foregoing.

**"Inventory"** means all goods forming part of the inventory of the Debtor, wheresoever situate, including, without limitation, all goods held for sale or lease or resale or furnished under contracts of service and all raw materials and work in progress and materials used or consumed in the business or profession of the Debtor.

**"Leases"** means all property of which the Debtor is the lessee or sublessee, provided that the last day of the term of any lease of real property shall be excepted out of the security hereby created and the Debtor shall hold such last day in trust for the Secured Party.

DocuSign Envelope ID: F6C7BB63-2FDD-4730-B55G-F10F39151570

**"Obligations"** means all present and future indebtedness, liabilities and obligations of any kind which the Debtor has from time to time incurred or may incur or be under to the Secured Party, including, without limitation, those that are direct or indirect, absolute or contingent, joint or several, due or to become due or that arise from dealings between the Debtor and the Secured Party, or that arise from dealings between the Debtor and other parties which are assigned to the Secured Party or whom the Secured Party represents and any unpaid balance thereof, and whether the liability of the Debtor is as principal, surety, guarantor, endorser or otherwise and includes, without limitation, such indebtedness of the Debtor to the Secured Party evidenced on the books of account of the Secured Party which, in the absence of manifest error, shall be conclusive evidence that such indebtedness so noted is a just debt to the Secured Party.

**"Proceeds"** means all personal property in any form (including fixtures) derived directly or indirectly from any dealing with any form of Collateral and any proceeds thereof and all proceeds and payments under policies of insurance (whether or not the Secured Party is loss payee thereof) that indemnify or compensate the Debtor for any form of Collateral or proceeds lost, damaged or destroyed, and any proceeds thereof.

**"Receivables"** means all debts, accounts, claims, moneys, currency, choses in action and contract rights which now are or which may at any time hereafter be due to, accruing to, owing to, or owed by, the Debtor, including any security therefor.

**"Records"** means all books, papers, records, documents and other papers and writings and all magnetic tapes or other electronic data recording devices and other information, however stored, which record, evidence or relate to any form of Collateral.

**"Securities"** means all shares, stocks, warrants, bonds, debentures, debenture stock or other securities issued by a corporation or other person, or a partnership, association or government, and all other securities or financial assets in any form, together with all renewals thereof, substitutions therefor, accretions thereto and all rights and claims in respect thereof.

**"Technology Rights"** means all new, useful and unobvious acts, processes, methods, manufactures, machines, compositions of matter and designs; all Canadian and foreign industrial design and patent applications, provided that no grant, assignment or transfer of any Canadian industrial design application shall be effective until it is registered; all Canadian and foreign letters patent and registered industrial designs; any divisions, reissues, continuations-in-part, renewals and extensions thereof; all trade secrets and know-how including but not limited to all customer lists, supplier information, data, plans, blueprints, specifications, designs, drawings, record knowledge, surveys, engineering reports, manuals, standards, catalogues, sales data, manufacturing data, storage and distributing data; the right to receive royalties and other compensation for the rights granted to others to make, use and sell the Debtor's inventions, patents, patent applications, trade secrets or know-how; all licences in inventions, patents, patent applications, trade secrets and know-how; and the right to sue for past, present and future infringements on the foregoing.

**"Trade Mark Rights"** means all trade marks, trade names, business names, trade styles, service marks, logos, design marks, certification marks, distinguishing guises; all Canadian and foregoing trade mark applications and registrations for the above and any renewals thereof; all rights to receive royalties and other compensation for the rights granted to others to exploit the above rights; all licences of trade marks and trade names; and the right to sue for past, present and future infringements on the foregoing.

## 2. <u>Grant of Security Interest</u>

As a general and continuing collateral security for the payment and performance of all Obligations, the Debtor hereby grants, assigns, conveys, mortgages and charges as and by way of a fixed and specific mortgage and charge to, and in favour of, the Secured Party, its successors and assigns, all of the Collateral, and grants to the Secured Party, his successors and assigns, a continuing security interest in all of the Collateral. The parties hereto intend the security to attach on the date hereof in the case of Collateral in which the Debtor has an interest at such date and immediately upon the Debtor obtaining any interest in the case of Collateral hereafter acquired by the Debtor.

## 3. <u>Ownership of Collateral</u>

The Debtor represents and warrants to the Secured Party that the Debtor is (or with respect to Collateral acquired after the date hereof, will be) the owner of the Collateral free from any mortgage, lien, charge, security interest, lease, trust or other encumbrance whatsoever other than that given to the Secured Party.

## 4. <u>Insurance</u>

The Debtor shall keep the Collateral insured against loss or damage by fire and such other risks as the Secured Party may reasonably require to the full insurable value thereof. If the Debtor neglects to maintain such insurance, the Secured Party may (but is not obliged to) maintain such insurance, and any premiums paid by the Secured Party together with interest thereon at the highest rate applicable to any of the Obligations of the Debtor to the Secured Party shall be secured hereunder and shall be paid by the Debtor to the Secured Party upon demand. The Secured Party shall not be responsible for the character, adequacy, validity or genuineness of any insurance, the solvency of any insurer or any other risk connected with insurance. The Debtor shall promptly notify the Secured Party of any loss or damage to the Collateral or any part thereof.

## 5. <u>Use and Possession of Collateral</u>

(a)     Until Default, the Debtor may, subject to the provisions of this agreement and any other agreement between the Debtor and the Secured Party, use the Collateral in any lawful manner not inconsistent with this agreement or any other agreement between the Debtor and the Secured Party or with the terms or conditions of any policy of insurance thereon and sell its Inventory in the ordinary course of its business. The Debtor agrees to do the following: make applications for unpatented but patentable inventions; make applications for unregistered trade marks; diligently prosecute such applications, use the proper notices in connection with its use of the Copyrights, Technology Rights and Trade Mark Rights; take all reasonable steps necessary to protect the secrecy of trade secrets and preserve and maintain all registrations of Copyrights, Technology Rights and Trade Mark Rights including any renewal thereof; and use the Trade Mark Rights in a manner that will not adversely affect the goodwill associated therewith or the validity or distinctiveness thereof. At the request of the Secured Party, the Debtor will deliver to the Secured Party at the time and place and in the manner specified by the Secured Party, any Collateral in which a security interest may be perfected by a secured party taking possession thereof, irrespective of any prior steps the Secured Party may have taken to perfect its security interests in such Collateral and whether or not Default has occurred. Until so requested the Debtor shall keep save and maintain the collateral at its registered office location or at such other place as the Secured Party may agree to in writing.

(b)      Upon Default, all payments received by the Debtor in connection with the Collateral shall be held by the Debtor in trust for the Secured Party, shall be segregated from other funds of the Debtor and shall, immediately upon receipt by the Debtor, be turned over to the Secured Party in the same form as received by the Debtor (duly endorsed to the Secured Party, if required).

6.      **Negative Covenants**

The Debtor shall not change its name, registered head office or principal place of business, without giving the Secured Party at least 30 days prior written notice. The Debtor shall not transfer the Collateral or remove from Ontario any of the Collateral located therein, except as permitted in Section 5 hereof.

7.      **Information and Inspection**

The Debtor shall from time to time, promptly upon the request of the Secured Party:

(a)      furnish to the Secured Party in writing all information relating to the Collateral;

(b)      allow the Secured Party to inspect the tangible Collateral and to take custody thereof and for such purposes, the Debtor hereby grants access to the Secured Party and its representatives to all premises occupied by the Debtor; and

(c)      mark all tangible Collateral with a notation satisfactory to the Secured Party disclosing that such Collateral is subject to a security interest in favour of the Secured Party.

The Debtor also agrees to promptly advise the Secured Party in sufficient detail of any substantial change relating to the type, quality or quantity of the Collateral, or any event which would have a material adverse effect upon the value of the Collateral or on the security interests granted to the Secured Party herein.

8.      **Default**

Time is of the essence of this agreement. The Debtor shall be in Default hereunder in each of the following events:

(a)      the failure of the Debtor to pay or perform when due any Obligation including, without limitation, any Obligation arising hereunder;

(b)      the failure of the Debtor to perform, observe or comply with any covenant or other obligation to the Secured Party arising under this agreement or any other agreement between the Debtor and the Secured Party, or if any representation, warranty, certificate or statement furnished by or on behalf of the Debtor to the Secured Party is untrue or incorrect in any material respect at any time;

(c)      the occurrence of an event of default under any instrument or agreement delivered by the Debtor to the Secured Party or otherwise acquired by the Secured Party;

(d)      the seizure, confiscation, loss, destruction of, or substantial damage to, all or any material part of the Collateral and the failure to act with due speed and diligence to redeem, replace or repair such part of the Collateral;

DocuSign Envelope ID: F6C7BB63-2FDD-4730-B55G-E1GF29151J7D

(e)     the Debtor ceases or threatens to cease to carry on its business in the normal course or goes out of business or surrenders its charter or sells all or substantially all of its assets or enters into a sale in bulk within the meaning of the *Bulk Sales Act* (Ontario); or

(f)     the Debtor becomes insolvent, or makes an assignment for the benefit of its creditors, or is adjudged bankrupt, or makes a proposal to its creditors under the *Bankruptcy and Insolvency Act* (Canada) or otherwise, or a liquidator is appointed of any of the assets or property of the Debtor, or proceedings are taken for the appointment by a court of competent jurisdiction of such a liquidator, or an interim receiver, a receiver or a receiver and manager is appointed with respect to all or part of the assets or property of the Debtor, whether by a court or otherwise, or if an encumbrancer takes possession or control of all or a material part of the property of the Debtor, or if any distress or execution or similar process is enforced against such property.

(g)     Waiver by the Secured Party of any Default shall not be a waiver of any other or subsequent Default.

## 9.     **Rights on Default**

Upon Default, the Secured Party may, at its option, and without notice or demand to the Debtor, declare all or any part of the Obligations to be immediately due and payable whereupon such Obligations shall become immediately due and payable without any notice, presentment, protest, or demand of any kind, each of which is expressly waived by the Debtor, and the security constituted hereby shall immediately become enforceable. In addition to the rights and privileges provided to secured parties by the *Personal Property Security Act,* (Ontario), the Secured Party shall have the following rights and powers upon Default:

(a)     the Secured Party may, by an instrument in writing, appoint a receiver (which term shall include a receiver and manager) of all or any part of the Collateral and may remove or replace such receiver from time to time or may institute proceedings in any court of competent jurisdiction for the appointment of such receiver. Any such receiver so appointed shall have power to take possession of the Collateral or any part thereof and to carry on, or concur in carrying on, the business of the Debtor and to collect, sell, dispose of, realize upon, borrow money on the security of, release to third parties and otherwise deal with the Collateral or any part thereof as to it deems best. The receiver may also be vested with such other rights, discretions and powers as may be granted in the instrument of appointment and any supplement thereto. The receiver shall for all purposes be deemed to be the agent of the Debtor and not the Secured Party. The Secured Party may, from time to time, fix the remuneration of the receiver. Any moneys from time to time received by the Secured Party or the receiver may be applied by the Secured Party or the receiver in discharge of all rents, taxes, rates, insurance premiums and outgoings affecting the Collateral, in payment of the remuneration of the receiver, and in keeping in good standing all liens and charges on the Collateral prior to the security constituted hereby. The balance of such moneys shall be applied in or toward payment of all or such parts of the Obligations as to the Secured Party seems best, and any residue of such moneys so received shall be paid in accordance with applicable law;

(b)     the Secured Party may collect, realize upon, sell or otherwise deal with the Collateral or any part thereof in such manner, upon such terms and conditions and at such time or times as may seem to it advisable and without notice to the Debtor (except as otherwise required by law) and may charge on its own behalf and pay to others reasonable sums for expenses incurred and for services rendered (expressly including legal advice and services) in or in connection with collecting, realizing upon, selling or obtaining payment for the Collateral and such sums shall be deemed to form part of

the Obligations and shall be secured hereby, provided that the Secured Party shall not be liable or accountable for any failure to collect, realize upon, sell or obtain payment for the Collateral; and

(c)    the Secured Party may carry on or concur in the carrying on of all or any part of the business of the Debtor and may, to the exclusion of others, including the Debtor, enter upon and occupy lands, premises, plants and undertakings of, or occupied by, the Debtor including those leased from third parties.

## 10.    **Receivables**

Upon Default, the Secured Party may collect, realize upon, sell or otherwise deal with the Receivables or any part thereof in such manner, upon such terms and conditions and at such time or times as may seem to it advisable and without notice to the Debtor (except as required by law). The Secured Party shall not be liable or accountable for any failure to collect, realize upon, sell or obtain payment of the Receivables or any part thereof and shall not be bound to institute proceedings for the purpose of collecting, realizing or obtaining payment of the same or for the purpose of preserving any rights of the Secured Party, the Debtor or any other person, firm or corporation in respect of the same.

## 11.    **Appropriation and Deficiency**

All amounts collected or received by the Secured Party in respect of the Collateral may be applied on account of such part of the Obligations as to the Secured Party seems best or, in the discretion of the Secured Party, may be held unappropriated or released to the Debtor, all without prejudice to the Secured Party's claims upon the Debtor and the Debtor shall remain liable for any deficiency outstanding after any such amounts are applied in payment of the Obligations.

## 12.    **Further Assurances**

The Debtor shall from time to time, promptly on the request of the Secured Party, do, make and execute all such further acts, documents, matters and things as may be required by the Secured Party in connection with the Collateral or any part thereof or as may be required to better assure and confirm to the Secured Party the validity, perfection and priority of the security interests granted hereby or to otherwise give effect to this agreement. The Debtor hereby irrevocably constitutes and appoints the Secured Party the true and lawful attorney of the Debtor with full power of substitution to do, make and execute from time to time all such further acts, documents, matters and things which may be required to give effect to this agreement or the rights and remedies available to the Secured Party hereunder, including without limitation, the power to transfer or register in the name of the Secured Party or his nominee any of the Collateral which may be in the possession of, or control of, the Secured Party, or any third party acting on behalf of the Secured Party and the right to use the name of the Debtor whenever and wherever it may be deemed necessary or expedient.

## 13.    **Dealings by the Secured Party**

DocuSign Envelope ID: F6C7BB63-2FDD-4730-B55G-F10F39151E7D

The Secured Party may grant extensions of time and other indulgences, take and give up securities, accept compositions, grant releases and discharges and otherwise deal with the Debtor and any third party having dealings with the Debtor, and with the Collateral or any part thereof, and with other securities as the Secured Party may see fit, all without prejudice to the Obligations or to the rights of the Secured Party under this agreement. The rights and powers conferred on the Secured Party hereunder are solely to protect its interests in the Collateral and shall not impose any duty upon it to exercise any such powers. Except for accounting for moneys actually received and exercising the same degree of care in the custody and preservation of Collateral in its possession as the Secured Party would exercise for his own property, the Secured Party shall have no duty as to any of the Collateral or as to the taking of any steps to preserve rights against prior parties or any other rights pertaining to any of the Collateral.

14.    **Expenses**

The Debtor agrees to pay all expenses (including, without limitation, solicitor's fees and disbursements and the remuneration of any receiver appointed hereunder) incurred by the Secured Party in the enforcement of this agreement and the amount of all such expenses shall be deemed to form part of the Obligations and shall be secured hereunder.

15.    **Grant of Licence to Use Copyrights, Technology Rights and Trade Mark Rights**

To enable the Secured Party to exercise its rights and remedies under Section 8 hereof at such time as the Secured Party, without regard to this Section 15, shall be lawfully entitled to do so, and for no other purpose, the Debtor hereby grants to the Secured Party an irrevocable, non-exclusive licence (exercisable without payment of royalty or other compensation to the Debtor) to use, assign or sublicense any of the Copyrights, Technology Rights or Trade Mark Rights now owned or hereafter acquired by the Debtor and wherever the same may be located, including in such licence reasonable access to all media in which any of the Copyrights, Technology Rights or Trade Mark Rights may be recorded or stored and to all computer programs used for the compilation or printout thereof.

16.    **Non-Merger**

This agreement shall not operate by way of merger of any of the Obligations and no judgment recovered by the Secured Party shall operate by way of merger of, or in any way affect the security of, this agreement, which is in addition to and not in substitution for any other security now or hereafter held by the Secured Party.

17.    **General**

(a)    <u>Governing Law</u>. This agreement shall be a continuing agreement in every respect and shall be governed by and construed in accordance with the laws of the Province of Ontario.

(b)    <u>Non-Exclusivity of Remedies</u>. No remedy for the enforcement of the rights of the Secured Party hereunder shall be exclusive of or dependent on any other such remedy but any one or more of such remedies may from time to time be exercised independently or in combination.

(c)     <u>Future Advances</u>. For greater certainty, it is declared that any and all future advances or other value which the Secured Party may in his discretion make or extend to or for the account of the Debtor shall be secured by this agreement.

(d)     <u>Reduction of Obligations</u>. The Obligations may be reduced to zero from time to time without affecting the validity, perfection or enforceability of this agreement or the security interests constituted hereby.

(e)     <u>Release of Information</u>. The Debtor hereby authorizes the Secured Party to provide a copy of this agreement and such other information (including particulars of the Obligations) as may be requested of the Secured Party by persons entitled thereto pursuant to any applicable legislation and otherwise with the consent of the Debtor.

(f)     <u>Successors</u>. This agreement shall enure to the benefit of and be binding on the Debtor and the Secured Party and their respective heirs, executors, administrators, successors and assigns.

(g)     <u>Sections and Headings</u>. The division of this agreement into sections and the insertion of headings are for convenience of reference only and shall not affect the interpretation of this agreement. Any reference in this agreement to any act or statute or any section thereof shall be deemed to be a reference to such act, statute or section as amended or re-enacted from time to time. Words importing the singular number include the plural and vice versa. Any defined term used in the singular preceded by "any" shall be taken to indicate any number of the members of the relevant class. Any reference in this agreement to a Party to this agreement shall include the successors and permitted assigns of such party.

(h)     <u>Acknowledgement of Receipt</u>. The Debtor acknowledges receipt of an executed copy of this agreement.

(i)     <u>Communication</u>. All communications provided for or permitted hereunder shall be in writing, personally delivered to the addressee, sent by telecopier or other means of telecommunication, or sent by registered and receipted mail, charges prepaid, to the applicable address set forth on the first page of this agreement or to such other address as any party hereto may from time to time designate to the others in such manner. Any communication so personally delivered shall be deemed to have been validly and effectively given on the date of such delivery. Communications so sent by mail shall be deemed to have been validly and effectively given on the business day next following the day on which it is received, as evidenced by the postal receipt. Communications so sent by telecopier or other means of telecommunication shall be deemed to have been validly and effectively given on the business day next following the day on which it is sent.

(j)     <u>Execution and Counterpart</u>. This agreement may be executed in counterparts, which together will constitute one document. Electronic signatures including by PDF, DocuSign and the equivalent shall have the same legal effect as original signatures.

[*Remainder of page deliberately blank. Signatures follow.*]

DATED as of the date first above written.

**LIGHTHOUSE IMMERSIVE INC.**

Per: _Corey Ross_
      Name:  Corey Ross
      Title:    President and Co-Founder
      I have authority to bind the corporation

Per: _Svetlana Dvoretsky_
      Name:  Svetlana Dvoretsky
      Title:    Vice-President and Co-Founder
      I have authority to bind the corporation

Per: _Slava Zheleznyakov_
      Name:  Vyacheslav Zheleznyakov
      Title:    Treasurer and Co-Founder
      I have authority to bind the corporation

**SHOW ONE PRODUCTIONS INC.**

Per: _Svetlana Dvoretsky_
      Name:  Svetlana Dvoretsky
      Title:    President
      I have authority to bind the corporation

**This is Exhibit "K" referred to in the affidavit**

**of** COREY ROSS, SWORN BEFORE ME
**this 27th day of July 2023**

_____

**A COMMISSIONER FOR TAKING AFFIDAVIT**

**ALINA STOICA**

## **GENERAL SECURITY AGREEMENT**

This agreement made as of the **29th day of December, 2022** is entered into between **Lighthouse Immersive Inc.,** an Ontario corporation with the address 640 Briar Hill Ave, Toronto, ON, M5N 1N2 (the "**Debtor**") and **Slava Z Holdco Inc.,** an Ontario corporation with the address 16 McCombe Lane, Maple, ON, L6A 4G2 (the "**Secured Party**").

**WHEREAS**, for valuable consideration now paid to the Debtor by the Secured Party and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the Debtor, the Debtor hereby agrees in favour of the Secured Party as follows:

1.    **Defined Terms**

Except as otherwise specifically provided herein, all terms used herein shall have the meanings ascribed thereto in the *Personal Property Security Act, (Ontario)*. In this agreement or any amendment hereto or supplement hereof, unless the context otherwise requires, the following words and phrases shall have the meanings set forth below:

**"Collateral"** means all right, title and interest of the Debtor, whether alone or through a joint venture, in any present or future undertaking, property or asset, whether now or hereafter owned, acquired or held, whether real or personal, and wherever situate including, without limitation, all Documents and Instruments, Equipment, Inventory, Leases, Proceeds, Receivables, Copyrights, Technology Rights, Trade Mark Rights, Records and Securities.

**"Copyrights"** means all Canadian and foreign copyrights and works protectable by copyrights including all manuals, blueprints and other literary works, all computer and machinery software and programs, all computer data bases and computer-stored information, all Canadian and foreign copyright registrations and all renewals and extensions thereof; all rights to receive royalties and other compensation for the rights granted to others to exploit any of the Debtor's copyright registrations; all licences of copyright and the right to sue for past, present and future infringements on the foregoing.

**"Default"** has the meaning ascribed thereto in Section 8.

**"Documents and Instruments"** means all chattel paper, warehouse receipts, bills of lading and other documents of title, whether negotiable or otherwise and all securities, bills, notes, instruments, writings and other documents.

**"Equipment"** means all equipment in any form of the Debtor including, without limitation, all machinery, fixtures, furniture, plants, vehicles and all accessions installed in or affixed or attached or appertaining to any of the foregoing.

**"Inventory"** means all goods forming part of the inventory of the Debtor, wheresoever situate, including, without limitation, all goods held for sale or lease or resale or furnished under contracts of service and all raw materials and work in progress and materials used or consumed in the business or profession of the Debtor.

**"Leases"** means all property of which the Debtor is the lessee or sublessee, provided that the last day of the term of any lease of real property shall be excepted out of the security hereby created and the Debtor shall hold such last day in trust for the Secured Party.

