**<u>Exhibit B</u>**

Moore Declaration

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| | ) |
| In re: | ) Chapter 15 |
| | ) |
| | ) Case No. 23-11021 (LSS) |
| Lighthouse Immersive Inc., *et al.*, | ) |
| | ) (Jointly Administered) |
| Debtors in a Foreign Proceeding[1]. | ) |
| | ) |

## DECLARATION OF VALERIE MOORE IN SUPPORT OF THE MOTION OF CITY NATIONAL BANK FOR RELIEF FROM THE AUTOMATIC STAY

I, Valerie Moore, declare as follows:

1.      I serve as Assistant Vice President of City National Bank ("**CNB**"). In my capacity as Assistant Vice President of CNB, I am familiar with its operations, day-to-day business affairs, and books and records.

2.      I am duly authorized to make and submit this declaration in support of CNB's *Motion for Relief from the Automatic Stay* (the "**Motion**").[2]

3.      Except as otherwise indicated, all facts set forth in this declaration are based on my personal knowledge, my communications with other members of CNB's management, employees and professionals, my review of relevant documents, or my opinion, based on my overall professional experience with CNB's operations and business affairs. Prior to the Petition Date, on or about October 25, 2021, Lighthouse Immersive USA Inc. ("**Lighthouse USA**") and CNB entered into that certain Commercial Credit Card Agreement and related Security Agreement under which CNB issued to Lighthouse USA a secured credit card account, with a secured limit of

---

[1] The Debtors and the last four digits of its U.S. Federal Employer Identification Numbers or other unique identifier are as follows: Lighthouse Immersive Inc. (9411) (Ontario Corporation No.) and Lighthouse Immersive USA Inc. (2401) (FEIN). The Debtors' mailing address is 640 Briar Hill Avenue, Toronto, Ontario, Canada, M5N 1N2.

[2] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such teams in the Motion.

$300,000. True and correct copies of the Commercial Credit Card Agreement (the "**Credit Card Agreement**") and related Security Agreement are attached hereto as <u>Exhibits 1 and 2</u>, respectively.

4.      The Credit Card is secured by collateral, consisting of

Savings Account Number [], maintained by Lighthouse Immersive USA, Inc at City National Bank, New York Business Banking Branch, and all additions thereto, all substitutions therefor and all proceeds thereof.

(the "**Collateral**"). *See* Security Agreement at page 1 (Savings Account Number omitted).

5.      City National Bank perfected its interest in the Collateral by obtaining control of the Deposit Account in accordance with New York law.

6.      As of the date hereof, the Collateral has a limited cash value of $300,000.

7.      The per diem interest factor on the Credit Card Account is .0437260% for both purchases and cash advances, which correlates to an annual percentage interest rate of 15.96%. As of the date hereof, no late charges have been assessed.

8.      As of July 28, 2023, the balance on the Credit Card Account was $240,612.70. As of August 11, 2023, however, the balance had grown to $267,005.27. This balance does not account for post-petition accrued interest nor reasonable attorneys' fees, recovery costs, and other legal expenses, which CNB is entitled to pursuant to the Security Agreement. Using a reasonable estimate for post-petition accrued interest, attorneys' fees, recovery costs, and other legal expenses of $40,000, CNB's claim exceeds the cash-secured threshold on the Credit Card Account of $300,000 by $7,005.27.

9.      Pursuant to the Security Agreement, the entire balance on the Credit Card Account became due and owing as of the Petition Date.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Executed on this 24th day of August 2023

/s/ *Valerie Moore*
Valerie Moore
Assistant Vice President
City National Bank

3

## **Exhibit 1**

Commercial Credit Card Agreement

# COMMERCIAL CREDIT CARD AGREEMENT

## (Retail Installment Credit Agreement)




**COMMERCIAL CREDIT CARD AGREEMENT
(RETAIL INSTALLMENT CREDIT
AGREEMENT) FOR
VISA® COMMERCIAL CARD
AND
VISA® CRYSTAL COMMERCIAL CARD**

This Commercial Credit Card Agreement, which includes any application that you submitted to the Bank ("Application") and, subject to applicable law, any changes that we make to it from time to time (the "Agreement"), governs the use and terms of your VISA® Commercial Credit Card account (**"VISA Commercial Account"**) or VISA® Crystal Commercial Credit Card account ("**VISA Crystal Account**"), as applicable (each of the VISA Commercial Account and VISA Crystal Account are referred to individually herein, as the "Commercial Account") with **CITY NATIONAL BANK**, a national banking association. Please read this Agreement carefully and keep it for your records.

**DEFINITIONS**
In addition to terms defined elsewhere, in this Agreement the following words have the following meanings:

- "**Access Device**" includes any PIN, account number or other means of accessing and obtaining credit advances from the Commercial Account and any Account, including the use of any virtual account or card number that we may offer through our online services or through a third party service provider.
- "**Account**" means (i) an account established under the Commercial Account for an Authorized User or (ii) a Department Card account.
- "**Account Number**" means the number(s) assigned to the Commercial Account and any Account.
- "**Administrator**" means, if applicable, one or more individuals designated by you in writing (which writing may be provided electronically) that are authorized to take actions with respect to the Commercial account.
- "**Authorized User**" means any of your designated employees, agents or representatives to whom you ask us to issue a Card or Access Device, as well as any person you or an Authorized User allows or authorizes to use a Card or Access Device.
- "**Bank**," "**we**," "**us**" and "**our**" mean City National Bank and its successors and assigns.
- "**Business Day**" means Monday through Friday, excluding federal legal holidays.
- "**Card**" means one or more credit cards issued in connection with the Commercial Account and any Account by which you or an Authorized User can obtain credit advances thereunder.
- "**Cash Advance**" means an advance of funds (1) from an Account at any financial institution or non-financial institution accepting the Card or Access Device, (2) from an automated teller machine ("ATM") using a Card and PIN and (3) for any payment posted to an outstanding Cash Advance that you make to us that is returned to us unpaid for any reason. "Cash Advance" includes any transaction that we consider to be equivalent to a Cash Advance, such as the purchase of money orders, lottery

1

tickets, bets, casino gaming chips and similar products and services.

- **"Credit Limit"** means, for the Commercial Account, the aggregate maximum balance that may be outstanding on the Commercial Account, and for each Account, the maximum balance that may be outstanding on the Account.
- **"Department Card Account"** means an account without the name of the Authorized user embossed or otherwise imprinted on the card (such as when a Card and any related Access Device is assigned to a department of yours for business expenses).
- **"Digital Wallet"** means a digital wallet, such as Apple Pay®, Google Pay®, or any other electronic payment system into which a card or Account Number may be enrolled on any mobile phone, tablet, watch or other device that supports an electronic payment system.
- **"Include,"** **"includes"** and **"including"** will be deemed to be followed by the words "without limitation."
- **"PIN"** means the personal identification number(s) issued in connection with a Card.
- **"You,"** **"your"** and **"yours"** mean the individual or business entity that signed and submitted the Application and to whom Bank approved and opened the Commercial Account, and includes each Administrator, if applicable.

**OPENING ACCOUNTS AND ISSUING CARDS**

You or any other person designated by you in writing to us may from time to time request that we establish an Account for an Authorized User and issue one or more Cards and Access Devices in connection therewith. A distinct Account Number and credit limit will be established for each Account, and the name of the Authorized User will be imprinted on the Card issued in connection with the Account.