DocuSign Envelope ID: F6C7BB63-2FDD-4730-B55G-F19F39151C7D

**"Obligations"** means all present and future indebtedness, liabilities and obligations of any kind which the Debtor has from time to time incurred or may incur or be under to the Secured Party, including, without limitation, those that are direct or indirect, absolute or contingent, joint or several, due or to become due or that arise from dealings between the Debtor and the Secured Party, or that arise from dealings between the Debtor and other parties which are assigned to the Secured Party or whom the Secured Party represents and any unpaid balance thereof, and whether the liability of the Debtor is as principal, surety, guarantor, endorser or otherwise and includes, without limitation, such indebtedness of the Debtor to the Secured Party evidenced on the books of account of the Secured Party which, in the absence of manifest error, shall be conclusive evidence that such indebtedness so noted is a just debt to the Secured Party.

**"Proceeds"** means all personal property in any form (including fixtures) derived directly or indirectly from any dealing with any form of Collateral and any proceeds thereof and all proceeds and payments under policies of insurance (whether or not the Secured Party is loss payee thereof) that indemnify or compensate the Debtor for any form of Collateral or proceeds lost, damaged or destroyed, and any proceeds thereof.

**"Receivables"** means all debts, accounts, claims, moneys, currency, choses in action and contract rights which now are or which may at any time hereafter be due to, accruing to, owing to, or owed by, the Debtor, including any security therefor.

**"Records"** means all books, papers, records, documents and other papers and writings and all magnetic tapes or other electronic data recording devices and other information, however stored, which record, evidence or relate to any form of Collateral.

**"Securities"** means all shares, stocks, warrants, bonds, debentures, debenture stock or other securities issued by a corporation or other person, or a partnership, association or government, and all other securities or financial assets in any form, together with all renewals thereof, substitutions therefor, accretions thereto and all rights and claims in respect thereof.

**"Technology Rights"** means all new, useful and unobvious acts, processes, methods, manufactures, machines, compositions of matter and designs; all Canadian and foreign industrial design and patent applications, provided that no grant, assignment or transfer of any Canadian industrial design application shall be effective until it is registered; all Canadian and foreign letters patent and registered industrial designs; any divisions, reissues, continuations-in-part, renewals and extensions thereof; all trade secrets and know-how including but not limited to all customer lists, supplier information, data, plans, blueprints, specifications, designs, drawings, record knowledge, surveys, engineering reports, manuals, standards, catalogues, sales data, manufacturing data, storage and distributing data; the right to receive royalties and other compensation for the rights granted to others to make, use and sell the Debtor's inventions, patents, patent applications, trade secrets or know-how; all licences in inventions, patents, patent applications, trade secrets and know-how; and the right to sue for past, present and future infringements on the foregoing.

**"Trade Mark Rights"** means all trade marks, trade names, business names, trade styles, service marks, logos, design marks, certification marks, distinguishing guises; all Canadian and foregoing trade mark applications and registrations for the above and any renewals thereof; all rights to receive royalties and other compensation for the rights granted to others to exploit the above rights; all licences of trade marks and trade names; and the right to sue for past, present and future infringements on the foregoing.

2.      **Grant of Security Interest**

As a general and continuing collateral security for the payment and performance of all Obligations, the Debtor hereby grants, assigns, conveys, mortgages and charges as and by way of a fixed and specific mortgage and charge to, and in favour of, the Secured Party, its successors and assigns, all of the Collateral, and grants to the Secured Party, his successors and assigns, a continuing security interest in all of the Collateral. The parties hereto intend the security to attach on the date hereof in the case of Collateral in which the Debtor has an interest at such date and immediately upon the Debtor obtaining any interest in the case of Collateral hereafter acquired by the Debtor.

3.      **Ownership of Collateral**

The Debtor represents and warrants to the Secured Party that the Debtor is (or with respect to Collateral acquired after the date hereof, will be) the owner of the Collateral free from any mortgage, lien, charge, security interest, lease, trust or other encumbrance whatsoever other than that given to the Secured Party.

4.      **Insurance**

The Debtor shall keep the Collateral insured against loss or damage by fire and such other risks as the Secured Party may reasonably require to the full insurable value thereof. If the Debtor neglects to maintain such insurance, the Secured Party may (but is not obliged to) maintain such insurance, and any premiums paid by the Secured Party together with interest thereon at the highest rate applicable to any of the Obligations of the Debtor to the Secured Party shall be secured hereunder and shall be paid by the Debtor to the Secured Party upon demand. The Secured Party shall not be responsible for the character, adequacy, validity or genuineness of any insurance, the solvency of any insurer or any other risk connected with insurance. The Debtor shall promptly notify the Secured Party of any loss or damage to the Collateral or any part thereof.

5.      **Use and Possession of Collateral**

(a)      Until Default, the Debtor may, subject to the provisions of this agreement and any other agreement between the Debtor and the Secured Party, use the Collateral in any lawful manner not inconsistent with this agreement or any other agreement between the Debtor and the Secured Party or with the terms or conditions of any policy of insurance thereon and sell its Inventory in the ordinary course of its business. The Debtor agrees to do the following: make applications for unpatented but patentable inventions; make applications for unregistered trade marks; diligently prosecute such applications, use the proper notices in connection with its use of the Copyrights, Technology Rights and Trade Mark Rights; take all reasonable steps necessary to protect the secrecy of trade secrets and preserve and maintain all registrations of Copyrights, Technology Rights and Trade Mark Rights including any renewal thereof; and use the Trade Mark Rights in a manner that will not adversely affect the goodwill associated therewith or the validity or distinctiveness thereof. At the request of the Secured Party, the Debtor will deliver to the Secured Party at the time and place and in the manner specified by the Secured Party, any Collateral in which a security interest may be perfected by a secured party taking possession thereof, irrespective of any prior steps the Secured Party may have taken to perfect its security interests in such Collateral and whether or not Default has occurred. Until so requested the Debtor shall keep save and maintain the collateral at its registered office location or at such other place as the Secured Party may agree to in writing.

(b)     Upon Default, all payments received by the Debtor in connection with the Collateral shall be held by the Debtor in trust for the Secured Party, shall be segregated from other funds of the Debtor and shall, immediately upon receipt by the Debtor, be turned over to the Secured Party in the same form as received by the Debtor (duly endorsed to the Secured Party, if required).

6.     **Negative Covenants**

The Debtor shall not change its name, registered head office or principal place of business, without giving the Secured Party at least 30 days prior written notice. The Debtor shall not transfer the Collateral or remove from Ontario any of the Collateral located therein, except as permitted in Section 5 hereof.

7.     **Information and Inspection**

The Debtor shall from time to time, promptly upon the request of the Secured Party:

(a)     furnish to the Secured Party in writing all information relating to the Collateral;

(b)     allow the Secured Party to inspect the tangible Collateral and to take custody thereof and for such purposes, the Debtor hereby grants access to the Secured Party and its representatives to all premises occupied by the Debtor; and

(c)     mark all tangible Collateral with a notation satisfactory to the Secured Party disclosing that such Collateral is subject to a security interest in favour of the Secured Party.

The Debtor also agrees to promptly advise the Secured Party in sufficient detail of any substantial change relating to the type, quality or quantity of the Collateral, or any event which would have a material adverse effect upon the value of the Collateral or on the security interests granted to the Secured Party herein.

8.     **Default**

Time is of the essence of this agreement. The Debtor shall be in Default hereunder in each of the following events:

(a)     the failure of the Debtor to pay or perform when due any Obligation including, without limitation, any Obligation arising hereunder;

(b)     the failure of the Debtor to perform, observe or comply with any covenant or other obligation to the Secured Party arising under this agreement or any other agreement between the Debtor and the Secured Party, or if any representation, warranty, certificate or statement furnished by or on behalf of the Debtor to the Secured Party is untrue or incorrect in any material respect at any time;

(c)     the occurrence of an event of default under any instrument or agreement delivered by the Debtor to the Secured Party or otherwise acquired by the Secured Party;

(d)     the seizure, confiscation, loss, destruction of, or substantial damage to, all or any material part of the Collateral and the failure to act with due speed and diligence to redeem, replace or repair such part of the Collateral;

DocuSign Envelope ID: F6C7BB63-2FDD-4730-B55G-F10F39151570

(e)      the Debtor ceases or threatens to cease to carry on its business in the normal course or goes out of business or surrenders its charter or sells all or substantially all of its assets or enters into a sale in bulk within the meaning of the *Bulk Sales Act* (Ontario); or

(f)      the Debtor becomes insolvent, or makes an assignment for the benefit of its creditors, or is adjudged bankrupt, or makes a proposal to its creditors under the *Bankruptcy and Insolvency Act* (Canada) or otherwise, or a liquidator is appointed of any of the assets or property of the Debtor, or proceedings are taken for the appointment by a court of competent jurisdiction of such a liquidator, or an interim receiver, a receiver or a receiver and manager is appointed with respect to all or part of the assets or property of the Debtor, whether by a court or otherwise, or if an encumbrancer takes possession or control of all or a material part of the property of the Debtor, or if any distress or execution or similar process is enforced against such property.

(g)      Waiver by the Secured Party of any Default shall not be a waiver of any other or subsequent Default.

9.      **Rights on Default**

Upon Default, the Secured Party may, at its option, and without notice or demand to the Debtor, declare all or any part of the Obligations to be immediately due and payable whereupon such Obligations shall become immediately due and payable without any notice, presentment, protest, or demand of any kind, each of which is expressly waived by the Debtor, and the security constituted hereby shall immediately become enforceable. In addition to the rights and privileges provided to secured parties by the *Personal Property Security Act,* (Ontario), the Secured Party shall have the following rights and powers upon Default:

(a)      the Secured Party may, by an instrument in writing, appoint a receiver (which term shall include a receiver and manager) of all or any part of the Collateral and may remove or replace such receiver from time to time or may institute proceedings in any court of competent jurisdiction for the appointment of such receiver. Any such receiver so appointed shall have power to take possession of the Collateral or any part thereof and to carry on, or concur in carrying on, the business of the Debtor and to collect, sell, dispose of, realize upon, borrow money on the security of, release to third parties and otherwise deal with the Collateral or any part thereof as to it deems best. The receiver may also be vested with such other rights, discretions and powers as may be granted in the instrument of appointment and any supplement thereto. The receiver shall for all purposes be deemed to be the agent of the Debtor and not the Secured Party. The Secured Party may, from time to time, fix the remuneration of the receiver. Any moneys from time to time received by the Secured Party or the receiver may be applied by the Secured Party or the receiver in discharge of all rents, taxes, rates, insurance premiums and outgoings affecting the Collateral, in payment of the remuneration of the receiver, and in keeping in good standing all liens and charges on the Collateral prior to the security constituted hereby. The balance of such moneys shall be applied in or toward payment of all or such parts of the Obligations as to the Secured Party seems best, and any residue of such moneys so received shall be paid in accordance with applicable law;

(b)      the Secured Party may collect, realize upon, sell or otherwise deal with the Collateral or any part thereof in such manner, upon such terms and conditions and at such time or times as may seem to it advisable and without notice to the Debtor (except as otherwise required by law) and may charge on its own behalf and pay to others reasonable sums for expenses incurred and for services rendered (expressly including legal advice and services) in or in connection with collecting, realizing upon, selling or obtaining payment for the Collateral and such sums shall be deemed to form part of

the Obligations and shall be secured hereby, provided that the Secured Party shall not be liable or accountable for any failure to collect, realize upon, sell or obtain payment for the Collateral; and

(c)    the Secured Party may carry on or concur in the carrying on of all or any part of the business of the Debtor and may, to the exclusion of others, including the Debtor, enter upon and occupy lands, premises, plants and undertakings of, or occupied by, the Debtor including those leased from third parties.

10.    **Receivables**

Upon Default, the Secured Party may collect, realize upon, sell or otherwise deal with the Receivables or any part thereof in such manner, upon such terms and conditions and at such time or times as may seem to it advisable and without notice to the Debtor (except as required by law). The Secured Party shall not be liable or accountable for any failure to collect, realize upon, sell or obtain payment of the Receivables or any part thereof and shall not be bound to institute proceedings for the purpose of collecting, realizing or obtaining payment of the same or for the purpose of preserving any rights of the Secured Party, the Debtor or any other person, firm or corporation in respect of the same.

11.    **Appropriation and Deficiency**

All amounts collected or received by the Secured Party in respect of the Collateral may be applied on account of such part of the Obligations as to the Secured Party seems best or, in the discretion of the Secured Party, may be held unappropriated or released to the Debtor, all without prejudice to the Secured Party's claims upon the Debtor and the Debtor shall remain liable for any deficiency outstanding after any such amounts are applied in payment of the Obligations.

12.    **Further Assurances**

The Debtor shall from time to time, promptly on the request of the Secured Party, do, make and execute all such further acts, documents, matters and things as may be required by the Secured Party in connection with the Collateral or any part thereof or as may be required to better assure and confirm to the Secured Party the validity, perfection and priority of the security interests granted hereby or to otherwise give effect to this agreement. The Debtor hereby irrevocably constitutes and appoints the Secured Party the true and lawful attorney of the Debtor with full power of substitution to do, make and execute from time to time all such further acts, documents, matters and things which may be required to give effect to this agreement or the rights and remedies available to the Secured Party hereunder, including without limitation, the power to transfer or register in the name of the Secured Party or his nominee any of the Collateral which may be in the possession of, or control of, the Secured Party, or any third party acting on behalf of the Secured Party and the right to use the name of the Debtor whenever and wherever it may be deemed necessary or expedient.

13.    **Dealings by the Secured Party**

The Secured Party may grant extensions of time and other indulgences, take and give up securities, accept compositions, grant releases and discharges and otherwise deal with the Debtor and any third party having dealings with the Debtor, and with the Collateral or any part thereof, and with other securities as the Secured Party may see fit, all without prejudice to the Obligations or to the rights of the Secured Party under this agreement. The rights and powers conferred on the Secured Party hereunder are solely to protect its interests in the Collateral and shall not impose any duty upon it to exercise any such powers. Except for accounting for moneys actually received and exercising the same degree of care in the custody and preservation of Collateral in its possession as the Secured Party would exercise for his own property, the Secured Party shall have no duty as to any of the Collateral or as to the taking of any steps to preserve rights against prior parties or any other rights pertaining to any of the Collateral.

14.    **Expenses**

The Debtor agrees to pay all expenses (including, without limitation, solicitor's fees and disbursements and the remuneration of any receiver appointed hereunder) incurred by the Secured Party in the enforcement of this agreement and the amount of all such expenses shall be deemed to form part of the Obligations and shall be secured hereunder.

15.    **Grant of Licence to Use Copyrights, Technology Rights and Trade Mark Rights**

To enable the Secured Party to exercise its rights and remedies under Section 8 hereof at such time as the Secured Party, without regard to this Section 15, shall be lawfully entitled to do so, and for no other purpose, the Debtor hereby grants to the Secured Party an irrevocable, non-exclusive licence (exercisable without payment of royalty or other compensation to the Debtor) to use, assign or sublicense any of the Copyrights, Technology Rights or Trade Mark Rights now owned or hereafter acquired by the Debtor and wherever the same may be located, including in such licence reasonable access to all media in which any of the Copyrights, Technology Rights or Trade Mark Rights may be recorded or stored and to all computer programs used for the compilation or printout thereof.

16.    **Non-Merger**

This agreement shall not operate by way of merger of any of the Obligations and no judgment recovered by the Secured Party shall operate by way of merger of, or in any way affect the security of, this agreement, which is in addition to and not in substitution for any other security now or hereafter held by the Secured Party.

17.    **General**

(a)    <u>Governing Law</u>. This agreement shall be a continuing agreement in every respect and shall be governed by and construed in accordance with the laws of the Province of Ontario.

(b)    <u>Non-Exclusivity of Remedies</u>. No remedy for the enforcement of the rights of the Secured Party hereunder shall be exclusive of or dependent on any other such remedy but any one or more of such remedies may from time to time be exercised independently or in combination.

(c)    <u>Future Advances</u>. For greater certainty, it is declared that any and all future advances or other value which the Secured Party may in his discretion make or extend to or for the account of the Debtor shall be secured by this agreement.

(d)    <u>Reduction of Obligations</u>. The Obligations may be reduced to zero from time to time without affecting the validity, perfection or enforceability of this agreement or the security interests constituted hereby.

(e)    <u>Release of Information</u>. The Debtor hereby authorizes the Secured Party to provide a copy of this agreement and such other information (including particulars of the Obligations) as may be requested of the Secured Party by persons entitled thereto pursuant to any applicable legislation and otherwise with the consent of the Debtor.

(f)    <u>Successors</u>. This agreement shall enure to the benefit of and be binding on the Debtor and the Secured Party and their respective heirs, executors, administrators, successors and assigns.

(g)    <u>Sections and Headings</u>. The division of this agreement into sections and the insertion of headings are for convenience of reference only and shall not affect the interpretation of this agreement. Any reference in this agreement to any act or statute or any section thereof shall be deemed to be a reference to such act, statute or section as amended or re-enacted from time to time. Words importing the singular number include the plural and vice versa. Any defined term used in the singular preceded by "any" shall be taken to indicate any number of the members of the relevant class. Any reference in this agreement to a Party to this agreement shall include the successors and permitted assigns of such party.

(h)    <u>Acknowledgement of Receipt</u>. The Debtor acknowledges receipt of an executed copy of this agreement.

(i)    <u>Communication</u>. All communications provided for or permitted hereunder shall be in writing, personally delivered to the addressee, sent by telecopier or other means of telecommunication, or sent by registered and receipted mail, charges prepaid, to the applicable address set forth on the first page of this agreement or to such other address as any party hereto may from time to time designate to the others in such manner. Any communication so personally delivered shall be deemed to have been validly and effectively given on the date of such delivery. Communications so sent by mail shall be deemed to have been validly and effectively given on the business day next following the day on which it is received, as evidenced by the postal receipt. Communications so sent by telecopier or other means of telecommunication shall be deemed to have been validly and effectively given on the business day next following the day on which it is sent.

(j)    <u>Execution and Counterpart</u>. This agreement may be executed in counterparts, which together will constitute one document. Electronic signatures including by PDF, DocuSign and the equivalent shall have the same legal effect as original signatures.

[*Remainder of page deliberately blank. Signatures follow.*]

DATED as of the date first above written.

**LIGHTHOUSE IMMERSIVE INC.**

Per: _Corey Ross_
878916D65E448494
Name:  Corey Ross
Title:    President and Co-Founder
I have authority to bind the corporation

Per: _Svetlana Dvoretsky_
6044B2C9A7044C2
Name:  Svetlana Dvoretsky
Title:    Vice-President and Co-Founder
I have authority to bind the corporation

Per: _Slava Zheleznyakov_
71622CEF492B4C9
Name:  Vyacheslav Zheleznyakov
Title:    Treasurer and Co-Founder
I have authority to bind the corporation

**SLAVA Z HOLDCO INC.**

Per: _Slava Zheleznyakov_
71622CEF492B4C9
Name:  Vyacheslav Zheleznyakov
Title:    President
I have authority to bind the corporation

**This is Exhibit "L" referred to in the affidavit**

**of** COREY ROSS, SWORN BEFORE ME
**this 27th day of July 2023**

_____

**A COMMISSIONER FOR TAKING AFFIDAVIT**

**ALINA STOICA**

# SECURITY AGREEMENT

**THIS SECURITY AGREEMENT** (this "Agreement") is made as of January 21, 2023 (the "Effective Date"), by **LIGHTHOUSE IMMERSIVE USA, INC.,** a Delaware corporation with an address at 640 Briar Hill Avenue, Toronto, ON M5N 1N2 (the "Borrower"), in favor of **SCS FINANCE, INC.,** a Delaware corporation with an address at 10 Torresdale Avenue, Suite 1606, Toronto, ON M2R 3V8  (the "Lender").

**PREMISES.**  On the date hereof, the Lender is extending a revolving loan to the Borrower in the maximum principal amount of $25,000,000.00 (the "Loan") as evidenced by a Revolving Loan Agreement by and between Lender and Borrower dated the Effective Date, a Revolving Promissory of Borrower dated the Effective Date payable to the order of Lender (the "Note") and related agreements, documents and instruments (collectively, together with this Agreement and the Note, the "Loan Documents").

**NOW, THEREFORE,** in consideration of these premises and the covenants and agreements herein contained, and in order to induce the Lender to extend or continue the loan or loans and/or other extensions of credit described above, the Borrower hereby agrees as follows:

**§1.**    **Grant of Security Interest.** The Borrower hereby grants to the Lender a present and continuing security interest in the Collateral to secure the Obligations.

**§2.**    **Definitions.**  For the purposes of this Security Agreement, the terms defined in this Section shall have the meanings assigned to them below.

(a)    Unless otherwise specifically defined herein, the terms "account", "chattel paper", "commodity account", "commodity contract", "deposit account" "document", "electronic chattel paper", "equipment", "fixture", "general intangible", "goods", "instrument", "inventory", "investment property", "letter-of-credit right", "payment intangible", "proceeds", "promissory note", "software", "supporting obligation", "tangible chattel paper", "certificated security", "financial asset", "negotiable instrument", "securities account", "security entitlement", "uncertificated security"  and the other terms defined in the Uniform Commercial Code as adopted by the State of New York, as amended (the "UCC"), shall have the meanings respectively assigned to such terms therein.

(b)    The term "Collateral" means all inventory, contracts, accounts, machinery and equipment, goods, fixtures, documents, instruments, money, deposit accounts, chattel paper (including tangible chattel paper and electronic chattel paper), general intangibles, commercial tort claims, commodity accounts, commodity contracts, health-care-insurance receivables, investment property, letter-of-credit rights, payment intangibles, promissory notes, software, supporting obligations, securities (including certificated securities and uncertificated securities), security entitlements, securities accounts, financial assets, negotiable instruments and other personal property of the Borrower, whether now owned or hereafter acquired, and any and all accessories and additions thereto, and any and all replacements and proceeds (including proceeds of insurance policies payable by reason of loss or damage to the foregoing) and products thereof.

25627620.3

DocuSign Envelope ID: 291AE58F-7E2F-4D97-BAA1-C03G9528FA50

(c)    The term "Obligations" means (i) any and all direct and indirect obligations and liabilities of Borrower to the Lender of any type under the Loan Documents, as the same may be amended, revised, increased extended, replaced or refinanced, and (ii) any and all direct and indirect obligations and liabilities of Borrower to the Lender of any type now existing or hereafter incurred or arising.

**§3.    Borrower's Representations and Warranties.** The Borrower hereby represents and warrants that:

(a)    Borrower is a corporation organized and existing under the laws of the State of Delaware.