With Bank's permission, if you issue a Card or Access Device from a Department Card Account without the name of the Authorized User (e.g., a department card),you understand and agree that (i) there may be an increase in the risk of fraudulent or unauthorized use for such card, (ii) you are responsible for the security and protection of such card, (iii) you are responsible for ensuring that such card is used only by your employees, agents and representatives, and (iv) subject to applicable law, you will be liable for the payment of all transactions and other amounts incurred under and charged to such card, even if such usage would otherwise constitute unauthorized use.

You agree that you and any designee will *only* request Cards and Access Devices for your employees, agents or representatives for business purposes. This Agreement will govern the Commercial Account and all Accounts and all Cards and Access Devices issued in connection therewith.

In addition, use of any Cards or Account Numbers through a Digital Wallet remains subject to the terms hereof and of separate terms and conditions imposed by each third party.

**BUSINESS PURPOSE**

The Commercial Account and each Account will be used solely to obtain credit for business purposes. You agree that none of the Commercial Account nor any Account, Card

2

and/or Access Device will be used for any personal, family or household purpose. You are responsible for instructing all Authorized Users of this business purpose. As such and to the extent permitted by applicable law, the Commercial Account and this Agreement are not subject to any statutes or regulations that apply to credit primarily used for personal, family or household purposes.

You agree to indemnify Bank and hold Bank harmless from any and all liability, loss or expense, including reasonable attorney's fees, arising from or out of any violation or alleged violation of the Truth-in-Lending Act or Regulation Z made or asserted against Bank based upon any use of the Commercial Account or any Account, Card or Access Device for an alleged consumer purpose

However, all amounts advanced on the Commercial Account and each of the Accounts remain subject to the promise to pay set forth below and the other provisions in this Agreement regardless of the purposes of any such advances.

**USING THE ACCOUNT**
Each Card must be activated by an Authorized User or, for a Department Card Account, by an employee of Company designated by you, using any activation process that is provided with the Card, and each Card must be signed by the Authorized User where indicated upon receipt. Each Authorized User can purchase or lease goods and services and obtain Cash Advances by using its Card and/or any Access Device provided to the Authorized User.

We will not be liable to you or any Authorized User if (a) any merchant, financial institution or ATM or any third party refuses to accept or honor a Card or any Access Device, even if that refusal results from restrictions or requirements we impose on the Commercial Account or any Account, (b) operational problems prevent a transaction from being authorized, or (c) a transaction is declined because the balance of the Commercial Account or any Account exceeds or would exceed its Credit Limit or you are in default under this Agreement. You acknowledge that other financial institutions' ATM networks may have limitations on the number and dollar amount of Cash Advances which may be withdrawn from their ATMs.

If you are also a VISA merchant with us or any other financial institution, no Commercial Account, Account, Card or any Access Device shall be used for the purpose of granting a Cash Advance on the Account through the use of any terminal or other device issued to you for the purpose of obtaining approval of a purchase or other transaction or for the acceptance of payment for a purchase or other transaction. Cash Advances may only be obtained in accordance with the provisions of this Agreement. You will not allow any person to use a Card or Access Device, other than the designated Authorized User for such Card or Access Device. Neither you nor any Authorized User will share any Card or Access Device with anyone. Both we and third parties may provide you with benefits and services that are not described in this Agreement. These benefits and services are not part of this Agreement and may be added, deleted or changed at any time without notice. We are not

responsible for benefits and services provided by third parties.

**IMPERMISSIBLE TRANSACTIONS**

You and each Authorized User will use a Card and Access Device only for lawful purposes. You and each Authorized User will not use a Card or Access Device for any Internet or illegal gambling transactions, but you will be responsible for any such transactions, which will be subject to all of the provisions of this Agreement. We will not be liable if you or an Authorized User uses a Card or any Access Device in any illegal transaction. You acknowledge and agree that no Commercial Account or any Account, Card and/or Access Device can be used to conduct transactions in any country or territory, or with any individual or entity, that is subject to economic sanctions administered and enforced by The Office of Foreign Assets Control of the U.S. Department of the Treasury ("OFAC"). Additionally, you have verified that none of the Authorized Users(i) are a Sanctioned Person or a Sanctioned Entity,(ii) have its assets located in Sanctioned Entities, or (iii) derive revenues from investments in, or transactions with Sanctioned Persons or Sanctioned Entities. As used herein, (x) "**Sanctioned Person**" means any government, country, corporation or other entity, group or individual with whom or which OFAC prohibits a U.S. person from engaging in transaction and includes any individual or corporation or other entity that appears on the current Specially Designated Nationals and Blocked Persons list published by OFAC and (y) "Sanctioned Entity" means (a) An agency of the government of, (b) an organization directly or indirectly controlled by, or (c) a person resident in, a country that is subject to a sanctions program identified on the list maintained by OFAC and available at http://www.treas.gov/offices/enforcement/ofac/sanctions/index.html or as otherwise published from time to time as such program may be applicable to such agency, organization or person.

**PROMISE TO PAY**

You promise to repay all amounts advanced on the Commercial Account and each of the Accounts whether by use of the Cards, Access Devices, through Digital Wallets, or otherwise (notwithstanding any terms contained on any sales or advance receipts to the contrary), plus all Finance Charges, late charges and other charges and fees imposed on the Commercial Account and all Accounts in accordance with the provisions of this Agreement. You are liable for all of these amounts, including amounts related to advances made to Authorized Users and to other persons you allow to use a Card or Access Device, even if such use is for personal, family or household purposes or is otherwise in violation of this Agreement. Except as otherwise provided in this Agreement, all fees and charges will be posted to the purchase segment of an Account as described in the applicable Fee Schedule.

**CREDIT LIMIT**

We will inform you by written notice of the amount of the initial approved Credit Limit for the Commercial Account and each Account. Such written notice is made a part of this Agreement. After that, if you elect to receive a Company

Statement (as defined below), the current Credit Limit for the Commercial Account will be the amount shown on the most recent Company Statement; the current Credit Limit for each Account will not be shown on such statement, but may be obtained by contacting us. If you elect to receive Cardholder Statements (as defined below), the current Credit Limit for an Account will be the amount shown on the most recent Cardholder Statement for that Account; the current Credit Limit for the Commercial Account will not be shown on such statement, but may be obtained by contacting us. We can establish different Credit Limits that apply to different segments of your Commercial Account and each Account (such as purchases and Cash Advances). **Note**: We can increase or decrease the Credit Limit on the Commercial Account or the Credit Limit of an Account at any time, either permanently or temporarily, without prior notice to you.

You agree not to permit the outstanding balance of the Commercial Account or any Account (including all accrued but unpaid advances, Finance Charges and other fees and charges) to exceed its Credit Limit. If any advance would cause the Credit Limit on the Commercial Account or an Account to be exceeded, we can refuse to authorize the transaction, or charge the Account for the transaction (even if this results in the assessment of an Overlimit Fee) without giving up any of our rights or remedies under this Agreement. Any transaction honored in excess of a Credit Limit will be subject to the terms of this Agreement, but will not result in an increase of the Commercial Account's Credit Limit or the Credit Limit of an Account unless we expressly notify you in writing. We can increase or decrease the Credit Limit on the Commercial Account or the Credit Limit of an Account at any time, either permanently or temporarily, without prior notice to you. We will not be liable to you or an Authorized User if a transaction on the Commercial Account or an Account is not honored for any reason, even if the Commercial Account or an Account had sufficient credit available under the assigned Credit Limit. You agree to pay us on demand any amount by which the outstanding balance on the Commercial Account or an Account exceeds its assigned Credit Limit.