(b)    Borrower has a place of business at the Borrower's address set forth in the first paragraph of this Agreement.

(c)    The Borrower is, as of the date of this Agreement, the owner of all of the Collateral free from any liens, security interests or encumbrances except for the security interest herein granted, and no financing statement, other than a financing statement filed in favor of the Lender, covering any of the Collateral or any proceeds thereof is on file in any public office.

**§4.    Covenants of Borrower.** The Borrower hereby agrees and covenants that:

(a)    The Borrower will defend the Collateral against all claims and demands of all persons, it will keep the Collateral free from any lien, security interest or encumbrance, except for the security interest granted to the Lender herein, and in good order and repair (ordinary wear and tear excepted), and it will not destroy the Collateral or any part thereof, nor will it in any manner sell or transfer the Collateral except in the ordinary course of the Borrower's business without the prior written consent of the Lender.

(b)    The Borrower will execute and deliver to the Lender, at such times and in such form and containing such terms as the Lender may reasonably require, financing and continuation statements and other instruments as the Lender may deem necessary or desirable to protect, perfect and preserve the security interest in the Collateral created herein. The Borrower will pay all reasonable costs incurred by the Lender in connection with the perfection, continued protection, and preservation of its interest in the Collateral. Furthermore, the Borrower irrevocably appoints, for the limited purposes stated herein, the Lender attorney-in-fact, and empowers the Lender, to make, execute and deliver any of the instruments or documents provided for in this Agreement in Borrower's name and on Borrower's behalf.

(c)    The Borrower shall be responsible for all risk of loss or of damage to the Collateral.

(d)    The Borrower will not change its name without giving the Lender sixty (60) days' prior written notice in which it sets forth its new name and the date on which the new name shall first be used.  Borrower will not change the location of the Collateral or the location of the records pertaining thereto, or remove any Collateral from the State in which it is presently located, without

2

giving sixty (60) days prior written notice to the Lender. Borrower shall not change its jurisdiction of organization, or become a party to any merger, consolidation or business acquisition or sale, without the prior written approval of the Lender.

(e)     The Borrower will immediately deliver to the Lender any and all certificates of title to any Collateral for which such certificates are issued and any Collateral consisting of instruments or chattel paper.

(f)     The Borrower will not assert against the Lender any claim or defense which it may have against any seller of the Collateral or any other person with respect to the Collateral.

(g)     The Borrower will indemnify and hold the Lender harmless from and against any loss, liability, damage, cost and expense whatsoever arising from the Borrower's use, operation, ownership or possession of the Collateral.

(h)     If the Borrower shall now or at any time hereafter hold or acquire any commercial tort claims, the Borrower shall immediately notify the Lender in a writing signed by the Borrower of the particulars thereof and grant to the Lender in such writing a security interest therein and in the proceeds thereof, all upon the terms of this Agreement, with such writing to be in form and substance satisfactory to the Lender, and Borrower will execute any and all instruments and take any and all steps required by the Lender in order to grant Lender a first priority perfected security interest in such commercial tort claims.

**§5.     Authorization to File Financing Statements.** The Borrower hereby irrevocably authorizes the Lender at any time and from time to time to file in any filing office in any Uniform Commercial Code jurisdiction any initial financing statements and amendments thereto that (a) indicate the Collateral (which may include a description of the Collateral as "all assets" or "all personal property") and (b) provide any other information required by part 5 of Article 9 of the UCC or such other jurisdictions for the sufficiency or filing office acceptance of any financing statement or amendment, including, if the Borrower is an organization, the type of organization and any organizational identification number issued to the Borrower. The Borrower agrees to furnish any such information to the Lender promptly upon the Lender's request. The Borrower also ratifies its authorization for the Lender to have filed in any Uniform Commercial Code jurisdiction any like initial financing statements or amendments thereto if filed prior to the date hereof.

**§6.     Lender's Rights.** At its option, the Lender may discharge taxes, liens or security interests or other encumbrances at any time levied against or placed on the Collateral, pay for insurance on the Collateral and pay for the maintenance, preservation and collection of the Collateral. The Borrower agrees to reimburse the Lender on demand for any payments made or any expenses incurred by the Lender pursuant to this Section, and such amounts extended pursuant to this Section shall be added to the Obligations.

**§7.     Remedies.** The Lender shall have all of the rights and remedies of a secured party under the UCC and all other rights and remedies under applicable law.

**§8.     Remedies Not Exclusive.** No remedy conferred upon or reserved to the Lender hereunder or under any other Loan Document shall be deemed to be exclusive of any other

available remedy or remedies. Each such remedy shall be distinct, separate, and cumulative, shall not be deemed to be inconsistent with or in exclusion of any other available remedy, may be exercised in the discretion of the Lender at any time, in any manner and in any order, and shall be in addition to and separate and distinct from any other remedy given to the Lender hereunder, or under any other Loan Document, or now or hereafter existing in favor of the Lender, at law, in equity or by statute.

## §9. **Miscellaneous.**

(a)    This Security Agreement shall be binding upon the heirs, personal representatives, successors and assigns of the Borrower; and shall inure to the benefit of the heirs, personal representatives, successors and assigns of the Lender. If there be more than one Borrower, all duties and obligations hereunder shall be joint and several. This Security Agreement shall become effective when signed by the Borrower.

(b)    Each and every provision of this Agreement has been mutually negotiated, prepared and drafted. In connection with the construction or interpretation of any provision hereof, no consideration shall be given to the issue of which party actually prepared, drafted, requested or negotiated any provision or deletion. This Agreement shall not be construed more severely against any one party hereto than against any other party hereto.

(c)    No waiver by the Lender of any obligation or right hereunder shall constitute a waiver of any other obligation or right, or of the same obligation or right on a future occasion, and the Lender's rights hereunder are cumulative and not alternative.

(e)    This Security Agreement and the security interest created hereby shall be governed by and construed in accordance with the laws of the State of New York (excluding conflicts of law provisions).

(g)    The Borrower hereby waives demand, presentment and notice of nonpayment with respect to any note or contract representing all or any part of the Obligations. The Borrower also waives its rights, if any, under Section 9-210 of the UCC.

(h)    The articles and section captions are inserted herein only as a matter of convenience and for reference, and in no way define, limit or describe the scope or intent of any such article or section, nor in any way affect this Agreement.

(i)    In case any one or more of the provisions contained in this Agreement, or any of the documents or agreements contemplated hereby, should be determined to be invalid, illegal or unenforceable in any respect, the validity, legality, and enforceability of the remaining provisions contained herein, or therein, shall not be in any way affected or impaired thereby.

(j)    This Agreement, together with all agreements and documents concurrently executed, constitutes the entire understanding and agreement between the Borrower and the Lender pertaining to the subject matter hereof and thereof and completely and fully supersedes all prior and contemporaneous understandings or agreements, both written and oral, between the Lender and the Borrower relating to the subject matter hereof.

(k)      From time to time, Borrower will execute and deliver, or will cause to be executed and delivered, to the Lender such additional documents and will provide such additional information as the Lender may reasonably require to carry out the terms of this Agreement and to be informed of the Borrower's status and affairs.

**IN WITNESS WHEREOF**, the undersigned has executed this Security Agreement on the date first above written.

**BORROWER:**
**Lighthouse Immersive USA, Inc.**

By:_____

Name: _____
      Corey Ross

Title: _____
      President

**This is Exhibit "M" referred to in the affidavit**

**of** COREY ROSS, SWORN BEFORE ME
**this 27th day of July 2023**

_____

**A COMMISSIONER FOR TAKING AFFIDAVIT**

**ALINA STOICA**

```
                                    PROVINCE OF ONTARIO
RUN NUMBER : 198                 MINISTRY OF GOVERNMENT SERVICES              REPORT : PSSR060
RUN DATE : 2023/07/17     PERSONAL PROPERTY SECURITY REGISTRATION SYSTEM      ᵇᴀɢᴇ   :      1
ID : 20230717093743.23                ENQUIRY RESPONSE                        (   3803)
                                       CERTIFICATE
```

THIS IS TO CERTIFY THAT A SEARCH HAS BEEN MADE IN THE RECORDS OF THE CENTRAL OFFICE
OF THE PERSONAL PROPERTY SECURITY REGISTRATION SYSTEM IN RESPECT OF THE FOLLOWING:

TYPE OF SEARCH       : BUSINESS DEBTOR

SEARCH CONDUCTED ON  : LIGHTHOUSE IMMERSIVE INC.

FILE CURRENCY        : 16JUL 2023

ENQUIRY NUMBER  20230717093743.23 CONTAINS     7   PAGE(S),    5   FAMILY(IES).

THE SEARCH RESULTS MAY INDICATE THAT THERE ARE SOME REGISTRATIONS WHICH SET OUT A BUSINESS DEBTOR NAME
WHICH IS SIMILAR TO THE NAME IN WHICH YOUR ENQUIRY WAS MADE.  IF YOU DETERMINE THAT THERE ARE OTHER
SIMILAR BUSINESS DEBTOR NAMES, YOU MAY REQUEST THAT ADDITIONAL ENQUIRIES BE MADE AGAINST THOSE NAMES.

MILLER THOMSON LLP (TORONTO) - TORONTOSEARCH TEAM

40 KING ST W
TORONTO ON  M5H 4A9

                                                    CONTINUED...     2



CERTIFIED BY/CERTIFIÉES PAR

V. Quintanilla W.

REGISTRAR OF
PERSONAL PROPERTY SECURITY//
LE REGISTRATEUR
DES SÛRETÉS MOBILIÈRES

(crfj6  05/2022)

Ontario

```
RUN NUMBER : 198                          PROVINCE OF ONTARIO                        REPORT : PSSR060
RUN DATE : 2023/07/17                 MINISTRY OF GOVERNMENT SERVICES                PAGE   :      2
ID : 20230717093743.23        PERSONAL PROPERTY SECURITY REGISTRATION SYSTEM               (   3804)
                                        ENQUIRY RESPONSE
                                          CERTIFICATE
```

TYPE OF SEARCH      : BUSINESS DEBTOR
SEARCH CONDUCTED ON : LIGHTHOUSE IMMERSIVE INC.
FILE CURRENCY       : 16JUL 2023

FORM 1C   FINANCING STATEMENT / CLAIM FOR LIEN

| | FILE NUMBER | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 00 | 794953962 | | | | | | | |

| | CAUTION FILING | PAGE NO. OF | TOTAL PAGES | MOTOR VEHICLE SCHEDULE | REGISTRATION NUMBER | REGISTERED UNDER | REGISTRATION PERIOD | |
|---|---|---|---|---|---|---|---|---|
| 01 | | 001 | 1 | | 20230705 0915 1532 5816 | P  PPSA | 5 | |

|  | | DATE OF BIRTH | FIRST GIVEN NAME | INITIAL | SURNAME | | | |
|---|---|---|---|---|---|---|---|---|
| 02 | DEBTOR | | | | | | | |
| 03 | NAME | BUSINESS NAME | LIGHTHOUSE IMMERSIVE INC. | | | | | |
| 04 | | ADDRESS | 640 BRIAR HILL AVENUE | | TORONTO | ONTARIO CORPORATION NO. ON   M5N 1N2 | | |

|  | | DATE OF BIRTH | FIRST GIVEN NAME | INITIAL | SURNAME | | | |
|---|---|---|---|---|---|---|---|---|
| 05 | DEBTOR | | | | | | | |
| 06 | NAME | BUSINESS NAME | | | | ONTARIO CORPORATION NO. | | |
| 07 | | ADDRESS | | | | | | |

| | SECURED PARTY / LIEN CLAIMANT | | ROYAL BANK OF CANADA | | | | | |
|---|---|---|---|---|---|---|---|---|
| 08 | | | ROYAL BANK OF CANADA | | | | | |
| 09 | | ADDRESS | 36 YORK MILLS ROAD, 4TH FLOOR | | TORONTO | ON   M2P 0A4 | | |

| | COLLATERAL CLASSIFICATION | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | CONSUMER GOODS | INVENTORY | EQUIPMENT | ACCOUNTS | OTHER | MOTOR VEHICLE INCLUDED | AMOUNT | DATE OF MATURITY OR | NO FIXED MATURITY DATE |
| 10 | | X | X | X | X | X | | | |

| | | YEAR MAKE | | MODEL | | V.I.N. | | |
|---|---|---|---|---|---|---|---|---|
| 11 | MOTOR | | | | | | | |
| 12 | VEHICLE | | | | | | | |

| 13 | GENERAL | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 14 | COLLATERAL | | | | | | | |
| 15 | DESCRIPTION | | | | | | | |

| 16 | REGISTERING AGENT | | D + H LIMITED PARTNERSHIP | | | | | |
|---|---|---|---|---|---|---|---|---|
| 17 | | ADDRESS | 2 ROBERT SPECK PARKWAY, 15TH FLOOR | | MISSISSAUGA | ON   L4Z 1H8 | | |

*** FOR FURTHER INFORMATION, CONTACT THE SECURED PARTY. ***

CONTINUED...    3



CERTIFIED BY/CERTIFIÉES PAR

V. Quintanilla JV.

REGISTRAR OF
PERSONAL PROPERTY SECURITY/
LE REGISTRATEUR
DES SÛRETÉS MOBILIÈRES

(crj1fv 05/2022)



Ontario

```
RUN NUMBER : 198                          PROVINCE OF ONTARIO                      REPORT : PSSR060
RUN DATE : 2023/07/17               MINISTRY OF GOVERNMENT SERVICES                PAGE   :     3
ID : 20230717093743.23       PERSONAL PROPERTY SECURITY REGISTRATION SYSTEM               (  3805)
                                        ENQUIRY RESPONSE
                                          CERTIFICATE
```

TYPE OF SEARCH      : BUSINESS DEBTOR
SEARCH CONDUCTED ON : LIGHTHOUSE IMMERSIVE INC.
FILE CURRENCY       : 16JUL 2023

|    | FORM 1C   FINANCING STATEMENT / CLAIM FOR LIEN | | | | | | |
|----|---|---|---|---|---|---|---|
| 00 | FILE NUMBER 789623811 | | | | | | |

| | CAUTION FILING | PAGE NO. OF | TOTAL PAGES | MOTOR VEHICLE SCHEDULE | REGISTRATION NUMBER | REGISTERED UNDER | REGISTRATION PERIOD |
|----|---|---|---|---|---|---|---|
| 01 | | 001 | 1 | | 20221229 1148 1590 4978 | P  PPSA | 5 |

| | | DATE OF BIRTH | FIRST GIVEN NAME | INITIAL | SURNAME | | |
|----|----|---|---|---|---|---|---|
| 02 | DEBTOR | | | | | | |
| 03 | NAME | BUSINESS NAME | LIGHTHOUSE IMMERSIVE INC. | | | | |
| 04 | | ADDRESS | 640 BRIAR HILL AVE | | TORONTO | ONTARIO CORPORATION NO. 002719411  ON   M5N 1N2 | |

| | | DATE OF BIRTH | FIRST GIVEN NAME | INITIAL | SURNAME | |
|----|----|---|---|---|---|---|
| 05 | DEBTOR | | | | | |
| 06 | NAME | BUSINESS NAME | | | | |
| 07 | | ADDRESS | | | ONTARIO CORPORATION NO. | |

| | | | | | |
|----|----|---|---|---|---|
| 08 | SECURED PARTY / LIEN CLAIMANT | | SHOW ONE PRODUCTIONS INC. | | |
| 09 | | ADDRESS | 10 TORRESDALE AVE, SUITE 1606 | TORONTO | ON   M2R 3V8 |

| | COLLATERAL CLASSIFICATION | | | | | | | | | |
|----|---|---|---|---|---|---|---|---|---|---|
| | | CONSUMER GOODS | INVENTORY | EQUIPMENT | ACCOUNTS | OTHER | MOTOR VEHICLE INCLUDED | AMOUNT | DATE OF MATURITY OR | NO FIXED MATURITY DATE |
| 10 | | X | X | X | X | X | | | | X |

| | | YEAR | MAKE | MODEL | V.I.N. |
|----|---|---|---|---|---|
| 11 | MOTOR | | | | |
| 12 | VEHICLE | | | | |

| | | |
|----|---|---|
| 13 | GENERAL | ALL OF THE DEBTOR'S PRESENT AND AFTER-ACQUIRED PERSONAL PROPERTY |
| 14 | COLLATERAL | PURSUANT TO A GENERAL SECURITY AGREEMENT. |
| 15 | DESCRIPTION | |

| | | | | | | |
|----|---|---|---|---|---|---|
| 16 | REGISTERING AGENT | | C. DERRICK CHUA, BARRISTER & SOLICITOR | | | |
| 17 | | ADDRESS | 208-9100 JANE STREET BUILDING A | VAUGHAN | ON   L4K 0A4 | |

*** FOR FURTHER INFORMATION, CONTACT THE SECURED PARTY. ***

CONTINUED...   4



CERTIFIED BY/CERTIFIÉES PAR

V. Quintanilla W.

REGISTRAR OF
PERSONAL PROPERTY SECURITY /
LE REGISTRATEUR
DES SÛRETÉS MOBILIÈRES

(crj1fv 05/2022)



Ontario

```
RUN NUMBER : 198                         PROVINCE OF ONTARIO                         REPORT : PSSR060
RUN DATE : 2023/07/17              MINISTRY OF GOVERNMENT SERVICES                    PAGE   :      4
ID : 20230717093743.23      PERSONAL PROPERTY SECURITY REGISTRATION SYSTEM                  (   3806)
                                       ENQUIRY RESPONSE
                                        CERTIFICATE
```

TYPE OF SEARCH    : BUSINESS DEBTOR
SEARCH CONDUCTED ON : LIGHTHOUSE IMMERSIVE INC.
FILE CURRENCY     : 16JUL 2023

FORM 1C   FINANCING STATEMENT / CLAIM FOR LIEN

00    FILE NUMBER
      789623955

| | CAUTION FILING | PAGE NO. OF | TOTAL PAGES | MOTOR VEHICLE SCHEDULE | REGISTRATION NUMBER | REGISTERED UNDER | REGISTRATION PERIOD |
|---|---|---|---|---|---|---|---|
| 01 | | 001 | 1 | | 20221229 1150 1590 4982 | P  PPSA | 5 |

| | | DATE OF BIRTH | FIRST GIVEN NAME | INITIAL | SURNAME |
|---|---|---|---|---|---|
| 02 | DEBTOR | | | | |
| 03 | NAME | BUSINESS NAME | LIGHTHOUSE IMMERSIVE INC. | | |

04          ADDRESS    640 BRIAR HILL AVE          TORONTO    ONTARIO CORPORATION NO. 002719411
                                                              ON    M5N 1N2

| | | DATE OF BIRTH | FIRST GIVEN NAME | INITIAL | SURNAME |
|---|---|---|---|---|---|
| 05 | DEBTOR | | | | |
| 06 | NAME | BUSINESS NAME | | | |

07          ADDRESS                                            ONTARIO CORPORATION NO.

08    SECURED PARTY /          DVORETSKY HOLDING INC.
      LIEN CLAIMANT
09             ADDRESS    10 TORRESDALE AVE, SUITE 1606    TORONTO    ON    M2R 3V8

| | COLLATERAL CLASSIFICATION | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | CONSUMER GOODS | INVENTORY | EQUIPMENT | ACCOUNTS | OTHER | MOTOR VEHICLE INCLUDED | AMOUNT | DATE OF MATURITY | OR | NO FIXED MATURITY DATE |
| 10 | X | X | X | X | X | | | | | X |

| | | YEAR | MAKE | MODEL | V.I.N. |
|---|---|---|---|---|---|
| 11 | MOTOR | | | | |
| 12 | VEHICLE | | | | |

13    GENERAL        ALL OF THE DEBTOR'S PRESENT AND AFTER-ACQUIRED PERSONAL PROPERTY
14    COLLATERAL     PURSUANT TO A GENERAL SECURITY AGREEMENT.
15    DESCRIPTION

16    REGISTERING        C. DERRICK CHUA, BARRISTER & SOLICITOR
17    AGENT
               ADDRESS   9100 JANE STREET, SUITE 208, BUILDING A    VAUGHAN    ON    L4K 0A4

          *** FOR FURTHER INFORMATION, CONTACT THE SECURED PARTY. ***

                                                              CONTINUED...    5

CERTIFIED BY/CERTIFIÉES PAR

V. Quintanilla W.

REGISTRAR OF
PERSONAL PROPERTY SECURITY/
LE REGISTRATEUR
DES SÛRETÉS MOBILIÈRES

(crj11v  06on22v)


Ontario

```
RUN NUMBER : 198                        PROVINCE OF ONTARIO                      REPORT : PSSR060
RUN DATE : 2023/07/17               MINISTRY OF GOVERNMENT SERVICES              PAGE   :      5
ID : 20230717093743.23      PERSONAL PROPERTY SECURITY REGISTRATION SYSTEM       (   3807)
                                      ENQUIRY RESPONSE
                                        CERTIFICATE
```

TYPE OF SEARCH       : BUSINESS DEBTOR
SEARCH CONDUCTED ON  : LIGHTHOUSE IMMERSIVE INC.
FILE CURRENCY        : 16JUL 2023

    FORM 1C   FINANCING STATEMENT / CLAIM FOR LIEN

00      FILE NUMBER
        789624009

```
        CAUTION    PAGE   TOTAL      MOTOR VEHICLE   REGISTRATION    REGISTERED  REGISTRATION
        FILING     NO. OF PAGES        SCHEDULE        NUMBER          UNDER       PERIOD
01                 001    1                        20221229 1152 1590 4983  P  PPSA    5
```

02  DEBTOR     DATE OF BIRTH    FIRST GIVEN NAME   INITIAL  SURNAME
03  NAME         BUSINESS NAME   LIGHTHOUSE IMMERSIVE INC.
04               ADDRESS   640 BRIAR HILL AVE          TORONTO    ONTARIO CORPORATION NO. 002719411
                                                                  ON    M5N 1N2

05  DEBTOR     DATE OF BIRTH    FIRST GIVEN NAME   INITIAL  SURNAME
06  NAME         BUSINESS NAME
07               ADDRESS                                      ONTARIO CORPORATION NO.