**FEES AND CHARGES**
We may charge our fees and charges on your Commercial Account or any Account as set forth in the applicable Fee Schedule. You are separately provided a schedule of our fees and charges. When a fee or charge is changed, we will notify you as required by law. You may obtain our current fee schedule for your account from your Relationship Manager or a Client Representative at your branch.

**FOREIGN CURRENCY TRANSACTIONS**
Transactions in foreign currencies will be converted to U.S. Dollars at the exchange rate determined by Visa in accordance to its operating regulations or conversion procedures in effect at the time the transaction is processed. Currently, the Visa operating regulations state that the exchange rate between the transaction currency and the billing currency is: (a) a rate selected by Visa from the range of rates available in wholesale currency markets for the applicable central processing date, which rate may vary from

the rate Visa itself receives or (b) the government-mandated rate in effect for the applicable central processing date, in each instance, plus or minus any adjustment determined by the card issuer. The exchange rate for the applicable central processing date may differ from the rate in effect on the transaction date or the posting date. The exchange rate used may be the same as, greater than, or less than the rate that would be available through a financial institution in the country in which the transaction occurred. A Foreign Transaction Fee may be imposed on any foreign transaction as set forth in the applicable Fee Schedule.

## BILLING CYCLES, PAYMENTS AND STATEMENTS

▪ **Billing Cycles**—A billing cycle is the time beginning the day following one billing statement closing date through and including the next billing statement closing date. You may select either (i) a seven (7)-day billing cycle ("**7-Day Cycle**"), (ii) a 14-day billing cycle ("**14-Day Cycle**") or (iii) a monthly billing cycle ("**Monthly Cycle**") by completing and submitting to us your selection on our designated form. If you do not designate to us, in writing, one of the above billing cycle period options, then your billing cycle will be the Monthly Cycle. You may request a change in the billing cycle from one billing cycle to another billing cycle not more than once every six (6) months by submitting a request to your Relationship Manager or other method acceptable to us. Your change to the new billing cycle will take effect once we have the opportunity to act upon it, and at our sole option, may only occur at the end of your current billing cycle.

▪ **Billing Statements**—You may elect in writing to Bank or if applicable, online, either (i) to receive a billing statement setting forth by Authorized User the activity and outstanding balance on each Account, with Authorized Users receiving memorandum statements of the activity in their Accounts ("**Company Statement**"), or (ii) to have each Authorized User receive its own billing statement for each billing cycle ("**Cardholder Statements**"). You change from a Company Statement to Cardholder Statements, and vice versa, by submitting a request to your Relationship Manager or other method acceptable to us. If you do request such change Bank will assign you a new Commercial Account Number and a new Account Number for each Authorized User and will send to each Authorized User a new card within a reasonable period of time. Except as otherwise agreed to by us, during such transition period, neither you nor any Authorized User will have access to the Commercial Account, or any Account, respectively. If you select the Company Statement option, any additional payments made on an Account during a billing cycle will not increase the amount of credit available for use under the Account until the beginning of the next billing cycle, unless the additional payment is made directly to the Cardholder Account.

A billing statement will be sent for each billing cycle during which an Account has an outstanding balance of $1.00 or more or on which a Finance Charge has been imposed, or in which transactions have been posted to the Account. Each billing statement and memorandum statement and summary cycle report will be sent to your address as shown in our records. Each billing statement will provide the information required by law, including the outstanding balance of the

Account at the end of each billing cycle (the "**New Balance**"). A billing statement may not be sent if we believe that the Commercial Account is uncollectible, if delinquency proceedings have been initiated, if we have charged off the Commercial Account and will not charge any additional fees or Finance Charges on the Commercial Account, or if furnishing the statement would violate applicable federal law.

▪ **Minimum Payment**—You may (i) pay the New Balance for each Account in full, or (ii) pay in periodic installments. If you choose to pay in periodic installments, you must pay at least the Minimum Payment Due for each Account. The "**Minimum Payment Due**" for each Account is (i) the greater of 5.0% of the most recent New Balance of the Account (rounded to the nearest dollar) or $50.00, except that a New Balance of less than $50.00 is payable in full, plus (ii) any past due payments, late charges and any outstanding balance on an Account in excess of its Credit Limit. **YOU MAY PAY THE TOTAL INDEBTEDNESS (New Balance) AT ANY TIME.**

▪ Payment Due Date—The Payment Due Date for each billing cycle is: (i) three (3) days after the Closing Date shown on the billing statement for a 7-Day Cycle, (ii) seven (7) days after the Closing Date shown on the billing statement for a 14-Day Cycle, or (iii) 25 days after the Closing Date shown on the billing statement for a Monthly Cycle.

▪ **Payment Instructions**—You will make all payments in U.S. Dollars, with a check, draft, money order or other negotiable instrument drawn on a U.S. financial institution, or by an electronic payment method that is acceptable to us. All payments (other than electronic payments) must be sent to the address shown on the most recent billing statement by the Payment Due Date shown on the billing statement, and must include the payment coupon from the billing statement. There could be a delay of up to five (5) business days in crediting any payment on an Account if you send any payment to us at any of our other addresses or you otherwise fail to follow our requirements for payments. This may result in the imposition of late charges, additional Finance Charges and Overlimit Fees, and it may also result in your default under this Agreement. You agree not to use the proceeds of any advance on the Commercial Account or an Account to make payments on any Account or to make payments on other loans from us. If payment on the Accounts is aggregated in one or more checks or other payment instrument(s), you agree to provide to us, along with such check(s) or payment instrument(s), a listing indicating the amount of the payment to be applied to each Account. If you do not provide us with such listing, we may apply the payment in any order and to such Accounts as we determine in our sole discretion.

▪ **Payment Allocation**—Subject to applicable law, we may apply payments and credits in a way that is most favorable to or convenient for us. If the Commercial Account has balances with different ANNUAL PERCENTAGE RATES, subject to applicable law, we will decide how to allocate the amount of the Minimum Payment Due. We may adjust an Account as appropriate to address errors, returned items, dishonored payments and other matters.

7

- **Payments Marked "Paid In Full," Etc.**—We may receive letters, checks or other types of payment showing "payment in full" or using other language to indicate satisfaction of your debt, without waiving any of our rights to receive full payment under this Agreement. You must send any such communication and payment to City National Bank, 555 Flower Street, 8th Floor, Los Angeles, CA 90071, Attention: Enterprise Cards - Operations. Satisfaction of your debt for less than the full amount due requires a written agreement by us, signed by one of our authorized officers.

- **Postdated Checks**—You agree that no payments will be made by postdated check or other payment instrument. If we receive a payment made by a postdated check or other payment instrument, we may deposit it and will have no liability if it is posted to your checking account prior to the date appearing on the check or payment instrument.

- **Credit Balances**—You may request a refund of a credit balance shown on your billing statement at any time by writing to us at the City National Bank, 555 S. Flower Street, 8th Floor, Los Angeles, CA 90071, Attention: Enterprise Cards - Operations. Your request must be in writing and in a mailing separate from your payment. Written notices on the payment coupon that is returned to us with a payment will be insufficient for this purpose. We may reduce the amount of any credit balance by the amount of new charges or fees billed to an Account.