08  SECURED PARTY /      SLAVA Z HOLDCO INC.
    LIEN CLAIMANT
09           ADDRESS   16 MCCOMBE LANE          MAPLE       ON    L6A 4G2

```
    COLLATERAL CLASSIFICATION
    CONSUMER                          MOTOR VEHICLE  AMOUNT   DATE OF      NO FIXED
    GOODS  INVENTORY EQUIPMENT ACCOUNTS OTHER INCLUDED      MATURITY OR  MATURITY DATE
10    X       X        X        X       X                                     X
```

11  MOTOR      YEAR MAKE            MODEL           V.I.N.
12  VEHICLE

13  GENERAL       ALL OF THE DEBTOR'S PRESENT AND AFTER-ACQUIRED PERSONAL PROPERTY
14  COLLATERAL    PURSUANT TO A GENERAL SECURITY AGREEMENT.
15  DESCRIPTION

16  REGISTERING        C. DERRICK CHUA, BARRISTER & SOLICITOR
17  AGENT     ADDRESS   9100 JANE STREET, SUITE 208, BUILDING A   VAUGHAN     ON   L4K 0A4

            *** FOR FURTHER INFORMATION, CONTACT THE SECURED PARTY. ***

                                                     CONTINUED...   6



CERTIFIED BY/CERTIFIÉES PAR

V. Quintanilla W.

REGISTRAR OF
PERSONAL PROPERTY SECURITY/
LE REGISTRATEUR
DES SÛRETÉS MOBILIÈRES

(crj1fv 05/2022)



Ontario

```
RUN NUMBER : 198                        PROVINCE OF ONTARIO                          REPORT : PSSR060
RUN DATE : 2023/07/17               MINISTRY OF GOVERNMENT SERVICES                  PAGE   :      6
ID : 20230717093743.23      PERSONAL PROPERTY SECURITY REGISTRATION SYSTEM                  (   3808)
                                       ENQUIRY RESPONSE
                                         CERTIFICATE
```

TYPE OF SEARCH      : BUSINESS DEBTOR
SEARCH CONDUCTED ON : LIGHTHOUSE IMMERSIVE INC.
FILE CURRENCY       : 16JUL 2023

FORM 1C   FINANCING STATEMENT / CLAIM FOR LIEN

|  | FILE NUMBER | | | | | | |
|---|---|---|---|---|---|---|---|
| 00 | 789414921 | | | | | | |

|  | CAUTION FILING | PAGE NO. OF | TOTAL PAGES | MOTOR VEHICLE SCHEDULE | REGISTRATION NUMBER | REGISTERED UNDER | REGISTRATION PERIOD |
|---|---|---|---|---|---|---|---|
| 01 |  | 001 OF | 1 | | 20221219 1602 1590 3894 | P  PPSA | 5 |

|  |  | DATE OF BIRTH | FIRST GIVEN NAME | INITIAL | SURNAME | | |
|---|---|---|---|---|---|---|---|
| 02 | DEBTOR | | | | | | |
| 03 | NAME | BUSINESS NAME | LIGHTHOUSE IMMERSIVE INC. | | | | |
| 04 | | ADDRESS | 640 BRIAR HILL AVE | | TORONTO | ONTARIO CORPORATION NO. 002719411 ON   M5N 1N2 |  |

|  |  | DATE OF BIRTH | FIRST GIVEN NAME | INITIAL | SURNAME | |
|---|---|---|---|---|---|---|
| 05 | DEBTOR | | | | | |
| 06 | NAME | BUSINESS NAME | | | | |
| 07 | | ADDRESS | | | | ONTARIO CORPORATION NO. |

| 08 | SECURED PARTY / | | COREY ROSS PRODUCTIONS INC. | | | |
|---|---|---|---|---|---|---|
|  | LIEN CLAIMANT | | | | | |
| 09 | | ADDRESS | 640 BRIAR HILL AVE | TORONTO | ON   M5N 1N2 | |

| COLLATERAL CLASSIFICATION | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
|  | CONSUMER GOODS | INVENTORY | EQUIPMENT | ACCOUNTS | OTHER | MOTOR VEHICLE INCLUDED | AMOUNT | DATE OF MATURITY OR | NO FIXED MATURITY DATE |
| 10 | X | X | X | X | X | | | | X |

|  | | YEAR | MAKE | MODEL | V.I.N. |
|---|---|---|---|---|---|
| 11 | MOTOR | | | | |
| 12 | VEHICLE | | | | |

| 13 | GENERAL | ALL OF THE DEBTOR'S PRESENT AND AFTER-ACQUIRED PERSONAL PROPERTY |
|---|---|---|
| 14 | COLLATERAL | PURSUANT TO A GENERAL SECURITY AGREEMENT. |
| 15 | DESCRIPTION | |

| 16 | REGISTERING | | C. DERRICK CHUA, BARRISTER & SOLICITOR |
|---|---|---|---|
| 17 | AGENT | ADDRESS | 9100 JANE STREET, SUITE 208, BUILDING A   VAUGHAN       ON       L4K 0A4 |

*** FOR FURTHER INFORMATION, CONTACT THE SECURED PARTY. ***

CONTINUED...      7



CERTIFIED BY/CERTIFIÉES PAR

V. Quintanilla W.

REGISTRAR OF
PERSONAL PROPERTY SECURITY/
LE REGISTRATEUR
DES SÛRETÉS MOBILIÈRES

(crj1fv 05/2022)

**Ontario**

```
RUN NUMBER : 198                        PROVINCE OF ONTARIO                      REPORT : PSSR060
RUN DATE : 2023/07/17              MINISTRY OF GOVERNMENT SERVICES               PAGE   :       7
ID : 20230717093743.23     PERSONAL PROPERTY SECURITY REGISTRATION SYSTEM        (    3809)
                                       ENQUIRY RESPONSE
                                         CERTIFICATE
```

```
TYPE OF SEARCH      : BUSINESS DEBTOR
SEARCH CONDUCTED ON : LIGHTHOUSE IMMERSIVE INC.
FILE CURRENCY       : 16JUL 2023
```

                    INFORMATION RELATING TO THE REGISTRATIONS LISTED BELOW IS ATTACHED HERETO.


| FILE NUMBER | REGISTRATION NUMBER | REGISTRATION NUMBER | REGISTRATION NUMBER | REGISTRATION NUMBER |
|-------------|---------------------|---------------------|---------------------|---------------------|
| 794953962   | 20230705 0915 1532 5816 | | | |
| 789623811   | 20221229 1148 1590 4978 | | | |
| 789623955   | 20221229 1150 1590 4982 | | | |
| 789624009   | 20221229 1152 1590 4983 | | | |
| 789414921   | 20221219 1602 1590 3894 | | | |

     5  REGISTRATION(S) ARE REPORTED IN THIS ENQUIRY RESPONSE.



CERTIFIED BY/CERTIFIÉES PAR

V. Quintanilla W.

REGISTRAR OF
PERSONAL PROPERTY SECURITY/
LE REGISTRATEUR
DES SÛRETÉS MOBILIÈRES

(crfj6  05/2022)



Ontario

**This is Exhibit "N" referred to in the affidavit**

**of** COREY ROSS, SWORN BEFORE ME
**this 27th day of July 2023**

_____
**A COMMISSIONER FOR TAKING AFFIDAVIT**

**ALINA STOICA**

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

| | |
|---|---|
| **A. NAME & PHONE OF CONTACT AT FILER (optional)**<br>ROBERT WONNEBERGER (315) 413-7128 | |
| **B. E-MAIL CONTACT AT FILER (optional)**<br>RWONNEBERGER@BARCLAYDAMON.COM | |
| **C. SEND ACKNOWLEDGMENT TO:** (Name and Address)<br><br>BARCLAY DAMON LLP<br>BARCLAY DAMON TOWER<br>125 EAST JEFFERSON STREET<br>SYRACUSE, NY 13202 | |

**Delaware Department of State**
**U.C.C. Filing Section**
**Filed: 04:29 PM 01/13/2023**
**U.C.C. Initial Filing No: 2023 0362532**

**Service Request No:  20230137121**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| LIGHTHOUSE IMMERSIVE USA, INC. | | | | | |
| **OR** 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS<br>640 BRIAR HILL AVENUE | CITY<br>TORONTO | STATE<br>ON | POSTAL CODE<br>M5N 1N2 | | COUNTRY<br>CA |

**2. DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| | | | | | |
| **OR** 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | | COUNTRY |

**3. SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| SCS FINANCE, INC. | | | | | |
| **OR** 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS<br>10 TORRESDALE AVENUE, SUITE 1606 | CITY<br>TORONTO | STATE<br>ON | POSTAL CODE<br>M2R 3V8 | | COUNTRY<br>CA |

**4. COLLATERAL:** This financing statement covers the following collateral:
**All assets now existing and hereafter arising.**
**Collateral Description - please see attached**

**5.** Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

**6a.** Check only if applicable and check only one box: ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility  **6b.** Check only if applicable and check only one box: ☐ Agricultural Lien ☐ Non-UCC Filing

**7.** ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

**8.** OPTIONAL FILER REFERENCE DATA:
3202276

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)    International Association of Commercial Administrators

## UCC FINANCING STATEMENT
**FOLLOW INSTRUCTIONS (front and back) CAREFULLY**

**A. NAME & PHONE OF CONTACT AT FILER [optional]**
Robert Wonneberger    (203) 672-2669

**B. SEND ACKNOWLEDGMENT TO: (Name and Address)**

Robert Wonneberger

Barclay Damon LLP

545 Long Wharf Drive, Ninth Floor

New Haven, CT 06511

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

**1. DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Lighthouse Immersive USA, Inc. | | | |

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 640 Briar Hill Avenue | Toronto | ON | M5N 1N2 | Canada |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| Not Applicable | | | | ☐ NONE |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| Not Applicable | | | | ☐ NONE |

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| SCS Finance, Inc. | | | |

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 10 Torresdale Avenue, Suite 1606 | Toronto | ON | M2R 3V8 | Canada |

**4. This FINANCING STATEMENT covers the following collateral:**

All assets now existing and hereafter arising.

**5.** ALTERNATIVE DESIGNATION [if applicable]: ☐ LESSEE/LESSOR  ☐ CONSIGNEE/CONSIGNOR  ☐ BAILEE/BAILOR  ☐ SELLER/BUYER  ☐ AG. LIEN  ☐ NON-UCC FILING
**6.** ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.    **7.** Check to REQUEST SEARCH REPORT(S) on Debtor(s)    ☐ All Debtors  ☐ Debtor 1  ☐ Debtor 2
**8.** OPTIONAL FILER REFERENCE DATA

**FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)**

**This is Exhibit "O" referred to in the affidavit**

**of** COREY ROSS, SWORN BEFORE ME
**this 27th day of July 2023**

_____

**A COMMISSIONER FOR TAKING AFFIDAVIT**

**ALINA STOICA**

**LIGHTHOUSE IMMERSIVE INC. ("LHI") & LIGHTHOUSE IMMERSIVE USA, INC. ("LHI USA")**
**Projected Cash Flow**
**July 24, 2023 to October 22, 2023**
*In USD*

| | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 | Week 9 | Week 10 | Week 11 | Week 12 | Week 13 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Week Ending** | 2023-07-30 | 2023-08-06 | 2023-08-13 | 2023-08-20 | 2023-08-27 | 2023-09-03 | 2023-09-10 | 2023-09-17 | 2023-09-24 | 2023-10-01 | 2023-10-08 | 2023-10-15 | 2023-10-22 | |
| **Cash Receipts** | | | | | | | | | | | | | | |
| Other Income (Note 1) | - | - | - | - | - | - | - | - | - | - | - | 150,000 | - | 150,000 |
| Divestiture of Surplus Inventory and Capital Assets | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Transfer from Operating Companies (Note 2) | 457,165 | 457,165 | 457,165 | 457,165 | 267,605 | 267,605 | 267,605 | 219,890 | 219,890 | 219,890 | 219,890 | 157,940 | 157,940 | 3,826,915 |
| **Total Receipts** | **457,165** | **457,165** | **457,165** | **457,165** | **267,605** | **267,605** | **267,605** | **219,890** | **219,890** | **219,890** | **219,890** | **307,940** | **157,940** | **3,976,915** |
| **Cash Disbursements** | | | | | | | | | | | | | | |
| LHI Payroll & Payroll Remittances (Note 3) | - | 168,675 | - | 134,940 | - | 134,940 | - | 101,205 | - | 101,205 | - | 101,205 | - | 742,170 |
| LHI USA Payroll & Payroll Remittances (Note 3) | - | 58,500 | - | 46,800 | - | 46,800 | - | 35,100 | - | 35,100 | - | 35,100 | - | 257,400 |
| Contract Payroll From Related Party (Note 4) | - | 32,000 | - | 32,000 | - | 32,000 | - | 32,000 | - | 32,000 | - | 32,000 | - | 192,000 |
| LHI Rent (Note 5) | 81,395 | - | - | - | - | 81,395 | - | - | - | 81,395 | - | - | - | 244,184 |
| LHI Utilities and Other Occupancy Costs (Note 5) | 5,340 | 5,340 | 5,340 | 5,340 | 5,340 | 5,340 | 5,340 | 5,340 | 5,340 | 5,340 | 5,340 | 5,340 | 5,340 | 69,420 |
| LHI Corporate Overhead (Note 6) | 30,000 | 30,000 | 30,000 | 25,000 | 25,000 | 25,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 305,000 |
| LHI USA Corporate Overhead (Note 6) | 30,000 | 30,000 | 30,000 | 25,000 | 25,000 | 25,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 305,000 |
| Transfer to LHI USA Wholly Owned Subsidiaries (Note 7) | 700,000 | 200,000 | 300,000 | - | 1,500,000 | - | 300,000 | - | 1,000,000 | - | - | - | - | 4,000,000 |
| **Total Operating Disbursements** | **846,735** | **524,515** | **365,340** | **269,080** | **1,555,340** | **350,475** | **345,340** | **213,645** | **1,045,340** | **295,040** | **45,340** | **213,645** | **45,340** | **6,115,174** |
| LHI & LHI USA Legal Counsel Fees | 150,000 | - | 50,000 | - | 50,000 | - | 125,000 | - | 50,000 | - | 50,000 | - | 50,000 | 525,000 |
| Proposed Monitor Fees | 75,000 | - | 50,000 | - | 50,000 | - | 75,000 | - | 50,000 | - | 50,000 | - | 50,000 | 400,000 |
| Proposed Monitor's Legal Counsel Fees | 50,000 | - | 25,000 | - | 25,000 | - | 25,000 | - | 25,000 | - | 25,000 | - | 25,000 | 200,000 |
| DIP Fees | 25,000 | - | - | - | - | - | - | - | - | - | - | - | - | 25,000 |
| **CCAA Professional Fees** | **300,000** | **-** | **125,000** | **-** | **125,000** | **-** | **225,000** | **-** | **125,000** | **-** | **125,000** | **-** | **125,000** | **1,150,000** |
| **Total Disbursements** | **1,146,735** | **524,515** | **490,340** | **269,080** | **1,680,340** | **350,475** | **570,340** | **213,645** | **1,170,340** | **295,040** | **170,340** | **213,645** | **170,340** | **7,265,174** |
| **Net Receipts** | **(689,570)** | **(67,350)** | **(33,175)** | **188,085** | **(1,412,735)** | **(82,870)** | **(302,735)** | **6,245** | **(950,450)** | **(75,150)** | **49,550** | **94,295** | **(12,400)** | **(3,288,259)** |
| **Opening Cash Position** | 84,650 | 495,081 | 427,731 | 394,556 | 1,732,641 | 319,906 | 237,036 | 684,301 | 690,546 | 240,096 | 164,946 | 214,496 | 308,791 | 84,650 |
| DIP Financing Advances | 1,100,000 | - | - | 1,150,000 | - | - | 750,000 | - | 500,000 | - | - | - | - | 3,500,000 |
| **Cash Ending Balance** | **495,081** | **427,731** | **394,556** | **1,732,641** | **319,906** | **237,036** | **684,301** | **690,546** | **240,096** | **164,946** | **214,496** | **308,791** | **296,391** | **296,391** |
| *Cumulative DIP Financing* | *1,100,000* | *1,100,000* | *1,100,000* | *2,250,000* | *2,250,000* | *2,250,000* | *3,000,000* | *3,000,000* | *3,500,000* | *3,500,000* | *3,500,000* | *3,500,000* | *3,500,000* | *3,500,000* |

**Disclaimer**

- This Projected Cash Flow is prepared by Lighthouse Immersive Inc. and Lighthouse Immersive USA, Inc. (collectively "Lighthouse") in accordance with s.s. 23(1)(b) of the Companies Creditors' Arrangement Act ("CCAA").

- Lighthouse has prepared this Projected Cash Flow on probable and hypothetical assumptions that reflect Lighthouse's planned course of action for the period of 13 weeks. Management is of the opinion that, as at the date of filing the Projected Cash Flow, the assumptions used to develop the projection represent the most probable set of economic conditions facing Lighthouse and that the assumptions used provide a reasonable basis for and are consistent with the purpose of this Projected Cash Flow.

- The Projected Cash Flow has been prepared by Lighthouse and has been reviewed by the Proposed Monitor. The Proposed Monitor has not verified or confirmed certain expenses incurred by Lighthouse which are reflected in this Projected Cash Flow.

- The information contained in this Projected Cash Flow is subject to changing assumptions and/or with the receipt of new or additional information the actual results may vary. This Projected Cash Flow should not be used for any other purpose than its stated purpose, and creditors are cautioned that the information provided in this Projected Cash Flow could vary based on changing future circumstances.

**LIGHTHOUSE IMMERSIVE INC. ("LHI") & LIGHTHOUSE IMMERSIVE USA, INC. ("LHI USA")**
**Notes to the Projected Cash Flow**
**July 24, 2023 to October 22, 2023**

**Note 1**
Other income represents licensing receipts that management anticipates being received in the middle of October. These receipts relate to a licensing agreement for a new show.

**Note 2**
The Projected Cash Flow assumes collection of reimbursed venue and payroll costs on a weekly basis from affiliates for shows that occurred in the prior week. The amount of this reimbursement reduces over the 13-week period as some shows come to an end.

**Note 3**
The Projected Cash Flow assumes that the payroll in LHI & LHI USA will be reduced over the 13-week period due to layoffs of some headquarter staff.

**Note 4**
These amounts represent reimbursements to a related party for biweekly payroll payments made for additional LHI employees.

**Note 5**
Rent, utilities and other occupancy costs are related to the premises located in Toronto.

**Note 6**
The Projected Cash Flow assumes reductions in corporate overhead for both LHI & LHI USA to what would only be essential for operations in a restructuring.

**Note 7**
Transfers to LHI USA wholly owned subsidiaries are made on an as needed basis when the subsidiaries require funding to cover their current operating expenses.

This Statement of Projected Cash Flow is prepared in accordance with s.s. 23(1)(b) of the Companies Creditors' Arrangement Act

B. Riley Farber Inc.
In its capacity as Proposed Monitor

Lighthouse Immersive Inc.
Lighthouse Immersive USA, Inc.

Per: Allan Nackan, CPA, CA, CIRP, LIT
Senior Managing Director

Per: Corey Ross, President

**This is Exhibit "P" referred to in the affidavit**

**of** COREY ROSS, SWORN BEFORE ME
**this 27th day of July 2023**


_____
**A COMMISSIONER FOR TAKING AFFIDAVIT**

**ALINA STOICA**

DocuSign Envelope ID: AA5B3FD7-B599-4E70-B6A3-5DBEB33DBC30

**July 26, 2023**

**Lighthouse Immersive Inc. and Lighthouse Immersive USA, Inc.**
640 Briar Hill Avenue
Toronto, Ontario, Canada, M5N 1N2

**Attention:**     Corey Ross, President and Svetlana Dvoretsky, Vice President

**Re:**     **Debtor-in-Possession Financing of Lighthouse Immersive Inc. and Lighthouse Immersive USA, Inc.**

A.     Lighthouse Immersive Inc. and Lighthouse Immersive USA, Inc. (together, the "**Applicants**") intend to make an application to the Ontario Superior Court of Justice (Commercial List) (the "**Court**") for an initial order (the "**Initial Order**"), among other things, commencing proceedings under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "**CCAA Proceedings**"), imposing a stay of proceedings in favour of the Applicants (the "**Initial Stay**"), appointing B. Riley Farber Inc., as Monitor of the Applicants (in such capacity, the "**Monitor**"), approving this term sheet (the "**Term Sheet**") and granting the DIP Lender's Charge (as defined herein) to secure the initial authorized advance of US$1,100,000.

B.     In the event that the Initial Order is granted, and prior to the expiry of the Initial Stay, the Applicants will seek an Amended and Restated Initial Order within the CCAA Proceedings (the "**ARIO**") seeking, in addition to the relief set out in the Initial Order: (i) an extension of the Initial Stay and (ii) an increase in the DIP Lender's Charge secure the balance of the funds advanced under this Term Sheet.

C.     The Applicants require funding to satisfy the cashflow requirements of the CCAA Proceedings, and other short-term liquidity requirements.

D.     The wholly-owned subsidiaries of the Applicants set out in Schedule "A" hereto (the "**Subsidiarie**s" or the "**Guarantors**") have agreed, jointly and severally, to guarantee such funding in accordance with this Term Sheet.

E.     SCS Finance, Inc. (the "**Lender**") has agreed to establish a debtor-in-possession loan facility in the maximum aggregate principal amount of US$3,500,000, subject to and in accordance with the terms and conditions of this Term Sheet.

**NOW THEREFORE** in consideration of the foregoing and the mutual covenants and agreements set forth below, and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereby agree as follows:

### SUMMARY OF TERMS FOR DIP FACILITY

| | | |
|---|---|---|
| 1. | **Borrowers:** | Lighthouse Immersive Inc., Lighthouse Immersive USA, Inc., and the wholly-owned subsidiaries of the Applicants set out in Schedule "A" hereto (the "**Subsidiarie**s"), on a joint and several basis. |
| 2. | **Guarantors:** | The Subsidiaries, on a joint and several basis. |
| 3. | **Lender:** | SCS Finance, Inc. |
| 4. | **DIP Facility:** | Non-revolving facility in the maximum aggregate principal amount of US$3,500,000 (the "**DIP Facility**"). |

| 5. | **Purpose:** | The DIP Facility shall be available to fund: (i) working capital needs of the Borrowers; (ii) professional fees and expenses incurred by the Borrowers and the Monitor in respect of the CCAA Proceedings, in each case in accordance with the cash flow projections approved by the Monitor and the Lender (the "**Cash Flow Projections**"); (iii) the Recoverable Expenses (as defined below); and (iv) such other costs and expenses of the Borrowers as may be agreed to by the Lender and the Monitor, in writing. |

The amount and purpose of the DIP Facility may be amended by the Borrowers, the Lender, in writing, and with the consent of the Monitor. The Borrowers may not use the proceeds of the DIP Facility to pay any pre-filing obligations of the Borrowers, except in accordance with the Cash Flow Projections or with the prior written consent of the Lender and the Monitor.

| 6. | **Advances:** | Subject to the funding conditions set out in Sections 11 and 12 of this Term Sheet, the DIP Facility shall be available in two advances as follows: |

    (a)    upon the issuance of the Initial Order, **US$1,100,000**, or such lesser amount as may be approved by the Initial Order and secured by the DIP Lender's Charge (the "**First Advance**"), shall be advanced to the Borrowers to finance working capital requirements for the 10-day period immediately following the date of the Initial Order; and

    (b)    upon the issuance of the ARIO, the balance of the DIP Facility, being **US$2,400,000**, shall be advanced to the Borrowers (the "**Second Advance**", and together with the First Advance, collectively, the "**Advances**").