- **Automatic Charges**—You or an Authorized User may authorize a third party to automatically charge an Account for repeat transactions. If automatic charges are stopped by any reason (including because an Account is closed or suspended), or an Account number changes, then you are responsible for notifying the biller and paying these charges directly. If an Account number changes, we may, but are not required to, pay from a new Account number charges that you or an Authorized User has authorized to be billed to the old Account number.

- **Immediate Payment Posting**—If you wish to make a payment to an Account and you maintain a checking or savings account with us, then except as provided below, you may call us on the day that you wish the payment to be made and request that we debit your checking or savings account for the amount of the payment. Your payment request must be received by us no later than 1:00 p.m. Pacific Time, on a Business Day, if you wish us to make the payment to an Account on that Business Day. To make a payment request, call your relationship manager at the Bank or the telephone number on the most recent periodic statement. If a payment request is received by us after 1:00 p.m. Pacific Time on a Business Day, the payment will be processed in accordance with our normal payment procedures and no special handling fee will be charged to the Account. If you have more than one checking or savings account with us, you may designate only one account to be debited for the payment. Debits from multiple checking or savings accounts are not permitted. Once your request has been received by us, it cannot be revoked or changed. You must have sufficient collected funds in your checking or savings account for the payment to be processed. In addition, the checking or savings account must be in your

name and there cannot be any signing restrictions which would preclude you from authorizing the debit. An Immediate Payment Posting Fee may apply and, if applicable, will be designated on the billing statement as an "Immediate Payment Posting Fee." See applicable Fee Schedule.

**SECURITY INTEREST**

As collateral security for repayment of all amounts due under this Agreement, you hereby grant to Bank a continuing security interest in any and all present and future funds on deposit with Bank including certificates of deposit and other deposit accounts in which you are an accountholder (with the exception of IRA, pension and other tax-deferred deposits). You agree that should there be a default hereunder, Bank may at any time thereafter apply any such funds on deposit with Bank toward any unpaid balance of the Commercial Card Account and any Account thereunder. Bank reserves the right to request a security agreement, guaranty or other collateral document in its discretion. Bank may also request additional collateral security for the obligations hereunder which may require additional documentation.

**DEFAULT**

The occurrence of any of the following will constitute a default under this Agreement:

(1) the failure to make any payment when due under this Agreement or a payment to us is returned or reversed for any reason;

(2) the failure by your or any Authorized User to comply with any of the terms or conditions of this Agreement;

(3) you fail to meet any other obligations to Bank, however arising, whether related or unrelated to this Agreement, including any obligations you have to Bank, as borrower, guarantor, pledgor, grantor or in any other capacity, under any note, account agreement, guaranty, loan agreement, security agreement or other credit or service document;

(4) any material default in the payment or performance of any obligation for borrowed money, any purchase obligation or any other liability of any kind to any person or entity, including us;

(5) there is an attachment, execution or levy against you or your property;

(6) the filing of a petition for bankruptcy, insolvency, receivership or similar protection is filed against you;

(7) any Authorized User exceeds his/her credit line or your overall credit limit is exceeded;

(8) you are dissolved, consolidated or merged, or a change in control of ownership occurs;

(9) if applicable, any guarantor of this Agreement becomes insolvent, dies or becomes incompetent, or revokes or disputes the validity of, or liability under any guaranty of indebtedness that includes this Agreement;

(10) if applicable, any guarantor of this Agreement fails to comply with any term or condition in the applicable guaranty;

(11) any financial statement provided by you or any guarantor to us is false or misleading;

9

(12) any sale or transfer of all or a substantial or material part of the assets of any of you or any guarantor, other than in the ordinary course of business; or

(13) Bank believes in good faith that the payment or performance of your obligations to Bank is impaired for any reason.

**REMEDIES UPON DEFAULT**
In the event of a default, we may, at our option, in addition to such other remedies as we may have with respect to such default and without prior notice to you or any Authorized User, do one or more of the following: (a) require immediate payment in full of the entire outstanding balance and all accrued Finance Charges and other fees and charges owed on the Commercial Account or any or all of the Accounts and under this Agreement; (b) suspend further credit privileges on the Commercial Account or any or all of the Accounts; (c) cancel the Commercial Account or any or all of the Accounts; (d) increase the Minimum Payment Due; or (e) suspend any features of the Commercial Account or any or all of the Accounts. Following the exercise of any such remedy, you will remain subject to the provisions of this Agreement, including your obligation to repay the outstanding balance of the Commercial Account and all of the Accounts.

**COLLECTION COSTS**
Subject to applicable law, you agree to pay all costs and expenses we may incur in collecting amounts owed under this Agreement, or otherwise enforcing or protecting our rights with respect to the Commercial Account and any Account, whether or not a lawsuit is filed. These costs and expenses include, but are not limited to, court costs, legal fees, attorneys' fees (which may include, as permitted by applicable law, those of attorneys employed by us), and the expenses of retrieving Cards (which expenses include those that we incur by having Card information placed in a warning bulletin or restricted list). We may charge the Commercial Account and any Account for any or all collection costs incurred with respect to the Commercial Account and that Account.

**OTHER RIGHTS TO CANCEL OR CHANGE CREDIT PRIVILEGES**
You may cancel the Commercial Account or terminate your credit privileges any time by providing us with written notice at the address stated in your most recent billing statement. Any cancellation or termination of the Commercial Account will result in a simultaneous cancellation or termination of the Accounts and shall be binding on the Authorized Users. We may require you to return all Cards, cut in half, in order to cancel or terminate the Commercial Account. If you wish to terminate the credit privileges of an Authorized User, you must notify us immediately and use reasonable efforts to retrieve and destroy such cards.

Except as limited by applicable law, we reserve the right to cancel, suspend or terminate credit privileges on the Commercial Account and any or all Accounts at any time (even if you are not in default under this Agreement) without prior notice. If the Commercial Account or an Authorized

User's Account is canceled or credit privileges are suspended or terminated by you or us, we will not be obligated to make further advances on the Commercial Account or Authorized User's Account, as the case may be, but you will remain subject to the provisions of this Agreement, including your obligation to repay the outstanding balance of the Commercial Account and all Accounts. In the event of any cancellation or termination, whether by you or by us, both you and the Authorized User will continue to be responsible for your and the Authorized User's transactions involving the Card or any Access Device until the cancellation or termination is effected by us.

If you or any Authorized User authorized any recurring credit card charges (e.g., auto payments, subscriptions, etc.), you will continue to be responsible for such recurring charges until you (or your Authorized User) cancels or terminates the authorization.

**AMENDMENTS**
We may amend any of the terms of this Agreement and the applicable Fee Schedule at any time without notice, except as required by law. **SUBJECT TO APPLICABLE LAW, ANY NEW TERMS MAY, AT OUR OPTION, BE APPLIED TO THE OUTSTANDING BALANCE OF THE COMMERCIAL ACCOUNT AND ANY AND ALL ACCOUNTS AT THE TIME OF CHANGE, AS WELL AS TO FUTURE TRANSACTIONS, REGARDLESS OF WHETHER YOU CONTINUE TO USE THE COMMERCIAL ACCOUNT AFTER THE NEW TERMS BECOME EFFECTIVE**. We will send you any notice of the change that is required by applicable law. If the notice gives you the opportunity to reject the change, and you reject the change in the manner provided in the notice, we may cancel the Commercial Account and any and all Accounts.