Nothing in this Term Sheet creates a legally binding obligation on the Lender to advance any amount under the DIP Facility at any time unless the Borrowers and the Guarantors are in compliance with the provisions of this Term Sheet.

| 7. | **Interest:** | Interest shall accrue on amounts advanced under the DIP Facility at a rate equal to 10% per annum (the "**Interest**"). Interest shall be calculated on the daily outstanding balance owing under the DIP Facility, not in advance, and shall accrue and be paid on the Maturity Date (as defined herein). |

| 8. | **Recoverable Expenses:** | The Borrowers shall pay all fees and expenses (collectively, the "**Recoverable Expenses**") incurred by the Lender in connection with the preparation, registration and ongoing administration of this Term Sheet, the DIP Facility, the Initial Order, the ARIO, the DIP Lender's Charge and with the enforcement of the Lender's rights and remedies hereunder and thereunder, at law or in equity, including, without limitation all reasonable legal fees and disbursements incurred by the Lender. For greater certainty, "Recoverable Expenses" shall include all reasonable fees and expenses incurred by the Lender in connection with the CCAA Proceedings and all Court attendances in respect thereof. If the Lender has paid any expenses for which the Lender is entitled to reimbursement from the Borrowers, such expenses shall be added to the DIP Facility and shall accrue Interest at the rate set out above. All such fees and expenses and Interest thereon shall be |

3

secured by the DIP Lender's Charge whether or not any funds under the DIP Facility are advanced.

9. **Guarantees and Security:** All debts, liabilities and obligations of the Borrowers to the Lender under or in connection with the DIP Facility (including, without limitation, Interest and Recoverable Expenses), this Term Sheet and any other documents executed in connection therewith shall be guaranteed by the Guarantors and secured by a Court-ordered priority charge (the "**DIP Lender's Charge**") granted to the Lender in and to all present and future properties, assets, and undertakings of the Borrowers and the Guarantors, real and personal, tangible and intangible, whether now owned or hereafter acquired, and the proceeds thereof (collectively, the "**Property**"), subject only to an administration charge in the maximum aggregate amount of US$275,000 under the Initial Order and as may be increased under the ARIO for the payment of the fees and expenses of the Monitor, counsel to the Borrowers and counsel to the Monitor (the "**Administration Charge**").

10. **Maturity Date:** Unless otherwise agreed to by the Lender and the Borrowers in writing, and consented to by the Monitor, the term of the DIP Facility shall expire, and the Borrowers shall repay all obligations owing to the Lender under this Term Sheet, on the earliest of the following (the "**Maturity Date**"):

   (a)  January 24, 2025, or such later date determined by the Lender in its sole discretion;

   (b)  the closing of a sale or investment transaction for substantially all of the Property, resulting from a sale process ("**SISP**"), which transaction has been approved by an order of the Court;

   (c)  the date on which the CCAA Proceedings are terminated for any reason, including if the CCAA Proceedings are converted into a proceeding under the *Bankruptcy and Insolvency Act*, R.S.C. 1985, C. B-3 (the "**BIA**"), or if a receiver or receiver and manager is appointed over any of the Borrowers, the Guarantors, or the Property; and

   (d)  the occurrence of an Event of Default (as defined herein), subject to a cure period of five (5) business days, beginning on the date of the occurrence of such Event of Default.

11. **Repayment:** The aggregate principal amount owing under the DIP Facility plus all accrued and unpaid Interest and Recoverable Expenses shall become immediately due and payable on the Maturity Date.

12. **Funding Conditions; First Advance:** The availability of the First Advance under the DIP Facility shall be subject to and conditional upon the following, which may be waived by the Lender in writing:

   (a)  the Court shall have issued the Initial Order, in a form satisfactory to the Lender, including:

      i.   approving this Term Sheet and the DIP Facility;

    ii.    granting the DIP Lender's Charge in favour of the Lender;

    iii.    authorizing the Lender to effect registrations, filings and recordings wherever in its discretion it deems appropriate regarding the DIP Lender's Charge;

    iv.    providing that the DIP Lender's Charge shall be valid and effective to secure all of the obligations of the Borrowers and the Guarantors to the Lender hereunder, without the necessity of the making of any registrations or filings and whether or not any other documents have been executed by the Borrowers or the Guarantors;

    v.    declaring that the granting of the DIP Lender's Charge and all other documents executed and delivered to the Lender as contemplated herein, including, without limitation, all actions taken to perfect, record and register the DIP Lender's Charge, do not constitute conduct meriting an oppression remedy, settlement, fraudulent preference, fraudulent conveyance or other challengeable or reviewable transaction under any applicable federal or provincial legislation; and

    vi.    provisions restricting the granting of any additional liens or encumbrances on the assets of the Borrowers, other than as permitted herein and the DIP Lender's Charge.

(b)    the Initial Order shall not have been vacated, stayed, appealed or amended in a manner not acceptable to the Lender, acting reasonably; and

(c)    no Event of Default shall have occurred.

**13. Funding Conditions; Second Advance:**    The availability of the Second Advance under the DIP Facility shall be subject to and conditional upon the following, which may be waived by the Lender in writing:

(a)    the Court shall have issued the ARIO, in a form satisfactory to the Lender, including:

    i.    approving this Term Sheet and the DIP Facility;

    ii.    granting the increased DIP Lender's Charge in favour of the Lender;

    iii.    authorizing the Lender to effect registrations, filings and recordings wherever in its discretion it deems appropriate regarding the DIP Lender's Charge;

    iv.    providing that the DIP Lender's Charge shall be valid and effective to secure all of the obligations of the Borrowers and the Guarantors to the Lender hereunder, without the necessity of the making of any registrations or filings and whether or not any

other documents have been executed by the Borrowers or the Guarantors;

    v.    declaring that the granting of the DIP Lender's Charge and all other documents executed and delivered to the Lender as contemplated herein, including, without limitation, all actions taken to perfect, record and register the DIP Lender's Charge, do not constitute conduct meriting an oppression remedy, settlement, fraudulent preference, fraudulent conveyance or other challengeable or reviewable transaction under any applicable federal or provincial legislation; and

    vi.    provisions restricting the granting of any additional liens or encumbrances on the assets of the Borrowers, other than as permitted herein and the DIP Lender's Charge.

(b)    the ARIO shall not have been vacated, stayed, appealed or amended in a manner not acceptable to the Lender, acting reasonably; and

(c)    no Event of Default shall have occurred.

**14. Covenants:**    The Borrowers and the Guarantors covenant and agree with the Lender, so long as any amounts are outstanding by the Borrowers to the Lender hereunder, to:

(a)    promptly on the receipt by the Borrowers and the Guarantors of the same, give the Lender a copy of any Notice of Motion or Application to vary, supplement, revoke, terminate or discharge the Initial Order, the ARIO, or any Court order approving the Transaction, including, without limitation, any application to the Court for the granting of new or additional security that will or may have priority over the DIP Lender's Charge, or otherwise for the variation of the priority of the DIP Lender's Charge;

(b)    provide the Lender with any additional financial information reasonably requested by the Lender, to the extent that it is readily available;

(c)    use the Advances under the DIP Facility for the purposes for which they are being provided, as set out in Section 4 of this Term Sheet, or such other purposes that may be agreed to by the Lender and the Monitor, in writing;

(d)    provide the Lender and the Monitor with prompt written notice of any event which constitutes, or which, with notice, lapse of time, or both, would constitute an Event of Default, a breach of any covenant, or other term or condition of this Term Sheet, or of any document executed in connection with this Term Sheet;

(e)    pay all claims which, under law, may rank prior to or *pari passu* with the DIP Lender's Charge due and payable from and after the

commencement of the CCAA Proceedings, as and when such amounts are due;

(f) not make any payment to any director, officer, investor or related party of the Borrowers or the Guarantors (except salary and wages in the normal course) without the prior written consent of the Lender and the Monitor;

(g) keep the Property fully insured against such perils in such manner, and only to the extent, as would be customarily insured by companies owning similar assets;

(h) not, without the prior written consent of the Lender, incur any borrowings or other secured indebtedness, obligations or liabilities, other than the DIP Facility, or create or grant any security (other than the Administration Charge and the DIP Lender's Charge) over any of the Borrowers' Property, whether ranking in priority to or subordinate to the DIP Lender's Charge; and

(i) conduct all activities in the ordinary course and in material compliance with the Cash Flow Projections.

**15. Events of Default:** The DIP Facility shall be subject to the following events of default (each, an "**Event of Default**"):

(a) the Borrowers' failure to pay any amount due hereunder when due and payable;

(b) the Borrowers' failure to comply with or fulfill, to the satisfaction of the Lender, any covenant, condition precedent, payment obligation, or other term or condition of this Term Sheet;

(c) the seeking or support by the Borrowers or the Guarantors (or any of them) of any Court order (in the CCAA Proceedings or otherwise) which is adverse or potentially adverse to the interests of the Lender;

(d) the issuance of any Court order (in the CCAA Proceedings or otherwise) which is adverse to the interests of the Lender;

(e) the issuance of any Court order lifting or terminating (in whole or in part) the stay of proceedings in the CCAA Proceedings, or discontinuing, dismissing or otherwise terminating the CCAA proceedings;

(f) the issuance of any Court order staying, reversing, vacating, or modifying the terms of the Initial Order, the ARIO, the DIP Facility or the DIP Lender's Charge, in each case without the Lender's consent;

(g) the occurrence of an event that will, in the opinion of the Lender, materially impair the Borrowers' financial condition, operations or ability to perform under this Term Sheet or any order of the Court;

(h)    the failure by the Borrowers to comply with the Initial Order, the ARIO, a SISP order, or any Court order approving a SISP transaction, or similar transaction;

(i)    the occurrence of any material adverse change in: (i) the business, operations, or financial condition of the Borrowers; (ii) the Property of the Borrowers; (iii) the DIP Lender's Charge, including its relative priority; (iv) the ability of the Borrowers to perform its obligations to the Lender or to any person under any material contract; (v) the Lender's ability to enforce any of its rights or remedies against the Borrowers' Property or for the obligations of the Borrowers to be satisfied from the realization thereof;

(j)    the Borrowers the Guarantors (or any of them) become bankrupt or subject to a proceeding under the BIA, or a receiver, interim receiver, receiver and manager or trustee in bankruptcy is appointed in respect of any of the Borrowers or the Guarantors, or any Property;

(k)    the sale, transfer, assignment, conveyance or lease of substantially all of the Property, except pursuant to a transaction resulting from a SISP or as may be otherwise approved by the Lender in writing;

(l)    the filing of any plan of reorganization, compromise, arrangement or liquidation to which the Lender does not consent;

(m)    the commencement of any claim, action, proceeding, application, motion, defense or other contested matter the purpose of which is to seek, or the result of which would be, to obtain any order, judgment, determination, declaration or similar relief: (i) invalidating, setting aside, avoiding, or subordinating the obligations of the Borrowers or the Guarantors (or any of them) under the DIP Facility, the DIP Lender's Charge or its priority; (ii) for monetary, injunctive or other relief against the Lender or the Borrowers' Property; or (iii) preventing, hindering or otherwise delaying the exercise by the Lender of any of its rights and remedies hereunder, pursuant to the Initial Order, the ARIO or under applicable law, or the enforcement or realization by the Lender against any of its collateral.

**16. Remedies and Enforcement:**    Following the occurrence of an Event of Default, and the expiration of the cure period prescribed in Section 9(d), upon written notice to the Borrowers and the Monitor, the Lender shall have the right, subject to the Lender obtaining an Order from the Court lifting the stay under the CCAA Proceedings, to:

(a)    terminate the DIP Facility;

(b)    enforce the DIP Lender's Charge and realize on the Property and any other collateral securing the DIP Facility;

(c)    exercise the rights and powers of a secured lender pursuant to the *Personal Property Security Act*, R.S.O. 1990, c. P.10, or any legislation of similar effect; and

    (d)    exercise all such other rights and remedies available to the Lender under this Term Sheet, the Initial Order, the ARIO, any other order of the Court or applicable law.

No failure or delay on the part of the Lender in exercising any of its rights and remedies shall be deemed to be a waiver of any kind.

**17. Further Assurances:**  The Borrowers and the Guarantors will, at their own expense and promptly on demand by the Lender at any time, do such acts and things and execute and deliver such documents as the Lender may reasonably request to give effect to any of the provisions set out hereunder.

**18. Assignment:**  The Borrowers and the Guarantors shall not assign this Term Sheet or any of the provisions set out herein without the prior written consent of the Lender. The Lender may assign or sell its rights or obligations with respect to this Term Sheet to any person without the prior written consent of the Borrowers or the Guarantors.

**19. Governing Law:**  The DIP Facility and the provisions set out herein shall be governed and construed in all respects in accordance with the laws of the Province of Ontario and the laws of Canada applicable therein.

**20. Currency:**  All dollar amounts herein are in United States Dollars.

**21. Acceptance:**  This Term Sheet is open for acceptance until 9:00 p.m. (Toronto time) on July 26, 2023. The Borrowers and Guarantors may accept this Term Sheet by returning a countersigned copy of this Term Sheet to the Lender (by electronic transmission or personal delivery).

**[*Signature Page Follows*]**

Dated this 26th day of July, 2023.

**SCS Finance, Inc.**

By: _Corey Ross_
_____

Name:     Corey Ross

Title:     President

I have authority to bind the Corporation.

# ACCEPTANCE

**TO THE DIP LENDER:**

For good and valuable consideration received, Lighthouse Immersive Inc. and Lighthouse Immersive USA, Inc. hereby accepts and agrees to comply with the provisions of the Term Sheet set out above.

Dated this 26th  day of July, 2023.

**LIGHTHOUSE IMMERSIVE INC.**

By: *Svetlana Dvoretsky*
    E30BDC97D4BE449

Name:    Svetlana Dvoretsky
Title:    Vice President
I have authority to bind the Corporation.


**LIGHTHOUSE IMMERSIVE USA, INC.**

By: *Svetlana Dvoretsky*
    E30BDC97D4BE449

Name:    Svetlana Dvoretsky
Title:    Vice President
I have authority to bind the Corporation.

**TO THE DIP LENDER:**

For good and valuable consideration received, the Guarantors listed below hereby accept and agree to comply with the provisions of the Term Sheet set out above.

Dated this 26th day of July, 2023.

**LIGHTHOUSE IMMERSIVE LAS VEGAS, LLC**

By: *Svetlana Dvoretsky*
    E30BDC97D4BE449

Name:    Svetlana Dvoretsky
Title:    Vice President
I have authority to bind the Corporation.

11

**LIGHTHOUSE IMMERSIVE DENVER, LLC**

By: _Svetlana Dvoretsky_

Name:    Svetlana Dvoretsky
Title:     Vice President
I have authority to bind the Corporation.


**LIGHTHOUSE IMMERSIVE DETROIT, LLC**

By: _Svetlana Dvoretsky_

Name:    Svetlana Dvoretsky
Title:     Vice President
I have authority to bind the Corporation.


**LIGHTHOUSE IMMERSIVE CLEVELAND, LLC**

By: _Svetlana Dvoretsky_

Name:    Svetlana Dvoretsky
Title:     Vice President
I have authority to bind the Corporation.


**LIGHTHOUSE IMMERSIVE COLUMBUS, LLC**

By: _Svetlana Dvoretsky_

Name:    Svetlana Dvoretsky
Title:     Vice President
I have authority to bind the Corporation.


**LIGHTHOUSE IMMERSIVE NASHVILLE, LLC**

By: _Svetlana Dvoretsky_

Name:    Svetlana Dvoretsky
Title:     Vice President
I have authority to bind the Corporation.

**LIGHTHOUSE IMMERSIVE KANSAS, LLC**

By: *Svetlana Dvoretsky*

      Name:    Svetlana Dvoretsky

      Title:    Vice President

I have authority to bind the Corporation.


**LIGHTHOUSE IMMERSIVE SAN ANTONIO, LLC**

By: *Svetlana Dvoretsky*

      Name:    Svetlana Dvoretsky

      Title:    Vice President

I have authority to bind the Corporation.


**LIGHTHOUSE IMMERSIVE MADISON, LLC**

By: *Svetlana Dvoretsky*

      Name:    Svetlana Dvoretsky

      Title:    Vice President

I have authority to bind the Corporation.


**LIGHTHOUSE IMMERSIVE ORLANDO, LLC**

By: *Svetlana Dvoretsky*

      Name:    Svetlana Dvoretsky

      Title:    Vice President

I have authority to bind the Corporation.

Schedule "A"

**Subsidiaries/Guarantors**

(a)      Lighthouse Immersive Las Vegas, LLC;

(b)      Lighthouse Immersive Denver, LLC;

(c)      Lighthouse Immersive Detroit, LLC;

(d)      Lighthouse Immersive Cleveland, LLC;

(e)      Lighthouse Immersive Columbus, LLC;

(f)      Lighthouse Immersive Nashville, LLC;

(g)      Lighthouse Immersive Kansas City, LLC;

(h)      Lighthouse Immersive San Antonio, LLC;

(i)      Lighthouse Immersive Madison, LLC; and

(j)      Lighthouse Immersive Orlando, LLC.

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c.C-36 AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF LIGHTHOUSE IMMERSIVE INC. et al.

Court File No.:

*ONTARIO*
**SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)**

Proceedings commenced at Toronto

**AFFIDAVIT OF COREY ROSS
(SWORN JULY 27, 2023)**

**MILLER THOMSON LLP**
40 King Street West, Suite 5800
Toronto, Ontario
M5H 3S1, Canada

**Kyla Mahar LSO#: 44182G**
kmahar@millerthomson.com
Tel: 416.597.4303

**Gina Rhodes LSO# 78849U**
grhodes@millerthomson.com
Tel: 416.597.4321

Lawyers for the Applicants

# TAB 3

Court File No.:

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c.C-36 AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF LIGHTHOUSE IMMERSIVE INC. AND LIGHTHOUSE IMMERSIVE USA INC.
(collectively, the "**Applicants**")

# CONSENT

B. Riley Farber Inc., hereby consents to act as Court-appointed Monitor in these proceedings should such an Initial Order be granted by the Court.

Dated at Toronto this __25th_____ day of July 2023

**B. RILEY FARBER INC.**

Per:

_____
Name:  Allan Nackan
Title:   Senior Managing Director
(I have the authority to bind the corporation)

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c.C-36 AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF LIGHTHOUSE IMMERSIVE INC. et al.

Court File No.:

---

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

Proceeding commenced at Toronto

---

### MONITOR'S CONSENT

---

**MILLER THOMSON** LLP
Scotia Plaza
40 King Street West, Suite 5800
P.O. Box 1011
Toronto, ON Canada  M5H 3S1

**Kyla Mahar LSO#: 44182G**
kmahar@millerthomson.com
Tel: 416.597.4303

**Gina Rhodes LSO# 78849U**
grhodes@millerthomson.com
Tel: 416.597.4321

Lawyers for the Applicants

# TAB 4

28614905.1

Court File No.

**ONTARIO**

**SUPERIOR COURT OF JUSTICE**

**COMMERCIAL LIST**

| | | |
|---|---|---|
| THE HONOURABLE MADAM | ) | THURSDAY, THE 27TH |
| | ) | |
| JUSTICE KIMMEL | ) | DAY OF JULY 2023 |

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c.C-36 AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF LIGHTHOUSE IMMERSIVE INC. AND LIGHTHOUSE IMMERSIVE USA, INC. (the "**Applicants**")

**INITIAL ORDER**

**THIS APPLICATION**, made by the Applicants pursuant to the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "**CCAA**") was heard this day via Zoom Videoconference.

**ON READING** the Affidavit of Corey Ross sworn July 26, 2023 and the Exhibits thereto (the "**Ross Affidavit**") and the pre-filing report of B. Riley Farber Inc., in its capacity as proposed Monitor of the Applicants ("**Monitor**") dated July 26, 2023, and on being advised that the secured creditors who are likely to be affected by the charges created herein were given notice, and on hearing the submissions of counsel for the Applicants and the wholly owned subsidiaries of the Applicants set out in Schedule "A" (the "**Subsidiaries**"), counsel for the Monitor and counsel for the DIP Lender (as defined below), no one else appearing although duly served as appears from the affidavit of service of Amanda Singh sworn on July 27, 2023, and on reading the consent of the Monitor:

**SERVICE**

1.      **THIS COURT ORDERS** that the time for service of the Notice of Application and the Application Record is hereby abridged and validated so that this Application is properly returnable today and hereby dispenses with further service thereof.

**APPLICATION**

2.      **THIS COURT ORDERS AND DECLARES** that the Applicants are companies to which the CCAA applies.

**POSSESSION OF PROPERTY AND OPERATIONS**

3.      **THIS COURT ORDERS** that the Applicants shall remain in possession and control of their current and future assets, undertakings and properties of every nature and kind whatsoever, and wherever situate including all proceeds thereof (the "**Property**"). Subject to further Order of this Court, the Applicants shall continue to carry on business in a manner consistent with the preservation of their businesses (the "**Business**") and Property. The Applicants are authorized and empowered to continue to retain and employ the employees, consultants, agents, experts, accountants, counsel and such other persons (collectively "**Assistants**") currently retained or employed by them, with liberty to retain such further Assistants as they deem reasonably necessary or desirable in the ordinary course of business or for the carrying out of the terms of this Order.

4.      **THIS COURT ORDERS** that the Applicants shall be entitled to continue to utilize the banking and cash management system currently in place as described in the Ross Affidavit or replace it with another substantially similar central cash management system (the "**Cash Management System**") and that any present or future bank providing the Cash Management

System shall not be under any obligation whatsoever to inquire into the propriety, validity or legality of any transfer, payment, collection or other action taken under the Cash Management System, or as to the use or application by the Applicants of funds transferred, paid, collected or otherwise dealt with in the Cash Management System, shall be entitled to provide the Cash Management System without any liability in respect thereof to any Person (as hereinafter defined) other than the Applicants, pursuant to the terms of the documentation applicable to the Cash Management System, and shall be, in its capacity as provider of the Cash Management System, an unaffected creditor under the Plan with regard to any claims or expenses it may suffer or incur in connection with the provision of the Cash Management System.