**DISCLAIMER**
BANK MAKES NO WARRANTIES, EXPRESS OR IMPLIED, IN CONNECTION WITH THE SERVICES PROVIDED TO YOU OR ANY AUTHORIZED USER WITH RESPECT TO THE COMMERCIAL CARD ACCOUNT OR ANY ACCOUNTS, CARDS AND/OR ACCESS DEVICES OR THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, ANY WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NONINFRINGEMENT. ALL SERVICES PROVIDED HEREIN ARE PROVIDED ON AN "AS IS" BASIS WITHOUT RECOURSE TO BANK.

**LIMITATION OF LIABILITY**
YOU AGREE THAT AN IMMATERIAL DEVIATION BY BANK FROM THE TERMS SET FORTH IN THE AGREEMENT SHALL NOT BE DEEMED A FAILURE TO EXERCISE ORDINARY CARE OR TO ACT IN GOOD FAITH. TO THE EXTENT PERMITTED BY LAW, BANK WILL NOT BE LIABLE (1) FOR ANY INDIRECT, SPECIAL, CONSEQUENTIAL, INCIDENTAL, PUNITIVE OR EXEMPLARY DAMAGES OR LOSSES, WHETHER OR NOT FORESEEABLE, (2) FOR ANY LOSS OR DAMAGE ARISING DIRECTLY OR INDIRECTLY FROM OR IN CONNECTION WITH ANY ACT OR OMISSION ON THE

PART OF ANY PERSON NOT WITHIN BANK'S REASONABLE CONTROL, OR ANY ERROR, FAILURE OR DELAY IN EXECUTION OF ANY TRANSACTION RESULTING FROM CIRCUMSTANCES BEYOND BANK'S REASONABLE CONTROL, INCLUDING BUT NOT LIMITED TO, ANY INOPERABILITY OF COMMUNICATIONS FACILITIES OR OTHER TECHNOLOGICAL FAILURE AND (3) FOR ANYTHING RELATING TO THE COMMERCIAL CARD ACCOUNT OR ANY ACCOUNTS, CARDS AND/OR ACCESS DEVICES OR THIS AGREEMENT EXCEPT TO THE EXTENT DIRECTLY ARISING OUT OF BANK'S OWN GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

**ASSIGNMENT**

We may sell, transfer or assign this Agreement, the Commercial Account, any Account or the amount owing under the Commercial Account or any Account without notice to you or any Authorized User. Neither you nor an Authorized User may sell, transfer or assign the Commercial Account, any Account or any of your or their obligations under this Agreement.

**OWNERSHIP OF CARDS**

We will at all times own all Cards provided in connection with the Accounts. We can revoke your and any Authorized User's right to use a Card, Access Device, or Account at any time. Upon revocation of an Authorized User's right to use a Card, Access Device or Account, such Authorized User must immediately discontinue use of the Card and use reasonable efforts to destroy the Card.

**FINANCIAL AND OTHER INFORMATION**

You represent and promise to us that (a) your most recent financial statements provided to us are true, complete and correct in all material respects, (b) they fairly represent your financial condition as of the date shown on such statements, and (c) no material adverse change has occurred in your financial condition since that date. You also represent and promise to us that the most recent federal income tax return and all schedules attached to such return ("Federal Tax Return") that you have given to us are a true and correct copy of such Federal Tax Return filed with the Internal Revenue Service for the tax period ending on the date indicated in such Federal Tax Return. We may reinvestigate any information you provided to us on or with your Application for the Commercial Account at any time. From time to time, you agree to promptly provide us with such financial statements and other information as we may request regarding you and your business operations and financial affairs, including a current list of Authorized Users. You authorize us to request and receive, from time to time, information from others concerning you and your credit history, and to answer questions and requests from, and provide information to, others (such as credit reporting agencies) about your credit or our other experience with you.

**CHANGE OF NAME OR ADDRESS**

If you change your name, your address or your telephone number, you agree to give us notice of such change by contacting your Relationship Manager or providing written notice of such change on the payment coupon of the next

billing statement in the space provided so we can change our records.

**LOST, STOLEN OR UNAUTHORIZED USE OF CARDS OR OTHER ACCESS DEVICES**

If any Card or Access Device is lost or stolen, or if you or any Authorized User think that any Card, Access Device, or Digital Wallet is being or may be used without your permission or in an unauthorized manner, **you agree to notify us immediately** by calling or writing to us at the telephone number or address shown on your most recent billing statement. If you (or any Authorized User), as applicable agrees to follow this up with written notice to us. Neither you nor any Authorized User will use the Card, or any Access Device or Digital Wallet after we have been notified, even if the Card, Access Device or Digital Wallet device (e.g., smart phone tablet), is found or returned.

Subject to applicable law, you will be liable for any unauthorized use that occurs unless and until you notify us, by telephone or in writing, of the loss or theft or possible unauthorized use of the Card, Access Device or Digital Wallet. Your notification must identify for us the charges on the billing statement that (i) were not made by you, an Authorized User or other person authorized by you, and (ii) from which you or such Authorized User or other authorized person received no benefit. Notwithstanding the foregoing, if we issue fewer than ten (10) Cards and/or Access Devices on the Commercial Account, your liability for transactions by a person who does not have actual, implied or apparent authority to use any Card or Access Device and whose use does not result in a direct or indirect benefit to you will not exceed $50 per Account for any unauthorized use or series of unauthorized uses on that Account.

You will make every reasonable effort to recover Cards or Access Devices from any person whose authority you intend to or has terminated, or from any unauthorized individual with possession or access to the Cards or Access Devices. You and each Authorized User will assist us in our investigation, by providing information relating to any loss, theft or possible unauthorized use of a Card or Access Device and by complying with such procedures as we may require in connection with our investigation.

At any time there is any loss, theft or possible unauthorized use of a Card or Access Device, we may close the *Commercial Account and the Accounts and open a new Commercial Account and new Accounts* and issue new Cards and Access Devices for each such Account. Such new Commercial Account and new Accounts will be subject to the terms of this Agreement, as amended from time to time.

**DUTY TO REVIEW BILLING STATEMENTS; BILLING DISPUTES AND CHARGEBACK REQUESTS.**

Upon receipt, you agree to promptly and carefully examine, or cause to be promptly and carefully examined, the billing statement(s) for the Commercial Card Account(s) and any Accounts, whether or not you elected to receive Company Statements or Cardholder Statements. You and your Authorized Users are in the best position to discover erroneous or unauthorized transactions. If you suspect there

is an error on a billing statement, you should notify us as soon as possible.

You may dispute amounts set forth on a billing statement that you reasonably believe is incorrect because (i) the amount does not reflect the actual face value of the transaction, (ii) the transaction on the billing statement did not result from the use of a Card or Access Device, (iii) any fee on the billing statement is inaccurate or not properly accrued, or (iv) the transaction is disputable with the honoring merchant under applicable Visa rules; provided, that in any case, you notify us within sixty (60) days of the transaction date of the disputed transaction or amount. Each request hereunder will be in writing and contain the following information (1) name and account number of Card/Access Device, (2) dollar amount of any billing dispute or suspected error, (3) reason for the dispute, and (4) if applicable, a summary of the steps already taken with the merchant to resolve the matter. We will investigate and determine whether the amount is properly payable by you. Until we complete the investigation and make a determination, you will not be responsible for the amount of the disputed transaction. You agree that your failure to dispute a transaction or other charge within sixty (60) days from the transaction date shall constitute a waiver of any right you may have to dispute the transaction or charge. In the event that the honoring merchant may be held liable under applicable Visa rules, we will attempt to charge the transaction back to the merchant in accordance with Visa rules and procedures. However, such attempted chargeback by us will not relieve you of your liability for the amount of the transaction even though the transaction may have been provisionally credited to your Account.