5.       **THIS COURT ORDERS** that the Applicants shall be entitled but not required to pay the following expenses, whether incurred prior to or after the date of this Order:

   (a)      all outstanding and future wages, salaries, employee and pension benefits, vacation pay and expenses payable on or after the date of this Order, in each case incurred in the ordinary course of business and consistent with existing compensation policies and arrangements; and

   (b)      the fees and disbursements of any Assistants retained or employed by the Applicants in respect of these proceedings, at their standard rates and charges.

6.       **THIS COURT ORDERS** that, except as otherwise provided to the contrary herein, the Applicants shall be entitled but not required to pay all reasonable expenses incurred by the Applicants in carrying on the Business in the ordinary course after this Order, and in carrying out the provisions of this Order, which expenses shall include, without limitation:

(a)     all expenses and capital expenditures reasonably necessary for the preservation of the Property or the Business including, without limitation, payments on account of insurance (including directors and officers insurance), maintenance and security services; and

(b)     payment for goods or services actually supplied to the Applicants following the date of this Order.

7.      **THIS COURT ORDERS** that the Applicants shall remit, in accordance with legal requirements, or pay:

(a)     any statutory deemed trust amounts in favour of the Crown in right of Canada or of any Province thereof or any other taxation authority which are required to be deducted from employees' wages, including, without limitation, amounts in respect of (i) employment insurance, (ii) Canada Pension Plan and (iii) income taxes;

(b)     all goods and services, or other applicable sales taxes (collectively, "**Sales Taxes**") required to be remitted by the Applicants in connection with the sale of goods and services by the Applicants, but only where such Sales Taxes are accrued or collected after the date of this Order, or where such Sales Taxes were accrued or collected prior to the date of this Order but not required to be remitted until on or after the date of this Order, and

(c)     any amount payable to the Crown in right of Canada or of any Province thereof or any political subdivision thereof or any other taxation authority in respect of municipal realty, municipal business or other taxes, assessments or levies of any nature or kind which are entitled at law to be paid in priority to claims of secured

creditors and which are attributable to or in respect of the carrying on of the Business by the Applicants.

8.      **THIS COURT ORDERS** that until a real property lease is disclaimed in accordance with the CCAA, the Applicants shall pay all amounts constituting rent or payable as rent under real property leases (including, for greater certainty, common area maintenance charges, utilities and realty taxes and any other amounts payable to the landlord(s) under the lease) or as otherwise may be negotiated between the Applicants and the landlord(s) from time to time ("**Rent**"), for the period commencing from and including the date of this Order, twice-monthly in equal payments on the first and fifteenth day of each month, in advance (but not in arrears).  On the date of the first of such payments, any Rent relating to the period commencing from and including the date of this Order shall also be paid.

9.      **THIS COURT ORDERS** that, except as specifically permitted herein, the Applicants are hereby directed, until further Order of this Court: (a) to make no payments of principal, interest thereon or otherwise on account of amounts owing by the Applicants to any of their creditors as of this date; (b) to grant no security interests, trust, liens, charges or encumbrances upon or in respect of any of their Property; and (c) to not grant credit or incur liabilities except in the ordinary course of the Business.

**RESTRUCTURING**

10.     **THIS COURT ORDERS** that the Applicants shall, subject to such requirements as are imposed by the CCAA and such covenants as may be contained in the Definitive Documents (as hereinafter defined), have the right to:

(a)     permanently or temporarily cease, downsize or shut down any of their business or operations, and to dispose of redundant or non-material assets not exceeding $250,000 in any one transaction or $1,500,000 in the aggregate; and

(b)     terminate the employment of such of their employees or temporarily lay off such of their employees as they deem appropriate;

all of the foregoing to permit the Applicants to proceed with an orderly restructuring of the Business (the "**Restructuring**").

## NO PROCEEDINGS AGAINST THE APPLICANTS OR THE PROPERTY

11.     **THIS COURT ORDERS** that until and including August 6, 2023, or such later date as this Court may order (the "**Stay Period**"), no proceeding or enforcement process in any court or tribunal (each, a "**Proceeding**") shall be commenced or continued against or in respect of the Applicants or the Monitor, or affecting the Business or the Property, except with the written consent of the Applicants and the Monitor, or with leave of this Court, and any and all Proceedings currently under way against or in respect of the Applicants or affecting the Business or the Property are hereby stayed and suspended pending further Order of this Court.

## NO EXERCISE OF RIGHTS OR REMEDIES

12.     **THIS COURT ORDERS** that during the Stay Period, all rights and remedies of any individual, firm, corporation, governmental body or agency, or any other entities (all of the foregoing, collectively being "**Persons**" and each being a "**Person**") against or in respect of the Applicants or the Monitor, or affecting the Business or the Property, are hereby stayed and suspended except with the written consent of the Applicants and the Monitor, or leave of this Court, provided that nothing in this Order shall (i) empower the Applicants to carry on any

business which the Applicants are not lawfully entitled to carry on, (ii) affect such investigations, actions, suits or proceedings by a regulatory body as are permitted by Section 11.1 of the CCAA, (iii) prevent the filing of any registration to preserve or perfect a security interest, or (iv) prevent the registration of a claim for lien.

**NO INTERFERENCE WITH RIGHTS**

13.     **THIS COURT ORDERS** that during the Stay Period, no Person shall discontinue, fail to honour, alter, interfere with, repudiate, terminate or cease to perform any right, renewal right, contract, agreement, lease, licence or permit in favour of or held by the Applicants, except with the written consent of the Applicants and the Monitor, or leave of this Court.

**CONTINUATION OF SERVICES**

14.     **THIS COURT ORDERS** that during the Stay Period, all Persons having oral or written agreements with the Applicants or statutory or regulatory mandates for the supply of goods and/or services, including without limitation all computer software, communication and other data services, centralized banking services, payroll services, insurance, transportation services, utility or other services to the Business or the Applicants, are hereby restrained until further Order of this Court from discontinuing, altering, interfering with or terminating the supply of such goods or services as may be required by the Applicants, and that the Applicants shall be entitled to the continued use of their current premises, telephone numbers, facsimile numbers, internet addresses and domain names, provided in each case that the normal prices or charges for all such goods or services received after the date of this Order are paid by the Applicants in accordance with normal payment practices of the Applicants or such other practices as may be

agreed upon by the supplier or service provider and each of the Applicants and the Monitor, or as may be ordered by this Court.

## NON-DEROGATION OF RIGHTS

15.    **THIS COURT ORDERS** that, notwithstanding anything else in this Order, no Person shall be prohibited from requiring immediate payment for goods, services, use of lease or licensed property or other valuable consideration provided on or after the date of this Order, nor shall any Person be under any obligation on or after the date of this Order to advance or re-advance any monies or otherwise extend any credit to the Applicants.  Nothing in this Order shall derogate from the rights conferred and obligations imposed by the CCAA.

## PROCEEDINGS AGAINST DIRECTORS AND OFFICERS

16.    **THIS COURT ORDERS** that during the Stay Period, and except as permitted by subsection 11.03(2) of the CCAA, no Proceeding may be commenced or continued against any of the former, current or future directors or officers of the Applicants with respect to any claim against the directors or officers that arose before the date hereof and that relates to any obligations of the Applicants whereby the directors or officers are alleged under any law to be liable in their capacity as directors or officers for the payment or performance of such obligations, until a compromise or arrangement in respect of the Applicants, if one is filed, is sanctioned by this Court or upon further order of this Court.

## DIRECTORS' AND OFFICERS' INDEMNIFICATION AND CHARGE

17.    **THIS COURT ORDERS** that the Applicants shall indemnify their directors and officers against obligations and liabilities that they may incur as directors or officers of the Applicants after the commencement of the within proceedings, except to the extent that, with respect to any

officer or director, the obligation or liability was incurred as a result of the director's or officer's gross negligence or wilful misconduct.

18. **THIS COURT ORDERS** that the directors and officers of the Applicants shall be entitled to the benefit of and are hereby granted a charge (the "**Directors' Charge**") on the Property, which charge shall not exceed an aggregate amount of $250,000, as security for the indemnity provided in paragraph 19 of this Order. The Directors' Charge shall have the priority set out in paragraphs 35 and 37 herein.

19. **THIS COURT ORDERS** that, notwithstanding any language in any applicable insurance policy to the contrary, (a) no insurer shall be entitled to be subrogated to or claim the benefit of the Directors' Charge, and (b) the Applicants' directors and officers shall only be entitled to the benefit of the Directors' Charge to the extent that they do not have coverage under any directors' and officers' insurance policy, or to the extent that such coverage is insufficient to pay amounts indemnified in accordance with paragraph 18 of this Order.

**APPOINTMENT OF MONITOR**

20. **THIS COURT ORDERS** that B. Riley Farber Inc. is hereby appointed pursuant to the CCAA as the Monitor, an officer of this Court, to monitor the business and financial affairs of the Applicants with the powers and obligations set out in the CCAA or set forth herein and that the Applicants and their respective shareholders, officers, directors, and Assistants shall advise the Monitor of all material steps taken by the Applicants pursuant to this Order, and shall co-operate fully with the Monitor in the exercise of its powers and discharge of its obligations and provide the Monitor with the assistance that is necessary to enable the Monitor to adequately carry out the Monitor's functions.

21.    **THIS COURT ORDERS** that the Monitor, in addition to its prescribed rights and obligations under the CCAA, is hereby directed and empowered to:

(a)    monitor the Applicants' receipts and disbursements;

(b)    report to this Court at such times and intervals as the Monitor may deem appropriate with respect to matters relating to the Property, the Business, and such other matters as may be relevant to the proceedings herein;

(c)    assist the Applicants, to the extent required by the Applicants, in their dissemination, to the DIP Lender and its counsel on a bi-weekly basis of financial and other information as agreed to between the Applicants and the DIP Lender which may be used in these proceedings including reporting on a basis to be agreed with the DIP Lender;

(d)    advise the Applicants in their preparation of the Applicants' cash flow statements and reporting required by the DIP Lender, which information shall be reviewed with the Monitor and delivered to the DIP Lender and its counsel on a periodic basis to the DIP Lender;

(e)    have full and complete access to the Property, including the premises, books, records, data, including data in electronic form, and other financial documents of the Applicants, to the extent that is necessary to adequately assess the Applicants' business and financial affairs or to perform its duties arising under this Order;

(f)    be at liberty to engage independent legal counsel or such other persons as the Monitor deems necessary or advisable respecting the exercise of its powers and performance of its obligations under this Order; and

(g)     perform such other duties as are required by this Order or by this Court from time to time.

22.     **THIS COURT ORDERS** that the Monitor shall not take possession of the Property and shall take no part whatsoever in the management or supervision of the management of the Business and shall not, by fulfilling its obligations hereunder, be deemed to have taken or maintained possession or control of the Business or Property, or any part thereof.

23.     **THIS COURT ORDERS** that nothing herein contained shall require the Monitor to occupy or to take control, care, charge, possession or management (separately and/or collectively, "**Possession**") of any of the Property that might be environmentally contaminated, might be a pollutant or a contaminant, or might cause or contribute to a spill, discharge, release or deposit of a substance contrary to any federal, provincial or other law respecting the protection, conservation, enhancement, remediation or rehabilitation of the environment or relating to the disposal of waste or other contamination including, without limitation, the *Canadian Environmental Protection Act*, the Ontario *Environmental Protection Act*, the *Ontario Water Resources Act*, or the Ontario *Occupational Health and Safety Act* and regulations thereunder (collectively, the "**Environmental Legislation**"), provided however that nothing herein shall exempt the Monitor from any duty to report or make disclosure imposed by applicable Environmental Legislation.  The Monitor shall not, as a result of this Order or anything done in pursuance of the Monitor's duties and powers under this Order, be deemed to be in Possession of any of the Property within the meaning of any Environmental Legislation, unless it is actually in possession.

24.     **THIS COURT ORDERS** that that the Monitor shall provide any creditor of the Applicants and the DIP Lender with information provided by the Applicants in response to

reasonable requests for information made in writing by such creditor addressed to the Monitor. The Monitor shall not have any responsibility or liability with respect to the information disseminated by it pursuant to this paragraph.  In the case of information that the Monitor has been advised by the Applicants is confidential, the Monitor shall not provide such information to creditors unless otherwise directed by this Court or on such terms as the Monitor and the Applicants may agree.

25.     **THIS COURT ORDERS** that, in addition to the rights and protections afforded the Monitor under the CCAA or as an officer of this Court, the Monitor shall incur no liability or obligation as a result of its appointment or the carrying out of the provisions of this Order, save and except for any gross negligence or wilful misconduct on its part.  Nothing in this Order shall derogate from the protections afforded the Monitor by the CCAA or any applicable legislation.

26.     **THIS COURT ORDERS** that the Monitor, counsel to the Monitor and counsel to the Applicants shall be paid their reasonable fees and disbursements, in each case at their standard rates and charges, whether incurred prior to, on, or subsequent, to the date of this Order by the Applicants as part of the costs of these proceedings.  The Applicants are hereby authorized and directed to pay the accounts of the Monitor, counsel for the Monitor and counsel for the Applicants on a bi-weekly basis and, in addition, the Applicants are hereby authorized to pay to the Monitor, counsel to the Monitor, and Canadian and US counsel to the Applicants, retainers in the amounts of US $75,000, US $50,000, US $75,000 and US $75,000, respectively, to be held by them as security for payment of their respective fees and disbursements outstanding from time to time.

27.    **THIS COURT ORDERS** that the Monitor and its legal counsel shall pass their accounts from time to time, and for this purpose the accounts of the Monitor and its legal counsel are hereby referred to a judge of the Commercial List of the Ontario Superior Court of Justice.

28.    **THIS COURT ORDERS** that the Monitor, counsel to the Monitor, if any, and the Applicants' counsel shall be entitled to the benefit of and are hereby granted a charge (the "**Administration Charge**") on the Property, which charge shall not exceed an aggregate amount of US $275,000, as security for their professional fees and disbursements incurred at the standard rates and charges of the Monitor and such counsel, both before and after the making of this Order in respect of these proceedings.  The Administration Charge shall have the priority set out in paragraphs 35 and 37 hereof.

**DIP FINANCING**

29.    **THIS COURT ORDERS** that the Applicants and the Subsidiaries are hereby authorized and empowered to obtain and borrow under a credit facility from SCS Finance Inc. (the "**DIP Lender**") in order to finance the Applicants' and the Subsidiaries' working capital requirements and other general corporate purposes and capital expenditures, provided that borrowings under such credit facility shall not exceed US $1,100,000 (plus interest, fees, and expenses in accordance with the DIP Term Sheet (as defined below)) unless permitted by further Order of this Court.

30.    **THIS COURT ORDERS** that such credit facility shall be on the terms and subject to the conditions set forth in the DIP Term Sheet between the Applicants, the Subsidiaries and the DIP Lender dated as of July 26, 2023 (the "**DIP Term Sheet**"), filed.

31.    **THIS COURT ORDERS** that the Applicants and the Subsidiaries are hereby authorized and empowered to execute and deliver such credit agreements, mortgages, charges, hypothecs and security documents, guarantees and other definitive documents (collectively, the "**Definitive Documents**"), as are contemplated by the DIP Term Sheet or as may be reasonably required by the DIP Lender pursuant to the terms thereof, and the Applicants are hereby authorized and directed to pay and perform all of their indebtedness, interest, fees, liabilities and obligations to the DIP Lender under and pursuant to the DIP Term Sheet and the Definitive Documents as and when the same become due and are to be performed, notwithstanding any other provision of this Order.

32.    **THIS COURT ORDERS** that the DIP Lender shall be entitled to the benefit of and is hereby granted a charge (the "**DIP Lender's Charge**") on the Property and the Subsidiaries' current and future assets, undertakings and properties of every nature and kind whatsoever, and wherever situate including all proceeds thereof, which DIP Lender's Charge shall not secure an obligation that exists before this Order is made.  The DIP Lender's Charge shall have the priority set out in paragraphs 35 and 37 hereof.

33.    **THIS COURT ORDERS** that, notwithstanding any other provision of this Order:

(a)    the DIP Lender may take such steps from time to time as it may deem necessary or appropriate to file, register, record or perfect the DIP Lender's Charge or any of the Definitive Documents;

(b)    upon the occurrence of an event of default under the Definitive Documents or the DIP Lender's Charge, the DIP Lender, upon five (5) business days written notice to the Applicants and the Monitor, may exercise any and all of its rights and remedies

against the Applicants or the Property under or pursuant to the DIP Term Sheet, Definitive Documents and the DIP Lender's Charge, including without limitation, to cease making advances to the Applicants and set off and/or consolidate any amounts owing by the DIP Lender to the Applicants against the obligations of the Applicants to the DIP Lender under the DIP Term Sheet, the Definitive Documents or the DIP Lender's Charge, to make demand, accelerate payment and give other notices, or to apply to this Court for the appointment of a receiver, receiver and manager or interim receiver, or for a bankruptcy order against the Applicants and for the appointment of a trustee in bankruptcy of the Applicants; and

(c)     the foregoing rights and remedies of the DIP Lender shall be enforceable against any trustee in bankruptcy, interim receiver, receiver or receiver and manager of the Applicants or the Property.

34.     **THIS COURT ORDERS AND DECLARES** that the DIP Lender shall be treated as unaffected in any plan of arrangement or compromise filed by the Applicants under the CCAA, or any proposal filed by the Applicants under the *Bankruptcy and Insolvency Act* of Canada (the "**BIA**"), with respect to any advances made under the Definitive Documents.

**VALIDITY AND PRIORITY OF CHARGES CREATED BY THIS ORDER**

35.     **THIS COURT ORDERS** that the priorities of the Directors' Charge, the Administration Charge and the DIP Lender's Charge, as among them, shall be as follows:

First – Administration Charge (to the maximum amount of US $275,000);

Second – DIP Lender's Charge; and

Third – Directors' Charge (to the maximum amount of US $250,000).

36.    **THIS COURT ORDERS** that the filing, registration or perfection of the Directors' Charge, the Administration Charge or the DIP Lender's Charge (collectively, the "**Charges**") shall not be required, and that the Charges shall be valid and enforceable for all purposes, including as against any right, title or interest filed, registered, recorded or perfected subsequent to the Charges coming into existence, notwithstanding any such failure to file, register, record or perfect.

37.    **THIS COURT ORDERS** that each of the Charges (all as constituted and defined herein) shall constitute a charge on the Property and such Charges shall rank in priority to all other security interests, trusts, liens, charges and encumbrances, claims of secured creditors, statutory or otherwise (collectively, "**Encumbrances**") in favour of any Person.

38.    **THIS COURT ORDERS** that except as otherwise expressly provided for herein, or as may be approved by this Court, the Applicants shall not grant any Encumbrances over any Property that rank in priority to, or *pari passu* with, any of the Charges, unless the Applicants also obtain the prior written consent of the Monitor, the DIP Lender and the beneficiaries of the Charges, or further Order of this Court.

39.    **THIS COURT ORDERS** that the Directors' Charge, the Administration Charge, the DIP Term Sheet, the Definitive Documents and the DIP Lender's Charge shall not be rendered invalid or unenforceable and the rights and remedies of the chargees entitled to the benefit of the Charges (collectively, the "**Chargees**") and/or the DIP Lender thereunder shall not otherwise be limited or impaired in any way by (a) the pendency of these proceedings and the declarations of insolvency made herein; (b) any application(s) for bankruptcy order(s) issued pursuant to BIA, or

any bankruptcy order made pursuant to such applications; (c) the filing of any assignments for the general benefit of creditors made pursuant to the BIA; (d) the provisions of any federal or provincial statutes; or (e) any negative covenants, prohibitions or other similar provisions with respect to borrowings, incurring debt or the creation of Encumbrances, contained in any existing loan documents, lease, sublease, offer to lease or other agreement (collectively, an "**Agreement**") which binds the Applicants, and notwithstanding any provision to the contrary in any Agreement:

(a)     neither the creation of the Charges nor the execution, delivery, perfection, registration or performance of the DIP Term Sheet or the Definitive Documents shall create or be deemed to constitute a breach by any of the Applicants of any Agreement to which it is a party;

(b)     none of the Chargees shall have any liability to any Person whatsoever as a result of any breach of any Agreement caused by or resulting from the Applicants entering into the DIP Term Sheet, the creation of the Charges, or the execution, delivery or performance of the Definitive Documents; and

(c)     the payments made by the Applicants pursuant to this Order, the DIP Term Sheet or the Definitive Documents, and the granting of the Charges, do not and will not constitute preferences, fraudulent conveyances, transfers at undervalue, oppressive conduct, or other challengeable or voidable transactions under any applicable law.

40.     **THIS COURT ORDERS** that any Charge created by this Order over leases of real property in Canada shall only be a Charge in the Applicants' interest in such real property leases.

**SERVICE AND NOTICE**

41.    **THIS COURT ORDERS** that the Monitor shall (i) without delay, publish in [Globe & Mail] a notice containing the information prescribed under the CCAA, (ii) within five (5) business days after the date of this Order, (A) make this Order publicly available in the manner prescribed under the CCAA, (B) send, in the prescribed manner, a notice to every known creditor who has a claim against any of the Applicants of more than $1000, and (C) prepare a list showing the names and addresses of those creditors and the estimated amounts of those claims, and make it publicly available in the prescribed manner, all in accordance with Section 23(1)(a) of the CCAA and the regulations made thereunder.

42.    **THIS COURT ORDERS** that the E-Service Protocol of the Commercial List (the "**Protocol**") is approved and adopted by reference herein and, in this proceeding, the service of documents made in accordance with the Protocol (which can be found on the Commercial List website at http://www.ontariocourts.ca/scj/practice/practice-directions/toronto/e-service-protocol/) shall be valid and effective service.  Subject to Rule 17.05 this Order shall constitute an order for substituted service pursuant to Rule 16.04 of the Rules of Civil Procedure. Subject to Rule 3.01(d) of the Rules of Civil Procedure and paragraph 21 of the Protocol, service of documents in accordance with the Protocol will be effective on transmission.  This Court further orders that a Case Website shall be established in accordance with the Protocol with the following URL: https://farbergroup.com/engagements/lighthouse-immersive/.