**DISPUTES OVER TRANSACTIONS**
Bank has no liability for goods or services purchased with, or for a merchant's failure to honor purchases or transactions made with a Card, Access Device or Digital Wallet. In a dispute with a merchant, Bank will be subrogated to your rights and each Authorized User's rights against the merchant. You shall make a good faith effort to resolve or otherwise settle all disputes in any way related to goods or delivery of services or performance directly with the merchant involved. Notwithstanding any dispute, you remain subject to the payment obligations under this Agreement. You shall not assert against Bank any claims or defenses that you may have or believe that you have against the merchant.

**EXPEDITE DELIVERY OF CARD OR REPLACEMENT OF CARD**
If you request that we expedite the delivery of any Card to an Authorized User, then subject to applicable law, we may charge the Authorized User's Account a reasonable fee for such expedited service. Subject to applicable law, we may charge an Account a Replacement Card Fee for each new Card that is issued to replace a Card for any reason (including the issuance of a new Card to replace a lost, stolen or damaged Card, but excluding the issuance of a new Card in connection with the renewal of an Account), after a Card has been replaced once on an Account. See

14

applicable Fee Schedule.

### WAIVER

We may delay or waive enforcement of any provision of this Agreement with respect to the Commercial Account or any Account without losing our rights to enforce the same provision later, or another provision at another time. You waive any right you have to require us to take collection action or otherwise proceed against any Authorized User before proceeding against you.

### PRIVACY

In the event you require Emergency Cash Disbursement or Emergency Card Replacement Services through Visa, you agree that we may provide your personal data to Visa U.S.A. or its or our contractors or services providers, for that purpose. By entering into this Agreement, you expressly consent to the release of this information.

### TELEPHONE MONITORING

Your telephone calls and those of an Authorized User with us and/or our agent regarding your Commercial Account and the Accounts may be monitored and recorded for the purpose of assuring quality service or as required by applicable law. We may retain any telephone recording for such time as we will determine, but we will have no liability to you if we do not retain the recording.

### NOTICES

We will send any notices to you at the address to which billing statements are mailed. Except as otherwise provided in this Agreement, you will send all notices to us to the address shown on the most recent billing statement for an Account.

### CUMULATIVE RIGHTS

All rights and remedies granted to us under this Agreement are cumulative and no one such right or remedy is exclusive to any other.

### CHOICE OF LAW

This Agreement (including all provisions relating to rates, fees and charges), the Commercial Account and each Account will be governed by federal law and the laws of the State of California (without reference to such state's conflicts of law rules), whether or not you or any Authorized User lives or uses a Card or any Access Device in California.

### VENUE; JURISDICTION

If there is a lawsuit, you agree that venue and jurisdiction will be with any court of competent jurisdiction located in the county and state in which you resided (if you are a sole proprietorship) or your principal place of business was located at the time the Commercial Account was established.

### SEVERABILITY

In the event that any provision of this Agreement is held or determined invalid or unenforceable, for any reason, the remainder of the Agreement will remain in full force and effect and unaffected by such holding or determination.

15

**OPTIONAL CARD SERVICES:**
**ONLINE ACCOUNT MANAGEMENT MODULES**

At your option, you may enroll in the Account and Statement Management Modules ("ASM Module"). If you enroll in the ASM Module, you may also enroll, at your option, in the Report and Expense Management Modules ("REM Module"). The ASM Module and REM Module are collectively referred to in this Agreement as the "Online Modules." You agree to comply with all of the terms and conditions of the applicable agreements for the Online Modules, including any license agreements, which agreements will be provided to you separately. The Online Modules are provided and serviced through a third-party processor ("Processor"). You acknowledge and agree that the Processor is solely responsible for the performance of the Online Modules and the services provided through each of the Online Modules. You also acknowledge and agree that CNB will not be liable for any failure of performance, error, omission, interruption, or other failure of operation of the Online Modules or the service provided by the Processor, or any damages (including without limitation direct, indirect, punitive, special, incidental or consequential damages, costs, lost profits, losses or other expenses) arising in connection with the use of such Online Modules or service.

**EXTEND**

At your option, you may enroll in a third party provided service which allows you and your Authorized Users to extend use of a designated portion of an Account (referred to herein individually or collectively, as the "**Extend PAN**") through the Extend Application (the "**Extend App**", and the service is referred to as, the "**Extend Service**" or "**Pay with Extend**"). By enrolling, you agree to the following additional terms.

▪ You will designate an administrator for the Extend Service in accordance with Bank guidelines.

▪ You hereby designate Extend as your third party service provider to generate virtual card numbers ("**VCNs**") in connection with the Extend PAN through the Extend App, which a Delegate (as defined below) will download to an Enabled Device. As used herein, "**Enabled Device**" means any mobile communications device, such as a smartphone, that is enabled by a Delegate to use the Extend App.

▪ You agree that the VCNs generated on the Extend PAN through the Extend App will be provided only to your employees, independent contractors or agents (the "**Delegates**") who reside in the United States and will be used solely for your business purposes as permitted in this Agreement. You further agree that Bank may set a maximum credit limit set for the Extend PAN at any time.

▪ To facilitate the generation of VCNs on the Extend PAN, you authorize Bank to allow Extend access to your Extend PAN, and to provide information about you and the Account, as necessary, to enable Extend to generate and maintain VCNs for you. If you terminate the Extend Service or revoke Extend's authority to generate VCNs on your behalf or to have access to your information, you will promptly notify Bank in writing and Bank shall have a reasonable amount of

time to give effect to such notice.

▪ Notwithstanding anything to the contrary contained herein, Bank may disable the Extend Service and/or Extend's access to your Extend PAN or your information and prevent the generation of VCNs at any time if (i) the Account or any Card linked to the Enabled Device is terminated or suspended, (ii) if Bank determines it to be necessary to prevent fraud or prohibited activity or to otherwise protect you or Bank or (iii) Bank terminates its arrangement with Extend for any reason.

▪ The Extend Service, the Account (including the Extend PAN) and the Cards, including any VCNs generated, shall at all times remain subject to the terms and conditions of this Agreement and any other terms provided by Extend. You acknowledge and agree that you are responsible (i) for any transactions conducted on any Enabled Device or through the Extend App on the Account, (ii) for any and all fees and charges incurred with the use of the VCNs generated on the Account and (iii) for ensuring that its Delegates comply with the terms of this Agreement.

▪ You acknowledge and agree that (i) Bank is not the provider of the Extend App or any Enabled Device. Bank makes no warranty related to the Extend App (or the use of the Account with the Extend App) or any Enabled Device, and (ii) Bank shall have no liability whatsoever for any damages related to Client's use of the Eligible Device or the Extend App. You further acknowledge and agree that from time to time, the use of the Account through the Extend App or the Extend App itself, may be delayed, interrupted, or disrupted for an unknown period of time for reasons outside of Bank's control. None of Bank or its affiliates will be liable for any claim arising from, or related to, the use of the Account through the Extend App or the Extend App itself due to such delay, interruption, disruption or similar failure.