43.    **THIS COURT ORDERS** that if the service or distribution of documents in accordance with the Protocol is not practicable, the Applicants and the Monitor are at liberty to serve or distribute this Order, any other materials and orders in these proceedings, any notices or other correspondence, by forwarding true copies thereof by prepaid ordinary mail, courier, personal

delivery or facsimile transmission to the Applicants' creditors or other interested parties at their respective addresses as last shown on the records of the respective Applicants and that any such service or distribution by courier, personal delivery or facsimile transmission shall be deemed to be received on the next business day following the date of forwarding thereof, or if sent by ordinary mail, on the third business day after mailing.

**FOREIGN PROCEEDINGS AND FOREIGN REPRESENTATIVE**

44.    **THIS COURT ORDER THAT** Lighthouse Immersive Inc. be and is hereby authorized and empowered to act as a foreign representative (the "**Foreign Representative**") in respect of these proceedings for the purpose of having these proceedings recognized in a foreign jurisdiction.

45.    **THIS COURT ORDER THAT** the Foreign Representative be and is hereby authorized to apply for foreign recognition of these proceedings, as necessary or advisable, in any jurisdiction outside of Canada, including without limitation, the United States pursuant to Chapter 15 of Title 11 of the United States Code 11 U.S.C., § 101 – 1532**.**

**GENERAL**

46.    **THIS COURT ORDERS** that the Applicants or the Monitor may from time to time apply to this Court for advice and directions in the discharge of their powers and duties hereunder.

47.    **THIS COURT ORDERS** that nothing in this Order shall prevent the Monitor from acting as an interim receiver, a receiver, a receiver and manager, or a trustee in bankruptcy of the Applicants, the Business or the Property.

48.    **THIS COURT HEREBY REQUESTS** the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada, the United States or elsewhere, to give effect to this Order and to assist the Applicants, the Monitor and their respective agents in carrying out the terms of this Order.  All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Applicants and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Applicants and the Monitor and their respective agents in carrying out the terms of this Order.

49.    **THIS COURT ORDERS** that each of the Applicants and the Monitor be at liberty and is hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order, and that the Applicants are authorized and empowered to act as a representative in respect of the within proceedings for the purpose of having these proceedings recognized in a jurisdiction outside Canada.

50.    **THIS COURT ORDERS** that any interested party (including the Applicants and the Monitor) may apply to this Court to vary or amend this Order on not less than seven (7) days notice to any other party or parties likely to be affected by the order sought or upon such other notice, if any, as this Court may order.

51.    **THIS COURT ORDERS** that this Order and all of its provisions are effective as of 12:01 a.m. Eastern Standard/Daylight Time on the date of this Order.

52.     **THIS COURT ORDERS** that this Order is effective from the date that it is made and is

enforceable without any need for entry and filing.

_____

Schedule "A"
**Subsidiaries**

(a)    Lighthouse Immersive Las Vegas, LLC;

(b)    Lighthouse Immersive Denver, LLC;

(c)    Lighthouse Immersive Detroit, LLC;

(d)    Lighthouse Immersive Cleveland, LLC;

(e)    Lighthouse Immersive Columbus, LLC;

(f)    Lighthouse Immersive Nashville, LLC;

(g)    Lighthouse Immersive Kansas City, LLC;

(h)    Lighthouse Immersive San Antonio, LLC;

(i)    Lighthouse Immersive Madison, LLC; and

(j)    Lighthouse Immersive Orlando, LLC.

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c.C-36 AS AMENDED
AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
LIGHTHOUSE IMMERSIVE INC. et al.

Court File No.: »

|  |  |
|---|---|
|  | ***ONTARIO***<br>**SUPERIOR COURT OF JUSTICE - COMMERCIAL LIST**<br><br>Proceeding commenced at TORONTO |
|  | **INITIAL ORDER**<br>**(DATED JULY 27, 2023)** |
|  | **MILLER THOMSON LLP**<br>Scotia Plaza<br>40 King Street West, Suite 5800<br>P.O. Box 1011<br>Toronto, ON Canada  M5H 3S1<br><br>**Kyla Mahar LSO#: 44182G**<br>kmahar@millerthomson.com<br>Tel: 416.597.4303<br><br>**Gina Rhodes LSO# 78849U**<br>grhodes@millerthomson.com<br>Tel: 416.597.4321<br><br>Lawyers for the Applicants |

# TAB 5

Revised: January 21, 2014

Court File No.

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

| | | |
|---|---|---|
| THE HONOURABLE ——MADAM | ) | WEEKDAYTHURSDAY, THE #27TH |
| | ) | |
| JUSTICE ——KIMMEL | ) | DAY OF MONTH,JULY 20YR2023 |

IN THE MATTER OF THE *COMPANIES'' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF [APPLICANT'S NAME] LIGHTHOUSE IMMERSIVE INC. AND LIGHTHOUSE IMMERSIVE USA, INC.
(the "Applicant""**Applicants"**)

**INITIAL ORDER**

**THIS APPLICATION**, made by the Applicant,Applicants pursuant to the *Companies''*

*Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the ""**CCAA**"") was heard this

day at 330 University Avenue, Toronto, Ontariovia Zoom Videoconference.

**ON READING** the affidavitAffidavit of [NAME]Corey Ross sworn [DATE]July 26,

2023 and the Exhibits thereto (the "**Ross Affidavit**") and the pre-filing report of B. Riley Farber

Inc., in its capacity as proposed Monitor of the Applicants ("**Monitor**") dated July 26, 2023, and

on being advised that the secured creditors who are likely to be affected by the charges created

herein were given notice, and on hearing the submissions of counsel for [NAMES]the Applicants

and the wholly owned subsidiaries of the Applicants set out in Schedule "A" (the

"**Subsidiaries**"), counsel for the Monitor and counsel for the DIP Lender (as defined below), no

one else appearing for [NAME]' although duly served as appears from the affidavit of service of

may be granted.  See, for example, CCAA Sections 11.2(1), 11.3(1), 11.4(1), 11.51(1), 11.52(1), 32(1), 32(3), 33(2)

[NAME]Amanda Singh sworn [DATE]on July 27, 2023, and on reading the consent of [MONITOR'S NAME] to act as the Monitor, .:

**SERVICE**

1.    **THIS COURT ORDERS** that the time for service of the Notice of Application and the Application Record is hereby abridged and validated[2] so that this Application is properly returnable today and hereby dispenses with further service thereof.

**APPLICATION**

2.    **THIS COURT ORDERS AND DECLARES** that the Applicant is a companyApplicants are companies to which the CCAA applies.

**PLAN OF ARRANGEMENT**

3.    THIS COURT ORDERS that the Applicant shall have the authority to file and may, subject to further order of this Court, file with this Court a plan of compromise or arrangement (hereinafter referred to as the "Plan").

**POSSESSION OF PROPERTY AND OPERATIONS**

3.    4. **THIS COURT ORDERS** that the ApplicantApplicants shall remain in possession and control of itstheir current and future assets, undertakings and properties of every nature and kind

---

may be granted. See, for example, CCAA Sections 11.2(1), 11.3(1), 11.4(1), 11.51(1), 11.52(1), 32(1), 32(3), 33(2) and 36(2).

[2] If service is effected in a manner other than as authorized by the Ontario *Rules of Civil Procedure*, an order validating irregular service is required pursuant to Rule 16.08 of the *Rules of Civil Procedure* and may be granted in appropriate circumstances.

whatsoever, and wherever situate including all proceeds thereof (the "**Property**").  Subject to further Order of this Court, the ~~Applicant~~Applicants shall continue to carry on business in a manner consistent with the preservation of ~~its business~~their businesses (the "**Business**") and Property.  The ~~Applicant is~~Applicants are authorized and empowered to continue to retain and employ the employees, consultants, agents, experts, accountants, counsel and such other persons (collectively "**Assistants**") currently retained or employed by ~~it~~them, with liberty to retain such further Assistants as ~~it deems~~they deem reasonably necessary or desirable in the ordinary course of business or for the carrying out of the terms of this Order.

4.  ~~5.~~ [**THIS COURT ORDERS** that the ~~Applicant~~Applicants shall be entitled to continue to utilize the ~~central~~banking and cash management system³ currently in place as described in the Ross Affidavit ~~of [NAME] sworn [DATE]~~ or replace it with another substantially similar central cash management system (the "**Cash Management System**") and that any present or future bank providing the Cash Management System shall not be under any obligation whatsoever to inquire into the propriety, validity or legality of any transfer, payment, collection or other action taken under the Cash Management System, or as to the use or application by the ~~Applicant~~Applicants of funds transferred, paid, collected or otherwise dealt with in the Cash Management System, shall be entitled to provide the Cash Management System without any liability in respect thereof to any Person (as hereinafter defined) other than the ~~Applicant~~Applicants, pursuant to the terms of the documentation applicable to the Cash Management System, and shall be, in its capacity as provider of the Cash Management System,

---

³ ~~This provision should only be utilized where necessary, in view of the fact that central cash management systems often operate in a manner that consolidates the cash of applicant companies.  Specific attention should be paid to cross-border and inter-company transfers of cash.~~

an unaffected creditor under the Plan with regard to any claims or expenses it may suffer or incur in connection with the provision of the Cash Management System.]

5. 6. **THIS COURT ORDERS** that the ~~Applicant~~Applicants shall be entitled but not required to pay the following expenses, whether incurred prior to or after the date of this Order:

(a)    all outstanding and future wages, salaries, employee and pension benefits, vacation pay and expenses payable on or after the date of this Order, in each case incurred in the ordinary course of business and consistent with existing compensation policies and arrangements; and

(b)    the fees and disbursements of any Assistants retained or employed by the ~~Applicant~~Applicants in respect of these proceedings, at their standard rates and charges.

6. 7. **THIS COURT ORDERS** that, except as otherwise provided to the contrary herein, the ~~Applicant~~Applicants shall be entitled but not required to pay all reasonable expenses incurred by the ~~Applicant~~Applicants in carrying on the Business in the ordinary course after this Order, and in carrying out the provisions of this Order, which expenses shall include, without limitation:

(a)    all expenses and capital expenditures reasonably necessary for the preservation of the Property or the Business including, without limitation, payments on account of insurance (including directors and officers insurance), maintenance and security services; and

(b)    payment for goods or services actually supplied to the ~~Applicant~~Applicants following the date of this Order.

7. ~~8.~~ **THIS COURT ORDERS** that the ~~Applicant~~Applicants shall remit, in accordance with legal requirements, or pay:

(a)   any statutory deemed trust amounts in favour of the Crown in right of Canada or of any Province thereof or any other taxation authority which are required to be deducted from employees'~~'~~ wages, including, without limitation, amounts in respect of (i) employment insurance, (ii) Canada Pension Plan~~,~~ and (iii) ~~Quebec Pension Plan, and (iv)~~ income taxes;

(b)   all goods and services~~,~~ or other applicable sales taxes (collectively, "~~"~~**Sales Taxes**"~~"~~) required to be remitted by the ~~Applicant~~Applicants in connection with the sale of goods and services by the ~~Applicant~~Applicants, but only where such Sales Taxes are accrued or collected after the date of this Order, or where such Sales Taxes were accrued or collected prior to the date of this Order but not required to be remitted until on or after the date of this Order, and

(c)   any amount payable to the Crown in right of Canada or of any Province thereof or any political subdivision thereof or any other taxation authority in respect of municipal realty, municipal business or other taxes, assessments or levies of any nature or kind which are entitled at law to be paid in priority to claims of secured creditors and which are attributable to or in respect of the carrying on of the Business by the ~~Applicant~~Applicants.

8.    9. **THIS COURT ORDERS** that until a real property lease is disclaimed **[or resiliated]**[4] in accordance with the CCAA, the ~~Applicant~~Applicants shall pay all amounts constituting rent or payable as rent under real property leases (including, for greater certainty, common area maintenance charges, utilities and realty taxes and any other amounts payable to the landlord(s) under the lease) or as otherwise may be negotiated between the ~~Applicant~~Applicants and the landlord(s) from time to time ("~~"~~**Rent**~~"~~"), for the period commencing from and including the date of this Order, twice-monthly in equal payments on the first and fifteenth day of each month, in advance (but not in arrears).  On the date of the first of such payments, any Rent relating to the period commencing from and including the date of this Order shall also be paid.

9.    10. **THIS COURT ORDERS** that, except as specifically permitted herein, the ~~Applicant is~~Applicants are hereby directed, until further Order of this Court: (a) to make no payments of principal, interest thereon or otherwise on account of amounts owing by the ~~Applicant~~Applicants to any of ~~its~~their creditors as of this date; (b) to grant no security interests, trust, liens, charges or encumbrances upon or in respect of any of ~~its~~their Property; and (c) to not grant credit or incur liabilities except in the ordinary course of the Business.

**RESTRUCTURING**

10.    11. **THIS COURT ORDERS** that the ~~Applicant~~Applicants shall, subject to such requirements as are imposed by the CCAA and such covenants as may be contained in the Definitive Documents (as hereinafter defined), have the right to:

---

[4] ~~The term "resiliate" should remain if there are leased premises in the Province of Quebec, but can otherwise be removed.~~

(a)    permanently or temporarily cease, downsize or shut down any of ~~its~~their business or operations, **[**and to dispose of redundant or non-material assets not exceeding $●250,000 in any one transaction or $●1,500,000 in the aggregate**]**[5]; and

(b)    **[**~~terminate~~ the employment of such of ~~its~~their employees or temporarily lay off such of ~~its~~their employees as ~~it deems~~they deem appropriate**]**; ~~and~~

~~(c)    pursue all avenues of refinancing of its Business or Property, in whole or part, subject to prior approval of this Court being obtained before any material refinancing,~~

all of the foregoing to permit the ~~Applicant~~Applicants to proceed with an orderly restructuring of the Business (the "**"Restructuring"**")~~.~~

~~12.    THIS COURT ORDERS that the Applicant shall provide each of the relevant landlords with notice of the Applicant's intention to remove any fixtures from any leased premises at least seven (7) days prior to the date of the intended removal.  The relevant landlord shall be entitled to have a representative present in the leased premises to observe such removal and, if the landlord disputes the Applicant's entitlement to remove any such fixture under the provisions of the lease, such fixture shall remain on the premises and shall be dealt with as agreed between any applicable secured creditors, such landlord and the Applicant, or by further Order of this Court upon application by the Applicant on at least two (2) days notice to such landlord and any such secured creditors. If the Applicant disclaims [or resiliates] the lease governing such leased premises in accordance with Section 32 of the CCAA, it shall not be required to pay Rent under such lease pending resolution of any such dispute (other than Rent payable for the notice period provided for in Section 32(5) of the CCAA), and the disclaimer [or resiliation] of the lease shall be without prejudice to the Applicant's claim to the fixtures in dispute.~~

---

~~[5] Section 36 of the amended CCAA does not seem to contemplate a pre-approved power to sell (see subsection 36(3)) and moreover requires notice (subsection 36(2)) and evidence (subsection 36(7)) that may not have occurred or be available at the initial CCAA hearing.~~

13.    THIS COURT ORDERS that if a notice of disclaimer **[or resiliation]** is delivered pursuant to Section 32 of the CCAA, then (a) during the notice period prior to the effective time of the disclaimer **[or resiliation]**, the landlord may show the affected leased premises to prospective tenants during normal business hours, on giving the Applicant and the Monitor 24 hours' prior written notice, and (b) at the effective time of the disclaimer **[or resiliation]**, the relevant landlord shall be entitled to take possession of any such leased premises without waiver of or prejudice to any claims or rights such landlord may have against the Applicant in respect of such lease or leased premises, provided that nothing herein shall relieve such landlord of its obligation to mitigate any damages claimed in connection therewith.

**NO PROCEEDINGS AGAINST THE ~~APPLICANT~~APPLICANTS OR THE PROPERTY**

11.    ~~14.~~ **THIS COURT ORDERS** that until and including ~~[DATE — MAX. 30 DAYS]~~August 6, 2023, or such later date as this Court may order (the "**Stay Period**"), no proceeding or enforcement process in any court or tribunal (each, a "**Proceeding**") shall be commenced or continued against or in respect of the ~~Applicant~~Applicants or the Monitor, or affecting the Business or the Property, except with the written consent of the ~~Applicant~~Applicants and the Monitor, or with leave of this Court, and any and all Proceedings currently under way against or in respect of the ~~Applicant~~Applicants or affecting the Business or the Property are hereby stayed and suspended pending further Order of this Court.

**NO EXERCISE OF RIGHTS OR REMEDIES**

12.    ~~15.~~ **THIS COURT ORDERS** that during the Stay Period, all rights and remedies of any individual, firm, corporation, governmental body or agency, or any other entities (all of the foregoing, collectively being "**Persons**" and each being a "**Person**") against or in respect of

the ~~Applicant~~Applicants or the Monitor, or affecting the Business or the Property, are hereby stayed and suspended except with the written consent of the ~~Applicant~~Applicants and the Monitor, or leave of this Court, provided that nothing in this Order shall (i) empower the ~~Applicant~~Applicants to carry on any business which the ~~Applicant is~~Applicants are not lawfully entitled to carry on, (ii) affect such investigations, actions, suits or proceedings by a regulatory body as are permitted by Section 11.1 of the CCAA, (iii) prevent the filing of any registration to preserve or perfect a security interest, or (iv) prevent the registration of a claim for lien.

**NO INTERFERENCE WITH RIGHTS**

13.    ~~16.~~ **THIS COURT ORDERS** that during the Stay Period, no Person shall discontinue, fail to honour, alter, interfere with, repudiate, terminate or cease to perform any right, renewal right, contract, agreement, lease, licence or permit in favour of or held by the ~~Applicant~~Applicants, except with the written consent of the ~~Applicant~~Applicants and the Monitor, or leave of this Court.

**CONTINUATION OF SERVICES**

14.    ~~17.~~ **THIS COURT ORDERS** that during the Stay Period, all Persons having oral or written agreements with the ~~Applicant~~Applicants or statutory or regulatory mandates for the supply of goods and/or services, including without limitation all computer software, communication and other data services, centralized banking services, payroll services, insurance, transportation services, utility or other services to the Business or the ~~Applicant~~Applicants, are hereby restrained until further Order of this Court from discontinuing, altering, interfering with or terminating the supply of such goods or services as may be required by the ~~Applicant~~Applicants, and that the ~~Applicant~~Applicants shall be entitled to the continued use of

~~its~~their current premises, telephone numbers, facsimile numbers, internet addresses and domain names, provided in each case that the normal prices or charges for all such goods or services received after the date of this Order are paid by the ~~Applicant~~Applicants in accordance with normal payment practices of the ~~Applicant~~Applicants or such other practices as may be agreed upon by the supplier or service provider and each of the ~~Applicant~~Applicants and the Monitor, or as may be ordered by this Court.

**NON-DEROGATION OF RIGHTS**

15. ~~18.~~ **THIS COURT ORDERS** that, notwithstanding anything else in this Order, no Person shall be prohibited from requiring immediate payment for goods, services, use of lease or licensed property or other valuable consideration provided on or after the date of this Order, nor shall any Person be under any obligation on or after the date of this Order to advance or re-advance any monies or otherwise extend any credit to the ~~Applicant~~Applicants.  Nothing in this Order shall derogate from the rights conferred and obligations imposed by the CCAA.[6]

**PROCEEDINGS AGAINST DIRECTORS AND OFFICERS**

16. ~~19.~~ **THIS COURT ORDERS** that during the Stay Period, and except as permitted by subsection 11.03(2) of the CCAA, no Proceeding may be commenced or continued against any of the former, current or future directors or officers of the ~~Applicant~~Applicants with respect to any claim against the directors or officers that arose before the date hereof and that relates to any obligations of the ~~Applicant~~Applicants whereby the directors or officers are alleged under any

---

[6] ~~This non-derogation provision has acquired more significance due to the recent amendments to the CCAA, since a number of actions or steps cannot be stayed, or the stay is subject to certain limits and restrictions.  See, for example, CCAA Sections 11.01, 11.04, 11.06, 11.07, 11.08, 11.1(2) and 11.5(1).~~

law to be liable in their capacity as directors or officers for the payment or performance of such obligations, until a compromise or arrangement in respect of the ~~Applicant~~Applicants, if one is filed, is sanctioned by this Court or ~~is refused by the creditors of the Applicant or~~upon further order of this Court.

**DIRECTORS' AND OFFICERS' INDEMNIFICATION AND CHARGE**

17. ~~20.~~ **THIS COURT ORDERS** that the ~~Applicant~~Applicants shall indemnify ~~its~~their directors and officers against obligations and liabilities that they may incur as directors or officers of the ~~Applicant~~Applicants after the commencement of the within proceedings,[7] except to the extent that, with respect to any officer or director, the obligation or liability was incurred as a result of the director~~'~~'s or officer~~'~~'s gross negligence or wilful misconduct.

18. ~~21.~~ **THIS COURT ORDERS** that the directors and officers of the ~~Applicant~~Applicants shall be entitled to the benefit of and are hereby granted a charge (the "~~"~~**Directors' Charge**"~~"~~)[8] on the Property, which charge shall not exceed an aggregate amount of $●250,000, as security for the indemnity provided in paragraph ~~[20]~~ of this Order.  The Directors' Charge shall have the priority set out in paragraphs ~~[38]~~36 and ~~[40]~~38 herein.

19. ~~22.~~ **THIS COURT ORDERS** that, notwithstanding any language in any applicable insurance policy to the contrary, (a) no insurer shall be entitled to be subrogated to or claim the

---

[7] ~~The broad indemnity language from Section 11.51 of the CCAA has been imported into this paragraph.  The granting of the indemnity (whether or not secured by a Directors' Charge), and the scope of the indemnity, are discretionary matters that should be addressed with the Court.~~

[8] ~~Section 11.51(3) provides that the Court may not make this security/charging order if in the Court's opinion the Applicant could obtain adequate indemnification insurance for the director or officer at a reasonable cost.~~

benefit of the Directors'' Charge, and (b) the ~~Applicant's~~Applicants' directors and officers shall only be entitled to the benefit of the Directors'' Charge to the extent that they do not have coverage under any directors'' and officers'' insurance policy, or to the extent that such coverage is insufficient to pay amounts indemnified in accordance with paragraph **[20]**19 of this Order.

**APPOINTMENT OF MONITOR**

20.    ~~23.~~ **THIS COURT ORDERS** that **[MONITOR'S NAME]**B. Riley Farber Inc. is hereby appointed pursuant to the CCAA as the Monitor, an officer of this Court, to monitor the business and financial affairs of the ~~Applicant~~Applicants with the powers and obligations set out in the CCAA or set forth herein and that the ~~Applicant~~Applicants and ~~its~~their respective shareholders, officers, directors, and Assistants shall advise the Monitor of all material steps taken by the ~~Applicant~~Applicants pursuant to this Order, and shall co-operate fully with the Monitor in the exercise of its powers and discharge of its obligations and provide the Monitor with the assistance that is necessary to enable the Monitor to adequately carry out the Monitor''s functions.