---

*New York Residents*:

**NOTICE TO THE BUYER: 1. Do not sign this credit agreement before you read it or if it contains any blank space. 2. You are entitled to a completely filled in copy of this credit Agreement.**

CARDHOLDER: Your signature (including any facsimile, electronic or digital signature) on any application for the Account or any sales slip or other evidence of indebtedness on your Account represents your signature on this Agreement.

**RETAIL INSTALLMENT CREDIT AGREEMENT**

---

**CITY NATIONAL BANK**

AN RBC COMPANY

**Member FDIC**        **Member Federal Reserve System**
VISA® is a registered trademark of VISA USA, Inc.
ID 67859 (Rev 08/2020)            (258)

## **Exhibit 2**

Security Agreement



**CITY NATIONAL BANK**

AN RBC COMPANY

# SECURITY AGREEMENT
(Commercial Credit Cards – New York)

In consideration of the covenants and agreements contained herein, and financial accommodations given, to be given or continued, the undersigned Debtor hereby grants to **City National Bank**, a national banking association ("CNB"), as secured party, a security interest in all of the Collateral described in the Collateral Description below.  The security interest created by this Agreement attaches immediately upon execution hereof, or as soon as Debtor acquires rights to the Collateral, and secures payment of any and all of (a) Debtor's indebtedness (including all debts, obligations, or liabilities now or hereafter existing, absolute or contingent, direct or indirect, matured or unmatured and including undisbursed future advances) to CNB arising under any and all credit card accounts issued to Debtor and any and all renewals, replacements, increases, extensions and substitutions of the credit card accounts (including any reissued and replacement cards reissued with new numbers), and the agreements evidencing such credit card accounts, and all amendments and modifications of such agreements; (b) amounts due CNB for its performance of Debtor's obligations under this Agreement; and (c) amounts due CNB in its enforcement of its rights and remedies under this Agreement (collectively, the "Indebtedness").

**DEBTOR(S)**

    a.   <u>LIGHTHOUSE IMMERSIVE USA, INC</u>               <u>██████2401</u>
          Name                                                Social Security or Employer Number

    b.   12255 LA PRADA PL
         LAS VEGAS, NV 89138
         Mailing Address

**SECURED PARTY-CITY NATIONAL BANK** (Transit and A.B.A. No.: **16-16066/1220**)

Mailing Address:    City National N.A.                            *
                         1140 6th Avenue, Sixteenth Floor
                         New York, NY 10036

**COLLATERAL DESCRIPTION:**

Savings Account Number ██████, maintained by Lighthouse Immersive USA, Inc at City National Bank, New York Business Banking Branch, and all additions thereto, all substitutions therefor and all proceeds thereof.

**I.  WARRANTIES AND REPRESENTATIONS**.  Debtor warrants and represents:

1.  **Debtor's Title**.  Debtor has title to all Collateral; all Collateral is genuine; and, except as CNB has expressly consented to in writing, no other person, entity, agency or government has or purports to have any right, title, lien, encumbrance, claim or interest in any Collateral and there is no financing statement on file anywhere covering or affecting the Collateral.

2.  **Debtor's Authority**.  Debtor has authority to enter into this Agreement.

3.  **Information**.  Debtor's most recent financial statements that have been delivered to CNB are true, complete and correct and fairly present the financial condition of Debtor as of the accounting period referenced on the statements, and there has been no material adverse change in the financial condition of Debtor since the date of such financial statements.  Debtor's most recent federal income tax return and all schedules attached to such return ("Federal Tax Return") that have been delivered to CNB are a true and correct copy of such Federal Tax Return filed with the Internal Revenue Service for the tax period ending on the date indicated in such Federal Tax Return.  Any and all other information now or hereafter supplied to CNB by Debtor is complete, true and correct.

**II.  COVENANTS AND AGREEMENTS**.  Debtor covenants and agrees:

1.  **General Powers over Collateral**.  Debtor agrees that CNB has exclusive possession and control over, and Debtor may not withdraw funds from, the Collateral until the end of the Collateral Period (as defined below). Debtor authorizes CNB to transfer the Collateral to its own or nominee's name, and to perform any and all acts which CNB believes in good faith to be necessary or desirable to protect or preserve the Collateral, its value or CNB's security interest therein.  These acts include, but are not limited to, entering into extension, reorganization, deposit, merger or consolidation agreements, compromising disputes and repledging the Collateral.

2.  **Notice of Changes in Information, Name, Structure or Litigation**.  Debtor shall immediately notify CNB of (a) any adverse changes in Debtor's financial condition or operations or in any financial or other information provided to CNB; (b) any change in Debtor's residence, chief executive office, mailing address, name, trade name, and, if Debtor is an organization, its identity or corporate structure; (c) any new openings of places of business by Debtor; (d) any litigation pending or threatened against Debtor or affecting the Collateral or having a material adverse effect upon Debtor's business or financial condition or its properties; and (e) any unpaid taxes of Debtor which are more than fifteen (15) days delinquent.

3.  **Reports; Verification; Inspection**.  Debtor shall provide CNB with such reports, accountings, documents and information as may be requested by CNB from time to time concerning the Collateral.  Debtor shall mark its books and records and the Collateral as requested by CNB to show CNB's security interest therein.  Debtor shall permit CNB, when requested, to inspect Debtor's locations and the Collateral and to inspect, examine, audit and copy any of Debtor's books, records, statements, correspondence and other data relating to Debtor's business and the Collateral.  Debtor shall assemble and make such Collateral and data available to CNB as requested by CNB.

4.  **Defense of Title**.  Debtor shall (a) appear in and defend any actions or proceedings purporting to affect CNB's security interest in or Debtor's or CNB's rights, powers or title to any Collateral; (b) take such actions which CNB deems necessary to keep the Collateral free and clear from all liens, encumbrances, claims, rights, counterclaims or defenses of others; and (c) pay such costs, expenses and attorneys' fees related to such actions.

5.  **Maintain Warranties**.  Debtor shall maintain all of the Warranties and Representations stated above on an ongoing basis for all Collateral which Debtor hereafter acquires or creates until all of the Indebtedness, and any rights of Debtor to future advances from CNB, are fully discharged.

6.  **Decrease in Value of Collateral**.  If, in CNB's judgment, the Collateral has materially decreased in value, Debtor shall either provide enough additional Collateral to satisfy CNB or reduce Debtor's total Indebtedness by an amount sufficient to satisfy CNB.

7.  **Taxes, Assessments, Charges, Liens**.  Debtor shall pay and discharge when due all taxes, assessments, charges, liens and encumbrances now or hereafter affecting the Collateral and, if the Collateral is on or attached to realty owned by Debtor, the realty on which the Collateral is located.

8.  **Additional Documents**.  Debtor shall execute, acknowledge and deliver to CNB any additional documents, assignments or agreements that CNB, from time to time, deems necessary or advisable respecting the Collateral.

9.  **General Business Operation**.  Debtor shall keep accurate and complete records regarding its business and the Collateral. Debtor shall conduct its business without voluntary interruption, except in the event of an emergency, and shall maintain all privileges, franchises, licenses and permits required to conduct its business.