21.    ~~24.~~ **THIS COURT ORDERS** that the Monitor, in addition to its prescribed rights and obligations under the CCAA, is hereby directed and empowered to:

    (a)    monitor the ~~Applicant's~~Applicants' receipts and disbursements;

    (b)    report to this Court at such times and intervals as the Monitor may deem appropriate with respect to matters relating to the Property, the Business, and such other matters as may be relevant to the proceedings herein;

(c)  assist the ~~Applicant~~Applicants, to the extent required by the ~~Applicant~~Applicants, in ~~its~~their dissemination, to the DIP Lender and its counsel on a ~~[TIME INTERVAL]~~bi-weekly basis of financial and other information as agreed to between the ~~Applicant~~Applicants and the DIP Lender which may be used in these proceedings including reporting on a basis to be agreed with the DIP Lender;

(d)  advise the ~~Applicant~~Applicants in ~~its~~their preparation of the ~~Applicant~~Applicants's cash flow statements and reporting required by the DIP Lender, which information shall be reviewed with the Monitor and delivered to the DIP Lender and its counsel on a periodic basis~~, but not less than [TIME INTERVAL], or as otherwise agreed~~ to ~~by~~ the DIP Lender;

~~(e)    advise the Applicant in its development of the Plan and any amendments to the Plan;~~

~~(f)    assist the Applicant, to the extent required by the Applicant, with the holding and administering of creditors' or shareholders' meetings for voting on the Plan;~~

(e)  ~~(g)~~ have full and complete access to the Property, including the premises, books, records, data, including data in electronic form, and other financial documents of the ~~Applicant~~Applicants, to the extent that is necessary to adequately assess the ~~Applicant's~~Applicants' business and financial affairs or to perform its duties arising under this Order;

(f)  ~~(h)~~ be at liberty to engage independent legal counsel or such other persons as the Monitor deems necessary or advisable respecting the exercise of its powers and performance of its obligations under this Order; and

(g)    ~~(i)~~ perform such other duties as are required by this Order or by this Court from time to time.

22.    ~~25.~~ **THIS COURT ORDERS** that the Monitor shall not take possession of the Property and shall take no part whatsoever in the management or supervision of the management of the Business and shall not, by fulfilling its obligations hereunder, be deemed to have taken or maintained possession or control of the Business or Property, or any part thereof.

23.    ~~26.~~ **THIS COURT ORDERS** that nothing herein contained shall require the Monitor to occupy or to take control, care, charge, possession or management (separately and/or collectively, "**Possession**") of any of the Property that might be environmentally contaminated, might be a pollutant or a contaminant, or might cause or contribute to a spill, discharge, release or deposit of a substance contrary to any federal, provincial or other law respecting the protection, conservation, enhancement, remediation or rehabilitation of the environment or relating to the disposal of waste or other contamination including, without limitation, the *Canadian Environmental Protection Act*, the Ontario *Environmental Protection Act*, the *Ontario Water Resources Act*, or the Ontario *Occupational Health and Safety Act* and regulations thereunder (collectively, the "**Environmental Legislation**"), provided however that nothing herein shall exempt the Monitor from any duty to report or make disclosure imposed by applicable Environmental Legislation.  The Monitor shall not, as a result of this Order or anything done in pursuance of the Monitor's duties and powers under this Order, be deemed to be in Possession of any of the Property within the meaning of any Environmental Legislation, unless it is actually in possession.

24. ~~27.~~ **THIS COURT ORDERS** that that the Monitor shall provide any creditor of the ~~Applicant~~Applicants and the DIP Lender with information provided by the ~~Applicant~~Applicants in response to reasonable requests for information made in writing by such creditor addressed to the Monitor.  The Monitor shall not have any responsibility or liability with respect to the information disseminated by it pursuant to this paragraph.  In the case of information that the Monitor has been advised by the ~~Applicant~~Applicants is confidential, the Monitor shall not provide such information to creditors unless otherwise directed by this Court or on such terms as the Monitor and the ~~Applicant~~Applicants may agree.

25. ~~28.~~ **THIS COURT ORDERS** that, in addition to the rights and protections afforded the Monitor under the CCAA or as an officer of this Court, the Monitor shall incur no liability or obligation as a result of its appointment or the carrying out of the provisions of this Order, save and except for any gross negligence or wilful misconduct on its part.  Nothing in this Order shall derogate from the protections afforded the Monitor by the CCAA or any applicable legislation.

26. ~~29.~~ **THIS COURT ORDERS** that the Monitor, counsel to the Monitor and counsel to the ~~Applicant~~Applicants shall be paid their reasonable fees and disbursements, in each case at their standard rates and charges, whether incurred prior to, on, or subsequent, to the date of this Order by the ~~Applicant~~Applicants as part of the costs of these proceedings.  The ~~Applicant is~~Applicants are hereby authorized and directed to pay the accounts of the Monitor, counsel for the Monitor and counsel for the ~~Applicant~~Applicants on a ~~[TIME INTERVAL]~~bi-weekly basis and, in addition, the ~~Applicant is~~Applicants are hereby authorized to pay to the Monitor, counsel to the Monitor, and Canadian and US counsel to the ~~Applicant~~Applicants, retainers in the ~~amount[s]~~amounts of US $●~~[~~75,000, US $50,000, US $75,000 and US $75,000, respectively,~~]~~

to be held by them as security for payment of their respective fees and disbursements outstanding from time to time.

27. ~~30.~~ **THIS COURT ORDERS** that the Monitor and its legal counsel shall pass their accounts from time to time, and for this purpose the accounts of the Monitor and its legal counsel are hereby referred to a judge of the Commercial List of the Ontario Superior Court of Justice.

28. ~~31.~~ **THIS COURT ORDERS** that the Monitor, counsel to the Monitor, if any, and the ~~Applicant~~Applicants's counsel shall be entitled to the benefit of and are hereby granted a charge (the "**Administration Charge**") on the Property, which charge shall not exceed an aggregate amount of US $●275,000,  as security for their professional fees and disbursements incurred at the standard rates and charges of the Monitor and such counsel, both before and after the making of this Order in respect of these proceedings.  The Administration Charge shall have the priority set out in paragraphs ~~[38]~~36 and ~~[40]~~38 hereof.

**DIP FINANCING**

29. ~~32.~~ **THIS COURT ORDERS** that the ~~Applicant is~~Applicants and the Subsidiaries are hereby authorized and empowered to obtain and borrow under a credit facility from ~~[DIP LENDER'S NAME]~~SCS Finance Inc. (the "**DIP Lender**") in order to finance the ~~Applicant's~~Applicants' and the Subsidiaries' working capital requirements and other general corporate purposes and capital expenditures, provided that borrowings under such credit facility shall not exceed US $●1,100,000 (plus interest, fees, and expenses in accordance with the DIP Term Sheet (as defined below)) unless permitted by further Order of this Court.

30.  33. **THIS COURT ORDERS** ~~THAT~~that such credit facility shall be on the terms and subject to the conditions set forth in the ~~commitment letter~~DIP Term Sheet between the ~~Applicant~~Applicants, the Subsidiaries and the DIP Lender dated as of ~~[DATE]~~July 26, 2023 (the "~~Commitment Letter~~"**DIP Term Sheet**"), filed.

31.  34. **THIS COURT ORDERS** that the ~~Applicant is~~Applicants and the Subsidiaries are hereby authorized and empowered to execute and deliver such credit agreements, mortgages, charges, hypothecs and security documents, guarantees and other definitive documents (collectively, the ""**Definitive Documents**""), as are contemplated by the ~~Commitment Letter~~DIP Term Sheet or as may be reasonably required by the DIP Lender pursuant to the terms thereof, and the ~~Applicant is~~Applicants are hereby authorized and directed to pay and perform all of ~~its~~their indebtedness, interest, fees, liabilities and obligations to the DIP Lender under and pursuant to the ~~Commitment Letter~~DIP Term Sheet and the Definitive Documents as and when the same become due and are to be performed, notwithstanding any other provision of this Order.

32.  35. **THIS COURT ORDERS** that the DIP Lender shall be entitled to the benefit of and is hereby granted a charge (the ""**DIP Lender's Charge**"") on the Property and the Subsidiaries' current and future assets, undertakings and properties of every nature and kind whatsoever, and wherever situate including all proceeds thereof, which DIP Lender"'s Charge shall not secure an obligation that exists before this Order is made.  The DIP Lender's Charge shall have the priority set out in paragraphs **[38]**36 and **[40]**38 hereof.

33.  36. **THIS COURT ORDERS** that, notwithstanding any other provision of this Order:

(a) the DIP Lender may take such steps from time to time as it may deem necessary or appropriate to file, register, record or perfect the DIP Lender's Charge or any of the Definitive Documents;

(b) upon the occurrence of an event of default under the Definitive Documents or the DIP Lender's Charge, the DIP Lender, upon ●five (5) business days written notice to the ~~Applicant~~Applicants and the Monitor, may exercise any and all of its rights and remedies against the ~~Applicant~~Applicants or the Property under or pursuant to the ~~Commitment Letter~~DIP Term Sheet, Definitive Documents and the DIP Lender's Charge, including without limitation, to cease making advances to the ~~Applicant~~Applicants and set off and/or consolidate any amounts owing by the DIP Lender to the ~~Applicant~~Applicants against the obligations of the ~~Applicant~~Applicants to the DIP Lender under the ~~Commitment Letter~~DIP Term Sheet, the Definitive Documents or the DIP Lender's Charge, to make demand, accelerate payment and give other notices, or to apply to this Court for the appointment of a receiver, receiver and manager or interim receiver, or for a bankruptcy order against the ~~Applicant~~Applicants and for the appointment of a trustee in bankruptcy of the ~~Applicant~~Applicants; and

(c) the foregoing rights and remedies of the DIP Lender shall be enforceable against any trustee in bankruptcy, interim receiver, receiver or receiver and manager of the ~~Applicant~~Applicants or the Property.

34. ~~37.~~ **THIS COURT ORDERS AND DECLARES** that the DIP Lender shall be treated as unaffected in any plan of arrangement or compromise filed by the ~~Applicant~~Applicants under the

CCAA, or any proposal filed by the ~~Applicant~~Applicants under the *Bankruptcy and Insolvency Act* of Canada (the "**BIA**"), with respect to any advances made under the Definitive Documents.

**VALIDITY AND PRIORITY OF CHARGES CREATED BY THIS ORDER**

35.   ~~38.~~ **THIS COURT ORDERS** that the priorities of the Directors' Charge, the Administration Charge and the DIP Lender's Charge, as among them, shall be as follows[9]:

> First – Administration Charge (to the maximum amount of US $●275,000);
>
> Second – DIP Lender's Charge; and
>
> Third – Directors' Charge (to the maximum amount of US $●250,000).

36.   ~~39.~~ **THIS COURT ORDERS** that the filing, registration or perfection of the Directors' Charge, the Administration Charge or the DIP Lender's Charge (collectively, the "**Charges**") shall not be required, and that the Charges shall be valid and enforceable for all purposes, including as against any right, title or interest filed, registered, recorded or perfected subsequent to the Charges coming into existence, notwithstanding any such failure to file, register, record or perfect.

---

[9] ~~The ranking of these Charges is for illustration purposes only, and is not meant to be determinative. This ranking may be subject to negotiation, and should be tailored to the circumstances of the case before the Court. Similarly, the quantum and caps applicable to the Charges should be considered in each case. Please also note that the CCAA now permits Charges in favour of critical suppliers and others, which should also be incorporated into this Order (and the rankings, above), where appropriate.~~

37.    40.  **THIS COURT ORDERS** that each of the ~~Directors' Charge, the Administration Charge and the DIP Lender's Charge~~Charges (all as constituted and defined herein) shall constitute a charge on the Property and such Charges shall rank in priority to all other security interests, trusts, liens, charges and encumbrances, claims of secured creditors, statutory or otherwise (collectively, "**Encumbrances**") in favour of any Person.

38.    41.  **THIS COURT ORDERS** that except as otherwise expressly provided for herein, or as may be approved by this Court, the ~~Applicant~~Applicants shall not grant any Encumbrances over any Property that rank in priority to, or *pari passu* with, any of the ~~Directors' Charge, the Administration Charge or the DIP Lender's Charge~~Charges, unless the ~~Applicant~~Applicants also ~~obtains~~obtain the prior written consent of the Monitor, the DIP Lender and the beneficiaries of the ~~Directors' Charge and the Administration Charge~~Charges, or further Order of this Court.

39.    42.  **THIS COURT ORDERS** that the Directors' Charge, the Administration Charge, the ~~Commitment Letter~~DIP Term Sheet, the Definitive Documents and the DIP Lender's Charge shall not be rendered invalid or unenforceable and the rights and remedies of the chargees entitled to the benefit of the Charges (collectively, the "**Chargees**") and/or the DIP Lender thereunder shall not otherwise be limited or impaired in any way by (a) the pendency of these proceedings and the declarations of insolvency made herein; (b) any application(s) for bankruptcy order(s) issued pursuant to BIA, or any bankruptcy order made pursuant to such applications; (c) the filing of any assignments for the general benefit of creditors made pursuant to the BIA; (d) the provisions of any federal or provincial statutes; or (e) any negative covenants, prohibitions or other similar provisions with respect to borrowings, incurring debt or the creation of Encumbrances, contained in any existing loan documents, lease, sublease, offer to lease or

other agreement (collectively, an "“**Agreement**"”) which binds the ~~Applicant~~Applicants, and notwithstanding any provision to the contrary in any Agreement:

(a)     neither the creation of the Charges nor the execution, delivery, perfection, registration or performance of the ~~Commitment Letter~~DIP Term Sheet or the Definitive Documents shall create or be deemed to constitute a breach by any of the ~~Applicant~~Applicants of any Agreement to which it is a party;

(b)     none of the Chargees shall have any liability to any Person whatsoever as a result of any breach of any Agreement caused by or resulting from the ~~Applicant~~Applicants entering into the ~~Commitment Letter~~DIP Term Sheet, the creation of the Charges, or the execution, delivery or performance of the Definitive Documents; and

(c)     the payments made by the ~~Applicant~~Applicants pursuant to this Order, the ~~Commitment Letter~~DIP Term Sheet or the Definitive Documents, and the granting of the Charges, do not and will not constitute preferences, fraudulent conveyances, transfers at undervalue, oppressive conduct, or other challengeable or voidable transactions under any applicable law.

40.     ~~43.~~ **THIS COURT ORDERS** that any Charge created by this Order over leases of real property in Canada shall only be a Charge in the ~~Applicant's~~Applicants' interest in such real property leases.

**SERVICE AND NOTICE**

41.     ~~44.~~ **THIS COURT ORDERS** that the Monitor shall (i) without delay, publish in [~~newspapers specified by the Court~~Globe & Mail] a notice containing the information prescribed

under the CCAA, (ii) within five (5) business days after the date of this Order, (A) make this Order publicly available in the manner prescribed under the CCAA, (B) send, in the prescribed manner, a notice to every known creditor who has a claim against any of the ApplicantApplicants of more than $1000, and (C) prepare a list showing the names and addresses of those creditors and the estimated amounts of those claims, and make it publicly available in the prescribed manner, all in accordance with Section 23(1)(a) of the CCAA and the regulations made thereunder.

42.    45. **THIS COURT ORDERS** that the E-Service Protocol of the Commercial List (the "**Protocol**") is approved and adopted by reference herein and, in this proceeding, the service of documents made in accordance with the Protocol (which can be found on the Commercial List website                                                                                                           at http://www.ontariocourts.ca/scj/practice/practice-directions/toronto/e-service-protocol/) shall be valid and effective service.   Subject to Rule 17.05 this Order shall constitute an order for substituted service pursuant to Rule 16.04 of the Rules of Civil Procedure. Subject to Rule 3.01(d) of the Rules of Civil Procedure and paragraph 21 of the Protocol, service of documents in accordance with the Protocol will be effective on transmission.  This Court further orders that a Case Website shall be established in accordance with the Protocol with the following URL: '<@>'https://farbergroup.com/engagements/lighthouse-immersive/.

43.    46. **THIS COURT ORDERS** that if the service or distribution of documents in accordance with the Protocol is not practicable, the ApplicantApplicants and the Monitor are at liberty to serve or distribute this Order, any other materials and orders in these proceedings, any notices or other correspondence, by forwarding true copies thereof by prepaid ordinary mail, courier, personal delivery or facsimile transmission to the Applicant'sApplicants' creditors or

other interested parties at their respective addresses as last shown on the records of the ~~Applicant~~respective Applicants and that any such service or distribution by courier, personal delivery or facsimile transmission shall be deemed to be received on the next business day following the date of forwarding thereof, or if sent by ordinary mail, on the third business day after mailing.

**FOREIGN PROCEEDINGS AND FOREIGN REPRESENTATIVE**

44.    **THIS COURT ORDER THAT** Lighthouse Immersive Inc. be and is hereby authorized and empowered to act as a foreign representative (the "**Foreign Representative**") in respect of these proceedings for the purpose of having these proceedings recognized in a foreign jurisdiction.

45.    **THIS COURT ORDER THAT** the Foreign Representative be and is hereby authorized to apply for foreign recognition of these proceedings, as necessary or advisable, in any jurisdiction outside of Canada, including without limitation, the United States pursuant to Chapter 15 of Title 11 of the United States Code 11 U.S.C., § 101 – 1532.

**GENERAL**

46.    ~~47.~~ **THIS COURT ORDERS** that the ~~Applicant~~Applicants or the Monitor may from time to time apply to this Court for advice and directions in the discharge of ~~its~~their powers and duties hereunder.

47.    ~~48.~~ **THIS COURT ORDERS** that nothing in this Order shall prevent the Monitor from acting as an interim receiver, a receiver, a receiver and manager, or a trustee in bankruptcy of the ~~Applicant~~Applicants, the Business or the Property.

48. ~~49.~~ **THIS COURT HEREBY REQUESTS** the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada ~~or in~~, the United States or elsewhere, to give effect to this Order and to assist the ~~Applicant~~Applicants, the Monitor and their respective agents in carrying out the terms of this Order.  All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the ~~Applicant~~Applicants and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the ~~Applicant~~Applicants and the Monitor and their respective agents in carrying out the terms of this Order.

49. ~~50.~~ **THIS COURT ORDERS** that each of the ~~Applicant~~Applicants and the Monitor be at liberty and is hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order, and that the ~~Monitor is~~Applicants are authorized and empowered to act as a representative in respect of the within proceedings for the purpose of having these proceedings recognized in a jurisdiction outside Canada.

50. ~~51.~~ **THIS COURT ORDERS** that any interested party (including the ~~Applicant~~Applicants and the Monitor) may apply to this Court to vary or amend this Order on not less than seven (7) days notice to any other party or parties likely to be affected by the order sought or upon such other notice, if any, as this Court may order.

51. ~~52.~~ **THIS COURT ORDERS** that this Order and all of its provisions are effective as of 12:01 a.m. Eastern Standard/Daylight Time on the date of this Order.

52.     **THIS COURT ORDERS** that this Order is effective from the date that it is made and is enforceable without any need for entry and filing.

_____

Schedule "A"
**Subsidiaries**

(a)     Lighthouse Immersive Las Vegas, LLC;

(b)     Lighthouse Immersive Denver, LLC;

(c)     Lighthouse Immersive Detroit, LLC;

(d)     Lighthouse Immersive Cleveland, LLC;

(e)     Lighthouse Immersive Columbus, LLC;

(f)     Lighthouse Immersive Nashville, LLC;

(g)     Lighthouse Immersive Kansas City, LLC;

(h)     Lighthouse Immersive San Antonio, LLC;

(i)     Lighthouse Immersive Madison, LLC; and

(j)     Lighthouse Immersive Orlando, LLC.

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c.C-36 AS AMENDED
AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF LIGHTHOUSE IMMERSIVE INC. et al.

Court File No.:  »

| | |
|---|---|
| Double Click on mouse to Add space for Third Party  <br><br><br>Double Click on mouse to Add more space to parties line  | ***ONTARIO***<br>SUPERIOR COURT OF JUSTICE - COMMERCIAL LIST<br><br>Proceeding commenced at TORONTO |
| | INITIAL ORDER<br>(DATED JULY 27, 2023) |
| | MILLER THOMSON LLP<br>Scotia Plaza<br>40 King Street West, Suite 5800<br>P.O. Box 1011<br>Toronto, ON Canada  M5H 3S1<br><br>Kyla Mahar LSO#: 44182G<br>kmahar@millerthomson.com<br>Tel: 416.597.4303<br><br>Gina Rhodes LSO# 78849U<br>grhodes@millerthomson.com<br>Tel: 416.597.4321<br><br>Lawyers for the Applicants |

Document comparison by Workshare Compare on Thursday, July 27, 2023 9:53:58 AM

| Input: | |
|---|---|
| Document 1 ID | iManage://MTDMSWSSC.MILLERTHOMSON.CORP/Legal/71208028/1 |
| Description | #71208028v1<Legal> - Model Order |
| Document 2 ID | iManage://MTDMSWSSC.MILLERTHOMSON.CORP/Legal/71335124/1 |
| Description | #71335124v1<Legal> - Draft Initial Order (July 26, 2023) (final draft to be delivered to Court) |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---:|
| | Count |
| Insertions | 366 |
| Deletions | 348 |
| Moved from | 0 |
| Moved to | 0 |
| Style changes | 0 |
| Format changes | 0 |
| Total changes | 714 |

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c.C-36 AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF LIGHTHOUSE IMMERSIVE INC. et al.

Court File No.:

|  |  |
|---|---|
|  | *ONTARIO*<br>**SUPERIOR COURT OF JUSTICE**<br>**(COMMERCIAL LIST)**<br><br>Proceedings commenced at Toronto |
|  | **APPLICATION RECORD**<br>**(returnable July ●, 2023)** |
|  | **MILLER THOMSON LLP**<br>40 King Street West, Suite 5800<br>Toronto, Ontario<br>M5H 3S1, Canada<br><br>**Kyla Mahar LSO#: 44182G**<br>kmahar@millerthomson.com<br>Tel: 416.597.4303<br><br>**Gina Rhodes LSO# 78849U**<br>grhodes@millerthomson.com<br>Tel: 416.597.4321<br><br>Lawyers for the Applicants |