10. **Power of Attorney**.  In order to preserve and protect CNB's rights under this Agreement and in the Collateral, Debtor appoints CNB as its true and lawful attorney in fact, with full power of substitution, to perform any and all acts which Debtor is obligated to do or CNB is entitled to do under this Agreement.  This power of attorney includes, but is not limited to, the right to use the Collateral as Debtor might use; collect the proceeds and profits of Collateral as Debtor might collect; release Collateral; receive, open and dispose of all mail addressed to Debtor; notify the Post Office to change the address for delivery of mail addressed to Debtor to such address as CNB shall designate; and endorse Debtor's name on all checks, drafts and other items remitted for payment with respect to the Collateral.  Nothing herein shall obligate CNB to exercise any of the rights granted by this power of attorney.  Debtor shall immediately reimburse CNB for any and all costs, attorneys' fees or expenses made or incurred by CNB (including attorneys' fees allocable to CNB's in-house counsel) while acting under this power of attorney.

11. **Reimbursement**.  Debtor shall reimburse and pay CNB, upon demand, any and all expenses, costs and attorneys' fees incurred by CNB, or allocable to CNB's in-house counsel as permitted by applicable law, whether or not a lawsuit is filed, in the enforcement or exercise of any of CNB's rights, powers or remedies or performance of any of Debtor's obligations under this Agreement or the protection, preservation or disposition of the Collateral, with interest from the date of expenditure or when the fee became allocable at the rate set forth in the Indebtedness (and if this Agreement secures more than one Indebtedness, at the highest of the interest rates), or if the Indebtedness does not specify a rate of interest, at a rate of interest equal to CNB's Prime Rate, as it may exist from time to time, plus five percent (5.0%) per year, but in no event less than ten percent (10.0%) per year.

12. **Debtor's Waivers**.  Debtor waives any rights to require CNB to proceed against any other person, to exhaust the Collateral or any other property securing the Indebtedness or to pursue any other remedies available to CNB.

13. **60-Day Hold on Collateral.**  CNB reserves the right to keep and not release the Collateral for up to sixty (60) days subsequent to the closure or termination of the credit card accounts and the repayment in full of the Indebtedness ("Collateral Period").

**III.  EVENTS OF DEFAULT**.  Debtor agrees that the occurrence of any of the following shall constitute an "Event of Default" under this Agreement:

1.  Debtor's failure to pay when due any principal, interest or other amount due under any of the Indebtedness.

2.  Debtor's failure to perform or observe any of the terms, provisions, covenants, agreements or obligations contained in this Agreement.

3.  Any Warranty or Representation made in this Agreement is false or misleading or is believed by CNB in good faith to be false or misleading.

4.  There shall occur an event of default or other violation of any term, condition, warranty, representation, or other provision of any promissory note, instrument or agreement evidencing any of the Indebtedness or executed in connection with any of the Indebtedness.

5.  CNB in good faith deems itself insecure because the prospect of performance of any covenant or agreement in this Agreement is impaired, or the value or priority of CNB's security interest in any of the Collateral is impaired or unenforceable.

**IV.  REMEDIES**.  Upon the occurrence of an Event of Default, in addition to any other rights or remedies provided or allowed by law, Debtor understands and agrees that CNB may, at its sole option, and without notice to Debtor, take one or more of the following actions:

1.  **Acceleration of Maturity.**  Declare all of Debtor's Indebtedness immediately due and payable.

2.  **Performance of Debtor's Obligations by CNB**.  Perform any of Debtor's obligations under this Agreement.

3.  **Protection**.  Take such actions as CNB deems necessary or appropriate to protect its interest in the Collateral.

4.  **Expenses**.  Incur any expenses which CNB deems necessary in exercising any rights, remedies or powers under this Agreement or applicable law, including reasonable attorneys' fees and legal costs and expenses, whether or not a lawsuit is filed.

5.  **Additional Collateral**.  Demand that Debtor provide enough additional Collateral to satisfy CNB.

6.  **Setoff**.  Exercise all rights of setoff to the same effect and in the same manner as if no Collateral had been given.

7.  **Notice**.  Notify other interested persons or entities of the default, acceleration and other actions by CNB.

8.  **Suit, Retention or Disposition of Collateral**.  Sue the Debtor or any other person or entity liable for the Indebtedness; retain the Collateral in satisfaction of the Indebtedness; dispose of the Collateral and apply the proceeds of disposition to the Indebtedness and the costs, expenses and attorneys' fees which CNB has incurred pursuant to this Agreement (including attorneys' fees allocable to CNB's in-house counsel as permitted by applicable law) in such order and manner as CNB desires.

**V.  RULES TO CONSTRUE AGREEMENT**.  Debtor understands and agrees that:

1.  **Time of Essence**.  Time is of the essence of this Agreement.

2.  **Waiver**.  CNB's acceptance of partial or delinquent payments or failure of CNB to exercise any right or remedy shall not be deemed a waiver of any obligation of Debtor or right of CNB nor constitute a modification of this Agreement, nor constitute a waiver of any other similar default subsequently occurring.

3.  **Complete Agreement**.  This Agreement, together with any exhibits, is intended by CNB and Debtor as a final expression of their agreement and is intended as a complete statement of the terms and conditions of their agreement.

4.  **Assignments, etc**.  The provisions of this Agreement are hereby made applicable to and shall inure to the benefit of CNB's successors and assigns and bind Debtor's heirs, legatees, devisees, administrators, executors, successors and assigns.

5.  **Law Governing**.  This Agreement shall be construed and governed by the laws of the State of New York.

6.  **Multiple Debtors**.  When more than one Debtor signs this Agreement all agree that:

    a.  Construction - whenever the word "Debtor" appears in this Agreement, it shall mean "each Debtor."

    b.  Breach - breach of any Covenant or Warranty by any Debtor may, at CNB's option, be treated as a breach by all Debtors.

    c.  Liability - the liability of each Debtor is joint and several and the discharge of any Debtor, for any reason other than full payment of the Indebtedness, or any extension, forbearance, change of rate of interest, or acceptance, release or substitution of security or any impairment or suspension of CNB's remedies or rights against one Debtor, shall not affect the liability of any other Debtor.

    d.  Waiver - all Debtors waive the right to require CNB to proceed against one Debtor before any other or to pursue any other remedy in CNB's power.

7.  **Notice**.  All notices to be provided under this Agreement shall be in writing and delivered, if to Debtor, at the address of its Chief Executive Office stated in this Agreement, and if to CNB, at its address stated in this Agreement, or such other address as one party shall give notice of to the other party as provided herein.

8.    **Severability**.  If any provision of this Agreement shall be held to be prohibited or unenforceable under applicable law, such provision shall be ineffective only to the extent of such prohibition or unenforceability, without invalidating the remainder of such provisions or any remaining provisions of this Agreement.

9.    **Headings**.  Section and subsection headings in this Agreement are included for convenience of reference only and shall not be a part of this Agreement for any purpose or be given any substantive effect.

10.    **Amendment or Modification.**  No provision or term of this Agreement may be modified, amended or waived without the prior written consent of CNB.

11.    **Counterparts.**  This Agreement may be signed in any number of counterparts which, when taken together, will constitute but one agreement.


Dated:  October 25, 2021

Lighthouse Immersive USA, Inc, a Delaware Corporation


By:  _____*Corey Ross*_____
        Corey Ross, President / Secretary