# **EXHIBIT C**

Second Monitor's Report and Supplemental Second Report

Court File No.:  CV-23-00703509-00CL

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS**
***ARRANGMENT ACT*, R.S.C., 1985, c.C-36 AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**LIGHTHOUSE IMMERSIVE INC. AND LIGHTHOUSE IMMERSIVE USA, INC.**
**(THE "APPLICANTS")**

**SECOND REPORT OF THE MONITOR**

**OCTOBER 5, 2023**

## TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................ 3

II.   TERMS OF REFERENCE ......................................................................... 5

III.  BACKGROUND ......................................................................................... 5

IV.   MONITOR'S ADMINISTRATIVE ACTIVITIES ................................... 6

V.    THE OCTOBER 3 ENDORSEMENT ...................................................... 7

VI.   PROPOSED SISP AND STALKING HORSE PURCHASE AGREEMENT .................. 8

VII.  INCREASE IN DIP FACILITY ............................................................... 15

VIII. MONITORING OF RECEIPTS AND DISBURSEMENTS ....................... 16

IX.   REVISED CASH FLOW FORECAST .................................................... 18

X.    STAY EXTENSION .................................................................................. 19

XI.   CONCLUSION AND RECOMMENDATIONS ...................................... 19

## APPENDICES

**APPENDIX "A" – AMENDED AND RESTATED INITIAL ORDER DATED AUGUST 3, 2023**

**APPENDIX "B" – FORECAST VS. ACTUAL VARIANCE ANALYSIS FOR THE 10 WEEKS ENDED OCTOBER 1, 2023**

**APPENDIX "C" – REVISED CASH FLOW FORECAST FOR THE 10-WEEK PERIOD ENDED DECEMBER 10, 2023**

**APPENDIX "D" – OCTOBER 3, 2023, ENDORSEMENT**

**APPENDIX "E" – SALE AND INVESTMENT SOLICITATION PROCESS**

**APPENDIX "F" – STALKING HORSE AGREEMENT**

**APPENDIX "G" – AMENDED DIP TERM SHEET (Clean and Blackline to the version approved in these CCAA Proceedings)**

- 3 -

## I.    INTRODUCTION

1.    On July 27, 2023, Lighthouse Immersive Inc. ("**Lighthouse**") and Lighthouse Immersive USA, Inc. ("**Lighthouse USA**") (collectively, the "**Applicants**") commenced proceedings (the "**CCAA Proceedings**") under the *Companies' Creditors Arrangement Act*, R.S.C., 1985, c. C-36 (the "**CCAA**") pursuant to the Order of the Honourable Madam Justice Kimmel of the Ontario Superior Court of Justice (Commercial List) (the "**Court**") dated July 27, 2023 (the "**Initial Order**").

2.    On August 3, 2023, the Honourable Madam Justice Kimmel of the Court issued an amended and restated initial order (the "**Amended and Restated Initial Order**"), a copy of which is attached hereto as **Appendix "A"**, that, among other things:

(a)    extended the stay of proceedings in favour of the Applicants through October 6, 2023;

(b)    increased the authorized borrowings under the DIP Facility from the principal amount of $1,100,000 to $3,500,000 (plus interest, fees and expenses); and

(c)    increased the amount of the Court-ordered Charges as follows:

(i)    increased the quantum of the Administration Charge from $275,000 to $500,000; and

(ii)    increased the quantum of the Directors' Charge from $250,000 to $500,000.

3.    The Monitor files this report (the "**Second Report**") in connection with the Applicants' motion, to be heard by this Honourable Court on October 6, 2023 (the "**October 6 Hearing**"), for the following orders:

(a)    a Sale and Investment Solicitation Process and Stalking Horse Agreement Approval Order (the "**SISP Order**") that, among other things:

(i)    approves a sale and investment solicitation process (the "**SISP**") involving the Property (as defined below) and Business (as defined below), and authorizes and directs the Applicants and the Monitor to carry out the SISP; and

- 4 -

    (ii)      approves of the Stalking Horse Purchase Agreement (the "**Stalking Horse**") entered into by Monitor, on behalf of the Applicants, in respect of the SISP and the Applicants' Business and Property (as defined herein) and as more particularly described below;

(b)    an Order approving an extension of the stay of proceedings in favour of the Applicants through December 8, 2023; and

(c)    an Ancillary Order, which among other things:

    (i)      approves the Amended DIP Term Sheet (as defined below); and

    (ii)      increases the authorized borrowings under the DIP Facility from the principal amount of $3,500,000 to $4,000,000 (plus interest, fees and expenses);

4.    This Second Report provides information to this Honourable Court in respect of the following:

(a)    the activities of the Monitor since the First Report, including the Monitor's expansion of powers pursuant to this Court's Endorsement dated October 3, 2023 (the "**October 3 Endorsement**");

(b)    the proposed SISP and Stalking Horse, together with the Monitor's observations thereon;

(c)    the Amended DIP Term Sheet;

(d)    the Applicant's actual receipts and disbursements for the ten (10) week period ended October 1, 2023, as compared with the cash flow forecast appended as Appendix "B" to the Pre-Filing Report of the Proposed Monitor dated July 27, 2023 (the "**July Cash Flow Forecast**");

(e)    the Applicant's revised cash flow forecast for the 10-week period ending December 10, 2023, a copy of which is attached hereto as **Appendix "C"** (the "**Revised Cash Flow Forecast**"); and

(f)    the Monitor's conclusions and recommendations with respect to the Applicants' motion as set out above.

## II.    TERMS OF REFERENCE

5.    In preparing this Second Report, the Monitor has relied upon the Applicants' unaudited financial information, certain other information and financial projections of the Applicants, and discussions with the Applicants' management ("**Management**") (collectively, the "**Information**").

6.    The Monitor has not audited or otherwise attempted to verify the accuracy or completeness of the Information in a manner that would wholly or partially comply with Canadian Auditing Standards ("**CAS**") pursuant to the Chartered Professional Accountants Canada Handbook, and, accordingly, the Monitor expresses no opinion or other form of insurance contemplated under CAS in respect of the Information. Any party wishing to place reliance on the Information should perform its own due diligence.

7.    Future oriented financial information referred to in this Second Report was prepared based on Management's estimates and assumptions. Readers are cautioned that, since projections are based upon assumptions about future events and conditions that are not ascertainable, the actual results may vary from the projections, even if the assumptions materialize, and those variances could be significant.

8.    Unless otherwise stated, all references to monetary amounts in this Second Report are expressed in U.S. dollars (**$USD**). Capitalized terms not otherwise defined herein have the meaning given to them in the Affidavit of Corey Ross dated July 27, 2023 ("**Ross Affidavit**"), the first report of the Monitor (the "**First Report**") dated August 1, 2023, the Amended and Restated Initial Order, and the October 3 Endorsement.

9.    Further information regarding the CCAA Proceedings, including all filed motion materials, reports of the Monitor, and Court Orders, is available on the Monitor's website at https://farbergroup.com/engagements/lighthouse-immersive/ (the "**Monitor's Website**").

## III.    BACKGROUND

10.    The Applicants are in the business of producing immersive show exhibits in Canada, the United States, and various cities around the world, through their multiple affiliated entities and their Subsidiaries.

- 6 -

11.    Detailed background information in respect of the Applicants has been provided in the Monitor's previous reports to the Court, and the Ross Affidavit, available on the Monitor's Website.

## IV.    MONITOR'S ADMINISTRATIVE ACTIVITIES

12.    Since the date of the First Report (August 1, 2023), the Monitor's primary activities have included the following:

*Cash Management*

    (a)    conducting and attending various meetings and discussions with Management and the Applicants' legal counsel regarding the Applicants' business and financial affairs, including its cash flow forecast, financing requirements, operational restructuring activities and other matters relating generally to the CCAA Proceedings;

    (b)    establishing a system for monitoring the Applicants' receipts and disbursements;

    (c)    monitoring the Applicants' receipts and disbursements on a regular basis including monitoring bank transactions, DIP Facility advances and vendor payments, among other things;

    (d)    reviewing with Management the Applicants' ongoing cash flow forecast and weekly variances from forecast as well as assisting the Applicants in the preparation of the Revised Cash Flow Forecast;

*Inventory and Capital Assets*

    (e)    corresponding with Management and individuals in charge of the Applicants' operations to compile, review and validate a list of the inventory and equipment that will become redundant and can possibly be liquidated;

    (f)    corresponding with liquidators to review the list of redundant inventory and equipment to provide feedback on the potential market value of the assets, any constraints or potential issues with the assets, what a liquidation timeframe could look like and the overall viability of the situation;

    (g)      discussions with a liquidator about the LHI's possible engagement for a "desk-top" appraisal on the equipment;

*Stakeholder Communications*

    (h)      attending several meetings and virtual calls with the legal counsel and financial advisors to the secured creditors of the Applicants and the DIP Lender to review the status operations and potential restructuring and strategic initiatives in the CCAA Proceedings;

    (i)       corresponding with the Applicants' legal counsel and Management in developing potential terms of a SISP (as discussed in further detail below); and

    (j)       discussions with stakeholders to consider and obtain alternative debtor-in-possession funding options that would align with the timeframes to address the restructuring options for the Applicants.

*Sale Process*

    (k)      corresponding with the Applicants' legal counsel and Management in developing the terms of the proposed SISP as further discussed herein;

    (l)       corresponding with the Applicants' legal counsel and Management in developing the terms of the proposed Stalking Horse Agreement as further discussed herein; and

*October 3 Endorsement*

    (m)     appearing at the case conference before this Court on October 3, 2023, to obtain an Endorsement to expand the powers of the Monitor as further discussed herein.

## V. THE OCTOBER 3 ENDORSEMENT

13.     On October 3, 2023, the Monitor appeared before this Court and obtained the October 3 Endorsement that expanded the scope of the Monitor's powers.

14.     Due to governance issues at the Applicants, the Monitor felt that it was in the best interest of the stakeholders of the Applicants and appropriate in the circumstances to expand the

- 8 -

Monitor's role, power and duties in these proceedings pursuant to ss. 11 and 23(1)(k) of the *Companies' Creditors Arrangement Act*, RSC 1985, c C-36. A copy of the October 3 Endorsement is attached hereto as **Appendix "D"**.

15.   Specifically, the October 3 Endorsement was obtained in order to permit the Applicants to proceed with a SISP, as discussed herein, and if necessary, obtain alternate financing from a second DIP Lender, also discussed herein.

## VI.   PROPOSED SISP AND STALKING HORSE PURCHASE AGREEMENT

*Summary of the SISP*

16.   The Applicants intend to seek approval of the SISP to canvass the market with the Monitor's assistance for an investment in, or a sale of, all or substantially all of the Applicants' property (the "**Property**") and business operations (the "**Business**") as a going concern or otherwise (the "**Opportunity**"). The SISP has been designed to:

   (a)   obtain the highest and best offer for the Applicants' Property and Business; and

   (b)   allow for a commercially reasonable marketing of the Property and Business of the Applicants given its significant liquidity constraints.

A copy of the SISP is attached as **Appendix "E"**.

17.   The Opportunity may include one or more transactions involving the restructuring, recapitalization or other form of reorganization of the Business as a going concern or a sale of all, substantially all or one or more components of the Property and the Business as a going concern or otherwise, or some combination thereof (each, a "**Transaction**").

18.   During the course of formulating the SISP, the Applicants, in consultation with the Monitor, entered into an agreement (the "**Stalking Horse Agreement**") with a potential purchaser (the "**Stalking Horse Bidder**") in respect of a bid related to the Property of the Applicants (the "**Stalking Horse Bid**"), which is to be included as a Potential Bidder participating in this SISP. This Stalking Horse Bid has been included as a proponent of the proposed SISP Order. In the event the SISP Order is approved by the Court, the Stalking Horse Bid shall

automatically be considered a Qualified Bid (as defined below) for the purposes of the Auction, as defined in the SISP.

19.    The SISP contemplates a one-stage process that involves the submission by interested parties of binding offers by the Bid Deadline, as defined in the SISP.

20.    The following table sets out the key milestones under the SISP:

| Milestone | Deadline |
|---|---|
| Commencement Date | Immediately following the granting of the SISP Order |
| Recognition of SISP in US Bankruptcy Court | Immediately following the granting of the SISP Order, subject to availability of the US Bankruptcy Court |
| Bid Deadline | November 8, 2023 at 5:00 p.m. (EST) |
| Auction Date | November 10, 2023 at 5:00 p.m. (EST) |
| Hearing of the Sale Approval Motion (as defined below) | No later than November 17, 2023, subject to the availability of the Court |
| Sale Approval Motion in US Bankruptcy Court | Immediately following the granting of the Sale Approval Motion, subject to availability of the US Bankruptcy Court |
| Closing of the Transaction | Immediately following the recognition of the Sale Approval Order by the US Bankruptcy Court |

21.    The Monitor, in consultation with the Applicants, will prepare a list of potential bidders, including (i) parties that have approached the Applicants or the Monitor indicating an interest in the Opportunity, and (ii) local and international strategic and financial parties who the Applicants, in consultation with the Monitor, believe may be interested in purchasing all or part of the Business and Property or investing in the Applicants pursuant to the SISP, in each case whether or not such party has submitted a letter of intent or similar document (collectively, "**Known Potential Bidders**").

22.    If the SISP is approved by this Honourable Court, the Monitor will send to each of these Known Potential Bidders a teaser document and a non-disclosure agreement (an "**NDA**"),

which the Monitor has prepared (with the assistance of the Applicant). In addition, if the SISP is approved, the Monitor will post the SISP Order and the SISP on the Monitor's Website and will cause a notice of the SISP (and such other relevant information which the Monitor, in consultation with the Applicants, considers appropriate) to be published in Insolvency Insider, the Monitor's Website and any other newspaper or journal as the Monitor, in consultation with the Applicants, consider appropriate, if any.

23. To be considered a Potential Bidder, as defined in the SISP, each Potential Bidder must provide to the Monitor an executed NDA, a letter setting forth the identity of the Potential Bidder, the contact information for such Potential Bidder and full disclosure of the direct and indirect principals of the Potential Bidder and, based on reasonable business judgement of the Monitor, in consultation with the Applicants, be determined to possess the financial wherewithal to close a transaction.

24. The Monitor will provide each Potential Bidder access to an electronic data room containing information about the Applicants and the Business.

25. To be considered a Qualified Bid, a Potential Bidder must submit a binding offer (a "**Bid**") to purchase or make an investment in the Applicants or their Property or Business to the Monitor by the Bid Deadline, as defined in the SISP, and the Bid must be either a binding offer to (a) acquire all, substantially all or a portion of the Property (a "**Sale Proposal**") or (b) make an investment in, restructure, reorganize or refinance the Business or the Applicants (an "**Investment Proposal**") or (c) carry out any combination of a Sale Proposal and an Investment Proposal. The Bid must also meet the requirements of paragraph 17 (d) and 17 (e) of the SISP, meaning: (i) the Bid must include duly authorized and executed Transaction agreements, including the purchase price, investment amount and other key economic terms expressed in U.S. dollars (the "**Purchase Price**"), and the Bid must be accompanied by a deposit in an amount equal to ten percent (10%) of the Purchase Price, as defined in the SISP, investment amount or other consideration to be paid in respect of the Bid.

26. Following the Bid Deadline, as defined in the SISP, the Monitor, in consultation with the Applicants will assess the Bids received and designate the most competitive bids as "**Qualified Bids**" that comply with the following non-exhaustive list of factors:

(a)     the Purchase Price and the net value provided by such bid;

(b)     the identity, circumstances and ability of the Bidder, as defined in the SISP, to successfully complete such Transactions;

(c)     the proposed Transaction documents;

(d)     the factors affecting the speed, certainty and value of the Transaction;

(e)     the assets included or excluded from the bid;

(f)     any related restructuring costs; and

(g)     the likelihood and timing of consummating such Transaction.

27.     In addition to the above considerations, the Monitor may only designate a Bid as a Qualified Bid where the proposed purchase price is equal to or greater than that contained in the Stalking Horse Bid, and includes a cash purchase price in an amount equal to or greater than the Stalking Horse Bid, *plus* $50,000.

28.     The SISP contemplates that the Stalking Horse Bid, will automatically be accepted as a Qualified Bid. Given the Stalking Horse Bid is a related party, it does not include a break fee or expense reimbursement amount.

29.     The Monitor, in consultation with the Applicants, may waive strict compliance with any one or more of the requirements for the Bids and deem such non-compliant Bids to be a Qualified Bid.

30.     The Monitor may, in consultation with and the Applicants, aggregate separate Bids from unaffiliated Bidders to create one Qualified Bid.

31.     If the Monitor receives at least one additional Qualified Bid, in addition to the Stalking Horse Bid, the Monitor will conduct and administer an Auction in accordance with the terms of the SISP.

*Observations*

32.    The Monitor makes the following observations with respect to the SISP:

(a)    the SISP, if approved, will be conducted by the Monitor, in consultation with the Applicants. The Monitor will control communications with bidders, the qualifying of prospective bidders and the determination of Qualified Bids and potential Overbids, as defined in the Auction process;

(b)    the design of the SISP provides flexibility with regards to the type of Transactions that can be consummated for the Opportunity in order to maximize the value received through the SISP;

(c)    the Monitor is of the view that the one-stage process (including a binding bid deadline of four (4) weeks, as well as the provision of an auction process) is reasonable given:

(i)    the continuing operating losses that the Applicants are sustaining on a weekly basis;

(ii)    the Applicants operations have almost completely halted besides one ongoing show in Lighthouse;

(iii)    the Property and Business is straightforward to understand for potential purchasers;

(iv)    rent and costs to store redundant inventory and equipment are ongoing; and

(v)    the Applicants liquidity constraints, as further outlined in the Revised Cash Flow Forecast appended to this Second Report as **Appendix "C"**

*Summary of the Stalking Horse Purchase Agreement*

33.    As described above, the Monitor, on behalf of the Applicants, has negotiated and entered into a stalking horse purchase agreement (the "**Stalking Horse Purchase Agreement**") between the Applicants and SCS, as purchaser (the "**Purchaser**"), subject to Court approval.  A copy of the Stalking Horse Purchase Agreement is attached as **Appendix "F"**.

34.    Pursuant to the Stalking Horse Purchase Agreement, the Purchaser has agreed to acquire substantially all of the assets of the Applicants.

35.    The material terms of the Stalking Horse Purchase Agreement are summarized as follows:[1]

   (a)    *Purchase Price* – the aggregate purchase price for the Purchased Assets shall be made up of the following amounts (in aggregate, the "**Purchase Price**"), in each case exclusive of Transfer Taxes:

      (i)    An amount required to satisfy the Priority Payables, which amount shall be subject to adjustment as at the Closing Time; *plus*

      (ii)    The Credit Bid Amount, which is estimated to be $4,000,000 as at the Closing Time; *plus*

      (iii)    The aggregate amount of the Assumed Liabilities, the Contract Assumed Liabilities and any cure costs arising from the assignment of a Consent Required Contract under any Assignment Order granted by the Court.

   (b)    *Conditions Precedent* – the conditions precedent included in the Stalking Horse Transaction are appropriate in the circumstances and customary in an asset sale approved in CCAA proceedings.

   (c)    *Closing Date* – the closing date is targeted to close on the third Business Day following the issuance of the Approval and Vesting Order with respect to the Stalking Horse Bid.

   (d)    *Employee Liabilities* – the Purchaser or its affiliate shall be offering employment to all of the employees of the Applicants conditional and effective on the Closing and on terms and conditions substantially similar to their respective terms and conditions of employment with the Companies existing as of the Closing Date. With respect to the employees of the Applicants who accept their offer of employment (the "**Transferred Employees**"), the Purchaser or its Affiliate shall be responsible for:

      (i)    All liabilities for salary, wages, bonuses, commissions, vacation pay, and other compensation relating to employment of the transferred employees in

---

[1] This is not an exhaustive list of terms. In the event of any inconsistency between this summary and the Stalking Horse Purchase Agreement, the Stalking Horse Purchase Agreement governs.

accordance with the offer made to such Transferred Employees by the Purchaser for the period on or after the closing date; and

(ii)     All statutory notice of termination or payment in lieu of notice obligations and statutory severance obligations in respect of the termination by the Purchaser of the employment of any Transferred Employees arising on or after the closing date.

(e)     *Assumed Liabilities* – the Purchaser will assume:

(i)     all of the Applicants' obligations and liabilities relating to the assets being purchased arising and accruing in respect of the period after the closing time;

(ii)     the obligations and liabilities of the Applicants' with respect to the employees transferred to the Purchaser;

(iii)     the obligations and liabilities associated with the contracts assigned to it; and

(iv)     any other liability which the Purchaser agrees in writing to assume on or before the closing date.

The Purchaser shall not be assuming:

(i)     any benefits of any contracts, agreements and understandings of the Applicants which were not assigned to it;

(ii)     any legal files of the Applicants in the possession of or maintained by counsel to the Applicants; or

(iii)     any other liability that is not either an assumed liability or a contract assumed liability.

## Observations

36.     The Stalking Horse Purchase Agreement will provide stability to the Applicants' business and give confidence to stakeholders (including customers, employees and suppliers) that a going-concern outcome of these CCAA Proceedings will be achieved through the SISP.

37.     By providing a baseline purchase price and deal certainty, the Stalking Horse Bid will not negatively impact the conduct of the SISP.

38.     Having reviewed the financial terms of the Stalking Horse Purchase Agreement, the Monitor believes that they are reasonable in the circumstances and provide a value greater than a liquidation of the Applicants' assets.

39.     The availability of the Closing DIP Loan under the Stalking Horse Purchase Agreement is important to ensure the Applicants have sufficient funding, if required, to address all closing conditions.

**VII.    INCREASE IN DIP FACILITY**

40.     The Amended and Restated Initial Order increased the DIP Lender's Charge to $3,500,000. The Applicants seek to increase the authorized borrowings allowable under the DIP Term Sheet and DIP Lender's Charge to $4,000,000.

41.     As noted above, the October 3 Endorsement permitted the Applicants to seek a second DIP Lender if necessary. Since the October 3 Endorsement, the Applicants and the DIP Lender have reached an agreement on the continuation of DIP Term Sheet, and the expansion of the borrowing amount to $4,000,000, pending approval by this Court. This increase in the borrowing amount is reflected in the amended DIP Term Sheet, which the Applicants' seek approval of from this Court in the proposed Ancillary Order (the "**Amended DIP Term Sheet**"). A copy of the Amended DIP Term Sheet, together with a blackline to the DIP Term Sheet is attached hereto as Appendix "G".

42.     The Cash Flow Forecast, as discussed below, indicates the need to receive $2,426,000 in additional total advances under the DIP Facility of $4,000,000 by December 10, 2023. The Monitor notes that as of the date of this Report, the amounts drawn by the Applicants are within the borrowing limited granted by this Court. The Monitor will continue working with the Applicants and DIP Lender to ensure that there is adequate liquidity in the Applicants' bank accounts in compliance with the DIP Term Sheet.

43.     Based on reviewing the Information, the Monitor is of the view that the DIP Lender's Charge increasing to $4,000,000 is reasonable and appropriate in the circumstances. Such increase will provide the Applicants with sufficient liquidity to the end of the extension of the Stay Period.

- 16 -

## VIII.        MONITORING OF RECEIPTS AND DISBURSEMENTS

44.    The Applicants' actual cash receipts and disbursements for the ten (10) week period ended October 1, 2023 (the "**Reporting Period**") as compared with the July Cash Flow Forecast may be located within Appendix "B" (the "**Variance Analysis**"). The Variance Analysis has been summarized below:

**LIGHTHOUSE IMMERSIVE INC. ("LHI") & LIGHTHOUSE IMMERSIVE USA, INC. ("LHI USA")**
**Actual Cash Flow vs. Filing Forecast - Cumulative Variance Analysis**
**For the 10 weeks ended October 1, 2023**
*In USD*

| | Forecast | Actual | Variance - B/(W) |
|---|---|---|---|
| **10-week period ending** | 10/1/2023 | 10/1/2023 | 10/1/2023 |
| **Cash Receipts** | | | |
| Box Office Ticket Sale Collections | $          - | $     246,454 | $     246,454 |
| Other Income | - | 500,000 | 500,000 |
| Divestiture of Surplus Inventory and Capital Assets | - | - | - |
| Transfer from Affiliated Companies | - | 97,000 | 97,000 |
| Rate Card Reimbursements from LHI Studios | 3,291,145 | 3,175,246 | (115,899) |
| **Total Receipts** | **$   3,291,145** | **$   4,018,700** | **$     727,555** |
| **Cash Disbursements** | | | |
| LHI Payroll & Payroll Remittances | $     640,965 | $     694,123 | $      (53,158) |
| LHI USA Payroll & Payroll Remittances | 222,300 | 262,189 | (39,889) |
| Contract Payroll From Related Party | 160,000 | - | 160,000 |
| LHI Rent | 244,184 | 134,927 | 109,257 |
| LHI Utilities and Other Occupancy Costs | 53,400 | 4,484 | 48,916 |
| LHI Corporate Overhead | 245,000 | 255,449 | (10,449) |
| LHI USA Corporate Overhead | 245,000 | 375,244 | (130,244) |
| Load out costs | - | 69,009 | (69,009) |
| Transfer to LHI USA Wholly Owned Subsidiaries | 4,000,000 | 2,919,025 | 1,080,975 |
| Foreign exchange loss | - | 2,100 | (2,100) |
| **Total Operating Disbursements** | **$   5,810,849** | **$   4,716,550** | **$  1,096,400** |
| LHI & LHI USA Legal Counsel Fees | $     425,000 | $     203,085 | $     221,915 |
| Proposed Monitor Fees | 300,000 | 115,925 | 184,075 |
| Proposed Monitor's Legal Counsel Fees | 150,000 | 58,067 | 91,933 |
| DIP Fees | 25,000 | - | 25,000 |
| **CCAA Professional Fees** | **$     900,000** | **$     377,077** | **$     522,923** |
| **Total Disbursements** | **$   6,710,849** | **$   5,093,627** | **$  1,619,323** |
| **Net Receipts** | **$  (3,419,704)** | **$  (1,074,927)** | **$  2,346,877** |
| **Opening Cash Position** | **$      84,650** | **$     210,981** | **$     126,331** |
| **DIP Financing Advances** | $   3,500,000 | $   1,574,000 | $ (1,926,000) |
| **Cash Ending Balance** | **$     164,946** | **$     710,054** | **$     545,108** |

45.    The Applicants reported a $1,074,927 cash flow shortfall before DIP Financing Advances; however, this was approximately $2.3 million better than projected up to that time.  The major variances, with explanations, are summarized below:

(a)    a favourable variance of approximately $246,000 in Box Office Ticket Sale Collection receipts. This amount relates to ticket sales from a Van Gogh Immersive show in Toronto which were not originally projected;

(b)    a favourable variance of $500,000 in other income, which related to a deposit for licensing fees for a new show received ahead of schedule (projected at $150,000 for week 12);

(c)    a favourable variance of $97,000 related to total transfers received from affiliated companies which were not forecasted;

(d)    an unfavourable variance of approximately $116,000 in rate card reimbursements. These amounts are transfers to the Applicants from Lighthouse Immersive Studios Inc. and Lighthouse Immersive Studios USA Corp. (collectively the "**Studios Entities**") for ongoing Disney shows;

(e)    an aggregate favourable variance of approximately $67,000 in payroll expenses for the Applicants and a related party. Part of the variance is a favourable timing difference, and this is partially offset by an unfavourable payroll expense which is partially due to the Van Gogh show in Toronto (which was not initially contemplated) and resulting from staff reductions occurring slower than initially forecasted;

(f)    an aggregate unfavourable variance of approximately $140,000 due to overhead expenses, which was due to the accounting allocation of credit card payments made post-filing for purchases made prior to the CCAA filing;

(g)    a favourable variance in the total transfers to the LHI USA wholly owned subsidiaries for approximately $1.1 million. The cash flow forecast reflected approximately $2 million of liabilities that were not yet due but will become due and therefore, it is anticipated that the variance would reverse in future weeks;

(h)    a favourable variance of approximately $523,000 in professional fee payments. This favourable variance is in part because the professional fees have not been incurred yet and also due to the delayed and unpaid DIP Advances (noted below). The professional fees are forecast to be paid in Week 11 and this will reverse the timing difference; and

(i)     an unfavourable variance of $1,926,000 of DIP Financing advances. Up to week 10 of the CCAA administration, the DIP Lender has only advanced approximately $1.5 million. The Monitor was advised that there was a disagreement among the shareholders in SCS Finance Inc., which was delaying the funding from the DIP Lender. However, that disagreement is now resolved and the DIP Lender will fund the DIP Facility. The DIP Lender has agreed to fund the DIP Advances to the Monitor, as requested by the Monitor, to ensure funding going forward is uninterrupted.

## IX.    REVISED CASH FLOW FORECAST

46.    The Applicants' Revised Cash Flow Forecast for the 10-week period ended December 10, 2023 (the "**Revised Cash Flow Period**"), attached hereto as **Appendix "C"**, is summarized below. The notes to the Revised Cash Flow Forecast, outlining the probable and hypothetical assumptions, should be read in conjunction with the Revised Cash Flow Forecast. The Revised Cash Flow Forecast reflects certain updated assumptions of Management based on developments to date during the course of the CCAA Proceedings.

47.    The Monitor makes the following observations with respect to the Revised Cash Flow Forecast:

(a)     the Revised Cash Flow Forecast is primarily focused on the Applicants' liquidity requirements for the eight (8) week period ending November 26, 2023, to execute the proposed SISP (the "**SISP Cash Flow Period**");

(b)     a summary of the Revised Cash Flow Forecast is as follows:

(i)     total receipts are forecast to be approximately $635,000 in the Revised Cash Flow Period. Of this amount, approximately $508,000 (80%) is forecast in the SISP Cash Flow Period;

(ii)    total operating disbursements are forecast to be approximately $2.9 million in the Revised Cash Flow Period. Significant disbursements include payroll and payroll remittances of approximately $1.1 million, load out costs for the closing of venues where shows have ended in the amount of approximately

$319,000, corporate overhead (which includes catch up of post-filing expenses) of approximately $488,000; and

(iii)    total additional professional fees of $680,000 to reflect payment of outstanding fees and projected fees to the end of the Revised Cash Flow Period; and

(iv)    the cumulative DIP requirements forecast through the Revised Cash Flow Period total $2.426 million.

(c)    the majority of receipts in the SISP Cash Flow Period relate to rate card reimbursements from the Studios Entities. Should these funds not be received, the DIP financing advances may not provide the necessary funds for the Applicants to operate in the normal course unless disbursements are significantly reduced;

(d)    the cumulative DIP requirement forecast in the SISP Cash Flow Period totals $2.426 million which will maintain operations through the SISP Cash Flow Period and allow for a transaction to be approved and closed as part of these proceedings.

## X. STAY EXTENSION

48.    Based on the Revised Cash Flow Forecast, the Applicants are forecasted to have the sufficient liquidity if Amended DIP Term Sheet is approved through the requested extension to the Stay Period.

49.    The Applicants have acted and continue to act in good faith and with due diligence. The extension of the Stay Period will allow the SISP to be conducted to maximize value for all the stakeholders of the Applicants.

## XI.    CONCLUSION AND RECOMMENDATIONS

50.    The Monitor's conclusions and recommendations on the relief sought by the Applicants are as follows:

(a)    In the Monitor's opinion, the Applicants are acting in good faith and with due diligence to further their restructuring efforts;

(b)     The Monitor recommends the approval of the proposed SISP and the Stalking Horse Bid. The SISP is reasonable in the circumstances and appropriately balances the Applicants' liquidity constraints and market value of the Opportunity. The Monitor believes that the SISP, although condensed, is targeted and appears to provide prospective purchasers with sufficient time to complete due diligence and submit flexible competitive bids. Additionally, the approval of the Stalking Horse Agreement within the SISP Order provides a baseline purchase price and deal certainty, which does not negatively impact the conduct of the SISP, and benefits all stakeholders;

(c)     The Monitor recommends the approval of the Amended DIP Term Sheet and the Second DIP Lender's Charge (and its corresponding priority) as this is the only funding available to the Applicants and the liquidity is required to maximize value for all of the Applicants' stakeholders; and

(d)     The Monitor recommends the extension of the stay of proceedings in favour of the Applicants through December 8, 2023. The extension is needed to continue providing creditor protection to the Applicants for the necessary amount of time to run a successful SISP.

All of which is respectfully submitted this 5th day of October, 2023.

**B. RILEY FARBER INC.**
**IN ITS CAPACITY AS THE COURT APPOINTED MONITOR OF**
**LIGHTHOUSE IMMERSIVE INC. AND**
**LIGHTHOUSE IMMERSIVE USA, INC.**
**AND NOT IN ITS PERSONAL OR CORPORATE CAPACITY**.

*B. Riley Farber Inc.*

_____

**APPENDIX "A"**

**AMENDED AND RESTATED INITIAL ORDER DATED AUGUST 3, 2023**

Electronically issued / Délivré par voie électronique : 03-Aug-2023
Toronto Superior Court of Justice / Cour supérieure de justice

**Court File No./N° du dossier du greffe :** CV-23-00703509-00CL



Court File No. CV-23-00703509-00CL

<div align="center">

**ONTARIO**

**SUPERIOR COURT OF JUSTICE**

**COMMERCIAL LIST**

</div>

| | | |
|---|---|---|
| THE HONOURABLE MADAM | ) | THURSDAY, THE 27TH |
| | ) | |
| JUSTICE KIMMEL | ) | DAY OF JULY 2023 |

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c.C-36 AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF LIGHTHOUSE IMMERSIVE INC. AND LIGHTHOUSE IMMERSIVE USA, INC. (the "**Applicants**")

<div align="center">

**AMENDED AND RESTATED INITIAL ORDER**

</div>

**THIS APPLICATION**, made by the Applicants pursuant to the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "**CCAA**") was heard this day via Zoom Videoconference.

**ON READING** the Affidavit of Corey Ross sworn on July 27, 2023 and the Exhibits thereto (the "**Ross Affidavit**"), the pre-filing report of B. Riley Farber Inc., in its capacity as proposed Monitor of the Applicants ("**Monitor**") dated July 27, 2023, and the first report of the Monitor (the "**First Report**") dated August 1, 2023, and on being advised that the secured creditors who are likely to be affected by the charges created herein were given notice, and on hearing the submissions of counsel for the Applicants and the wholly owned subsidiaries of the Applicants set out in Schedule "A" (the "**Subsidiaries**"), counsel for the Monitor and counsel for the DIP Lender (as defined below), no one else appearing although duly served as appears from

Electronically issued / Délivré par voie électronique : 03-Aug-2023
Toronto Superior Court of Justice / Cour supérieure de justice

**Court File No./N° du dossier du greffe :** CV-23-00703509-00CL

the affidavits of service sworn on July 27, 2023 and August 1, 2023, and on reading the consent

of the Monitor,

**SERVICE AND DEFINITIONS**

1.      **THIS COURT ORDERS** that the time for service of the Notice of Application and the

Application Record is hereby abridged and validated so that this Application is properly

returnable today and hereby dispenses with further service thereof.

2.      **THIS COURT ORDERS** that, for avoidance of doubt, reference in this Order to the

"date of this Order", "the date hereof" or similar phrases refer to the date the Initial Order of this

Court was granted in the within proceedings, being July 27, 2023.

**APPLICATION**

3.      **THIS COURT ORDERS AND DECLARES** that the Applicants are companies to

which the CCAA applies.

**PLAN OF ARRANGEMENT**

4.      **THIS COURT ORDERS** that the Applicants shall have the authority to file and may,

subject to further order of this Court, file with this Court a plan of compromise or arrangement

(hereinafter referred to as the "**Plan**").

**POSSESSION OF PROPERTY AND OPERATIONS**

5.      **THIS COURT ORDERS** that the Applicants shall remain in possession and control of

their current and future assets, undertakings and properties of every nature and kind whatsoever,

and wherever situate including all proceeds thereof (the "**Property**").  Subject to further Order of

Electronically issued / Délivré par voie électronique : 03-Aug-2023
Toronto Superior Court of Justice / Cour supérieure de justice

**Court File No./N° du dossier du greffe :** CV-23-00703509-00CL

this Court, the Applicants shall continue to carry on business in a manner consistent with the preservation of their businesses (the "**Business**") and Property. The Applicants are authorized and empowered to continue to retain and employ the employees, consultants, agents, experts, accountants, counsel and such other persons (collectively "**Assistants**") currently retained or employed by them, with liberty to retain such further Assistants as they deem reasonably necessary or desirable in the ordinary course of business or for the carrying out of the terms of this Order.

6.       **THIS COURT ORDERS** that the Applicants shall be entitled to continue to utilize the banking and cash management system currently in place as described in the Ross Affidavit or replace it with another substantially similar central cash management system (the "**Cash Management System**") and that any present or future bank providing the Cash Management System shall not be under any obligation whatsoever to inquire into the propriety, validity or legality of any transfer, payment, collection or other action taken under the Cash Management System, or as to the use or application by the Applicants of funds transferred, paid, collected or otherwise dealt with in the Cash Management System, shall be entitled to provide the Cash Management System without any liability in respect thereof to any Person (as hereinafter defined) other than the Applicants, pursuant to the terms of the documentation applicable to the Cash Management System, and shall be, in its capacity as provider of the Cash Management System, an unaffected creditor under the Plan with regard to any claims or expenses it may suffer or incur in connection with the provision of the Cash Management System.

7.       **THIS COURT ORDERS** that the Applicants shall be entitled but not required to pay the following expenses, whether incurred prior to or after the date of this Order:

Electronically issued / Délivré par voie électronique : 03-Aug-2023
Toronto Superior Court of Justice / Cour supérieure de justice     **Court File No./N° du dossier du greffe :** CV-23-00703509-00CL

(a)     all outstanding and future wages, salaries, employee and pension benefits, vacation pay, expenses to employees, and such similar payments to independent contractors, payable on or after the date of this Order, in each case incurred in the ordinary course of business and consistent with existing compensation policies and arrangements; and

(b)     the fees and disbursements of any Assistants retained or employed by the Applicants in respect of these proceedings, at their standard rates and charges.

8.     **THIS COURT ORDERS** that, except as otherwise provided to the contrary herein, the Applicants shall be entitled but not required to pay all reasonable expenses incurred by the Applicants in carrying on the Business in the ordinary course after this Order, and in carrying out the provisions of this Order, which expenses shall include, without limitation:

(a)     all expenses and capital expenditures reasonably necessary for the preservation of the Property or the Business including, without limitation, payments on account of insurance (including directors and officers insurance), maintenance and security services; and

(b)     payment for goods or services actually supplied to the Applicants following the date of this Order.

9.     **THIS COURT ORDERS** that the Applicants shall remit, in accordance with legal requirements, or pay:

(a)     any statutory deemed trust amounts in favour of the Crown in right of Canada or of any Province thereof or any other taxation authority which are required to be deducted from employees' wages, including, without limitation, amounts in respect of (i) employment insurance, (ii) Canada Pension Plan and (iii) income taxes;

Electronically issued / Délivré par voie électronique : 03-Aug-2023
Toronto Superior Court of Justice / Cour supérieure de justice

**Court File No./N° du dossier du greffe :** CV-23-00703509-00CL

(b)     all goods and services, or other applicable sales taxes (collectively, "**Sales Taxes**")

required to be remitted by the Applicants in connection with the sale of goods and

services by the Applicants, but only where such Sales Taxes are accrued or collected

after the date of this Order, or where such Sales Taxes were accrued or collected prior

to the date of this Order but not required to be remitted until on or after the date of

this Order, and

(c)     any amount payable to the Crown in right of Canada or of any Province thereof or

any political subdivision thereof or any other taxation authority in respect of

municipal realty, municipal business or other taxes, assessments or levies of any

nature or kind which are entitled at law to be paid in priority to claims of secured

creditors and which are attributable to or in respect of the carrying on of the Business

by the Applicants.

10.     **THIS COURT ORDERS** that until a real property lease is disclaimed in accordance

with the CCAA, the Applicants shall pay all amounts constituting rent or payable as rent under

real property leases (including, for greater certainty, common area maintenance charges, utilities

and realty taxes and any other amounts payable to the landlord(s) under the lease) or as otherwise

may be negotiated between the Applicants and the landlord(s) from time to time ("**Rent**"), for

the period commencing from and including the date of this Order, twice-monthly in equal

payments on the first and fifteenth day of each month, in advance (but not in arrears).  On the

date of the first of such payments, any Rent relating to the period commencing from and

including the date of this Order shall also be paid.

11.     **THIS COURT ORDERS** that, except as specifically permitted herein, the Applicants

are hereby directed, until further Order of this Court: (a) to make no payments of principal,

Electronically issued / Délivré par voie électronique : 03-Aug-2023
Toronto Superior Court of Justice / Cour supérieure de justice

**Court File No./N° du dossier du greffe :** CV-23-00703509-00CL

interest thereon or otherwise on account of amounts owing by the Applicants to any of their
creditors as of this date; (b) to grant no security interests, trust, liens, charges or encumbrances
upon or in respect of any of their Property; and (c) to not grant credit or incur liabilities except in
the ordinary course of the Business.

**RESTRUCTURING**

12.     **THIS COURT ORDERS** that the Applicants shall, subject to such requirements as are
imposed by the CCAA and such covenants as may be contained in the Definitive Documents (as
hereinafter defined), have the right to:

(a)     permanently or temporarily cease, downsize or shut down any of their business or
operations, and to dispose of redundant or non-material assets not exceeding
$250,000 in any one transaction or $1,500,000 in the aggregate;

(b)     terminate the employment of such of their employees or temporarily lay off such of
their employees as they deem appropriate; and

(c)     pursue all avenues of sale or investment or refinancing of their Business or Property,
in whole or part, subject to prior approval of this Court being obtained before any
material sale or refinancing,

all of the foregoing to permit the Applicants to proceed with an orderly restructuring of the
Business (the "**Restructuring**").

13.     **THIS COURT ORDERS** that the Applicants shall provide each of the relevant landlords
with notice of the Applicants' intention to remove any fixtures from any leased premises at least
seven (7) days prior to the date of the intended removal.  The relevant landlord shall be entitled

Electronically issued / Délivré par voie électronique : 03-Aug-2023
Toronto Superior Court of Justice / Cour supérieure de justice

**Court File No./N° du dossier du greffe :** CV-23-00703509-00CL

to have a representative present in the leased premises to observe such removal and, if the landlord disputes the Applicants' entitlement to remove any such fixture under the provisions of the lease, such fixture shall remain on the premises and shall be dealt with as agreed between any applicable secured creditors, such landlord and the Applicants, or by further Order of this Court upon application by the Applicants on at least two (2) days notice to such landlord and any such secured creditors. If the Applicants disclaim the lease governing such leased premises in accordance with Section 32 of the CCAA, they shall not be required to pay Rent under such lease pending resolution of any such dispute (other than Rent payable for the notice period provided for in Section 32(5) of the CCAA), and the disclaimer of the lease shall be without prejudice to the Applicants' claim to the fixtures in dispute.

14. **THIS COURT ORDERS** that if a notice of disclaimer is delivered pursuant to Section 32 of the CCAA, then (a) during the notice period prior to the effective time of the disclaimer, the landlord may show the affected leased premises to prospective tenants during normal business hours, on giving the Applicants and the Monitor 24 hours' prior written notice, and (b) at the effective time of the disclaimer, the relevant landlord shall be entitled to take possession of any such leased premises without waiver of or prejudice to any claims or rights such landlord may have against the Applicants in respect of such lease or leased premises, provided that nothing herein shall relieve such landlord of its obligation to mitigate any damages claimed in connection therewith.

**NO PROCEEDINGS AGAINST THE APPLICANTS OR THE PROPERTY**

15. **THIS COURT ORDERS** that until and including October 6, 2023, or such later date as this Court may order (the "**Stay Period**"), no proceeding or enforcement process in any court or tribunal (each, a "**Proceeding**") shall be commenced or continued against or in respect of the

Electronically issued / Délivré par voie électronique : 03-Aug-2023
Toronto Superior Court of Justice / Cour supérieure de justice

**Court File No./N° du dossier du greffe :** CV-23-00703509-00CL

Applicants or the Monitor, or affecting the Business or the Property, except with the written consent of the Applicants and the Monitor, or with leave of this Court, and any and all Proceedings currently under way against or in respect of the Applicants or affecting the Business or the Property are hereby stayed and suspended pending further Order of this Court.

**NO EXERCISE OF RIGHTS OR REMEDIES**

16.      **THIS COURT ORDERS** that during the Stay Period, all rights and remedies of any individual, firm, corporation, governmental body or agency, or any other entities (all of the foregoing, collectively being "**Persons**" and each being a "**Person**") against or in respect of the Applicants or the Monitor, or affecting the Business or the Property, are hereby stayed and suspended except with the written consent of the Applicants and the Monitor, or leave of this Court, provided that nothing in this Order shall (i) empower the Applicants to carry on any business which the Applicants are not lawfully entitled to carry on, (ii) affect such investigations, actions, suits or proceedings by a regulatory body as are permitted by Section 11.1 of the CCAA, (iii) prevent the filing of any registration to preserve or perfect a security interest, or (iv) prevent the registration of a claim for lien.

**NO INTERFERENCE WITH RIGHTS**

17.      **THIS COURT ORDERS** that during the Stay Period, no Person shall discontinue, fail to honour, alter, interfere with, repudiate, terminate or cease to perform any right, renewal right, contract, agreement, lease, licence or permit in favour of or held by the Applicants, except with the written consent of the Applicants and the Monitor, or leave of this Court.

Electronically issued / Délivré par voie électronique : 03-Aug-2023
Toronto Superior Court of Justice / Cour supérieure de justice

**CONTINUATION OF SERVICES**

18.     **THIS COURT ORDERS** that during the Stay Period, all Persons having oral or written agreements with the Applicants or statutory or regulatory mandates for the supply of goods and/or services, including without limitation all computer software, communication and other data services, centralized banking services, payroll services, insurance, transportation services, utility or other services to the Business or the Applicants, are hereby restrained until further Order of this Court from discontinuing, altering, interfering with or terminating the supply of such goods or services as may be required by the Applicants, and that the Applicants shall be entitled to the continued use of their current premises, telephone numbers, facsimile numbers, internet addresses and domain names, provided in each case that the normal prices or charges for all such goods or services received after the date of this Order are paid by the Applicants in accordance with normal payment practices of the Applicants or such other practices as may be agreed upon by the supplier or service provider and each of the Applicants and the Monitor, or as may be ordered by this Court.

**NON-DEROGATION OF RIGHTS**

19.     **THIS COURT ORDERS** that, notwithstanding anything else in this Order, no Person shall be prohibited from requiring immediate payment for goods, services, use of lease or licensed property or other valuable consideration provided on or after the date of this Order, nor shall any Person be under any obligation on or after the date of this Order to advance or re-advance any monies or otherwise extend any credit to the Applicants.  Nothing in this Order shall derogate from the rights conferred and obligations imposed by the CCAA.

Electronically issued / Délivré par voie électronique : 03-Aug-2023
Toronto Superior Court of Justice / Cour supérieure de justice

**Court File No./N° du dossier du greffe :** CV-23-00703509-00CL

**PROCEEDINGS AGAINST DIRECTORS AND OFFICERS**

20.      **THIS COURT ORDERS** that during the Stay Period, and except as permitted by subsection 11.03(2) of the CCAA, no Proceeding may be commenced or continued against any of the former, current or future directors or officers of the Applicants with respect to any claim against the directors or officers that arose before the date hereof and that relates to any obligations of the Applicants whereby the directors or officers are alleged under any law to be liable in their capacity as directors or officers for the payment or performance of such obligations, until a compromise or arrangement in respect of the Applicants, if one is filed, is sanctioned by this Court or upon further order of this Court.

**DIRECTORS' AND OFFICERS' INDEMNIFICATION AND CHARGE**

21.      **THIS COURT ORDERS** that the Applicants shall indemnify their directors and officers against obligations and liabilities that they may incur as directors or officers of the Applicants after the commencement of the within proceedings, except to the extent that, with respect to any officer or director, the obligation or liability was incurred as a result of the director's or officer's gross negligence or wilful misconduct.

22.      **THIS COURT ORDERS** that the directors and officers of the Applicants shall be entitled to the benefit of and are hereby granted a charge (the "**Directors' Charge**") on the Property, which charge shall not exceed an aggregate amount of $500,000, as security for the indemnity provided in paragraph 23 of this Order.  The Directors' Charge shall have the priority set out in paragraphs 39 and 41 herein.

23.      **THIS COURT ORDERS** that, notwithstanding any language in any applicable insurance policy to the contrary, (a) no insurer shall be entitled to be subrogated to or claim the

Electronically issued / Délivré par voie électronique : 03-Aug-2023
Toronto Superior Court of Justice / Cour supérieure de justice

**Court File No./N° du dossier du greffe :** CV-23-00703509-00CL

benefit of the Directors' Charge, and (b) the Applicants' directors and officers shall only be entitled to the benefit of the Directors' Charge to the extent that they do not have coverage under any directors' and officers' insurance policy, or to the extent that such coverage is insufficient to pay amounts indemnified in accordance with paragraph 22 of this Order.

## APPOINTMENT OF MONITOR

24.     **THIS COURT ORDERS** that B. Riley Farber Inc. is hereby appointed pursuant to the CCAA as the Monitor, an officer of this Court, to monitor the business and financial affairs of the Applicants with the powers and obligations set out in the CCAA or set forth herein and that the Applicants and their respective shareholders, officers, directors, and Assistants shall advise the Monitor of all material steps taken by the Applicants pursuant to this Order, and shall co-operate fully with the Monitor in the exercise of its powers and discharge of its obligations and provide the Monitor with the assistance that is necessary to enable the Monitor to adequately carry out the Monitor's functions.

25.     **THIS COURT ORDERS** that the Monitor, in addition to its prescribed rights and obligations under the CCAA, is hereby directed and empowered to:

(a)     monitor the Applicants' receipts and disbursements;

(b)     report to this Court at such times and intervals as the Monitor may deem appropriate with respect to matters relating to the Property, the Business, and such other matters as may be relevant to the proceedings herein;

(c)     assist the Applicants, to the extent required by the Applicants, in their dissemination, to the DIP Lender and its counsel on a bi-weekly basis of financial and other information as agreed to between the Applicants and the DIP Lender which may be

Electronically issued / Délivré par voie électronique : 03-Aug-2023
Toronto Superior Court of Justice / Cour supérieure de justice

**Court File No./N° du dossier du greffe :** CV-23-00703509-00CL

used in these proceedings including reporting on a basis to be agreed with the DIP Lender;

(d)    advise the Applicants in their preparation of the Applicants' cash flow statements and reporting required by the DIP Lender, which information shall be reviewed with the Monitor and delivered to the DIP Lender and its counsel on a periodic basis to the DIP Lender;

(e)    advise the Applicants in their development of the Plan and any amendments to the Plan;

(f)    assist the Applicants, to the extent required by the Applicants, with the holding and administering of creditors' or shareholders' meetings for voting on the Plan;

(g)    have full and complete access to the Property, including the premises, books, records, data, including data in electronic form, and other financial documents of the Applicants, to the extent that is necessary to adequately assess the Applicants' business and financial affairs or to perform its duties arising under this Order;

(h)    be at liberty to engage independent legal counsel or such other persons as the Monitor deems necessary or advisable respecting the exercise of its powers and performance of its obligations under this Order; and

(i)    perform such other duties as are required by this Order or by this Court from time to time.

26.    **THIS COURT ORDERS** that the Monitor shall not take possession of the Property and shall take no part whatsoever in the management or supervision of the management of the

Electronically issued / Délivré par voie électronique : 03-Aug-2023
Toronto Superior Court of Justice / Cour supérieure de justice

Business and shall not, by fulfilling its obligations hereunder, be deemed to have taken or maintained possession or control of the Business or Property, or any part thereof.

27.     **THIS COURT ORDERS** that nothing herein contained shall require the Monitor to occupy or to take control, care, charge, possession or management (separately and/or collectively, "**Possession**") of any of the Property that might be environmentally contaminated, might be a pollutant or a contaminant, or might cause or contribute to a spill, discharge, release or deposit of a substance contrary to any federal, provincial or other law respecting the protection, conservation, enhancement, remediation or rehabilitation of the environment or relating to the disposal of waste or other contamination including, without limitation, the *Canadian Environmental Protection Act*, the Ontario *Environmental Protection Act*, the *Ontario Water Resources Act*, or the Ontario *Occupational Health and Safety Act* and regulations thereunder (collectively, the "**Environmental Legislation**"), provided however that nothing herein shall exempt the Monitor from any duty to report or make disclosure imposed by applicable Environmental Legislation.  The Monitor shall not, as a result of this Order or anything done in pursuance of the Monitor's duties and powers under this Order, be deemed to be in Possession of any of the Property within the meaning of any Environmental Legislation, unless it is actually in possession.

28.     **THIS COURT ORDERS** that that the Monitor shall provide any creditor of the Applicants and the DIP Lender with information provided by the Applicants in response to reasonable requests for information made in writing by such creditor addressed to the Monitor. The Monitor shall not have any responsibility or liability with respect to the information disseminated by it pursuant to this paragraph.  In the case of information that the Monitor has been advised by the Applicants is confidential, the Monitor shall not provide such information to

Electronically issued / Délivré par voie électronique : 03-Aug-2023
Toronto Superior Court of Justice / Cour supérieure de justice

**Court File No./N° du dossier du greffe :** CV-23-00703509-00CL

creditors unless otherwise directed by this Court or on such terms as the Monitor and the Applicants may agree.

29.     **THIS COURT ORDERS** that, in addition to the rights and protections afforded the Monitor under the CCAA or as an officer of this Court, the Monitor shall incur no liability or obligation as a result of its appointment or the carrying out of the provisions of this Order, save and except for any gross negligence or wilful misconduct on its part. Nothing in this Order shall derogate from the protections afforded the Monitor by the CCAA or any applicable legislation.

30.     **THIS COURT ORDERS** that the Monitor, counsel to the Monitor and counsel to the Applicants shall be paid their reasonable fees and disbursements, in each case at their standard rates and charges, whether incurred prior to, on, or subsequent, to the date of this Order by the Applicants as part of the costs of these proceedings. The Applicants are hereby authorized and directed to pay the accounts of the Monitor, counsel for the Monitor and counsel for the Applicants on a bi-weekly basis and, in addition, the Applicants are hereby authorized to pay to the Monitor, counsel to the Monitor, and Canadian and US counsel to the Applicants, retainers in the amounts of US $75,000, US $50,000, US $75,000 and US $75,000, respectively, to be held by them as security for payment of their respective fees and disbursements outstanding from time to time.

31.     **THIS COURT ORDERS** that the Monitor and its legal counsel shall pass their accounts from time to time, and for this purpose the accounts of the Monitor and its legal counsel are hereby referred to a judge of the Commercial List of the Ontario Superior Court of Justice.

32.     **THIS COURT ORDERS** that the Monitor, counsel to the Monitor, if any, and the Applicants' counsel shall be entitled to the benefit of and are hereby granted a charge (the

Electronically issued / Délivré par voie électronique : 03-Aug-2023
Toronto Superior Court of Justice / Cour supérieure de justice

**Court File No./N° du dossier du greffe :** CV-23-00703509-00CL

"**Administration Charge**") on the Property, which charge shall not exceed an aggregate amount of US $500,000, as security for their professional fees and disbursements incurred at the standard rates and charges of the Monitor and such counsel, both before and after the making of this Order in respect of these proceedings.  The Administration Charge shall have the priority set out in paragraphs 39 and 41 hereof.

**DIP FINANCING**

33.    **THIS COURT ORDERS** that the Applicants and the Subsidiaries are hereby authorized and empowered to obtain and borrow under a credit facility from SCS Finance, Inc. (the "**DIP Lender**") in order to finance the Applicants' and the Subsidiaries' working capital requirements and other general corporate purposes and capital expenditures, provided that borrowings under such credit facility shall not exceed US $3,500,000 (plus interest, fees, and expenses in accordance with the DIP Term Sheet (as defined below)) unless permitted by further Order of this Court.

34.    **THIS COURT ORDERS** that such credit facility shall be on the terms and subject to the conditions set forth in the DIP Term Sheet between the Applicants, the Subsidiaries and the DIP Lender dated as of July 26, 2023, as amended from time to time (the "**DIP Term Sheet**"), filed.

35.    **THIS COURT ORDERS** that the Applicants and the Subsidiaries are hereby authorized and empowered to execute and deliver such credit agreements, mortgages, charges, hypothecs and security documents, guarantees and other definitive documents (collectively, the "**Definitive Documents**"), as are contemplated by the DIP Term Sheet or as may be reasonably required by the DIP Lender pursuant to the terms thereof, and the Applicants are hereby authorized and directed to pay and perform all of their indebtedness, interest, fees, liabilities and obligations to

Electronically issued / Délivré par voie électronique : 03-Aug-2023
Toronto Superior Court of Justice / Cour supérieure de justice

**Court File No./N° du dossier du greffe :** CV-23-00703509-00CL

the DIP Lender under and pursuant to the DIP Term Sheet and the Definitive Documents as and

when the same become due and are to be performed, notwithstanding any other provision of this

Order.

36.     **THIS COURT ORDERS** that the DIP Lender shall be entitled to the benefit of and is

hereby granted a charge (the "**DIP Lender's Charge**") on the Property and the Subsidiaries'

current and future assets, undertakings and properties of every nature and kind whatsoever, and

wherever situate including all proceeds thereof, which DIP Lender's Charge shall not secure an

obligation that exists before this Order is made.  The DIP Lender's Charge shall have the priority

set out in paragraphs 39 and 41 hereof.

37.     **THIS COURT ORDERS** that, notwithstanding any other provision of this Order:

(a)     the DIP Lender may take such steps from time to time as it may deem necessary or

appropriate to file, register, record or perfect the DIP Lender's Charge or any of the

Definitive Documents;

(b)     upon the occurrence of an event of default under the Definitive Documents or the DIP

Lender's Charge, the DIP Lender, upon five (5) business days written notice to the

Applicants and the Monitor, may exercise any and all of its rights and remedies

against the Applicants or the Property under or pursuant to the DIP Term Sheet,

Definitive Documents and the DIP Lender's Charge, including without limitation, to

cease making advances to the Applicants and set off and/or consolidate any amounts

owing by the DIP Lender to the Applicants against the obligations of the Applicants

to the DIP Lender under the DIP Term Sheet, the Definitive Documents or the DIP

Lender's Charge, to make demand, accelerate payment and give other notices, or to

Electronically issued / Délivré par voie électronique : 03-Aug-2023
Toronto Superior Court of Justice / Cour supérieure de justice

**Court File No./N° du dossier du greffe :** CV-23-00703509-00CL

apply to this Court for the appointment of a receiver, receiver and manager or interim receiver, or for a bankruptcy order against the Applicants and for the appointment of a trustee in bankruptcy of the Applicants; and

(c)    the foregoing rights and remedies of the DIP Lender shall be enforceable against any trustee in bankruptcy, interim receiver, receiver or receiver and manager of the Applicants or the Property.

38.    **THIS COURT ORDERS AND DECLARES** that the DIP Lender shall be treated as unaffected in any plan of arrangement or compromise filed by the Applicants under the CCAA, or any proposal filed by the Applicants under the *Bankruptcy and Insolvency Act* of Canada (the "**BIA**"), with respect to any advances made under the Definitive Documents.

**VALIDITY AND PRIORITY OF CHARGES CREATED BY THIS ORDER**

39.    **THIS COURT ORDERS** that the priorities of the Directors' Charge, the Administration Charge and the DIP Lender's Charge, as among them, shall be as follows:

First – Administration Charge (to the maximum amount of US $500,000);

Second – DIP Lender's Charge; and

Third – Directors' Charge (to the maximum amount of US $500,000).

40.    **THIS COURT ORDERS** that the filing, registration or perfection of the Directors' Charge, the Administration Charge or the DIP Lender's Charge (collectively, the "**Charges**") shall not be required, and that the Charges shall be valid and enforceable for all purposes, including as against any right, title or interest filed, registered, recorded or perfected subsequent

Electronically issued / Délivré par voie électronique : 03-Aug-2023
Toronto Superior Court of Justice / Cour supérieure de justice

to the Charges coming into existence, notwithstanding any such failure to file, register, record or perfect.

41.     **THIS COURT ORDERS** that each of the Charges (all as constituted and defined herein) shall constitute a charge on the Property and such Charges shall rank in priority to all other security interests, trusts, liens, charges and encumbrances, claims of secured creditors, statutory or otherwise (collectively, "**Encumbrances**") in favour of any Person.

42.     **THIS COURT ORDERS** that except as otherwise expressly provided for herein, or as may be approved by this Court, the Applicants shall not grant any Encumbrances over any Property that rank in priority to, or *pari passu* with, any of the Charges, unless the Applicants also obtain the prior written consent of the Monitor, the DIP Lender and the beneficiaries of the Charges, or further Order of this Court.

43.     **THIS COURT ORDERS** that the Directors' Charge, the Administration Charge, the DIP Term Sheet, the Definitive Documents and the DIP Lender's Charge shall not be rendered invalid or unenforceable and the rights and remedies of the chargees entitled to the benefit of the Charges (collectively, the "**Chargees**") and/or the DIP Lender thereunder shall not otherwise be limited or impaired in any way by (a) the pendency of these proceedings and the declarations of insolvency made herein; (b) any application(s) for bankruptcy order(s) issued pursuant to BIA, or any bankruptcy order made pursuant to such applications; (c) the filing of any assignments for the general benefit of creditors made pursuant to the BIA; (d) the provisions of any federal or provincial statutes; or (e) any negative covenants, prohibitions or other similar provisions with respect to borrowings, incurring debt or the creation of Encumbrances, contained in any existing loan documents, lease, sublease, offer to lease or other agreement (collectively, an

Electronically issued / Délivré par voie électronique : 03-Aug-2023
Toronto Superior Court of Justice / Cour supérieure de justice

**Court File No./N° du dossier du greffe :** CV-23-00703509-00CL

"**Agreement**") which binds the Applicants, and notwithstanding any provision to the contrary in any Agreement:

(a)     neither the creation of the Charges nor the execution, delivery, perfection, registration or performance of the DIP Term Sheet or the Definitive Documents shall create or be deemed to constitute a breach by any of the Applicants of any Agreement to which it is a party;

(b)     none of the Chargees shall have any liability to any Person whatsoever as a result of any breach of any Agreement caused by or resulting from the Applicants entering into the DIP Term Sheet, the creation of the Charges, or the execution, delivery or performance of the Definitive Documents; and

(c)     the payments made by the Applicants pursuant to this Order, the DIP Term Sheet or the Definitive Documents, and the granting of the Charges, do not and will not constitute preferences, fraudulent conveyances, transfers at undervalue, oppressive conduct, or other challengeable or voidable transactions under any applicable law.

44.     **THIS COURT ORDERS** that any Charge created by this Order over leases of real property in Canada shall only be a Charge in the Applicants' interest in such real property leases.

**SERVICE AND NOTICE**

45.     **THIS COURT ORDERS** that the Monitor shall (i) without delay, publish in The Globe & Mail for one (1) week, a notice containing the information prescribed under the CCAA, (ii) within five (5) business days after the date of this Order, (A) make this Order publicly available in the manner prescribed under the CCAA, (B) send, in the prescribed manner, a notice to every known creditor who has a claim against any of the Applicants of more than $1000, and (C)

Electronically issued / Délivré par voie électronique : 03-Aug-2023
Toronto Superior Court of Justice / Cour supérieure de justice

**Court File No./N° du dossier du greffe :** CV-23-00703509-00CL

prepare a list showing the names and addresses of those creditors and the estimated amounts of those claims, and make it publicly available in the prescribed manner, all in accordance with Section 23(1)(a) of the CCAA and the regulations made thereunder.

46.     **THIS COURT ORDERS** that the E-Service Protocol of the Commercial List (the "**Protocol**") is approved and adopted by reference herein and, in this proceeding, the service of documents made in accordance with the Protocol (which can be found on the Commercial List website at http://www.ontariocourts.ca/scj/practice/practice-directions/toronto/e-service-protocol/) shall be valid and effective service. Subject to Rule 17.05 this Order shall constitute an order for substituted service pursuant to Rule 16.04 of the Rules of Civil Procedure. Subject to Rule 3.01(d) of the Rules of Civil Procedure and paragraph 21 of the Protocol, service of documents in accordance with the Protocol will be effective on transmission. This Court further orders that a Case Website shall be established in accordance with the Protocol with the following URL: https://farbergroup.com/engagements/lighthouse-immersive/.

47.     **THIS COURT ORDERS** that if the service or distribution of documents in accordance with the Protocol is not practicable, the Applicants and the Monitor are at liberty to serve or distribute this Order, any other materials and orders in these proceedings, any notices or other correspondence, by forwarding true copies thereof by prepaid ordinary mail, courier, personal delivery or facsimile transmission to the Applicants' creditors or other interested parties at their respective addresses as last shown on the records of the respective Applicants and that any such service or distribution by courier, personal delivery or facsimile transmission shall be deemed to be received on the next business day following the date of forwarding thereof, or if sent by ordinary mail, on the third business day after mailing.

Electronically issued / Délivré par voie électronique : 03-Aug-2023
Toronto Superior Court of Justice / Cour supérieure de justice

**Court File No./N° du dossier du greffe :** CV-23-00703509-00CL

## FOREIGN PROCEEDINGS AND FOREIGN REPRESENTATIVE

48.    **THIS COURT ORDER THAT** Lighthouse Immersive Inc. be and is hereby authorized and empowered to act as a foreign representative (the "**Foreign Representative**") in respect of these proceedings for the purpose of having these proceedings recognized in a foreign jurisdiction.

49.    **THIS COURT ORDER THAT** the Foreign Representative be and is hereby authorized to apply for foreign recognition of these proceedings, as necessary or advisable, in any jurisdiction outside of Canada, including without limitation, the United States pursuant to Chapter 15 of Title 11 of the United States Code 11 U.S.C., § 101 – 1532**.**

## GENERAL

50.    **THIS COURT ORDERS** that the Applicants or the Monitor may from time to time apply to this Court for advice and directions in the discharge of their powers and duties hereunder.

51.    **THIS COURT ORDERS** that nothing in this Order shall prevent the Monitor from acting as an interim receiver, a receiver, a receiver and manager, or a trustee in bankruptcy of the Applicants, the Business or the Property.

52.    **THIS COURT HEREBY REQUESTS** the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada, the United States or elsewhere, to give effect to this Order and to assist the Applicants, the Monitor and their respective agents in carrying out the terms of this Order.  All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Applicants and to the Monitor, as an officer of this Court, as may be necessary or desirable to

Electronically issued / Délivré par voie électronique : 03-Aug-2023
Toronto Superior Court of Justice / Cour supérieure de justice

give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Applicants and the Monitor and their respective agents in carrying out the terms of this Order.

53.     **THIS COURT ORDERS** that each of the Applicants and the Monitor be at liberty and is hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order, and that the Applicants are authorized and empowered to act as a representative in respect of the within proceedings for the purpose of having these proceedings recognized in a jurisdiction outside Canada.

54.     **THIS COURT ORDERS** that any interested party (including the Applicants and the Monitor) may apply to this Court to vary or amend this Order on not less than seven (7) days notice to any other party or parties likely to be affected by the order sought or upon such other notice, if any, as this Court may order.

55.     **THIS COURT ORDERS** that this Order and all of its provisions are effective as of 12:01 a.m. Eastern Standard/Daylight Time on the date of this Order.

56.     **THIS COURT ORDERS** that this Order is effective from the date that it is made and is enforceable without any need for entry and filing.

Digitally signed by
Jessica Kimmel
Date: 2023.08.03
11:47:50 -04'00'

Electronically issued / Délivré par voie électronique : 03-Aug-2023
Toronto Superior Court of Justice / Cour supérieure de justice

**Court File No./N° du dossier du greffe :** CV-23-00703509-00CL

Schedule "A"
**Subsidiaries**

(a)     Lighthouse Immersive Las Vegas, LLC;

(b)     Lighthouse Immersive Denver, LLC;

(c)     Lighthouse Immersive Detroit, LLC;

(d)     Lighthouse Immersive Cleveland, LLC;

(e)     Lighthouse Immersive Columbus, LLC;

(f)     Lighthouse Immersive Nashville, LLC;

(g)     Lighthouse Artspace Kansas City, LLC;

(h)     Lighthouse Immersive San Antonio, LLC;

(i)     Lighthouse Immersive Madison, LLC; and

(j)     Lighthouse Immersive Orlando, LLC.

Court File No./N° du dossier du greffe : CV-23-00703509-00CL

Electronically issued / Délivré par voie électronique : 03-Aug-2023
Toronto Superior Court of Justice / Cour supérieure de justice

Court File No.:  CV-23-00703509-00CL

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985,
c.C-36 AS AMENDED
AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
LIGHTHOUSE IMMERSIVE INC. et al.

*ONTARIO*
**SUPERIOR COURT OF JUSTICE -
COMMERCIAL LIST**

Proceeding commenced at TORONTO

**AMENDED AND RESTATED
INITIAL ORDER
(DATED JULY 27, 2023)**

**MILLER THOMSON** LLP
Scotia Plaza
40 King Street West, Suite 5800
P.O. Box 1011
Toronto, ON Canada  M5H 3S1

**Kyla Mahar LSO#: 44182G**
kmahar@millerthomson.com
Tel: 416.597.4303

**Gina Rhodes LSO#: 78849U**
grhodes@millerthomson.com
Tel: 416.597.4321

Lawyers for the Applicants

**APPENDIX "B"**

**FORECAST VS. ACTUAL VARIANCE ANALYSIS FOR THE 10 WEEKS ENDED OCTOBER 1, 2023**

**LIGHTHOUSE IMMERSIVE INC. ("LHI") & LIGHTHOUSE IMMERSIVE USA, INC. ("LHI USA")**
**Actual Cash Flow vs. Filing Forecast - Cumulative Variance Analysis**
**For the 10 weeks ended October 1, 2023**
*In USD*

| | Forecast | Actual | Variance - B/(W) |
|---|---|---|---|
| **10-week period ending** | **10/1/2023** | **10/1/2023** | **10/1/2023** |
| **Cash Receipts** | | | |
| Box Office Ticket Sale Collections | $            - | $      246,454 | $      246,454 |
| Other Income | - | 500,000 | 500,000 |
| Divestiture of Surplus Inventory and Capital Assets | - | - | - |
| Transfer from Affiliated Companies | - | 97,000 | 97,000 |
| Rate Card Reimbursements from LHI Studios | 3,291,145 | 3,175,246 | (115,899) |
| **Total Receipts** | **$   3,291,145** | **$   4,018,700** | **$      727,555** |
| **Cash Disbursements** | | | |
| LHI Payroll & Payroll Remittances | $      640,965 | $      694,123 | $       (53,158) |
| LHI USA Payroll & Payroll Remittances | 222,300 | 262,189 | (39,889) |
| Contract Payroll From Related Party | 160,000 | - | 160,000 |
| LHI Rent | 244,184 | 134,927 | 109,257 |
| LHI Utilities and Other Occupancy Costs | 53,400 | 4,484 | 48,916 |
| LHI Corporate Overhead | 245,000 | 255,449 | (10,449) |
| LHI USA Corporate Overhead | 245,000 | 375,244 | (130,244) |
| Load out costs | - | 69,009 | (69,009) |
| Transfer to LHI USA Wholly Owned Subsidiaries | 4,000,000 | 2,919,025 | 1,080,975 |
| Foreign exchange loss | - | 2,100 | (2,100) |
| **Total Operating Disbursements** | **$   5,810,849** | **$   4,716,550** | **$   1,096,400** |
| LHI & LHI USA Legal Counsel Fees | $      425,000 | $      203,085 | $      221,915 |
| Proposed Monitor Fees | 300,000 | 115,925 | 184,075 |
| Proposed Monitor's Legal Counsel Fees | 150,000 | 58,067 | 91,933 |
| DIP Fees | 25,000 | | 25,000 |
| **CCAA Professional Fees** | **$      900,000** | **$      377,077** | **$      522,923** |
| **Total Disbursements** | **$   6,710,849** | **$   5,093,627** | **$   1,619,323** |
| **Net Receipts** | **$  (3,419,704)** | **$  (1,074,927)** | **$   2,346,877** |
| **Opening Cash Position** | **$        84,650** | **$      210,981** | **$      126,331** |
| DIP Financing Advances | 3,500,000 | 1,574,000 | (1,926,000) |
| **Cash Ending Balance** | **$      164,946** | **$      710,054** | **$      545,108** |

**APPENDIX "C"**

**REVISED CASH FLOW FORECAST FOR THE 10-WEEK PERIOD ENDED DECEMBER 10, 2023**

**LIGHTHOUSE IMMERSIVE INC. ("LHI") & LIGHTHOUSE IMMERSIVE USA, INC. ("LHI USA")**
**Projected Cash Flow**
**October 2, 2023 to December 10, 2023**
*In USD*

| | Projected Week 1 | Projected Week 2 | Projected Week 3 | Projected Week 4 | Projected Week 5 | Projected Week 6 | Projected Week 7 | Projected Week 8 | Projected Week 9 | Projected Week 10 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Week Ending** | 10/8/2023 | 10/15/2023 | 10/22/2023 | 10/29/2023 | 11/5/2023 | 11/12/2023 | 11/19/2023 | 11/26/2023 | 12/3/2023 | 12/10/2023 | |
| **Cash Receipts** | | | | | | | | | | | |
| Box Office Ticket Sale Collections (Note 1) | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 200,000 |
| Divestiture of Surplus Inventory and Capital Assets | - | - | - | - | - | - | - | - | - | - | - |
| Rate Card Reimbursements from LHI Studios Inc. (Note 2) | 43,450 | 43,450 | 43,450 | 43,450 | 43,450 | 43,450 | 43,450 | 43,450 | 43,450 | 43,450 | 434,497 |
| **Total Receipts** | 63,450 | 63,450 | 63,450 | 63,450 | 63,450 | 63,450 | 63,450 | 63,450 | 63,450 | 63,450 | 634,497 |
| **Cash Disbursements** | | | | | | | | | | | |
| **Royalties** | | | | | | | | | | | |
| Visioni | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 10,000 |
| LHI Payroll & Payroll Remittances | 114,413 | - | 114,413 | - | 114,413 | - | 114,413 | - | 114,413 | - | 572,063 |
| LHI USA Payroll & Payroll Remittances | 45,000 | - | 45,000 | - | 45,000 | - | 45,000 | - | 45,000 | - | 225,000 |
| Contract Payroll From Related Party (Note 3) | 64,000 | - | 64,000 | - | 64,000 | - | 64,000 | - | 64,000 | - | 320,000 |
| LHI Rent (Note 4) | 81,395 | - | - | - | 81,395 | - | - | - | 81,395 | - | 244,184 |
| LHI Utilities and Other Occupancy Costs (Note 4) | 5,340 | 5,340 | 5,340 | 5,340 | 5,340 | 5,340 | 5,340 | 5,340 | 5,340 | 5,340 | 53,400 |
| LHI Corporate Overhead (Note 5) | 37,040 | 28,540 | 28,540 | 28,540 | 28,540 | 28,540 | 28,540 | 28,540 | 28,540 | 28,540 | 293,897 |
| LHI USA Corporate Overhead (Note 5) | 28,380 | 18,380 | 18,380 | 18,380 | 18,380 | 18,380 | 18,380 | 18,380 | 18,380 | 18,380 | 193,805 |
| Load Out Costs (Note 6) | 15,938 | 79,688 | 31,875 | 63,750 | 63,750 | 63,750 | - | - | - | - | 318,750 |
| Transfer to LHI USA Wholly Owned Subsidiaries (Note 7) | 400,000 | - | - | - | 300,000 | - | - | - | - | - | 700,000 |
| **Total Operating Disbursements** | 792,505 | 132,948 | 308,548 | 117,010 | 721,817 | 117,010 | 276,673 | 53,260 | 358,067 | 53,260 | 2,931,099 |
| LHI & LHI USA Legal Counsel Fees | 100,000 | - | 45,000 | - | 45,000 | - | 45,000 | - | 45,000 | - | 280,000 |
| Monitor Fees | 90,000 | - | 45,000 | - | 45,000 | - | 45,000 | - | 45,000 | - | 270,000 |
| Monitor's Legal Counsel Fees | 40,000 | - | 22,500 | - | 22,500 | - | 22,500 | - | 22,500 | - | 130,000 |
| **CCAA Professional Fees** | 230,000 | - | 112,500 | - | 112,500 | - | 112,500 | - | 112,500 | - | 680,000 |
| **Total Disbursements** | 1,022,505 | 132,948 | 421,048 | 117,010 | 834,317 | 117,010 | 389,173 | 53,260 | 470,567 | 53,260 | 3,611,099 |
| **Net Receipts** | (959,055) | (69,498) | (357,598) | (53,560) | (770,868) | (53,560) | (325,723) | 10,190 | (407,118) | 10,190 | (2,976,601) |
| **Opening Cash Position** | 710,054 | 1,050,999 | 981,501 | 623,903 | 570,342 | 925,475 | 871,914 | 546,191 | 556,381 | 149,263 | 710,054 |
| DIP Financing Advances | 1,300,000 | - | - | - | 1,126,000 | - | - | - | - | - | 2,426,000 |
| **Cash Ending Balance** | 1,050,999 | 981,501 | 623,903 | 570,342 | 925,475 | 871,914 | 546,191 | 556,381 | 149,263 | 159,453 | 159,453 |

**Disclaimer**

- This Projected Cash Flow is prepared by Lighthouse Immersive Inc. and Lighthouse Immersive USA, Inc. (collectively "Lighthouse") in accordance with s.s. 23(1)(b) of the Companies Creditors' Arrangement Act ("CCAA").

- Lighthouse has prepared this Projected Cash Flow on probable and hypothetical assumptions that reflect Lighthouse's planned course of action for the period of 10 weeks. Management is of the opinion that, as at the date of filing the Projected Cash Flow,  the assumptions used to develop the projection represent the most probable set of economic conditions facing Lighthouse and that the assumptions used provide a reasonable basis for and are consistent with the purpose of this Projected Cash Flow.

- The Projected Cash Flow has been prepared by Lighthouse and has been reviewed by the Monitor. The Monitor has not verified or confirmed certain expenses incurred by Lighthouse which are reflected in this Projected Cash Flow.

- The information contained in this Projected Cash Flow is subject to changing assumptions and/or with the receipt of new or additional information the actual results may vary. This Projected Cash Flow should not be used for any other purpose than its stated purpose, and creditors are cautioned that the information provided in this Projected Cash Flow could vary based on changing future circumstances.

**LIGHTHOUSE IMMERSIVE INC. ("LHI") & LIGHTHOUSE IMMERSIVE USA, INC. ("LHI USA")**
**Notes to the Projected Cash Flow**
**October 2, 2023 to December 10, 2023**

**Note 1**
Box office ticket sale receipts relate to the Immersive Van Gogh Exhibition being run in Toronto.

**Note 2**
The Projected Cash Flow assumes the collection of reimbursed venue and payroll costs on a weekly basis for Toronto shows from Lighthouse Immersive Studios Inc. ("**Studios**"). The reimbursed amounts are determined on a weekly basis calculated as LHI's proportionate share of these costs related to revenue that Studios receives from these shows.

**Note 3**
These amounts represent reimbursements to a related party for biweekly payroll payments made for additional LHI employees. Included within these amounts are catch up payments for these additional LHI employees that were not previously paid.

**Note 4**
Rent, utilities and other occupancy costs are related to the premises located in Toronto.

**Note 5**
The Projected Cash Flow assumes reductions in corporate overhead for both LHI & LHI USA to what would only be essential for operations in a restructuring.

**Note 6**
These amounts represent LHI USA's portion of costs incurred to shut down US shows and remove inventory and equipment from the venues.

**Note 7**
Transfers to LHI USA wholly owned subsidiaries are made on an as needed basis when the subsidiaries require funding to cover their current operating expenses.

This Statement of Projected Cash Flow is prepared in accordance with s.s. 23(1)(b) of the Companies Creditors' Arrangement Act

B. Riley Farber Inc.                                    Lighthouse Immersive Inc.
In its capacity as Monitor                              Lighthouse Immersive USA, Inc.

Per: Allan Nackan, CPA, CA, CIRP, LIT                   Per: Corey Ross, President
        Senior Managing Director

**APPENDIX "D"**

**OCTOBER 3, 2023, ENDORSEMENT**



## SUPERIOR COURT OF JUSTICE

## ENDORSEMENT

**COURT FILE NO.:**  CV-23-00703509-00CL                    **DATE:**  October 3, 2023

**NO. ON LIST:**  2

**TITLE OF PROCEEDING:**   IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT R.S.C. 1985, C. c-36 AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF LIGHTHOUSE IMMERSIVE INC. AND LIGHTHOUSE IMMERSIVE USA, INC.

**BEFORE:**          **JUSTICE CAVANAGH**

### PARTICIPANT INFORMATION

**For Plaintiff, Applicant, Moving Party:**

| Name of Person Appearing | Name of Party | Contact Info |
| --- | --- | --- |
| Kyla Mahar | Counsel for the Applicants | kmahar@millerthomson.com |
| Gina Rhodes | | grhodes@millerthomson.com |

**For Defendant, Respondent, Responding Party:**

| Name of Person Appearing | Name of Party | Contact Info |
| --- | --- | --- |
| David Ullmann | Counsel for Svetlana Dvoretsky and Dvoretsky Holdco Inc. | dullmann@blaney.com |

**For Other, Self-Represented:**

| Name of Person Appearing | Name of Party | Contact Info |
| --- | --- | --- |
| Rebecca Kennedy | Counsel for the Monitor | rkennedy@tgf.ca |
| Rachel Fielding | | rfielding@tgf.ca |
| Hylton Levy | Monitor | hlevy@brileyfin.com |
| Allan Nackan | | anackan@brileyfin.com |
| Steven Weisz | Counsel for Corey Ross and SCS | sweisz@cozen.com |

1

|  |  |  |
|--|--|--|

## ENDORSEMENT

A case conference was brought by the Applicants and B. Riley Farber Inc., in its capacity as CCAA monitor of the Applicants (the "**Monitor**") pursuant to the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended, (the "**CCAA**") by Zoom video conference. The following is my endorsement relating to the enhanced powers of the Monitor.

## DEFINED TERMS

1.      Capitalized terms used in this Endorsement and not otherwise defined herein shall have the meaning ascribed to them under the Amended and Restated Initial Order dated August 3, 2023 (the "**Initial Order**").

## MONITOR'S ENHANCED POWERS

2.      In addition to the powers and duties set out in the Initial Order, or any other Order of this Court in these proceedings, and without altering in any way the limitations and obligations of the Applicants as a result of these proceedings, the Monitor be and is hereby authorized and empowered, but not required, to:

(a)     exercise any powers which may be properly exercised by a board of directors of any of the Applicants;

(b)     cause the Applicants to exercise any powers which may be properly exercised in the Applicants' capacity as shareholder(s) of any wholly-owned subsidiary of the Applicants;

(c)     take any and all actions and steps, and execute all documents and writings, on behalf of, and in the name of an Applicant or all Applicants, in order to facilitate the performance of any ongoing obligations of the Applicants, and to carry out the Monitor's duties under this Endorsement or any other Order of this Court in these CCAA Proceedings;

2

(d)    engage with and instruct assistants or advisors or cause the Applicants to engage with and instruct assistants or advisors as the Monitor deems necessary or desirable to carry out the terms of the Initial Order or any other Order made in these proceedings, provide instructions to such assistants or advisors, including legal counsel to the Applicants, and all such persons shall be deemed to be "Assistants" under the Initial Order;

(e)    cause the Applicants to perform such other functions or duties as the Monitor considers necessary or desirable in order to facilitate or assist the Applicants in dealing with the Applicants' Property or operations, restructuring, wind-down, liquidation, distribution of proceeds, or any other related activities; and

(f)    meet with, consult and direct management or employees of and persons retained by the Applicants with respect to any of the foregoing including, without limitation, operational, restructuring, and liquidation matters.

The Monitor, in exercising these powers, shall do so independently and in its sole discretion and business judgment.

3.      The enhancement of the Monitor's powers as set forth in this Endorsement, the exercise by the Monitor of any of its powers, the performance by the Monitor of any of its duties, or the employment by the Monitor of any person in connection with its appointment and the performance of its powers and duties shall not constitute the Monitor as the employer, successor employer or related employer of the employees of the Applicants within the meaning of any provincial, federal, or municipal legislation, or common law governing employment, pensions or labour standards or any other statute, regulation or rule of law or equity for any purpose whatsoever or expose the Monitor to liability to any individual arising from or relating to their previous employment by the Applicants.

4.      Without limiting the provisions of the Initial Order, all employees and consultants of the Applicants shall remain employees or consultants of the Applicants until such time as the Monitor, on the Applicants' behalf, may

terminate the employment of such employees or other contractual or consulting arrangements. Nothing in this Endorsement shall, in and of itself, cause the Monitor to be liable for any employee-related liabilities or duties, including, without limitation, wages, severance pay, termination pay, vacation pay and pension or benefit amounts.

5.      The Monitor is not and shall not be or be deemed to be, a director, officer, or employee of the Applicants.

6.      Without limiting the provisions of the Initial Order, the Applicants shall remain in possession and control of the Applicants' Property and the Applicants' Business and that the Monitor shall not take possession and control of the Applicants' Property, the Applicants' Business, or any part thereof.

7.      The Applicants shall cooperate fully with the Monitor and any directions it may provide pursuant to this Endorsement and shall provide such assistance as the Monitor may reasonably request from time to time to enable the Monitor to carry out its duties and powers as set out in the Initial Order, this Endorsement, or any other Order of this Court under the CCAA or applicable law generally.

8.      Nothing in this Endorsement shall constitute or be deemed to constitute the Monitor as receiver, assignee, liquidator, administrator, receiver-manager, agent of the creditors or legal representative of any of the Applicants within the meaning of any relevant legislation and that any distributions to creditors of the Applicants by the Monitor will be deemed to have been made by the Applicants themselves.

9.      The power and authority granted to the Monitor by virtue of this Endorsement shall, if exercised in any case, be paramount to the power and authority of the Applicants with respect to such matters and, in the event of a conflict between the terms of this Endorsement and those of the Initial Order or any other Order of this Court, the provisions of this Endorsement shall govern.

Digitally signed by
Mr. Justice Cavanagh

_____
Justice Cavanagh

Date: October 3, 2023

4

**APPENDIX "E"**

**SALE AND INVESTMENT SOLICITATION PROCESS**

**Sale and Investment Solicitation Process**
**Lighthouse Immersive Inc. and Lighthouse Immersive USA Inc.**

## Introduction

1.  On July 27, 2023, Lighthouse Immersive Inc. and Lighthouse Immersive USA Inc. (together, the "**Applicants**") were granted an initial order (as amended or amended and restated from time to time, the "**Initial Order**") under the *Companies' Creditors Arrangement Act* (the "**CCAA**" and the "**CCAA Proceedings**") by the Ontario Superior Court of Justice (the "**CCAA Court**"). The Initial Order (which was amended and restated on August 3, 2023), among other things:

    (a)   stayed all proceedings against the Applicants, their assets and their respective directors and officers;

    (b)   appointed B. Riley Farber Inc. as the monitor of the Applicants (in such capacity, the "**Monitor**");

    (c)   authorized the Applicants to enter into a debtor-in-possession financing facility with SCS Finance, Inc. ("**SCS**") pursuant to a Term Sheet dated July 26, 2023 (the "**DIP Term Sheet**"), as well as the related charge in favour of the DIP Lender (the "**DIP Charge**") over all of the Applicants' present and future assets, property and undertakings of every nature and kind whatsoever, and wherever situate including all proceeds thereof to secure the amounts outstanding under or in connection with the DIP Facility; and

    (d)   authorized the Applicants to pursue all avenues of sale or investment of their assets or business, in whole or in part, subject to prior approval of the Court before any material sale or refinancing.

2.  Pursuant to proceedings (the "**Chapter 15 Proceedings**", and together with the CCAA Proceedings, the "**Insolvency Proceedings**") commenced in the United States Bankruptcy Court for the District of Delaware (the "**US Bankruptcy Court**", and together with the CCAA Court, the "**Insolvency Courts**") under Chapter 15, Title 11, of the United States Code (the "**US Bankruptcy Code**"), the Applicants obtained, among other things, recognition of the CCAA Proceedings.

3.  Further to the Applicants' restructuring efforts and the terms of the DIP Facility, the Monitor will conduct the sale and investment solicitation process (the "**SISP**") described herein, with the assistance of the Applicants, and pursuant to the Order of the CCAA Court dated [**October ●, 2023**] (the "**SISP Order**"). The SISP is intended to solicit interest in an acquisition or refinancing of the business or a sale of the assets and/or the business of the Applicants by way of merger, reorganization, recapitalization, primary equity issuance or other similar transaction. The Monitor intends to provide all qualified interested parties with an opportunity to participate in the SISP.

4.  The SISP Order also approves the stalking horse agreement between the Applicants and SCS Finance, Inc. (in such capacity, the "**Stalking Horse Bidder**") dated October 5, 2023 (as may be amended from time to time, the "**Stalking Horse Agreement**"), under which

the Stalking Horse Bidder agreed to purchase substantially all of the Applicants' assets and business operations, and act as the stalking horse bid in the SISP (the "**Stalking Horse Bid**"). The Stalking Horse Bid shall automatically be considered a Qualified Bid (as defined herein) for the purposes of the Auction (as defined herein).

**Opportunity**

5.      The SISP is intended to solicit interest in, and opportunities for, a sale of, or investment in, all or part of the Applicants' assets and business operations, (the "**Opportunity**"). The Opportunity may include one or more of a restructuring, recapitalization or other form or reorganization of the business and affairs of the Applicants as a going concern or a sale of all, substantially all or one or more components of the Applicants' assets (the "**Property**") and business operations (the "**Business**") as a going concern or otherwise, or some combination thereof (each, a "**Transaction**").

6.      This document describes the SISP, including the manner in which individuals, corporations, limited and unlimited liability companies, general and limited partnerships, associations, trusts, unincorporated organizations, joint ventures, governmental organizations or other entities (each, a "**Person**") may gain access to or continue to have access to due diligence materials concerning the Applicants, the Property and the Business, how bids involving the Applicants, the Property or the Business will be submitted to and dealt with by the Monitor and how Court approval will be obtained in respect of a Transaction.

7.      The SISP contemplates a one-stage process that involves the submission by interested parties of binding offers by the Bid Deadline (as defined below).

8.      Except to the extent otherwise set forth in a definitive sale or investment agreement with a successful bidder, any Transaction will be on an "as is, where is" basis and without surviving representations or warranties of any kind, nature, or description by the Monitor, the Applicants, or any of their respective agents, advisors or estates, and, in the event of a sale, all of the right, title and interest of the Applicants in and to the Property to be acquired will be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options, and interests therein and thereon pursuant to Court orders, to the extent that the Court deems it appropriate to grant such relief and except as otherwise provided in such Court orders.

9.      In the SISP, (i) "**Business Day**" means any day (other than Saturday or Sunday) that banks are open for business in Toronto, Ontario.  If any deadline date referred to in the SISP falls on a day that is not a Business Day, then such date shall be extended until the next Business Day; and (ii) the words "include", "includes" and "including" shall be deemed to be followed by the phrase, "without limitation".

**Timeline**

10.     The following table sets out the key milestones under the SISP:

| Milestone | Deadline |
|---|---|
| Commencement Date | Immediately following the granting of the SISP Order |
| Recognition of SISP in US Bankruptcy Court | Immediately following the granting of the SISP Order, subject to availability of the US Bankruptcy Court |
| Bid Deadline | November 8, 2023 at 5:00 p.m. (EST) |
| Auction Date | November 10, 2023 at 5:00 p.m. (EST) |
| Sale Approval Motion (as defined below) in CCAA Court | No later than November 17, 2023, subject to the availability of the CCAA Court |
| Sale Approval Motion in US Bankruptcy Court | Immediately following the granting of the Sale Approval Motion, subject to availability of the US Bankruptcy Court |
| Closing of the Transaction | As soon as reasonably practicable following the granting of the Sale Approval Motion in the US Bankruptcy Court |

11.    Subject to any order of the Court, the dates set out in the SISP may be extended by the Monitor with the consent and approval of the Applicants.

**Solicitation of Interest: Notice of the SISP**

12.    As soon as reasonably practicable:

(a)    the Monitor, in consultation with the Applicants, will prepare a list of potential bidders, including (i) parties that have approached the Applicants or the Monitor indicating an interest in the Opportunity, and (ii) local and international strategic and financial parties who the Applicants, in consultation with the Monitor, believe may be interested in a Transaction pursuant to the SISP, in each case whether or not such party has submitted a letter of intent or similar document (collectively, "**Known Potential Bidders**");

(b)    the Monitor will arrange for a notice of the SISP (and such other relevant information which the Monitor, in consultation with the Applicants, considers appropriate) (the "**Notice**") to be published in Insolvency Insider, the Monitor's website, and any other newspaper or journal as the Applicants, in consultation with the Monitor, consider appropriate, if any; and

(c)    the Monitor, in consultation with the Applicants, will prepare: (i) a process summary (the "**Teaser Letter**") describing the Opportunity, outlining the process under the SISP and inviting recipients of the Teaser Letter to express their interest

pursuant to the SISP; and (ii) a non-disclosure agreement in form and substance satisfactory to the Applicants and the Monitor, and their respective counsel (an "**NDA**").

13.    The Monitor will send the Teaser Letter and NDA to each Known Potential Bidder and to any other Person who requests a copy of the Teaser Letter and NDA or who is identified to the Applicants or the Monitor as a potential bidder as soon as reasonably practicable after such request or identification, as applicable.

**Potential Bidders and Due Diligence Materials**

14.    Any party who wishes to participate in the SISP (a "**Potential Bidder**"), other than the Stalking Horse Bidder, must provide to the Monitor an NDA executed by it, and which shall inure to the benefit of any purchaser of the Business or Property, or any portion thereof, and a letter setting forth the identity of the Potential Bidder, the contact information for such Potential Bidder and full disclosure of the direct and indirect principals of the Potential Bidder.

15.    The Monitor, in consultation with the Applicants, shall in their reasonable business judgment and subject to competitive and other business considerations, afford each Potential Bidder who has signed and delivered an NDA to the Monitor and provided information as to their financial wherewithal to close a transaction such access to due diligence material and information relating to the Property and Business as the Applicants or the Monitor deem appropriate. Due diligence shall include access to an electronic data room containing information about the Applicants, the Property and the Business, and may also include management presentations, on-site inspections, and other matters which a Potential Bidder may reasonably request and as to which the Applicants, in their reasonable business judgment and after consulting with the Monitor, may agree. The Monitor will designate a representative to coordinate all reasonable requests for additional information and due diligence access from Potential Bidders and the manner in which such requests must be communicated. Neither the Applicants nor the Monitor will be obligated to furnish any information relating to the Property or Business to any person other than to Potential Bidders. Furthermore and for the avoidance of doubt, selected due diligence materials may be withheld from certain Potential Bidders if the Applicants, in consultation with and with the approval of the Monitor, determine such information to represent proprietary or sensitive competitive information. Neither the Applicants nor the Monitor is responsible for, and will bear no liability with respect to, any information obtained by any party in connection with the Sale of the Property and the Business.

16.    Potential Bidders must rely solely on their own independent review, investigation and/or inspection of all information and of the Property and Business in connection with their participation in the SISP and any transaction they enter into with the Applicants.

**Formal Binding Offers**

17.    Potential Bidders that wish to make a formal offer to purchase or make an investment in the Applicants or their Property or Business (a "**Bidder**") shall submit a binding offer (a

- 5 -

"**Bid**") that complies with all of the following requirements to the Monitor and Applicants' counsel at the addresses specified in Schedule "1" hereto (including by e-mail), so as to be received by them not later than **5:00 PM (EST) on November 8, 2023** or as may be modified in the Bid process letter that may be circulate by the Monitor to Potential Bidders, with the approval of the Applicants (the "**Bid Deadline**"):

(a)     the Bid must be either a binding offer to:

    (i)     acquire all, substantially all or a portion of the Property (a "**Sale Proposal**"); and/or

    (ii)     make an investment in, restructure, reorganize or refinance the Business or the Applicants (an "**Investment Proposal**"); or

    (iii)     carry out any combination of a Sale Proposal and an Investment Proposal;

(b)     the Bid (either individually or in combination with other bids that make up one bid) is an offer to purchase or make an investment in some or all of the Applicants or their Property or Business and is consistent with any necessary terms and conditions established by the Applicants and the Monitor and communicated to Bidders;

(c)     the Bid includes a letter stating that the Bidder's offer is irrevocable until the selection of the Successful Bidder (as defined below), provided that if such Bidder is selected as the Successful Bidder, its offer shall remain irrevocable until the closing of the transaction with the Successful Bidder;

(d)     the Bid includes duly authorized and executed Transaction agreements, including the purchase price, investment amount and any other key economic terms expressed in US dollars (the "**Purchase Price**"), together with all exhibits and schedules thereto;

(e)     the Bid is accompanied by a deposit (the "**Deposit**") in the form of a wire transfer (to a trust account specified by the Monitor), in an amount equal to ten percent (10%) of the Purchase Price, investment amount or other consideration to be paid in respect of the Bid, to be held and dealt with in accordance with this SISP;

(f)     the Bid includes written evidence of a firm, irrevocable commitment for financing or other evidence of ability to consummate the proposed transaction, that will allow the Applicants and the Monitor to make a determination as to the Bidder's financial and other capabilities to consummate the proposed transaction;

(g)     the Bid is not conditioned on (i) the outcome of unperformed due diligence by the Bidder, or (ii) obtaining financing, but may be conditioned upon the Applicants receiving the required approvals or amendments relating to the licences required to operate the business, if necessary;

(h)     the Bid fully discloses the identity of each entity that will be entering into the transaction or the financing, or that is otherwise participating or benefiting from such bid;

(i)     for a Sale Proposal, the Bid includes:

(i) the purchase price in US dollars and a description of any non-cash consideration, including details of any liabilities to be assumed by the Bidder and key assumptions supporting the valuation;

(ii) a description of the Property that is expected to be subject to the transaction and any of the Property expected to be excluded;

(iii) a specific indication of the financial capability of the Bidder and the expected structure and financing of the transaction;

(iv) a description of the conditions and approvals required to complete the closing of the transaction;

(v) a description of those liabilities and obligations (including operating liabilities) which the Bidder intends to assume and which such liabilities and obligations it does not intend to assume; and

(vi) any other terms or conditions of the Sale Proposal that the Bidder believes are material to the transaction.

(j) for an Investment Proposal, the Bid includes:

(i) a description of how the Bidder proposes to structure the proposed investment, restructuring, recapitalization, refinancing or reorganization, and a description of any non-cash consideration;

(ii) the aggregate amount of the equity and/or debt investment to be made in the Business or the Applicants in US dollars;

(iii) the underlying assumptions regarding the pro forma capital structure;

(iv) a specific indication of the sources of capital for the Bidder and the structure and financing of the transaction;

(v) a description of the conditions and approvals required for to complete the closing of the transaction;

(vi) a description of those liabilities and obligations (including operating liabilities) which the Bidder intends to assume and which such liabilities and obligations it does not intend to assume; and

(vii) any other terms or conditions of the Investment Proposal.

(k) the Bid includes acknowledgements and representations of the Bidder that the Bidder:

(i) is completing the Transaction on an "as is, where is" basis;

(ii) has had an opportunity to conduct any and all due diligence regarding the Property, the Business and the Applicants prior to making its Bid;

(iii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Property in making its Bid; and

(iv) did not rely upon any written or oral statements, representations, warranties, or guarantees whatsoever, whether express, implied, statutory or otherwise, regarding the Business, the Property, or the Applicants or the completeness

of any information provided in connection therewith, except as expressly stated in the definitive transaction agreement(s) signed by the Applicants;

(l)     the Bid is received by the Bid Deadline; and

(m)     the Bid contemplates closing the Transaction set out therein immediately following the granting of the Sale Approval Order.

18.     Following the Bid Deadline, the Monitor will assess the Bids received. The Monitor, in consultation with the Applicants, will designate the most competitive bids that comply with the foregoing requirements to be "**Qualified Bids**". No Bids received shall be deemed not to be Qualified Bids without the approval of the Monitor. Only Bidders whose bids have been designated as Qualified Bids are eligible to become the Successful Bidder(s).

19.     The Stalking Horse Bid shall be deemed to be a Qualified Bid.

20.     The Monitor may only designate a Bid as a Qualified Bid where the proposed purchase price is equal to or greater than that contained in the Stalking Horse Bid, and includes a cash purchase price in an amount equal to or greater than the Stalking Horse Bid, *plus* $50,000 US.

21.     The Monitor, in consultation with the Applicants, may waive strict compliance with any one or more of the requirements specified above and deem such non-compliant Bids to be a Qualified Bid. The Monitor and the Applicants will be under no obligation to negotiate identical terms with, or extend identical terms to, each Bidder.

22.     The Monitor shall notify each Bidder in writing as to whether its Bid constituted a Qualified Bid within two (2) business days of the Bid Deadline, or at such later time as the Monitor deems appropriate.

23.     The Monitor may, in consultation with the Applicants, aggregate separate Bids from unaffiliated Bidders to create one Qualified Bid.

**Evaluation of Competing Bids**

24.     A Qualified Bid will be evaluated based upon several factors including, without limitation: (i) the Purchase Price and the net value provided by such bid, (ii) the identity, circumstances and ability of the Bidder to successfully complete such Transactions, (iii) the proposed Transaction documents, (iv) factors affecting the speed, certainty and value of the Transaction, (v) the assets included or excluded from the bid, (vi) any related restructuring costs, and (vii) the likelihood and timing of consummating such Transaction, each as determined by the Applicants and the Monitor.

**Auction**

25.     If the Monitor receives at least one additional Qualified Bid in addition to the Stalking Horse Bid, the Monitor will conduct and administer an Auction in accordance with the terms of this SISP (the "**Auction**"). Instructions to participate in the Auction, which will

take place via video conferencing, will be provided to Qualified Parties (as defined below) not less than 24 hours prior to the Auction.

26. Only parties that provided a Qualified Bid by the Bid Deadline, as confirmed by the Monitor, including the Stalking Horse Bid (collectively, the "**Qualified Parties**"), shall be eligible to participate in the Auction. No later than 5:00 p.m. (EST) on the day prior to the Auction, each Qualified Party must inform the Monitor whether it intends to participate in the Auction. The Monitor will promptly thereafter inform in writing each Qualified Party who has expressed its intent to participate in the Auction of the identity of all other Qualified Parties that have indicated their intent to participate in the Auction. If no Qualified Party provides such expression of intent, the Stalking Horse Bidder shall be the Successful Bid (as defined below).

**Auction Procedure**

27. The Auction shall be governed by the following procedures:

(a) **Participation at the Auction.** Only the Applicants, the Qualified Parties, including the Stalking Horse Bidder, the Monitor and each of their respective advisors will be entitled to attend the Auction, and only the Qualified Parties will be entitled to make any subsequent Overbids (as defined below) at the Auction. The Monitor shall provide all Qualified Bidders with the details of the lead bid by 5:00 PM (EST) two (2) Business Days after the Bid Deadline. Each Qualified Bidder must inform the Monitor whether it intends to participate in the Auction no later than 5:00 PM (EST) on the Business Day prior to the Auction;

(b) **No Collusion.** Each Qualified Party participating at the Auction shall be required to confirm on the record at the Auction that: (i) it has not engaged in any collusion with respect to the Auction and the bid process; and (ii) its bid is a good-faith *bona fide* offer and it intends to consummate the proposed transaction if selected as the Successful Bid;

(c) **Minimum Overbid.** The Auction shall begin with the Qualified Bid that represents the highest or otherwise best Qualified Bid as determined by the Monitor, in consultation with the Applicants (the "**Initial Bid**"), and any bid made at the Auction by a Qualified Party subsequent to the Monitors announcement of the Initial Bid (each, an "**Overbid**"), must proceed in minimum additional cash increments of $100,000 US;

(d) **Bidding Disclosure.** The Auction shall be conducted such that all bids will be made and received in one group video-conference, on an open basis, and all Qualified Parties will be entitled to be present for all bidding with the understanding that the true identity of each Qualified Party will be fully disclosed to all other Qualified Parties and that all material terms of each subsequent bid will be fully disclosed to all other Qualified Parties throughout the entire Auction; provided, however, that the Monitor, in its discretion, may establish separate video conference rooms to permit interim discussions between the Monitor and individual Qualified Parties with the understanding that all formal bids will be delivered in one group video conference, on an open basis;

    (e)    **Bidding Conclusion.** The Auction shall continue in one or more rounds and will conclude after each participating Qualified Party has had the opportunity to submit one or more additional bids with full knowledge and written confirmation of the then-existing highest bid(s); and

    (f)    **No Post-Auction Bids.** No bids will be considered for any purpose after the Auction has concluded.

    (g)    **Auction Procedures.** The Monitor shall be at liberty to set additional procedural rules at the Auction as it sees fit.

**Selection of Successful Bid**

28.    Before the conclusion of the Auction, the Monitor, in consultation with the Applicants, will:

    (a)    review and evaluate each Qualified Bid, considering the factors set out in paragraph 17 and any other factor that the Applicants or the Monitor may reasonably deem relevant, provided that each Qualified Bid may be negotiated among the Monitor in consultation with the Applicants and the Qualified Bidder, and may be amended, modified or varied to improve such Qualified Bid as a result of such negotiations; and

    (b)    identify the highest or otherwise best bid received at the Auction (the "**Successful Bid**" and the Qualified Party making such bid, the "**Successful Party**").

29.    The Successful Party shall complete and execute all agreements, contracts, instruments or other documents evidencing and containing the terms and conditions upon which the Successful Bid was made within one business day of the Successful Bid being selected as such, unless extended by the Monitor, in consultation with the Applicants, subject to the milestones set forth in paragraph 10.

**Sale Approval Motion Hearing**

30.    At the hearing of the motion to approve any transaction with a Successful Party (the "**Sale Approval Motion**"), the Monitor or the Applicants shall seek, among other things, approval from the Court to consummate any Successful Bid. All the Qualified Bids other than the Successful Bid, if any, shall be deemed to be rejected by the Monitor and the Applicants on and as of the date of approval of the Successful Bid by the Court.

**Confidentiality and Access to Information**

31.    All discussions regarding a Sale Proposal, Investment Proposal, or Bid should be directed through the Monitor. Under no circumstances should the management of the Applicants be contacted directly without the prior consent of the Monitor. Any such unauthorized contact or communication could result in exclusion of the interested party from the SISP process.

32.    Participants and prospective participants in the SISP shall not be permitted to receive any information that is not made generally available to all participants relating to the number or identity of Potential Bidders, Bidders, Qualified Bids, the details of any Bids submitted

the text

or the details of any confidential discussions or correspondence between the Applicants, the Monitor and such other bidders or Potential Bidders in connection with the SISP, except to the extent the Applicants, with the approval of the Monitor and consent of the applicable participants, are seeking to combine separate bids from Qualified Bidders.

**Supervision of the SISP**

33.     The Monitor shall oversee and conduct the SISP, in all respects, and, without limitation to that supervisory role, the Monitor will participate in the SISP in the manner set out in this SISP Procedure, the SISP Order, the Initial Order and any other orders of the Court, and is entitled to receive all information in relation to the SISP.

34.     This SISP does not, and will not be interpreted to create any contractual or other legal relationship between the Applicants or the Monitor and any Potential Bidder, any Qualified Bidder or any other Person, other than as specifically set forth in a definitive agreement that may be entered into with the Applicants.

35.     Without limiting the preceding paragraph, the Monitor shall not have any liability whatsoever to any person or party, including without limitation any Potential Bidder, Bidder, the Successful Bidder, the Applicants, the DIP Lender, or any other creditor or other stakeholder of the Applicants, for any act or omission related to the process contemplated by this SISP Procedure, except to the extent such act or omission is the result from gross negligence or wilful misconduct of the Monitor. By submitting a bid, each Bidder, or Successful Bidder shall be deemed to have agreed that it has no claim against the Monitor for any reason whatsoever, except to the extent that such claim is the result of gross negligence or wilful misconduct of the Monitor.

36.     Participants in the SISP are responsible for all costs, expenses and liabilities incurred by them in connection with the submission of any Bid, due diligence activities, and any further negotiations or other actions whether or not they lead to the consummation of a Transaction.

37.     The Monitor, in consultation with the Applicants, shall have the right to modify the SISP (including, without limitation, pursuant to the Bid process letter) if, in their reasonable business judgment, such modification will enhance the process or better achieve the objectives of the SISP; provided that the Service List in these CCAA proceedings shall be advised of any substantive modification to the procedures set forth herein.

**Deposits**

38.     All Deposits received pursuant to this SISP shall be held in trust by the Monitor. The Monitor shall hold Deposits paid by each of the Bidders in accordance with the terms outlined in this SISP. In the event that a Deposit is paid pursuant to this SISP and the Monitor elects not to proceed to negotiate and settle the terms and conditions of a definitive agreement with the Person that paid such Deposit, the Monitor shall return the Deposit to that Person. In the event that the Successful Bidder defaults in the payment or performance of any obligations owed to the Monitor or the Applicants pursuant to any Final Agreement,

the Deposit paid by the Successful Bidder, as applicable, shall be forfeited as liquidated damages and not as a penalty.

**Schedule "1"**

**Address of Monitor**

**To the Monitor:**

**B. Riley Farber Inc.**
150 York Street, Suite 1600
Toronto, ON, Canada, M5H 3S5

Attention:      Allan Nackan, Hylton Levy, Rob Biehler

Email:          anackan@brileyfin.com
                hlevy@brileyfin.com
                rbiehler@brileyfin.com


with a copy to:

**Miller Thomson LLP**
Scotia Plaza
40 King Street West, Suite 5800
P.O. Box 1011
Toronto, Ontario  M5H 3S1

Attention:      Kyla Mahar and Gina Rhodes

Email:          kmahar@millerthomson.com
                grhodes@millerthomson.com

**APPENDIX "F"**

**STALKING HORSE AGREEMENT**

ASSET PURCHASE AGREEMENT

- between -

LIGHTHOUSE IMMERSIVE INC.

- and -

LIGHTHOUSE IMMERSIVE USA, INC.

- and -

SCS FINANCE, INC.

DATED OCTOBER 5, 2023

## ASSET PURCHASE AGREEMENT

This Agreement dated October 5, 2023 (the "**Effective Date**") is made

**B E T W E E N**

>   **Lighthouse Immersive Inc.**
>
>   ("**Lighthouse Canada**")
>
>   **- and -**
>
>   **Lighthouse Immersive USA, Inc.**
>
>   ("**Lighthouse USA**", and together with Lighthouse Canada, the "**Companies**")
>
>   **- and -**
>
>   **SCS Finance, Inc.**
>
>   (the "**Purchaser**")

**RECITALS:**

**WHEREAS** on July 26, 2023, the Purchaser and the Companies entered into a debtor-in-possession financing term sheet (the "**DIP Term Sheet**") whereby the Purchaser (in such capacity, the "**DIP Lender**") agreed to provide a non-revolving credit facility up to the maximum amount of $1,100,000 (the "**DIP Facility**");

**AND WHEREAS** pursuant to the Order of the Honourable Madam Justice Kimmel of the Ontario Superior Court of Justice (Commercial List) (the "**Court**") issued July 27, 2023 (as may be further amended or amended and restated from time to time, the "**Initial Order**"), Lighthouse Canada and Lighthouse USA were granted, among other things, creditor protection under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c.C-36, as amended (the "**CCAA**") and B. Riley Farber Inc. was appointed as the CCAA monitor of the Companies (in such capacity, the "**Monitor**");

**AND WHEREAS** on August 3, 2023, the Court granted an amended and restated Initial Order that, among other things, approved an increase to the authorized borrowing under the DIP Facility from the principal amount of $1,100,000 to $3,500,000 (plus interest, fees, and expenses).

**AND WHEREAS** in connection with the proceedings initiated by the Initial Order (the "**CCAA Proceedings**"), the United States Bankruptcy Court for the District of Delaware (the "**US Bankruptcy Court**") provisionally enforced and recognized the Initial Order and the CCAA Proceedings as foreign main proceedings by Order dated July 28, 2023 and finally enforced and recognized the Initial Order and the CCAA Proceedings as foreign main proceedings by Order dated August 28, 2023 (the "**Recognition Proceedings**").

**AND WHEREAS** in connection with the CCAA Proceedings the Companies intend to seek the approval of the Court to run a SISP (as defined below) pursuant to which this Agreement will serve as the Stalking Horse Bid (as defined below) for the Purchased Assets (as defined below).

**AND WHEREAS** the Companies are seeking an Order from the Court approving an increase to the authorized borrowing under the DIP Facility from the principal amount of $3,500,000 to $4,000,000 (plus interest, fees, and expenses).

**AND WHEREAS** in the event that this Agreement is selected as the Successful Bid (as defined below) in the SISP, the Companies have agreed to sell and transfer to the Purchaser, and the Purchaser has agreed to purchase from the Companies, all of the Companies' right, title and interest in and to the Purchased Assets, subject to and in accordance with the terms and conditions set forth in this Agreement,

**NOW THEREFORE**, in consideration of the mutual covenants and agreements set forth in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby irrevocably acknowledged, the parties hereto (collectively, the "**Parties**", and each, a "**Party**") hereby acknowledge and agree as follows:

<div align="center">

**ARTICLE 1**
**INTERPRETATION**

</div>

**1.1     Definitions.**  In this Agreement:

"**Accounts Receivable**" means all accounts receivable, notes receivable and other debts due or accruing due to the Companies.

"**Administrative Professionals**" means the Companies' legal counsel, the Monitor and the Monitor's legal counsel.

"**Administration Charge**" means the charge granted by the Court pursuant to the Initial Order to secure the fees and expenses of the Administrative Professionals;

"**Affiliate**" means, with respect to any Person, any other Person who directly or indirectly controls, is controlled by, or is under direct or indirect common control with, such Person, and includes any Person in like relation to an Affiliate. A Person shall be deemed to "**control**" another Person if such Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such other Person, whether through the ownership of voting securities, by contract or otherwise; and the term "**controlled**" shall have a similar meaning.

"**Agreement**" means this asset purchase agreement and all the Exhibits and the Schedules attached hereto.

"**Applicable Law**" means, with respect to any Person, property, transaction, event or other matter, (i) any foreign or domestic constitution, treaty, law, statute, regulation, code, ordinance, principle of common law or equity, rule, municipal by-law, Order or other requirement having the force of law, (ii) any policy, practice, protocol, standard or guideline of any Governmental Authority which, although not necessarily having the force of law, is regarded by such Governmental Authority as requiring compliance as if it had the force of law (collectively, the "**Law**") relating or applicable to such Person, property, transaction, event or other matter and also includes, where appropriate, any interpretation of the Law (or any part thereof) by any Person having jurisdiction over it, or charged with its administration or interpretation.

"**Approval and Vesting Order**" means an order by the Court , in form and substance satisfactory to the Purchaser, acting reasonably, among other things: (i) authorizing and approving the

Transactions contemplated in this Agreement and pursuant to the terms of this Agreement; (ii) vesting in the Purchaser all right, title, benefit, and interest in and to the Purchased Assets free and clear from any Encumbrances upon delivery of the Monitor's Certificate to the Purchaser indicating, among other things, that parties to this Agreement have certified in writing to the Monitor that the conditions precedent to the consummation of the transactions contemplated by this Agreement have been satisfied or waived (where permissible) and (iii) releasing the officers and directors of the Company, its advisors, the Monitor and the Monitor's counsel.

"**Assignment and Assumption Agreement**" has the meaning set forth in Section 8.2(d)

"**Assumed Liabilities**" means those liabilities and obligations set forth in Section 2.3.

"**Auction**" has the meaning set out in Section 5.1(c)**Error! Reference source not found.**.

"**Bid Deadline**" has the meaning set forth in **Schedule "A"**.

"**Books and Records**" means (i) all of the Companies' files, documents, instruments, papers, books and records (wether stored or maintained in hard copy, digital or electronic format or otherwise),  and (ii) all files, documents, instruments, papers, books and records (whether stored or maintained in hard copy, digital or electronic format or otherwise), used or intended for use by, or in the possession of the Companies or any of their respective Affiliates including drawings, engineering information, manuals and data, sales and advertising materials, sales and purchase correspondence, trade association files, research and development records, documents and records relating to customer lists, customer information and account records, sales records, computer files, data processing records, employment and personnel records, sales literature, advertising and marketing data and records, cost and pricing information, production reports and records, equipment logs, operating guides and manuals, credit records, records relating to present and former suppliers and contractors, plans and projections and all other records, data and information stored electronically, digitally or on computer-related media.

"**Business**" means the business carried on by the Companies, which involve producing immersive show exhibits in Canada and the United States of America.

"**Business Day**" means any day except Saturday, Sunday or any day on which banks are generally not open for business in the City of Toronto.

 "**CCAA**" means the *Companies' Creditors Arrangement Act* (Canada).

"**CCAA Proceedings**" means the proceeding commenced by the Companies under the CCAA pursuant to the Initial Order.

"**Claim**" means any civil, criminal, administrative, regulatory, arbitral or investigative inquiry, action, suit, investigation or proceeding and any claim of any nature or kind (including any cross-claim or counterclaim), demand, investigation, audit, chose in or cause of action, demand, suit, default, assessment, litigation, prosecution, third party action, arbitral proceeding or proceeding, complaint or allegation, by or before any Person, any debt, obligation, Legal Proceeding, Liability, Damages, losses, costs and expenses (including attorneys' fees) of every kind or nature whatsoever, known or unknown, actual or potential, suspected or unsuspected, fixed or contingent.

"**Closing**" means the completion of the purchase and sale of the Purchased Assets in accordance with the provisions of this Agreement.

"**Closing Date**" means the third Business Day following the issuance of the Approval and Vesting Order or such earlier or later date as may be agreed to in writing by the Parties.

"**Closing Time**" means the time of Closing on the Closing Date.

"**Consent**" means any consent, approval, permit, waiver, ruling, exemption or acknowledgement from any Person (other than the Companies) which is provided for or required: (i) in respect of or pursuant to the terms of any Contract; or (ii) under any Applicable Law, in either case in connection with the sale of the Purchased Assets to the Purchaser on the terms contemplated in this Agreement or which is otherwise necessary to permit the Parties to perform their obligations under this Agreement, but does not include a Regulatory Approval.

"**Contracts**" means all pending and executory contracts, agreements, leases and arrangements (whether oral or written) to which the Companies are a party or by which the Companies or any of its properties or assets or the Business are bound or under which the Companies have rights, including premises leases and Permitted Encumbrances.

"**Contract Assumed Liabilities**" shall have the meaning defined in Section 3.1(b).

"**Companies**" means, collectively, Lighthouse Immersive Inc. and Lighthouse Immersive USA, Inc.

"**Court**" has the meaning set out in the Recitals.

"**Credit Bid Amount**" means the amount equivalent to all amounts owing to the Purchaser under the DIP Term Sheet as of the Closing Time including any accrued and unpaid interest, expenses, fees and other amounts.

"**Credit Bid Consideration Statement**" has the meaning set out in Section 4.2(b).

"**Damages**" means any loss, cost, Liability, claim, interest, fine, penalty, assessment, damages available at law or in equity (including incidental, consequential, special, aggravated, exemplary or punitive damages), expense (including reasonable costs, fees and expenses of legal counsel on a full indemnity basis, without reduction for tariff rates or similar reductions and reasonable costs, fees and expenses of investigation) or diminution in value.

"**Data Processing Systems**" means the computer equipment and associated peripheral devices and the related operating and application systems and other software owned, leased or licenced by the Companies and used by it in connection with the Business other than off the shelf personal computer software subject to transferable licences.

"**DIP Facility**" has the meaning set out in the Recitals.

"**DIP Lender**" has the meaning set out in the Recitals.

"**DIP Term Sheet**" has the meaning set out in the Recitals.

"**Effective Date**" has the meaning set out in the preamble.

"**Employee Plans**" means all the employee benefit, fringe benefit, supplemental unemployment benefit, bonus, incentive, profit sharing, termination, change of control, retirement, pension, registered retirement savings, health, welfare, medical, dental, disability, life insurance and similar plans, programmes, arrangements or practices relating to the current or former directors, officers or employees of the Companies maintained, sponsored or funded by the Companies, whether written or oral, funded or unfunded, insured or self-insured, registered or unregistered.

"**Encumbrance**" means any security interest, lien, Claim, charge, right of retention, deemed trust, judgement, writ of seizure, write of execution, notice of seizure, notice of execution, notice of sale, hypothec, reservation of ownership, pledge, encumbrance, mortgage or right of a third party (including any contractual rights such as purchase options, rights of first refusal, rights of first offer or any other pre-emptive contractual right) or encumbrance of any nature or kind whatsoever and any agreement, option or privilege (whether by law, contract or otherwise) capable of becoming any of the foregoing, (including any conditional sale or title retention agreement, or any capital or financing lease).

"**ETA**" means the *Excise Tax Act*, R.S.C, 1985, c. E-15.

"**Excluded Assets**" has the meaning set out in Section 2.2.

"**GST/HST**" means all goods and services tax and harmonized sales tax imposed under Part IX of the ETA or any other statute in any jurisdiction of Canada.

"**Governmental Authority**" means:

(a)      any domestic or foreign government, whether national, federal, provincial, state, territorial, municipal or local (whether administrative, legislative, executive or otherwise);

(b)      any agency, authority, ministry, department, regulatory body, court, central bank, bureau, board or other instrumentality having legislative, judicial, taxing, regulatory, prosecutorial or administrative powers or functions of, or pertaining to, government;

(c)      any court, commission, individual, arbitrator, arbitration panel or other body having adjudicative, regulatory, judicial, quasi-judicial, administrative or similar functions; and

(d)      any other body or entity created under the authority of or otherwise subject to the jurisdiction of any of the foregoing, including any stock or other securities exchange or professional association.

"**Income Tax Act**" means the *Income Tax Act*, R.S.C. 1985, 5th Supplement and the regulations thereunder.

"**Initial Order**" has the meaning set out in the Recitals.

"**Intellectual Property**" means domestic and foreign: (i) patents, applications for patents and reissues, divisions, continuations, renewals, extensions and continuations-in-part of patents or patent applications; (ii) proprietary and nonpublic business information, including inventions (whether patentable or not), invention disclosures, improvements, discoveries, trade secrets,

confidential information, know-how, methods, processes, designs, technology, technical data, schematics, formulae and customer lists, and documentation relating to any of the foregoing; (iii) copyrights, copyright registrations and applications for copyright registration; (iv) mask works, mask work registrations and applications for mask work registrations; (v) designs, design registrations, design registration applications and integrated circuit topographies; (vi) trade names, business names, corporate names, domain names, website names and world wide web addresses, common law trade-marks, trade-mark registrations, trade mark applications, trade dress and logos, and the goodwill associated with any of the foregoing; (vii) computer software and programs (both source code and object code form), all proprietary rights in the computer software and programs and all documentation and other materials related to the computer software and programs; and (viii) any other intellectual property and industrial property. "**Interim Period**" means the period from the Effective Date and the Closing Time.

"**Law**" has the meaning set out in the definition of "Applicable Law".

"**Legal Proceeding**" means any litigation, action, application, suit, investigation, hearing, Claim, deemed complaint, grievance, civil, administrative, regulatory or criminal, arbitration proceeding or other similar proceeding, before or by any court, tribunal or Governmental Authority, and includes any appeal or review thereof and any application for leave for appeal or review.

"**Liability**" means, with respect to any Person, any liability or obligation of such Person of any kind, character or description, whether known or unknown, absolute or contingent, accrued or unaccrued, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, vested or unvested, executory, determined, determinable or otherwise, and whether or not the same is required to be accrued on the financial statements of such Person.

"**License**" means any license, permit, authorization, approval or other evidence of authority issued or granted to, conferred upon, or otherwise created for, the Companies by any Governmental Authority.

"**Lien**" means any lien, mortgage, charge, hypothec, pledge, security interest, prior assignment, option, warrant, lease, sublease, right to possession, encumbrance, claim, right or restriction which affects, by way of a conflicting ownership interest or otherwise, the right, title or interest in or to any particular property.

"**Monitor**" has the meaning set out in the Recitals.

"**Monitor's Certificate**" means a certificate signed by the Monitor to be filed with the Court following Closing substantially in the form attached to the Approval and Vesting Order.

"**Order**" means any order, directive, judgment, decree, injunction, decision, ruling, award or writ of any Governmental Authority.

"**Outside Date**" means November 30, 2023 or such later date as the Parties may mutually agree.

"**Parties**" has the meaning set out in the recitals hereto.

"**Party**" has the meaning set out in the recitals hereto.

"**Permitted Encumbrances**" means the Encumbrances listed in **Schedule "B"**.

"**Person**" is to be broadly interpreted and includes an individual, a corporation, a partnership, a trust, an unincorporated organization, a Governmental Authority, and the executors, administrators or other legal representatives of an individual in such capacity.

"**Priority Payables**" means all the fees and disbursements secured by or to be secured by the Administration Charge including any amount necessary to complete the administration of the CCAA Proceedings and the Recognition Proceedings.

"**Purchase Price**" has the meaning set out in Section 4.1.

"**Purchased Assets**" has the meaning set out in Section 2.1.

"**Qualified Bid**" has the meaning given in the SISP.

"**Recognition Proceedings**" has the meaning set out in the Recitals.

"**Regulatory Approval**" means any approval, Consent, ruling, authorization, notice, permit or acknowledgement that may be required from any Person pursuant to Applicable Law or under the terms of any License or the conditions of any Order in connection with the sale of the Purchased Assets to the Purchaser on the terms contemplated in this Agreement, to permit the Companies to carry on the Business after Closing or which is otherwise necessary to permit the Parties to perform their obligations under this Agreement.

"**Representative**" when used with respect to a Party means each director, officer, employee, agent, consultant, adviser and other representative of that Party who is involved in the Transaction contemplated by this Agreement.

"**SISP**" means the stalking horse sale and investment solicitation process to be conducted pursuant to the sale and bidding procedures substantially in the form set out in **Schedule "A"** hereto.

"**Stalking Horse SISP Order**" means an order of the Court issued in the CCAA Proceedings approving the execution of this Agreement as the "Stalking Horse Bid" and the SISP, in form and content acceptable to the Parties and the Monitor, each acting reasonably.

"**Stalking Horse Bid**" has the meaning set out in Section 5.1(b).

"**Successful Bid**" has the meaning given in the SISP.

"**Tangible Personal Property**" means, collectively, all furniture, fixtures, equipment, machinery, tools, vehicles, office equipment, supplies, computers, telephones, towers, other network assets, and other tangible personal property.

"**Taxes**" means all taxes including all income, sales, use, goods and services, harmonized sales, value added, capital, capital gains, alternative, net worth, transfer, profits, withholding, payroll, employer health, excise, franchise, real property and personal property taxes, and any other taxes, customs duties, fees, levies, imposts and other assessments or similar charges in the nature of a tax including Canada Pension Plan and provincial pension plan contributions, employment insurance and unemployment insurance payments and workers' compensation premiums, together with any

instalments with respect thereto, and any interest, fines and penalties, in all cases imposed by any Governmental Authority in respect thereof and whether disputed or not.

"**Transfer Taxes**" means all applicable sales, use, goods, and services, harmonized sales, value added, or similar taxes, including where applicable, all GST/HST payable upon or in connection with the transactions contemplated by this Agreement and any filing, registration, recording or transfer fees payable in connection with the instruments of transfer provided for in this Agreement.

"**Transferred Employees**" means those employees of the Companies who accept offers of employment given in accordance with this Agreement from either the Purchaser or an Affiliate of the Purchaser, as the case may be.

"**Threatened**", when used in relation to a Legal Proceeding or other matter, means that a demand or statement (oral or written) has been made or a notice (oral or written) has been given that a Legal Proceeding or other matter is to be asserted, commenced, taken or otherwise pursued in the future or that an event has occurred or circumstances exist that would lead a reasonable Person to conclude that a Legal Proceeding or other matter is likely to be asserted, commenced, taken or otherwise pursued in the future.

"**Transaction**" means all of the transactions contemplated by this Agreement, including the purchase and sale transaction whereby the Purchaser will acquire the Purchased Assets.

"**US Bankruptcy Court**" has the meaning set out in the Recitals.

"**Winning Bidder**" has the meaning set out in Section 5.1(c).

## 1.2     Actions on Non-Business Days.

If any payment is required to be made or other action (including the giving of notice) is required to be taken pursuant to this Agreement on a day which is not a Business Day, then such payment or action shall be considered to have been made or taken in compliance with this Agreement if made or taken on the next succeeding Business Day.

## 1.3     Currency and Payment Obligations.

Except as otherwise expressly provided in this Agreement:

(a)             all dollar amounts referred to in this Agreement are stated in United States Dollars; and

(b)             any payment contemplated by this Agreement shall be made by wire transfer of immediately available funds to an account specified by the payee, by cash, by certified cheque or by any other method that provides immediately available funds.

## 1.4     Calculation of Time.

In this Agreement, a period of days shall be deemed to begin on the first day after the event which began the period and to end at 5:00 p.m. Toronto time on the last day of the period. If any period of time is to expire hereunder on any day that is not a Business Day, the period shall be deemed to expire at 5:00 p.m. Toronto time on the next succeeding Business Day.

**1.5    Interpretation Not Affected by Headings, etc.**

The division of this Agreement into Articles and Sections and the insertion of headings are for convenience of reference only and shall not affect the construction or interpretation of this Agreement.

**1.6    General Construction**

The terms "this Agreement", "hereof", "herein" and "hereunder" and similar expressions refer to this Agreement and not to any particular section hereof. The expression "Section" or reference to another subdivision followed by a number mean and refer to the specified Section or other subdivision of this Agreement. The language used in this Agreement is the language chosen by the Parties to express their mutual intent, and no rule of strict construction shall be applied against any Party.

**1.7    Extended Meanings**

Words importing the singular include the plural and vice versa and words importing gender include all genders. The term "including" means "including, without limitation," and such terms as "includes" have similar meanings and the term "third party" means any other Person other than the Companies or the Purchaser, or any Affiliates thereof.

**1.8    Schedules and Exhibits.**

The following are the Schedules and Exhibits attached to and incorporated in this Agreement by reference and deemed to be a part hereof:

**SCHEDULES**

Schedule "A"          SISP
Schedule "B"          Permitted Encumbrances


The Parties acknowledge that as of the Effective Date, Schedule "B" is not complete. Such Schedule may be amended or completed by the Purchaser, in its sole and absolute discretion, on or before the date of the motion seeking the Approval and Vesting Order on notice to the Companies and the Monitor.

<div align="center">

**ARTICLE 2**
**PURCHASE OF ASSETS AND ASSUMPTION OF LIABILITIES**

</div>

**2.1    Purchase and Sale of the Purchased Assets**

Subject to the terms and conditions of this Agreement, except for the Excluded Assets, the Companies agree to sell, assign and transfer to the Purchaser and the Purchaser agrees to purchase from the Companies, on the Closing Date, effective as of the Closing Time, or such later time as is contemplated by this Agreement, all undertakings, property and assets of the Companies, including any and all assets that relate to or are used in connection with the operation of the Business (collectively, the "**Purchased Assets**"), including but not limited to the following assets, all free and clear of all Encumbrances (other than Permitted Encumbrances):

(a)    all cash on hand, cash equivalents and bank deposits;

(b)    all inventory and supplies;

(c)    all Tangible Personal Property, leasehold improvements, furniture fixtures, and racking;

(d)    all Accounts Receivable;

(e)    all prepaid expenses and deposits;

(f)    all client files;

(g)    all Data Processing Systems;

(h)    the benefit of all of the Assigned Contracts, provided that such benefit shall not be sold, transferred and assigned until the relevant Assigned Contract becomes an Assigned Contract in accordance with ARTICLE 3 or pursuant to an Assignment Order;

(i)    all Intellectual Property owned or licensed by the Companies;

(j)    the proceeds of any and all refunds that may be due to the Companies from Canada Revenue Agency and from any other tax authorities;

(k)    all consents, whether express or implied, granted in favour of the Companies in accordance with An Act to promote the efficiency and adaptability of the Canadian economy by regulating certain activities that discourage reliance on electronic means of carrying out commercial activities, and to amend the Canadian Radio-television and Telecommunications Commission Act, the Competition Act, the Personal Information Protection and Electronic Documents Act and the Telecommunications Act (Canada) (commonly known as "Canada's Anti-Spam Law" or "CASL") or any other equivalent legislation;

(l)    all orders, authorizations, approvals, licenses or permits of any Governmental Authority, owned, held or used by the Companies;

(m)    all information in any form relating to, or used in connection with, the Business, including the Books and Records;

(n)    all customer contracts;

(o)    all Claims, actions, causes of action, indemnities, warranties, guarantees, rights of recovery, rights of set-off and rights of recoupment of the Companies;

(p)    all proceeds payable to the Companies under any policies of insurance; and

(q)    the goodwill of the Business, including the exclusive right of the Purchaser to (i) represent itself as carrying on the Business in continuation of and in succession to the Companies, and (ii) use any words indicating that the Business is carried on.

**2.2**     **Excluded Assets.**

The Purchased Assets shall not include any of the following (collectively, the "**Excluded Assets**"):

(a)     the benefit of any contracts, agreements and understandings to which the Companies are a party other than those contracts that are assigned to the Purchaser pursuant to ARTICLE 3 or to an Assignment Order; and

(b)     any legal files of the Companies in the possession of or maintained by counsel for the Companies; and

(c)     Tangible Personal Property associated with contracts that are not Assigned Contracts.

For greater certainty, the Purchase Price will not be adjusted or set off against for Excluded Assets.

**2.3**     **Assumed Liabilities**

Subject to the Closing, and except for the Excluded Liabilities, the Purchaser agrees to assume, as of the Closing Time or such later time as is contemplated by this Agreement, all of the Companies' obligations and liabilities (and no other obligations or liabilities) relating to (collectively, the "**Assumed Liabilities**"):

(a)     the Purchased Assets arising and accruing in respect of the period after the Closing Time and not related to any default existing at, prior to or as a consequence of Closing (which excludes all obligations and liabilities in connection with the Assigned Contracts, the assumption of obligations and liabilities of which is dealt with pursuant to ARTICLE 3);

(b)     the obligations and liabilities of the Companies with respect to the Transferred Employees that are expressly assumed by the Purchaser; and

(c)     any other liability which the Purchaser agrees in writing to assume on or before the Closing Date.

**2.4**     **Excluded Liabilities.**

(a)     Other than the Assumed Liabilities and the Contract Assumed Liabilities, the Purchaser shall not assume and shall have no obligation to discharge, perform or fulfill any liability or obligation of the Companies or in connection with the Purchased Assets or the Business (the "**Excluded Liabilities**"), whether known, unknown, direct, indirect, absolute, contingent or otherwise or arising out of facts, circumstances or events, in existence on or prior to the Closing Time (with respect to the Assumed Liabilities) or, subject to ARTICLE 3, on or prior to the date on which a Contract to which the Companies is a party becomes an Assigned Contract, respectively (with respect to the Contract Assumed Liabilities).

(b)     Without limiting the generality of Section 2.4(a), the Purchaser shall not assume and shall have no obligation in respect of (i) any of the Excluded Assets or (ii) except as expressly provided herein, any liabilities of the Companies for Taxes other than Transfer Taxes payable by the Purchaser pursuant to Section 10.3(a).

**ARTICLE 3**
**ASSIGNMENT AND ASSUMPTION OF CONTRACTS AND LEASES**

3.1 **Assignment of Assigned Contracts.**

(a)     On or prior to the granting of the Approval and Vesting Order, the Purchaser may, in its sole discretion, designate any contract to which the Companies is a party to become an Assigned Contract.

(b)     Subject to Section 3.2, on Closing the Companies shall be deemed to have assigned the benefit of any Assigned Contract and the Purchaser shall be deemed to have assumed, all of the Companies obligations and liabilities relating to such Assigned Contract arising and accruing in respect of the period after Closing and not related to any default existing at, prior to or as a consequence of the Closing or of the assignment of such Assigned Contract (collectively, the "**Contract Assumed Liabilities**"), in each case without payment of any additional consideration.

3.2 **Consent Required Contracts.**

(a)     Nothing in this Agreement shall be construed as an agreement to assign any Consent Required Contract, unless the consent, approval or waiver required to assign such Consent Required Contract has been given or an Assignment Order has been made with respect to such Consent Required Contract.

(b)     The Companies and the Purchaser shall use reasonable commercial efforts to obtain the consents, approvals and waivers required for the assignment of the Consent Required Contracts that are designated as Assigned Contracts. The Purchaser shall be under no obligation to pay any money, incur any obligations, commence any legal proceedings, or offer or grant any accommodation (financial or otherwise) to any third party in order to obtain any consent, approval or waiver for any Consent Required Contract.

(c)     Upon request by the Purchaser, and at the Purchaser's sole expense in respect of the Motion and any cure costs arising from the assignment of a Consent Required Contract under any Assignment Order granted by the Court, the Companies shall see to obtain an Assignment Order, should the Purchaser and Companies not otherwise obtain any of the consents provided for in Section 3.2(b) above.

**ARTICLE 4**
**PURCHASE PRICE**

4.1 **Purchase Price.**

The aggregate purchase price for the Purchased Assets shall be made up of the following amounts (in aggregate, the "**Purchase Price**"), in each case exclusive of Transfer Taxes:

(a)     An amount required to satisfy the Priority Payables, which amount shall be subject to adjustment as at the Closing Time; *plus*

(b)     The Credit Bid Amount, which is estimated to be $4,000,000 as at the Closing Time; *plus*

(c)     The aggregate amount of the Assumed Liabilities and the Contract Assumed Liabilities and the cure costs arising under Section 3.2(c), if any.

**4.2    Payment of Purchase Price.**

The Purchaser shall pay the Purchase Price at the Closing Time as follows:

(a)     <u>Cash</u>. The Purchaser shall pay to the Monitor by wire transfer, certified cheque, bank draft or other means of immediately available funds the amount required to satisfy the Priority Payables;

(b)     <u>Credit Bid</u>. The Credit Bid Amount as particularized in a written payout statement provided by the Purchaser to the Companies and the Monitor by no less than two Business Days prior to the Closing Date (the "**Credit Bid Consideration Statement**") shall be treated as credited against (in satisfaction of that amount of) the Purchase Price and which the Purchaser shall cause the release thereof at Closing in favour of the Companies and other borrowers under the DIP Term Sheet; and

(c)     <u>Assumed Liabilities.</u> By assuming the Assumed Liabilities, the Contract Assumed Liabilities and the cure costs arising under Section 3.2(c), if any as of Closing Date.

<div align="center">

**ARTICLE 5**
**STALKING HORSE SISP**

</div>

**5.1    Stalking Horse SISP Order; Approval and Vesting Order.**

(a)     This Agreement is subject to Court approval and the granting of the Stalking Horse SISP Order, and Closing is subject to: (i) this Agreement being determined to be the Successful Bid in accordance with the SISP, and (ii) the issuance of the Approval and Vesting Order.

(b)     The Companies shall bring a motion as soon as practicable for approval of the SISP. The Stalking Horse SISP Order shall: (i) recognize this Agreement as a baseline or "stalking horse bid" (the "**Stalking Horse Bid**"); and (ii) shall provide for a marketing process of all or substantially all of the assets of the Companies by the Companies with the potential for competitive bidding. The Purchaser acknowledges and agrees that the aforementioned process is in contemplation of determining whether a superior bid can be obtained for the Purchased Assets and that the within Stalking Horse Bid may be the Successful Bid for the Purchased Assets.

(c)     In the event that one or more Persons submits a Qualified Bid on or before the Bid Deadline, the Monitor shall conduct an auction (the "**Auction**") for the determination and selection of a winning bid (the Person submitting such bid being the "**Winning Bidder**") in accordance with the SISP.

(d)    Upon the selection of the Winning Bidder, there shall be a binding agreement of purchase and sale between the Winning Bidder and the Companies. The Companies shall forthwith bring a motion following the selection of the Winning Bidder for an order, among other things, approving the agreement reached with the Winning Bidder and, if granted, shall proceed with closing the transaction forthwith.

(e)    Subject to the provision of Section 5.1(c), in the event that the Purchaser is not the Winning Bidder, then upon the closing of a transaction with such Winning Bidder: (i) this Agreement shall be terminated; and (ii) neither Party hereto shall have any further Liability, except as expressly provided for in this Agreement.

(f)    If no Qualified Bids other than the Stalking Horse Bid are received by the Bid Deadline, the Companies shall forthwith bring a motion to the Court to obtain the Approval and Vesting Order and, if granted, shall proceed with completing the Transaction contemplated hereby forthwith.

## ARTICLE 6
## EMPLOYEE MATTERS

### 6.1    Offer to Employees.

The Purchaser or its Affiliate, as designated by the Purchaser in its sole discretion, shall offer employment to all of the employees of the Companies, conditional and effective on the Closing and on terms and conditions substantially similar to their respective terms and conditions of employment with the Companies existing as of the Closing Date. The Purchaser shall acknowledge the prior service of the employees of the Companies for all purposes required by statute.

### 6.2    Employee Plans.

Notwithstanding Section 6.1, the Purchaser shall not assume any of the Employee Plans or liability for accrued benefits or any other liability under or in respect of any of the Employee Plans. The employees who accept an offer of employment from the Purchaser as of the Closing Date, shall cease to accrue further benefits under the Employee Plans.

### 6.3    Employee Liability.

(a)    The Companies shall be liable for all salary, wages, bonuses, commissions, vacation pay, and other compensation relating to employment of all employees of the Companies for the period prior to the Closing Date.

(b)    The Companies shall be liable for statutory notice of termination or payment in lieu of notice obligations and statutory severance obligations in respect of any employees of the Companies who do not accept the Purchaser's offer of employment.

(c)    Without limiting the Purchaser's obligations in respect of the Transferred Employees, the Purchaser or its Affiliate, as applicable, shall be responsible for:

(i)    All liabilities for salary, wages, bonuses, commissions, vacation pay, and other compensation relating to employment of the

<div style="margin-left:2em">

Transferred Employees in accordance with the offer made to such Transferred Employees by the Purchaser for the period on or after the Closing Date; and

(ii) All statutory notice of termination or payment in lieu of notice obligations and statutory severance obligations in respect of the termination by the Purchaser of the employment of any Transferred Employee arising on or after the Closing Date.

</div>

<div align="center">

**ARTICLE 7**
**REPRESENTATIONS AND WARRANTIES**

</div>

**7.1 Representations and Warranties of the Companies.**

Subject to the issuance of the Approval and Vesting Order, each of Lighthouse Canada and Lighthouse USA, in their individual capacities only and not acting or making representations on behalf of the other, hereby represent and warrant to and in favour of the Purchaser as set out below, and acknowledge that, as of the Closing Time, the Purchaser is entering into this Agreement in reliance upon the representations and warranties of Lighthouse Canada and Lighthouse USA as set out in this Section 7.1:

(a) <u>Authority; Companies and Power of the Companies.</u> Lighthouse Canada and Lighthouse USA are Companies duly incorporated, organized and subsisting under the laws of the jurisdiction of their Companies and are in good standing under the *Business Companies Act* (Ontario) and the *Delaware General Company Law*, respectively. Lighthouse Canada and Lighthouse USA each have the corporate power, authority and capacity to execute and deliver this Agreement and all other agreements and instruments to be executed by them as contemplated herein and to perform their other obligations hereunder and under all such other agreements and instruments.

(b) <u>Authorization.</u> The execution, delivery and, subject to obtaining of the Approval and Vesting Order in respect of the matters to be approved therein, performance by the Companies of this Agreement has been duly authorized, including all necessary corporate actions, on the part of each of Lighthouse Canada and Lighthouse USA.

(c) <u>Enforceability of the Companies' Obligations.</u> Subject to the Approval and Vesting Order having been issued, this Agreement constitutes a legal, valid and binding obligation of both Lighthouse Canada and Lighthouse USA enforceable against Lighthouse Canada and Lighthouse USA in accordance with its terms.

(d) <u>No Other Agreements to Purchase.</u> Except for the Purchaser's rights under this Agreement, no Person has any contractual right, option or privilege for the purchase or acquisition from the Companies the Purchased Assets.

(e) <u>Legal Proceedings.</u> There are no Legal Proceeding in progress, pending or, to the knowledge of Lighthouse Canada and Lighthouse USA, Threatened against or affecting either Lighthouse Canada or Lighthouse USA or any of their property or assets or title thereto, which would reasonably be expected to enjoin, delay, restrict or prohibit the Closing of the Transaction, as contemplated by this Agreement.

Except for Orders granted in the CCAA Proceeding and the Recognition Proceeding, as applicable, there is no outstanding Order against or affecting either Lighthouse Canada or Lighthouse USA or any of their property or assets, which would reasonably be expected to enjoin, delay, restrict or prohibit the Closing of the Transaction, as contemplated by this Agreement.

(f)     Residence of the Companies. Lighthouse Canada is not a non-resident of Canada for purposes of section 116 of the Income Tax Act and Lighthouse USA is a non-resident of Canada for purposes of section 116 of the Income Tax Act.

(g)     Regulatory Approvals. No Regulatory Approval or filing with, notice to, or waiver from any Governmental Authority is required to be obtained or made by either Lighthouse Canada or Lighthouse USA: (a) in connection with the execution and delivery of, and performance by Lighthouse Canada and Lighthouse USA of their obligations under this Agreement or the consummation of the Transaction contemplated hereby; (b) to avoid the loss of any License; or (c) to permit the Companies to carry on the Business after the Closing as the Business is currently carried on by the Companies.

## 7.2     Representations and Warranties of the Purchaser.

The Purchaser represents and warrants to the Companies as follows:

(a)     Company and Corporate Power. The Purchaser is a company incorporated, organized and subsisting under the laws of the jurisdiction of Delaware is in good standing under such act and has the power and authority to enter into, deliver and perform its obligations under this Agreement

(b)     Authorization by Purchaser. The execution and delivery of this Agreement and all other agreements and instruments to be executed by it as contemplated herein and the completion of the Transaction contemplated by this Agreement and all such other agreements and instruments have been duly authorized by all necessary corporate action on the part of the Purchaser.

(c)     Enforceability of Obligations. This Agreement constitutes a valid and binding obligation of the Purchaser enforceable against the Purchaser in accordance with its terms.

(d)     Legal Proceedings. There is no Legal Proceeding in progress, pending, or, to the knowledge of the Purchaser, Threatened against or affecting the Purchaser, and there are no grounds on which any such Legal Proceeding might be commenced and there is no Order outstanding against or affecting the Purchaser which, in any such case, affects adversely or might affect adversely the ability of the Purchaser to enter into this Agreement or to perform its obligations hereunder.

(e)     Absence of Conflict. The execution, delivery and performance of this Agreement by the Purchaser and the completion of the Transaction contemplated by this Agreement do not and will not result in or constitute any of the following:

(i)     a default, breach or violation or an event that, with notice or lapse of time or both, would be a default, breach or violation of any of the terms, conditions or provisions of the articles or by-laws of the Purchaser; or

(ii)    the violation of any Applicable Law.

(f)     <u>Consents, Regulatory Approvals.</u> No Consent or Regulatory Approval or filing with, notice to, or waiver from any Governmental Authority is required to be obtained or made by the Purchaser in connection with the execution and delivery of, and performance by the Purchaser of its obligations under, this Agreement or the consummation of the Transaction contemplated hereby.

## 7.3    As is, Where is.

The representations and warranties of the Companies shall survive the Closing Time on the Closing Date. The Purchaser acknowledges, agrees and confirms that, at the Closing Time, the Purchased Assets shall be sold and delivered to the Purchaser on an "as is, where is" basis, subject only to the representations and warranties contained herein. Other than those representations and warranties contained herein, no representation, warranty or condition is expressed or can be implied as to title, liens, description, fitness for purpose, merchantability, condition or quality or in respect of any other matter or thing whatsoever.

<div align="center">

**ARTICLE 8**
**CLOSING ARRANGEMENTS**

</div>

## 8.1    Closing.

The Closing shall take place on the Closing Date effective as of the Closing Time electronically (or as otherwise determined by mutual agreement of the Parties in writing), by the exchange of deliverables (in counterparts or otherwise) by electronic transmission in PDF format.

## 8.2    Companies' Closing Deliveries.

At the Closing, the Companies shall deliver or cause to be delivered to the Purchaser the following documents:

(a)     a true copy of the Approval and Vesting Order, as issued and entered by the Court;

(b)     an executed copy of the Monitor's Certificate;

(c)     a bill of sale in the form satisfactory to the Parties hereto, duly executed by the Companies, transferring the Purchased Assets to the Purchaser;

(d)     an assignment and assumption agreement in a form satisfactory to the Parties (the "**Assignment and Assumption Agreement**"), duly executed by the Companies, effecting the assignment to and assumption by the Purchaser of the Purchased Assets and the Assumed Liabilities;

(e)     all such other assurances, consents, agreements, documents and instruments as may be reasonably required by the Purchaser to complete the Transaction provided for in

this Agreement, all of which shall be in form and substance satisfactory to the Purchaser, acting reasonably.

**8.3    Purchaser's Closing Deliveries.**

At the Closing, the Purchaser shall deliver or cause to be delivered to the Companies the following documents and payments:

(a)    the Credit Bid Consideration Statement;

(b)    the Assignment and Assumption Agreement duly executed by the Purchaser;

(c)    a release of the Companies from the DIP Lender for all amounts owing from the Companies to the DIP Lender under the DIP Term Sheet, including the Credit Bid Amount;

(d)    the payment referred to in Section 4.2(a), which shall be made to the Monitor; and

(e)    all such other assurances, consents, agreements, documents and instruments as may be reasonably required by the Companies to complete the Transaction provided for in this Agreement, all of which shall be in form and substance satisfactory to the Companies, acting reasonably.

## ARTICLE 9
## CONDITIONS OF CLOSING

**9.1    Purchaser's Conditions.**

The Purchaser shall not be obligated to complete the Transaction pursuant to this Agreement unless, at or before the Closing Time, each of the conditions listed below in this Section 9.1 has been satisfied, it being understood that the said conditions are included for the exclusive benefit of the Purchaser. The Companies shall take all such actions, steps and proceedings as are reasonably within their control as may be necessary to ensure that the conditions listed below in this Section 9.1 are fulfilled at or before the Closing Time.

(a)    <u>Court Approval.</u> The Stalking Horse SISP Order and the Approval and Vesting Order shall each have been issued and entered by the Court.

(b)    <u>Successful Bid.</u> The Companies, in consultation with the Monitor, shall have determined in accordance with the SISP that this Agreement is the Successful Bid.

(c)    <u>Companies' Deliverables.</u> The Companies shall have executed and delivered or caused to have been executed and delivered to the Purchaser at the Closing all the documents contemplated in Section 8.3.

(d)    <u>Representations and Warranties.</u> Except as such representations and warranties may be affected by the occurrence of events or transactions specifically contemplated by this Agreement, the representations and warranties of the Companies in Section 7.1 shall be true and correct in all material respects: (i) as at the Closing as if made on and as of such date; or (ii) if made as of a date specified therein, as of such date.

(e)     <u>Companies' Compliance.</u> The Companies shall have performed and complied with all of the terms and conditions in this Agreement on their part to be performed or complied with at or before the Closing Time and shall have executed and delivered or caused to have been executed and delivered to the Purchaser at the Closing all the documents contemplated in Section 8.3 and elsewhere in this Agreement.

(f)     <u>Monitor's Certificate.</u> The Monitor shall have provided an executed copy of the Monitor's Certificate confirming that all other conditions to Closing have either been satisfied or waived by both the Purchaser and the Companies

## 9.2     Companies' Conditions.

The Companies shall not be obligated to complete the Transaction contemplated by this Agreement unless, at or before the Closing Time, each of the conditions listed below in this Section 9.2 has been satisfied, it being understood that the said conditions are included for the exclusive benefit of the Companies. The Purchaser shall take all such actions, steps and proceedings as are reasonably within the Purchaser's control as may be necessary to ensure that the conditions listed below in this Section 9.2 are fulfilled at or before the Closing Time.

(a)     <u>Court Approval.</u> The Stalking Horse SISP Order and the Approval and Vesting Order shall each have been issued and entered by the Court.

(b)     <u>Successful Bid.</u> The Companies, in consultation with the Monitor, shall have determined in accordance with the SISP that this Agreement is the Successful Bid.

(c)     <u>Purchaser's Deliverables.</u> The Purchaser shall have executed and delivered or caused to have been executed and delivered to the Companies at the Closing all the documents contemplated in Section 8.3.

(d)     <u>Representations and Warranties.</u> The representations and warranties of the Purchaser in Section 7.2 shall be true and correct at the Closing.

(e)     <u>Purchaser's Compliance.</u> The Purchaser shall have performed and complied with all of the terms and conditions in this Agreement on its part to be performed or complied with at or before the Closing Time and shall have executed and delivered or caused to have been executed and delivered to the Companies at the Closing all the documents contemplated in Section 8.3 and elsewhere in this Agreement.

(f)     <u>Monitor's Certificate.</u> The Monitor shall have provided an executed copy of the Monitor's Certificate confirming that all other conditions to Closing have either been satisfied or waived by both the Purchaser and the Companies.

## 9.3     Monitor's Certificate.

The Parties acknowledge and agree that the Monitor shall be entitled to deliver to the Purchaser, and file with the Court, an executed Monitor's Certificate without independent investigation, upon receiving written confirmation from both Parties (or the applicable Party's counsel) that all conditions of Closing in favour of such Party have been satisfied or waived, and the Monitor shall have no Liability to the Parties in connection therewith. The Parties further acknowledge and agree

that upon written confirmation from each Party that all conditions of Closing in favour of such Party have been satisfied or waived, the Monitor may deliver the executed Monitor's Certificate to the Purchaser's counsel in escrow, with the sole condition of its release from escrow being the Monitor's written confirmation that all such funds have been received. Upon such confirmation being given, the Monitor's Certificate will be released from escrow to the Purchaser, and the Closing shall be deemed to have occurred.

<div align="center">

**ARTICLE 10**
**COVENANTS**

</div>

**10.1    Closing Date**

The Parties shall cooperate with each other and shall use their commercially reasonable efforts to effect the Closing on or before the Outside Date.

**10.2    Motion for Approval and Vesting Order**

As soon as practicable if the Purchaser is selected as the Winning Bidder, the Companies shall bring a motion for the Approval and Vesting Order. The Companies shall diligently use its commercially reasonable efforts to seek the issuance and entry of the Approval and Vesting Order and the Purchaser shall cooperate with the Companies in its efforts to obtain the issuance and entry of the Approval and Vesting Order, including for greater certainty, supporting the approval of the releases of the directors and officers of the Companies, its advisors, the Monitor and the Monitor's counsel sought in the Approval and Vesting Order.

**10.3    Tax Matters**

(a)     The Purchase Price is exclusive of any applicable Transfer Taxes.  The Purchaser shall be responsible to pay all Transfer Taxes payable by it in respect of the purchase and sale of the Purchased Assets under this Agreement, and, on request of the Monitor or Companies, the Purchaser shall furnish to the Monitor or Companies proof of direct payment to a Governmental Authority.

(b)     In respect of any GST/HST to be self-assessed by the Purchaser, the Purchaser shall deliver to the Monitor a GST/HST certificate and indemnity in form agreeable to the Monitor.

(c)     If any payment made by the Companies or the Purchaser as the result of a breach, modification or termination of this Agreement is deemed by the ETA to include GST/HST, or is deemed by any applicable provincial or territorial legislation to include a similar value-added or multi-staged tax, the amount of such payment shall be increased accordingly.

(d)     The Purchaser shall indemnify and save harmless the Companies from any amounts, including interest and penalties, that may be assessed against the Companies arising out of the failure of the Purchaser to pay, when due, any taxes described in this Section 10.3.

**10.4    Interim Period**

During the Interim Period, except as otherwise expressly contemplated or permitted by this Agreement (including the Approval and Vesting Order), the Companies shall, unless consented to by the Purchaser under the DIP Term Sheet, comply with the DIP Term Sheet and continue to maintain the Business, operations of the Companies in substantially the same manner as conducted on the Effective Date and in material compliance with all Applicable Laws.

**10.5    Risk of Loss.**

If before the Closing all or any substantial portion of the property or assets of the Companies are lost, damaged or destroyed or are expropriated or seized by any Governmental Authority or any other Person in accordance with Applicable Law or if notice of any such expropriation or seizure shall have been given in accordance with Applicable Law, the Purchaser, in its sole discretion, shall have the option, exercisable by notice to the Companies given prior to the Closing Time:

(a)     to terminate this Agreement by notice to the Companies, as provided in Section 11.1(d); or

(b)     to complete the Transaction contemplated by this Agreement and require the Companies to reduce the Purchase Price by the amount of the cost of repair of the property and assets which were damaged or destroyed or, if lost or damaged beyond repair or seized or expropriated, by the replacement cost of the property and assets so lost, damaged, expropriated or seized, such reduction in price to be net of all proceeds of insurance or compensation for expropriation or seizure actually received by the Companies.

**10.6    Consents and Approvals.**

Commencing forthwith after the date hereof the Companies shall use all commercially reasonable efforts to obtain, at or prior to the Closing Time, any Consents and Regulatory Approvals.

<div align="center">

**ARTICLE 11**
**TERMINATION**

</div>

**11.1    Grounds for Termination.**

This Agreement may be terminated on or prior to the Closing Date:

(a)     automatically and without any action or notice by either the Companies to the Purchaser or the Purchaser to the Companies, immediately upon the selection by the Companies, in consultation with the Monitor, of a Successful Bid if this Agreement is not the Successful Bid selected at such time;

(b)     by either Party upon written notice to the other Party if: (i) the Approval and Vesting Order has not been obtained by the Outside Date, or (ii) the Court declines at any time to grant the Approval and Vesting Order; in each case for reasons other than a breach of this Agreement by the Party proposing to terminate the Agreement;

(c)     by the mutual written agreement of the Companies and the Purchaser, provided however that if this Agreement has been approved by the Court, any such termination shall require either the consent of the Monitor or approval of the Court;

(d)     by written notice from the Purchaser to the Companies in accordance with Section 10.5 (Risk of Loss);

(e)     by written notice from the Purchaser to the Companies if there has been a material breach by the Companies of any representation, warranty or covenant contained in this Agreement, which breach has not been waived by the Purchaser, and such breach is not curable and has rendered the satisfaction of any condition in Section 9.1 impossible by the Outside Date, provided that at the time of providing such notice of termination, the Purchaser is not in breach of any of its obligations under this Agreement or the DIP Term Sheet;

(f)     by written notice from the Companies to the Purchaser if there has been a material breach by the Purchaser of any representation, warranty or covenant contained in this Agreement, which breach has not been waived by the Companies and such breach is not curable and has rendered the satisfaction of any condition in Section 9.1 impossible by the Outside Date, provided that at the time of providing such notice of termination, the Companies are not in breach of any of their obligations under this Agreement; and

(g)     by the Purchaser, on the one hand, or by the Companies, on the other hand, upon written notice to the other Party if the Closing has not occurred by the Outside Date, provided, however, that the right to terminate this Agreement pursuant to this Section 11.1(g) shall not be available to any Party whose breach hereof has been the principal cause of, or has directly resulted in the Closing not occurring by the Outside Date.

## 11.2    Effect of Termination.

If this Agreement is terminated pursuant to Section 11.1, all further obligations of the Parties under this Agreement will terminate and no Party will have any Liability hereunder, except as contemplated in Sections  11.2 (Effect of Termination), 12.2 (Notices), 12.6 (Successors and Assigns), 12.7 (Entire Agreement), 12.8 (Amendment), 12.11 (Governing Law), 12.13 (Assignment), and 12.16 (Severability) which shall survive such termination.

## ARTICLE 12
## GENERAL

## 12.1    Payment of Taxes.

Except as otherwise provided in this Agreement, each Party shall be responsible for its own Taxes.

## 12.2    Notices.

(a)     Mode of Giving Notice. Any notice, direction, certificate, consent, determination or other communication required or permitted to be given or made under this Agreement shall be in writing and shall be effectively given and made if (i)

delivered personally, (ii) sent by prepaid courier service or mail, or (iii) sent by email or other similar means of electronic communication, in each case to the applicable address set out below:

    (i)        if to the Companies to:

**Lighthouse Immersive Inc. and Lighthouse Immersive USA, Inc.**
1 Yonge Street
Toronto, ON M5E 2A3

Attention: Svetlana Dvoretsky
Email: svetlana@lighthouseimmersive.com

with a copy to:

**Miller Thomson LLP**
Scotia Plaza, 40 King Street West
Suite 5800
Toronto, ON M5H 3S1

Attention: Kyla Mahar
Email: kmahar@millerthomson.com

    (ii)       if to the Purchaser, to:

**SCS Finance Inc.**

**640 Briar Hill Ave. Toronto M5N 1N2**

Attention: Corey Ross
Email: corey@lighthouseimmersive.com

with a copy to:

**Cozen O'Connor**
Bay Adelaide Centre - West Tower
333 Bay Street, Suite 1100
Toronto, ON M5H 2R2

Attention:     Steve Weisz
Email: sweisz@cozen.com

    (iii)     in each case, with a further copy to the Monitor as follows:

**B. Riley Farber Inc.**
150 York St. Suite 1600
Toronto, Ontario M5H 3S5

Attention: Hylton Levy
Email: hlevy@brileyfin.com

with a copy to:

**Thornton Grout Finnigan LLP**
Suite 3200, 100 Wellington Street West
P.O. Box 329, Toronto-Dominion Centre
Toronto, ON M5K 1K7

Attention: Rebecca Kennedy & Rachel Fielding
Email: rkennedy@tgf.ca; rfielding@tgf.ca

(b)     <u>Deemed Delivery of Notice.</u> Any such notice or other communication, if transmitted by email before 4:30 p.m. (Toronto time) on a Business Day, will be deemed to have been given on such Business Day, and if transmitted by email after 4:30 p.m. (Toronto time) on a Business Day, will be deemed to have been given on the Business Day after the date of the transmission. In the case of a communication by email or other electronic means, if an autoreply is received indicating that the email is no longer monitored or in use, delivery must be followed by the dispatch of a copy of such communication pursuant to one of the other methods described above; provided however that any communication originally delivered by electronic means shall be deemed to have been given on the date stipulated above for electronic delivery.

Sending a copy of a notice or other communication to a Party's legal counsel as contemplated above is for information purposes only and does not constitute delivery of the notice or other communication to that Party. The failure to send a copy of a notice or other communication to legal counsel does not invalidate delivery of that notice or other communication to a Party. A Person may change its address for service by notice given in accordance with the foregoing and any subsequent communication must be sent to such Person at its changed address.

(c)     <u>Change of Address.</u> Any Party may from time to time change its address under this Section 12.2 by notice to the other Party given in the manner provided by this Section 12.2.

## 12.3    Public Announcements.

The Companies shall be entitled to disclose this Agreement to the Court and parties in interest in the CCAA Proceedings and the Recognition Proceedings and this Agreement may be posted on the Monitor's website maintained in connection with the CCAA Proceedings.

## 12.4    Time of Essence.

Time shall be of the essence of this Agreement in all respects.

**12.5    Survival**

The representations and warranties of the Parties contained in this Agreement shall merge on Closing and the representations, warranties and covenants of the Parties contained herein to be performed after the Closing shall not survive Closing.

**12.6    Successors and Assigns.**

This Agreement shall enure to the benefit of, and be binding on, the Parties and their respective successors and permitted assigns. Neither Party may assign or transfer, whether absolutely, by way of security or otherwise, all or any part of its respective rights or obligations under this Agreement without the prior written consent of the other Party.

**12.7    Entire Agreement.**

This Agreement, among the Companies and the Purchaser constitutes the entire agreement between the Parties pertaining to the subject matter of this Agreement and supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written. There are no conditions, representations, warranties, obligations or other agreements between the Parties in connection with the subject matter of this Agreement (whether oral or written, express or implied, statutory or otherwise) except or explicitly set out in this Agreement**.**

**12.8    Amendment.**

No amendment of this Agreement shall be effective unless made in writing and signed by the Parties.

**12.9    Waiver.**

A waiver of any default, breach or non-compliance under this Agreement shall not be effective unless in writing and signed by the Party to be bound by the waiver. No waiver shall be inferred from or implied by any failure to act or delay in acting by a Party in respect of any default, breach or non-observance or by anything done or omitted to be done by the other Party. The waiver by a Party of any default, breach or non-compliance under this Agreement will not operate as a waiver of that Party's rights under this Agreement in respect of any continuing or subsequent default, breach or nonobservance (whether of the same or any other nature).

**12.10    Paramountcy**

In the event of any conflict or inconsistency between the provisions of this Agreement, and any other agreement, document or instrument executed or delivered in connection with this Transaction, the provisions of this Agreement shall prevail to the extent of such conflict or inconsistency; provided that nothing in this Agreement affects the rights and obligations of the Parties under the DIP Term Sheet.

**12.11    Governing Law.**

This Agreement shall be governed by and construed in accordance with the laws of the Province of Ontario and the laws of Canada applicable therein and each of the Parties irrevocably attorns to the exclusive jurisdiction of the Court, and any appellate courts of the Province of Ontario therefrom.

**12.12   Remedies Cumulative.**

The rights, remedies, powers and privileges herein provided to a Party are cumulative and in addition to and not exclusive of or in substitution for any rights, remedies, powers and privileges otherwise available to that Party.

**12.13   Assignment.**

Prior to the issuance of the Approval and Vesting Order, the Purchaser may assign all of its rights and obligations under this Agreement to an Affiliate, provided that (i) the Purchaser shall remain liable to perform all of its obligations hereunder, and (ii) the Purchaser and its assignee execute and deliver to the Companies an Assignment and Assumption Agreement, in form and substance satisfactory to the Companies, evidencing such assignment. Other than in accordance with the preceding sentence, the Purchaser may not assign or transfer, whether absolutely, by way of security or otherwise, all or any part of its rights or obligations under this Agreement.

**12.14   Further Assurances.**

Each Party shall from time to time promptly execute and deliver or cause to be executed and delivered all such further documents and instruments and shall do or cause to be done all such further acts and things in connection with this Agreement that the other Party may reasonably require as being necessary or desirable in order to effectively carry out or better evidence or perfect the full intent and meaning of this Agreement or any provision hereof.

**12.15   Counterparts.**

This Agreement may be executed in counterparts, each of which shall be deemed to be an original and both of which taken together shall be deemed to constitute one and the same instrument. To evidence its execution of an original counterpart of this Agreement, a Party may send a copy of its original signature on the execution page hereof to the other Party by electronic transmission and such transmission shall constitute delivery of an executed copy of this Agreement to the receiving Party.

**12.16   Severability.**

Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction will, as to that jurisdiction, be ineffective to the extent of such prohibition or unenforceability and will be severed from the balance of this Agreement, all without affecting the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

**12.17   Monitor's Capacity**

In addition to all of the protections granted to the Monitor under the CCAA or any order of the Court in this CCAA Proceeding, the Companies and the Purchaser acknowledge and agree that the Monitor, acting in its capacity as Monitor of the Companies and not in its personal capacity, will have no Liability, in its personal capacity or otherwise, in connection with this Agreement or the Transactions contemplated herein whatsoever as Monitor.

**IN WITNESS WHEREOF** the Parties have executed this Agreement as of the date first above written.

<div align="center">

**LIGHTHOUSE IMMERSIVE INC.**

</div>

By: _____
     Name:
     Title:

<div align="center">

**LIGHTHOUSE IMMERSIVE USA, INC.**

</div>

By: _____
     Name:
     Title:

<div align="center">

**SCS FINANCE, INC.**

</div>

By: _____
     Name:
     Title:

# SCHEDULE "A" – SISP

## SCHEDULE "B" – PERMITTED ENCUMBRANCES

**To be completed prior to the Closing Date, if any.**

**APPENDIX "G"**

**AMENDED DIP TERM SHEET (Clean and Blackline to the version approved in these CCAA Proceedings)**

**CLEAN VERSION**

LEGAL\65004827\2

**October 5, 2023**

**Lighthouse Immersive Inc. and Lighthouse Immersive USA, Inc.**
640 Briar Hill Avenue
Toronto, Ontario, Canada, M5N 1N2

**Attention:**     Corey Ross, President and Svetlana Dvoretsky, Vice President

**Re:**               **Amended Debtor-in-Possession Financing of Lighthouse Immersive Inc. and Lighthouse Immersive USA, Inc.**

A.       Lighthouse Immersive Inc. and Lighthouse Immersive USA, Inc. (together, the "**Applicants**") made an application to the Ontario Superior Court of Justice (Commercial List) (the "**Court**") for an initial order (the "**Initial Order**"), among other things, commencing proceedings under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "**CCAA Proceedings**"), imposing a stay of proceedings in favour of the Applicants (the "**Initial Stay**"), appointing B. Riley Farber Inc., as Monitor of the Applicants (in such capacity, the "**Monitor**"), approving this term sheet (the "**Term Sheet**") between SCS Finance, Inc. (the "**Lender**"), the Applicants and the Subsidiaries (as defined herein)and granting the DIP Lender's Charge (as defined herein) to secure the initial authorized advance of US$1,100,000.

B.       On July 27, 2023, the Initial Order is granted, which was thereafter amended and restated (the "**ARIO**") which, among other things (i) extended the Initial Stay and (ii) increased the authorized borrowings under this Term Sheet to US$3,500,000, subject to and in accordance with the terms and conditions of this Term Sheet.

C.       The Applicants require and continue to require additional funding to satisfy the revised cashflow requirements of the CCAA Proceedings, and other short term liquidity requirements.

D.       The wholly-owned subsidiaries of the Applicants set out in Schedule "A" hereto (the "**Subsidiaries**" or the "**Guarantors**") have agreed, jointly and severally, to guarantee such funding in accordance with this Term Sheet.

E.       The Lender has agreed to increase the established from a maximum aggregate principal amount of US$3,500,000 to a maximum aggregate principal amount of US$4,000,000, in accordance with the terms and conditions of this Term Sheet, subject to the Court granting a DIP Increase Order authorizing the increase in the authorized borrowings under the DIP from US$3,500,000 to US$4,000,000 (the "**DIP Increase Order**").

**NOW THEREFORE** in consideration of the foregoing and the mutual covenants and agreements set forth below, and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereby agree as follows:

<div align="center">

**SUMMARY OF TERMS FOR DIP FACILITY**

</div>

| | | |
|---|---|---|
| 1. | **Borrowers:** | Lighthouse Immersive Inc., Lighthouse Immersive USA, Inc., and the wholly-owned subsidiaries of the Applicants set out in Schedule "A" hereto (the "**Subsidiaries**"), on a joint and several basis. |
| 2. | **Guarantors:** | The Subsidiaries, on a joint and several basis. |
| 3. | **Lender:** | SCS Finance, Inc. |

| **4. DIP Facility:** | Non-revolving facility in the maximum aggregate principal amount of US$4,000,000 (the "**DIP Facility**"). |
|---|---|

| **5. Purpose:** | The DIP Facility shall be available to fund: (i) working capital needs of the Borrowers; (ii) professional fees and expenses incurred by the Borrowers and the Monitor in respect of the CCAA Proceedings, in each case in accordance with the cash flow projections approved by the Monitor and the Lender (the "**Cash Flow Projections**"); (iii) the Recoverable Expenses (as defined below); and (iv) such other costs and expenses of the Borrowers as may be agreed to by the Lender and the Monitor, in writing. |

The amount and purpose of the DIP Facility may be amended by the Borrowers, the Lender, in writing, and with the consent of the Monitor. The Borrowers may not use the proceeds of the DIP Facility to pay any pre-filing obligations of the Borrowers, except in accordance with the Cash Flow Projections or with the prior written consent of the Lender and the Monitor.

| **6. Advances:** | Subject to the funding conditions set out in Sections 11 and 12 of this Term Sheet, the DIP Facility shall be available in multiple advances as follows: |

(a)    upon the issuance of the Initial Order, **US$1,100,000**, or such lesser amount as may be approved by the Initial Order and secured by the DIP Lender's Charge (the "**First Advance**"), shall be advanced to the Borrowers to finance working capital requirements for the 10-day period immediately following the date of the Initial Order; and

(b)    upon the issuance of the ARIO, the balance of the DIP Facility, being **US$2,400,000**, shall be advanced to the Borrowers in advances in accordance with the cashflow and with the approval of the Monitor and such amount shall increase to US$2,900,000 upon the issuance of the DIP Increase Order (the "**Additional Advance**s", and together with the First Advance, collectively, the "**Advances**").

Nothing in this Term Sheet creates a legally binding obligation on the Lender to advance any amount under the DIP Facility at any time unless the Borrowers and the Guarantors are in compliance with the provisions of this Term Sheet.

| **7. Interest:** | Interest shall accrue on amounts advanced under the DIP Facility at a rate equal to 10% per annum (the "**Interest**"). Interest shall be calculated on the daily outstanding balance owing under the DIP Facility, not in advance, and shall accrue and be paid on the Maturity Date (as defined herein). |

| **8. Recoverable Expenses:** | The Borrowers shall pay all fees and expenses (collectively, the "**Recoverable Expenses**") incurred by the Lender in connection with the preparation, registration and ongoing administration of this Term Sheet, the DIP Facility, the Initial Order, the ARIO, the DIP Lender's Charge and with the enforcement of the Lender's rights and remedies hereunder and thereunder, at law or in equity, including, without limitation all reasonable legal fees and disbursements incurred by the Lender. For greater certainty, "Recoverable Expenses" shall include all reasonable fees and expenses |

3

incurred by the Lender in connection with the CCAA Proceedings and all Court attendances in respect thereof. If the Lender has paid any expenses for which the Lender is entitled to reimbursement from the Borrowers, such expenses shall be added to the DIP Facility and shall accrue Interest at the rate set out above. All such fees and expenses and Interest thereon shall be secured by the DIP Lender's Charge whether or not any funds under the DIP Facility are advanced.

**9.  Guarantees    and Security:**

All debts, liabilities and obligations of the Borrowers to the Lender under or in connection with the DIP Facility (including, without limitation, Interest and Recoverable Expenses), this Term Sheet and any other documents executed in connection therewith shall be guaranteed by the Guarantors and secured by a Court-ordered priority charge (the "**DIP Lender's Charge**") granted to the Lender in and to all present and future properties, assets, and undertakings of the Borrowers and the Guarantors, real and personal, tangible and intangible, whether now owned or hereafter acquired, and the proceeds thereof (collectively, the "**Property**"), subject only to an administration charge in the maximum aggregate amount of US$275,000 under the Initial Order and as may be increased under the ARIO for the payment of the fees and expenses of the Monitor, counsel to the Borrowers and counsel to the Monitor (the "**Administration Charge**").

**10.  Maturity Date:**

Unless otherwise agreed to by the Lender and the Borrowers in writing, and consented to by the Monitor, the term of the DIP Facility shall expire, and the Borrowers shall repay all obligations owing to the Lender under this Term Sheet, on the earliest of the following (the "**Maturity Date**"):

(a)  January 24, 2024, or such later date determined by the Lender in its sole discretion;

(b)  the closing of a sale or investment transaction for substantially all of the Property, resulting from a sale process ("**SISP**"), which transaction has been approved by an order of the Court;

(c)  the date on which the CCAA Proceedings are terminated for any reason, including if the CCAA Proceedings are converted into a proceeding under the *Bankruptcy and Insolvency Act*, R.S.C. 1985, C. B-3 (the "**BIA**"), or if a receiver or receiver and manager is appointed over any of the Borrowers, the Guarantors, or the Property; and

(d)  the occurrence of an Event of Default (as defined herein), subject to a cure period of five (5) business days, beginning on the date of the occurrence of such Event of Default.

**11.  Repayment:**

The aggregate principal amount owing under the DIP Facility plus all accrued and unpaid Interest and Recoverable Expenses shall become immediately due and payable on the Maturity Date.

4

| **12. Funding Conditions; First Advance:** | The availability of the First Advance under the DIP Facility shall be subject to and conditional upon the following, which may be waived by the Lender in writing: |

(a)  the Court shall have issued the Initial Order, in a form satisfactory to the Lender, including:

    i.  approving this Term Sheet and the DIP Facility;

    ii.  granting the DIP Lender's Charge in favour of the Lender;

    iii.  authorizing the Lender to effect registrations, filings and recordings wherever in its discretion it deems appropriate regarding the DIP Lender's Charge;

    iv.  providing that the DIP Lender's Charge shall be valid and effective to secure all of the obligations of the Borrowers and the Guarantors to the Lender hereunder, without the necessity of the making of any registrations or filings and whether or not any other documents have been executed by the Borrowers or the Guarantors;

    v.  declaring that the granting of the DIP Lender's Charge and all other documents executed and delivered to the Lender as contemplated herein, including, without limitation, all actions taken to perfect, record and register the DIP Lender's Charge, do not constitute conduct meriting an oppression remedy, settlement, fraudulent preference, fraudulent conveyance or other challengeable or reviewable transaction under any applicable federal or provincial legislation; and

    vi.  provisions restricting the granting of any additional liens or encumbrances on the assets of the Borrowers, other than as permitted herein and the DIP Lender's Charge.

(b)  the Initial Order shall not have been vacated, stayed, appealed or amended in a manner not acceptable to the Lender, acting reasonably; and

(c)  no Event of Default shall have occurred.

| **13. Funding Conditions; Second Advance:** | The availability of the Second Advance under the DIP Facility shall be subject to and conditional upon the following, which may be waived by the Lender in writing: |

(a)  the Court shall have issued the ARIO, in a form satisfactory to the Lender, including:

    i.  approving this Term Sheet and the DIP Facility;

    ii.  granting the increased DIP Lender's Charge in favour of the Lender;

iii.    authorizing the Lender to effect registrations, filings and recordings wherever in its discretion it deems appropriate regarding the DIP Lender's Charge;

iv.    providing that the DIP Lender's Charge shall be valid and effective to secure all of the obligations of the Borrowers and the Guarantors to the Lender hereunder, without the necessity of the making of any registrations or filings and whether or not any other documents have been executed by the Borrowers or the Guarantors;

v.    declaring that the granting of the DIP Lender's Charge and all other documents executed and delivered to the Lender as contemplated herein, including, without limitation, all actions taken to perfect, record and register the DIP Lender's Charge, do not constitute conduct meriting an oppression remedy, settlement, fraudulent preference, fraudulent conveyance or other challengeable or reviewable transaction under any applicable federal or provincial legislation; and

vi.    provisions restricting the granting of any additional liens or encumbrances on the assets of the Borrowers, other than as permitted herein and the DIP Lender's Charge.

(b)    the ARIO shall not have been vacated, stayed, appealed or amended in a manner not acceptable to the Lender, acting reasonably; and

(c)    no Event of Default shall have occurred.

**14. Covenants:**    The Borrowers and the Guarantors covenant and agree with the Lender, so long as any amounts are outstanding by the Borrowers to the Lender hereunder, to:

(a)    promptly on the receipt by the Borrowers and the Guarantors of the same, give the Lender a copy of any Notice of Motion or Application to vary, supplement, revoke, terminate or discharge the Initial Order, the ARIO, or any Court order approving the Transaction, including, without limitation, any application to the Court for the granting of new or additional security that will or may have priority over the DIP Lender's Charge, or otherwise for the variation of the priority of the DIP Lender's Charge;

(b)    provide the Lender with any additional financial information reasonably requested by the Lender, to the extent that it is readily available;

(c)    use the Advances under the DIP Facility for the purposes for which they are being provided, as set out in Section 4 of this Term Sheet, or such other purposes that may be agreed to by the Lender and the Monitor, in writing;

(d)    provide the Lender and the Monitor with prompt written notice of any event which constitutes, or which, with notice, lapse of time, or both,

would constitute an Event of Default, a breach of any covenant, or other term or condition of this Term Sheet, or of any document executed in connection with this Term Sheet;

(e)   pay all claims which, under law, may rank prior to or *pari passu* with the DIP Lender's Charge due and payable from and after the commencement of the CCAA Proceedings, as and when such amounts are due;

(f)   not make any payment to any director, officer, investor or related party of the Borrowers or the Guarantors (except salary and wages in the normal course) without the prior written consent of the Lender and the Monitor;

(g)   keep the Property fully insured against such perils in such manner, and only to the extent, as would be customarily insured by companies owning similar assets;

(h)   not, without the prior written consent of the Lender, incur any borrowings or other secured indebtedness, obligations or liabilities, other than the DIP Facility, or create or grant any security (other than the Administration Charge and the DIP Lender's Charge) over any of the Borrowers' Property, whether ranking in priority to or subordinate to the DIP Lender's Charge; and

(i)   conduct all activities in the ordinary course and in material compliance with the Cash Flow Projections.

**15. Events of Default:**   The DIP Facility shall be subject to the following events of default (each, an "**Event of Default**"):

(a)   the Borrowers' failure to pay any amount due hereunder when due and payable;

(b)   the Borrowers' failure to comply with or fulfill, to the satisfaction of the Lender, any covenant, condition precedent, payment obligation, or other term or condition of this Term Sheet;

(c)   the seeking or support by the Borrowers or the Guarantors (or any of them) of any Court order (in the CCAA Proceedings or otherwise) which is adverse or potentially adverse to the interests of the Lender;

(d)   the issuance of any Court order (in the CCAA Proceedings or otherwise) which is adverse to the interests of the Lender;

(e)   the issuance of any Court order lifting or terminating (in whole or in part) the stay of proceedings in the CCAA Proceedings, or discontinuing, dismissing or otherwise terminating the CCAA proceedings;

(f)     the issuance of any Court order staying, reversing, vacating, or modifying the terms of the Initial Order, the ARIO, the DIP Facility or the DIP Lender's Charge, in each case without the Lender's consent;

(g)     the occurrence of an event that will, in the opinion of the Lender, materially impair the Borrowers' financial condition, operations or ability to perform under this Term Sheet or any order of the Court;

(h)     the failure by the Borrowers to comply with the Initial Order, the ARIO, a SISP order, or any Court order approving a SISP transaction, or similar transaction;

(i)     the occurrence of any material adverse change in: (i) the business, operations, or financial condition of the Borrowers; (ii) the Property of the Borrowers; (iii) the DIP Lender's Charge, including its relative priority; (iv) the ability of the Borrowers to perform its obligations to the Lender or to any person under any material contract; (v) the Lender's ability to enforce any of its rights or remedies against the Borrowers' Property or for the obligations of the Borrowers to be satisfied from the realization thereof;

(j)     the Borrowers the Guarantors (or any of them) become bankrupt or subject to a proceeding under the BIA, or a receiver, interim receiver, receiver and manager or trustee in bankruptcy is appointed in respect of any of the Borrowers or the Guarantors, or any Property;

(k)     the sale, transfer, assignment, conveyance or lease of substantially all of the Property, except pursuant to a transaction resulting from a SISP or as may be otherwise approved by the Lender in writing;

(l)     the filing of any plan of reorganization, compromise, arrangement or liquidation to which the Lender does not consent;

(m)     the commencement of any claim, action, proceeding, application, motion, defense or other contested matter the purpose of which is to seek, or the result of which would be, to obtain any order, judgment, determination, declaration or similar relief: (i) invalidating, setting aside, avoiding, or subordinating the obligations of the Borrowers or the Guarantors (or any of them) under the DIP Facility, the DIP Lender's Charge or its priority; (ii) for monetary, injunctive or other relief against the Lender or the Borrowers' Property; or (iii) preventing, hindering or otherwise delaying the exercise by the Lender of any of its rights and remedies hereunder, pursuant to the Initial Order, the ARIO or under applicable law, or the enforcement or realization by the Lender against any of its collateral.

**16. Remedies and Enforcement:**     Following the occurrence of an Event of Default, and the expiration of the cure period prescribed in Section 9(d), upon written notice to the Borrowers and the Monitor, the Lender shall have the right, subject to the Lender obtaining an Order from the Court lifting the stay under the CCAA Proceedings, to:

(a)    terminate the DIP Facility;

(b)    enforce the DIP Lender's Charge and realize on the Property and any other collateral securing the DIP Facility;

(c)    exercise the rights and powers of a secured lender pursuant to the *Personal Property Security Act*, R.S.O. 1990, c. P.10, or any legislation of similar effect; and

(d)    exercise all such other rights and remedies available to the Lender under this Term Sheet, the Initial Order, the ARIO, any other order of the Court or applicable law.

No failure or delay on the part of the Lender in exercising any of its rights and remedies shall be deemed to be a waiver of any kind.

**17. Further Assurances:**    The Borrowers and the Guarantors will, at their own expense and promptly on demand by the Lender at any time, do such acts and things and execute and deliver such documents as the Lender may reasonably request to give effect to any of the provisions set out hereunder.

**18. Assignment:**    The Borrowers and the Guarantors shall not assign this Term Sheet or any of the provisions set out herein without the prior written consent of the Lender. The Lender may assign or sell its rights or obligations with respect to this Term Sheet to any person without the prior written consent of the Borrowers or the Guarantors.

**19. Governing Law:**    The DIP Facility and the provisions set out herein shall be governed and construed in all respects in accordance with the laws of the Province of Ontario and the laws of Canada applicable therein.

**20. Currency:**    All dollar amounts herein are in United States Dollars.

**21. Acceptance:**    This Term Sheet is open for acceptance until 9:00 a.m. (Toronto time) on October 6, 2023. The Borrowers and Guarantors may accept this Term Sheet by returning a countersigned copy of this Term Sheet to the Lender (by electronic transmission or personal delivery).

**[*Signature Page Follows*]**

9

Originally dated the 26th day of July, 2023, and amended and dated this 5th day of October, 2023.

**SCS Finance, Inc.**

By: _____

        Name:    Corey Ross
        Title:     President

I have authority to bind the Corporation.

**ACCEPTANCE**

**TO THE DIP LENDER:**

For good and valuable consideration received, Lighthouse Immersive Inc. and Lighthouse Immersive USA, Inc. hereby accepts and agrees to comply with the provisions of the Term Sheet set out above.

Originally dated the 26th day of July, 2023, and amended and dated this 5th day of October, 2023.

**LIGHTHOUSE IMMERSIVE INC.**

By: _____
     Name:    Svetlana Dvoretsky
     Title:    Vice President
I have authority to bind the Corporation.

**LIGHTHOUSE IMMERSIVE USA, INC.**

By: _____
     Name:    Svetlana Dvoretsky
     Title:    Vice President
I have authority to bind the Corporation.

**TO THE DIP LENDER:**

For good and valuable consideration received, the Guarantors listed below hereby accept and agree to comply with the provisions of the Term Sheet set out above.

Originally dated the 26th day of July, 2023, and amended and dated this 5th day of October, 2023.

**LIGHTHOUSE IMMERSIVE LAS VEGAS, LLC**

By: _____
     Name:    Svetlana Dvoretsky
     Title:    Vice President
I have authority to bind the Corporation.

11

**LIGHTHOUSE IMMERSIVE DENVER, LLC**

By: _____
     Name:    Svetlana Dvoretsky
     Title:    Vice President
I have authority to bind the Corporation.

**LIGHTHOUSE IMMERSIVE DETROIT, LLC**

By: _____
     Name:    Svetlana Dvoretsky
     Title:    Vice President
I have authority to bind the Corporation.

**LIGHTHOUSE IMMERSIVE CLEVELAND, LLC**

By: _____
     Name:    Svetlana Dvoretsky
     Title:    Vice President
I have authority to bind the Corporation.

**LIGHTHOUSE IMMERSIVE COLUMBUS, LLC**

By: _____
     Name:    Svetlana Dvoretsky
     Title:    Vice President
I have authority to bind the Corporation.

**LIGHTHOUSE IMMERSIVE NASHVILLE, LLC**

By: _____
     Name:    Svetlana Dvoretsky
     Title:    Vice President
I have authority to bind the Corporation.

**LIGHTHOUSE IMMERSIVE KANSAS, LLC**

By: _____
    Name:      Svetlana Dvoretsky
    Title:      Vice President
I have authority to bind the Corporation.

**LIGHTHOUSE IMMERSIVE SAN ANTONIO, LLC**

By: _____
    Name:      Svetlana Dvoretsky
    Title:      Vice President
I have authority to bind the Corporation.

**LIGHTHOUSE IMMERSIVE MADISON, LLC**

By: _____
    Name:      Svetlana Dvoretsky
    Title:      Vice President
I have authority to bind the Corporation.

**LIGHTHOUSE IMMERSIVE ORLANDO, LLC**

By: _____
    Name:      Svetlana Dvoretsky
    Title:      Vice President
I have authority to bind the Corporation.

Schedule "A"

**Subsidiaries/Guarantors**


(a)        Lighthouse Immersive Las Vegas, LLC;

(b)        Lighthouse Immersive Denver, LLC;

(c)        Lighthouse Immersive Detroit, LLC;

(d)        Lighthouse Immersive Cleveland, LLC;

(e)        Lighthouse Immersive Columbus, LLC;

(f)        Lighthouse Immersive Nashville, LLC;

(g)        Lighthouse Artspace Kansas City, LLC;

(h)        Lighthouse Immersive San Antonio, LLC;

(i)        Lighthouse Immersive Madison, LLC; and

(j)        Lighthouse Immersive Orlando, LLC.

**BLACKLINE TO VERSION APPROVED IN THESE PROCEEDINGS**

~~July 26~~October 5, 2023

**Lighthouse Immersive Inc. and Lighthouse Immersive USA, Inc.**
640 Briar Hill Avenue
Toronto, Ontario, Canada, M5N 1N2

**Attention:**     Corey Ross, President and Svetlana Dvoretsky, Vice President

**Re:**        Amended Debtor-in-Possession Financing of Lighthouse Immersive Inc. and Lighthouse Immersive USA, Inc.

A.     Lighthouse Immersive Inc. and Lighthouse Immersive USA, Inc. (together, the "**Applicants**") ~~intend to make~~made an application to the Ontario Superior Court of Justice (Commercial List) (the "**Court**") for an initial order (the "**Initial Order**"), among other things, commencing proceedings under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "**CCAA Proceedings**"), imposing a stay of proceedings in favour of the Applicants (the "**Initial Stay**"), appointing B. Riley Farber Inc., as Monitor of the Applicants (in such capacity, the "**Monitor**"), approving this term sheet (the "**Term Sheet**") between SCS Finance, Inc. (the "**Lender**"), the Applicants and the Subsidiaries (as defined herein)and granting the DIP Lender's Charge (as defined herein) to secure the initial authorized advance of US$1,100,000.

B.     ~~In the event that~~On July 27, 2023, the Initial Order is granted, ~~and prior to the expiry of the Initial Stay, the Applicants will seek an Amended and Restated Initial Order within the CCAA Proceedings (the "ARIO") seeking, in addition to the relief set out in the Initial Order:~~which was thereafter amended and restated (the "**ARIO**") which, among other things (i) ~~an extension of~~extended the Initial Stay and (ii) ~~an increase in~~increased the ~~DIP Lender's Charge secure the balance of the funds advanced~~authorized borrowings under this Term Sheet to US$3,500,000, subject to and in accordance with the terms and conditions of this Term Sheet.

C.     The Applicants require and continue to require additional funding to satisfy the revised cashflow requirements of the CCAA Proceedings, and other short- term liquidity requirements.

D.     The wholly-owned subsidiaries of the Applicants set out in Schedule "A" hereto (the "**Subsidiarie**s" or the "**Guarantors**") have agreed, jointly and severally, to guarantee such funding in accordance with this Term Sheet.

E.     ~~SCS Finance, Inc. (the "~~The Lender~~"~~) has agreed to ~~establish a debtor-in-possession loan facility in~~increase the established from a maximum aggregate principal amount of US$3,500,000~~, subject to and in accordance with the terms and conditions of this Term Sheet~~ to a maximum aggregate principal amount of US$4,000,000, in accordance with the terms and conditions of this Term Sheet, subject to the Court granting a DIP Increase Order authorizing the increase in the authorized borrowings under the DIP from US$3,500,000 to US$4,000,000 (the "**DIP Increase Order**").

**NOW THEREFORE** in consideration of the foregoing and the mutual covenants and agreements set forth below, and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereby agree as follows:

<div align="center">SUMMARY OF TERMS FOR DIP FACILITY</div>

**1.  Borrowers:**        Lighthouse Immersive Inc., Lighthouse Immersive USA, Inc., and the wholly-owned subsidiaries of the Applicants set out in Schedule "A" hereto (the "**Subsidiarie**s"), on a joint and several basis.

| | | |
|---|---|---|
| **2.** | **Guarantors:** | The Subsidiaries, on a joint and several basis. |
| **3.** | **Lender:** | SCS Finance, Inc. |
| **4.** | **DIP Facility:** | Non-revolving facility in the maximum aggregate principal amount of US$~~3,500,000~~4,000,000 (the "**DIP Facility**"). |
| **5.** | **Purpose:** | The DIP Facility shall be available to fund: (i) working capital needs of the Borrowers; (ii) professional fees and expenses incurred by the Borrowers and the Monitor in respect of the CCAA Proceedings, in each case in accordance with the cash flow projections approved by the Monitor and the Lender (the "**Cash Flow Projections**"); (iii) the Recoverable Expenses (as defined below); and (iv) such other costs and expenses of the Borrowers as may be agreed to by the Lender and the Monitor, in writing. |
| | | The amount and purpose of the DIP Facility may be amended by the Borrowers, the Lender, in writing, and with the consent of the Monitor. The Borrowers may not use the proceeds of the DIP Facility to pay any pre-filing obligations of the Borrowers, except in accordance with the Cash Flow Projections or with the prior written consent of the Lender and the Monitor. |
| **6.** | **Advances:** | Subject to the funding conditions set out in Sections 11 and 12 of this Term Sheet, the DIP Facility shall be available in ~~two~~multiple advances as follows: |

    (a)    upon the issuance of the Initial Order, **US$1,100,000**, or such lesser amount as may be approved by the Initial Order and secured by the DIP Lender's Charge (the "**First Advance**"), shall be advanced to the Borrowers to finance working capital requirements for the 10-day period immediately following the date of the Initial Order; and

    (b)    upon the issuance of the ARIO, the balance of the DIP Facility, being **US$2,400,000**, shall be advanced to the Borrowers in advances in accordance with the cashflow and with the approval of the Monitor and such amount shall increase to US$2,900,000 upon the issuance of the DIP Increase Order (the "~~Second Advance~~Additional Advances", and together with the First Advance, collectively, the "**Advances**").

| | | |
|---|---|---|
| | | Nothing in this Term Sheet creates a legally binding obligation on the Lender to advance any amount under the DIP Facility at any time unless the Borrowers and the Guarantors are in compliance with the provisions of this Term Sheet. |
| **7.** | **Interest:** | Interest shall accrue on amounts advanced under the DIP Facility at a rate equal to 10% per annum (the "**Interest**"). Interest shall be calculated on the daily outstanding balance owing under the DIP Facility, not in advance, and shall accrue and be paid on the Maturity Date (as defined herein). |
| **8.** | **Recoverable Expenses:** | The Borrowers shall pay all fees and expenses (collectively, the "**Recoverable Expenses**") incurred by the Lender in connection with the preparation, registration and ongoing administration of this Term Sheet, the |

DIP Facility, the Initial Order, the ARIO, the DIP Lender's Charge and with the enforcement of the Lender's rights and remedies hereunder and thereunder, at law or in equity, including, without limitation all reasonable legal fees and disbursements incurred by the Lender. For greater certainty, "Recoverable Expenses" shall include all reasonable fees and expenses incurred by the Lender in connection with the CCAA Proceedings and all Court attendances in respect thereof. If the Lender has paid any expenses for which the Lender is entitled to reimbursement from the Borrowers, such expenses shall be added to the DIP Facility and shall accrue Interest at the rate set out above. All such fees and expenses and Interest thereon shall be secured by the DIP Lender's Charge whether or not any funds under the DIP Facility are advanced.

**9. Guarantees and Security:**

All debts, liabilities and obligations of the Borrowers to the Lender under or in connection with the DIP Facility (including, without limitation, Interest and Recoverable Expenses), this Term Sheet and any other documents executed in connection therewith shall be guaranteed by the Guarantors and secured by a Court-ordered priority charge (the "**DIP Lender's Charge**") granted to the Lender in and to all present and future properties, assets, and undertakings of the Borrowers and the Guarantors, real and personal, tangible and intangible, whether now owned or hereafter acquired, and the proceeds thereof (collectively, the "**Property**"), subject only to an administration charge in the maximum aggregate amount of US$275,000 under the Initial Order and as may be increased under the ARIO for the payment of the fees and expenses of the Monitor, counsel to the Borrowers and counsel to the Monitor (the "**Administration Charge**").

**10. Maturity Date:**

Unless otherwise agreed to by the Lender and the Borrowers in writing, and consented to by the Monitor, the term of the DIP Facility shall expire, and the Borrowers shall repay all obligations owing to the Lender under this Term Sheet, on the earliest of the following (the "**Maturity Date**"):

(a) January 24, 2024, or such later date determined by the Lender in its sole discretion;

(b) the closing of a sale or investment transaction for substantially all of the Property, resulting from a sale process ("**SISP**"), which transaction has been approved by an order of the Court;

(c) the date on which the CCAA Proceedings are terminated for any reason, including if the CCAA Proceedings are converted into a proceeding under the *Bankruptcy and Insolvency Act*, R.S.C. 1985, C. B-3 (the "**BIA**"), or if a receiver or receiver and manager is appointed over any of the Borrowers, the Guarantors, or the Property; and

(d) the occurrence of an Event of Default (as defined herein), subject to a cure period of five (5) business days, beginning on the date of the occurrence of such Event of Default.

**11. Repayment:**

The aggregate principal amount owing under the DIP Facility plus all accrued and unpaid Interest and Recoverable Expenses shall become immediately due and payable on the Maturity Date.

**12. Funding**

The availability of the First Advance under the DIP Facility shall be

4

**Conditions; First Advance:**   subject to and conditional upon the following, which may be waived by the Lender in writing:

   (a)   the Court shall have issued the Initial Order, in a form satisfactory to the Lender, including:

      i.   approving this Term Sheet and the DIP Facility;

      ii.   granting the DIP Lender's Charge in favour of the Lender;

      iii.   authorizing the Lender to effect registrations, filings and recordings wherever in its discretion it deems appropriate regarding the DIP Lender's Charge;

      iv.   providing that the DIP Lender's Charge shall be valid and effective to secure all of the obligations of the Borrowers and the Guarantors to the Lender hereunder, without the necessity of the making of any registrations or filings and whether or not any other documents have been executed by the Borrowers or the Guarantors;

      v.   declaring that the granting of the DIP Lender's Charge and all other documents executed and delivered to the Lender as contemplated herein, including, without limitation, all actions taken to perfect, record and register the DIP Lender's Charge, do not constitute conduct meriting an oppression remedy, settlement, fraudulent preference, fraudulent conveyance or other challengeable or reviewable transaction under any applicable federal or provincial legislation; and

      vi.   provisions restricting the granting of any additional liens or encumbrances on the assets of the Borrowers, other than as permitted herein and the DIP Lender's Charge.

   (b)   the Initial Order shall not have been vacated, stayed, appealed or amended in a manner not acceptable to the Lender, acting reasonably; and

   (c)   no Event of Default shall have occurred.

**13. Funding Conditions; Second Advance:**   The availability of the Second Advance under the DIP Facility shall be subject to and conditional upon the following, which may be waived by the Lender in writing:

   (a)   the Court shall have issued the ARIO, in a form satisfactory to the Lender, including:

      i.   approving this Term Sheet and the DIP Facility;

      ii.   granting the increased DIP Lender's Charge in favour of the Lender;

      iii.   authorizing the Lender to effect registrations, filings and recordings wherever in its discretion it deems appropriate regarding the DIP Lender's Charge;

LEGAL\65004827\2

5

<ol type="i" start="4">
<li>providing that the DIP Lender's Charge shall be valid and effective to secure all of the obligations of the Borrowers and the Guarantors to the Lender hereunder, without the necessity of the making of any registrations or filings and whether or not any other documents have been executed by the Borrowers or the Guarantors;</li>

<li>declaring that the granting of the DIP Lender's Charge and all other documents executed and delivered to the Lender as contemplated herein, including, without limitation, all actions taken to perfect, record and register the DIP Lender's Charge, do not constitute conduct meriting an oppression remedy, settlement, fraudulent preference, fraudulent conveyance or other challengeable or reviewable transaction under any applicable federal or provincial legislation; and</li>

<li>provisions restricting the granting of any additional liens or encumbrances on the assets of the Borrowers, other than as permitted herein and the DIP Lender's Charge.</li>
</ol>

<ol type="a" start="2">
<li>the ARIO shall not have been vacated, stayed, appealed or amended in a manner not acceptable to the Lender, acting reasonably; and</li>

<li>no Event of Default shall have occurred.</li>
</ol>

**14. Covenants:**    The Borrowers and the Guarantors covenant and agree with the Lender, so long as any amounts are outstanding by the Borrowers to the Lender hereunder, to:

<ol type="a">
<li>promptly on the receipt by the Borrowers and the Guarantors of the same, give the Lender a copy of any Notice of Motion or Application to vary, supplement, revoke, terminate or discharge the Initial Order, the ARIO, or any Court order approving the Transaction, including, without limitation, any application to the Court for the granting of new or additional security that will or may have priority over the DIP Lender's Charge, or otherwise for the variation of the priority of the DIP Lender's Charge;</li>

<li>provide the Lender with any additional financial information reasonably requested by the Lender, to the extent that it is readily available;</li>

<li>use the Advances under the DIP Facility for the purposes for which they are being provided, as set out in Section 4 of this Term Sheet, or such other purposes that may be agreed to by the Lender and the Monitor, in writing;</li>

<li>provide the Lender and the Monitor with prompt written notice of any event which constitutes, or which, with notice, lapse of time, or both, would constitute an Event of Default, a breach of any covenant, or other term or condition of this Term Sheet, or of any document executed in connection with this Term Sheet;</li>

<li>pay all claims which, under law, may rank prior to or *pari passu* with the DIP Lender's Charge due and payable from and after the commencement of the CCAA Proceedings, as and when such</li>
</ol>

amounts are due;

(f)   not make any payment to any director, officer, investor or related party of the Borrowers or the Guarantors (except salary and wages in the normal course) without the prior written consent of the Lender and the Monitor;

(g)   keep the Property fully insured against such perils in such manner, and only to the extent, as would be customarily insured by companies owning similar assets;

(h)   not, without the prior written consent of the Lender, incur any borrowings or other secured indebtedness, obligations or liabilities, other than the DIP Facility, or create or grant any security (other than the Administration Charge and the DIP Lender's Charge) over any of the Borrowers' Property, whether ranking in priority to or subordinate to the DIP Lender's Charge; and

(i)   conduct all activities in the ordinary course and in material compliance with the Cash Flow Projections.

**15. Events of Default:**   The DIP Facility shall be subject to the following events of default (each, an "**Event of Default**"):

(a)   the Borrowers' failure to pay any amount due hereunder when due and payable;

(b)   the Borrowers' failure to comply with or fulfill, to the satisfaction of the Lender, any covenant, condition precedent, payment obligation, or other term or condition of this Term Sheet;

(c)   the seeking or support by the Borrowers or the Guarantors (or any of them) of any Court order (in the CCAA Proceedings or otherwise) which is adverse or potentially adverse to the interests of the Lender;

(d)   the issuance of any Court order (in the CCAA Proceedings or otherwise) which is adverse to the interests of the Lender;

(e)   the issuance of any Court order lifting or terminating (in whole or in part) the stay of proceedings in the CCAA Proceedings, or discontinuing, dismissing or otherwise terminating the CCAA proceedings;

(f)   the issuance of any Court order staying, reversing, vacating, or modifying the terms of the Initial Order, the ARIO, the DIP Facility or the DIP Lender's Charge, in each case without the Lender's consent;

(g)   the occurrence of an event that will, in the opinion of the Lender, materially impair the Borrowers' financial condition, operations or ability to perform under this Term Sheet or any order of the Court;

(h)   the failure by the Borrowers to comply with the Initial Order, the ARIO, a SISP order, or any Court order approving a SISP transaction, or similar transaction;

(i)   the occurrence of any material adverse change in: (i) the business, operations, or financial condition of the Borrowers; (ii) the Property of the Borrowers; (iii) the DIP Lender's Charge, including its relative priority; (iv) the ability of the Borrowers to perform its obligations to

the Lender or to any person under any material contract; (v) the Lender's ability to enforce any of its rights or remedies against the Borrowers' Property or for the obligations of the Borrowers to be satisfied from the realization thereof;

(j)     the Borrowers the Guarantors (or any of them) become bankrupt or subject to a proceeding under the BIA, or a receiver, interim receiver, receiver and manager or trustee in bankruptcy is appointed in respect of any of the Borrowers or the Guarantors, or any Property;

(k)     the sale, transfer, assignment, conveyance or lease of substantially all of the Property, except pursuant to a transaction resulting from a SISP or as may be otherwise approved by the Lender in writing;

(l)     the filing of any plan of reorganization, compromise, arrangement or liquidation to which the Lender does not consent;

(m)    the commencement of any claim, action, proceeding, application, motion, defense or other contested matter the purpose of which is to seek, or the result of which would be, to obtain any order, judgment, determination, declaration or similar relief: (i) invalidating, setting aside, avoiding, or subordinating the obligations of the Borrowers or the Guarantors (or any of them) under the DIP Facility, the DIP Lender's Charge or its priority; (ii) for monetary, injunctive or other relief against the Lender or the Borrowers' Property; or (iii) preventing, hindering or otherwise delaying the exercise by the Lender of any of its rights and remedies hereunder, pursuant to the Initial Order, the ARIO or under applicable law, or the enforcement or realization by the Lender against any of its collateral.

**16. Remedies and Enforcement:**    Following the occurrence of an Event of Default, and the expiration of the cure period prescribed in Section 9(d), upon written notice to the Borrowers and the Monitor, the Lender shall have the right, subject to the Lender obtaining an Order from the Court lifting the stay under the CCAA Proceedings, to:

(a)     terminate the DIP Facility;

(b)     enforce the DIP Lender's Charge and realize on the Property and any other collateral securing the DIP Facility;

(c)     exercise the rights and powers of a secured lender pursuant to the *Personal Property Security Act*, R.S.O. 1990, c. P.10, or any legislation of similar effect; and

(d)     exercise all such other rights and remedies available to the Lender under this Term Sheet, the Initial Order, the ARIO, any other order of the Court or applicable law.

No failure or delay on the part of the Lender in exercising any of its rights and remedies shall be deemed to be a waiver of any kind.

**17. Further Assurances:**    The Borrowers and the Guarantors will, at their own expense and promptly on demand by the Lender at any time, do such acts and things and execute and deliver such documents as the Lender may reasonably request to give effect to any of the provisions set out hereunder.

**18. Assignment:** The Borrowers and the Guarantors shall not assign this Term Sheet or any of the provisions set out herein without the prior written consent of the Lender. The Lender may assign or sell its rights or obligations with respect to this Term Sheet to any person without the prior written consent of the Borrowers or the Guarantors.

**19. Governing Law:** The DIP Facility and the provisions set out herein shall be governed and construed in all respects in accordance with the laws of the Province of Ontario and the laws of Canada applicable therein.

**20. Currency:** All dollar amounts herein are in United States Dollars.

**21. Acceptance:** This Term Sheet is open for acceptance until 9:00 ~~p~~a.m. (Toronto time) on ~~July 26~~October 6, 2023. The Borrowers and Guarantors may accept this Term Sheet by returning a countersigned copy of this Term Sheet to the Lender (by electronic transmission or personal delivery).

**[*Signature Page Follows*]**

9

~~Dated~~Originally dated the 26th day of July, 2023, and amended and dated this ~~26~~5th day of ~~July~~October, 2023.

SCS Finance, Inc.

By: _____
     Name:    Corey Ross
     Title:     President
I have authority to bind the Corporation.

10

## ACCEPTANCE

**TO THE DIP LENDER:**

For good and valuable consideration received, Lighthouse Immersive Inc. and Lighthouse Immersive USA, Inc. hereby accepts and agrees to comply with the provisions of the Term Sheet set out above.

~~Dated this~~Originally dated the 26th day of July, 2023, and amended and dated this 5th day of October, 2023.

**LIGHTHOUSE IMMERSIVE INC.**

By: _____
      Name:    Svetlana Dvoretsky
      Title:    Vice President
I have authority to bind the Corporation.

**LIGHTHOUSE IMMERSIVE USA, INC.**

By: _____
      Name:    Svetlana Dvoretsky
      Title:    Vice President
I have authority to bind the Corporation.

**TO THE DIP LENDER:**

For good and valuable consideration received, the Guarantors listed below hereby accept and agree to comply with the provisions of the Term Sheet set out above.

~~Dated this~~Originally dated the 26th day of July, 2023, and amended and dated this 5th day of October, 2023.

**LIGHTHOUSE IMMERSIVE LAS VEGAS, LLC**

By: _____
      Name:    Svetlana Dvoretsky
      Title:    Vice President
I have authority to bind the Corporation.

**LIGHTHOUSE IMMERSIVE DENVER, LLC**

By: _____
      Name:    Svetlana Dvoretsky
      Title:     Vice President
I have authority to bind the Corporation.


**LIGHTHOUSE IMMERSIVE DETROIT, LLC**

By: _____
      Name:    Svetlana Dvoretsky
      Title:     Vice President
I have authority to bind the Corporation.


**LIGHTHOUSE IMMERSIVE CLEVELAND, LLC**

By: _____
      Name:    Svetlana Dvoretsky
      Title:     Vice President
I have authority to bind the Corporation.


**LIGHTHOUSE IMMERSIVE COLUMBUS, LLC**

By: _____
      Name:    Svetlana Dvoretsky
      Title:     Vice President
I have authority to bind the Corporation.


**LIGHTHOUSE IMMERSIVE NASHVILLE, LLC**

By: _____
      Name:    Svetlana Dvoretsky
      Title:     Vice President
I have authority to bind the Corporation.


**LIGHTHOUSE IMMERSIVE KANSAS, LLC**

By: _____

12

Name:     Svetlana Dvoretsky
Title:     Vice President
I have authority to bind the Corporation.


**LIGHTHOUSE IMMERSIVE SAN ANTONIO, LLC**

By: _____
Name:     Svetlana Dvoretsky
Title:     Vice President
I have authority to bind the Corporation.


**LIGHTHOUSE IMMERSIVE MADISON, LLC**

By: _____
Name:     Svetlana Dvoretsky
Title:     Vice President
I have authority to bind the Corporation.


**LIGHTHOUSE IMMERSIVE ORLANDO, LLC**

By: _____
Name:     Svetlana Dvoretsky
Title:     Vice President
I have authority to bind the Corporation.

13

Schedule "A"

**Subsidiaries/Guarantors**

(a)     Lighthouse Immersive Las Vegas, LLC;

(b)     Lighthouse Immersive Denver, LLC;

(c)     Lighthouse Immersive Detroit, LLC;

(d)     Lighthouse Immersive Cleveland, LLC;

(e)     Lighthouse Immersive Columbus, LLC;

(f)     Lighthouse Immersive Nashville, LLC;

(g)     Lighthouse ~~Immersive~~Artspace Kansas City, LLC;

(h)     Lighthouse Immersive San Antonio, LLC;

(i)     Lighthouse Immersive Madison, LLC; and

(j)     Lighthouse Immersive Orlando, LLC.

Document comparison by Workshare Compare on Thursday, October 5, 2023 10:22:32 PM

| Input: | |
|---|---|
| Document 1 ID | iManage://MTDMSWSSC.MILLERTHOMSON.CORP/Legal/71333798/2 |
| Description | #71333798v2<Legal> - DIP Term Sheet Execution Version (July 26 2023) |
| Document 2 ID | iManage://MTDMSWSSC.MILLERTHOMSON.CORP/Legal/72632954/2 |
| Description | #72632954v2<Legal> - Amended DIP Term Sheet (MT Draft October 5, 2023) |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 30 |
| Deletions | 23 |
| Moved from | 1 |
| Moved to | 1 |
| Style changes | 0 |
| Format changes | 0 |

| Total changes | 55 |
|---|---|

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c.C-36 AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF LIGHTHOUSE IMMERSIVE INC. AND LIGHTHOUSE IMMERSIVE USA, INC. (collectively, the "**Applicants**")

Court File No.: CV-23-00703509-00CL

|  | |
|---|---|
| | ***ONTARIO***<br>**SUPERIOR COURT OF JUSTICE**<br>**COMMERCIAL LIST** |
| | Proceedings commenced at Toronto |
| | **SECOND REPORT OF THE MONITOR**<br>**Dated October 5, 2023** |
| | **Thornton Grout Finnigan LLP**<br>Barristers and Solicitors<br>Toronto-Dominion Centre<br>100 Wellington Street West<br>Suite 3200, P.O. Box 329<br>Toronto, ON  M5K 1K7<br>Fax:      416-304-1313<br><br>**Rebecca Kennedy (LSO# 61146S)**<br>Tel:  (416) 304-0603  /  Email:  rkennedy@tgf.ca<br><br>**Rachel Fielding (LSO# 72211S)**<br>Tel:  (416) 304-0971  /  Email:  rfielding@tgf.ca<br><br>**Marco Gaspar (LSO# 84199A)**<br>Tel:  (416) 306-5825  /  Email:  mgaspar@tgf.ca<br><br>Lawyers for the Court-Appointed Monitor, B. Riley Farber Inc. |

Court File No.:  CV-23-00703509-00CL

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS***
***ARRANGEMENT ACT*, R.S.C., 1985, c.C-36 AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**LIGHTHOUSE IMMERSIVE INC. AND LIGHTHOUSE IMMERSIVE USA, INC.**
**(THE "APPLICANTS")**

**SUPPLEMENT TO THE SECOND REPORT OF THE MONITOR**

**OCTOBER 12, 2023**

- 2 -

## TABLE OF CONTENTS

**INTRODUCTION** .............................................................................................................. 3

**TERMS OF REFERENCE** ............................................................................................... 4

**THE MONITOR'S ENHANCED POWERS** ................................................................. 4

**THE DEVELOPMENT OF THE SISP** .......................................................................... 6

    Potential Liquidation .......................................................................................................... 6

    Negotiation of the SISP and the Stalking Horse Purchase Agreement ............................. 7

    Analysis of SCS Secured Debt ......................................................................................... 8

**THE RESPONDENT'S REQUEST FOR INFORMATION** ........................................ 9

**CONCLUSION AND RECOMMENDATIONS** ............................................................ 9

## APPENDICES

**CONFIDENTIAL APPENDIX "A" – LIQUIDATION ANALYSIS**

**INTRODUCTION**

1.      On October 5, 2023, the Applicants filed a Notice of Motion (the "**Motion**"), returnable on October 6, 2023, which sought, amongst other relief:

      (a)      an extension of the Stay Period to December 8, 2023;

      (b)      approval of a Sale and Investment Solicitation Process and Stalking Horse Purchase Agreement Approval Order; and

      (c)      approval of the Amended DIP Term Sheet, increasing the authorized borrowings under the DIP Facility from the principal amount of $3,500,000 to $4,000,000 (plus interest, fees and expenses).

2.      On October 5, 2023, the Monitor filed its Second Report of the Monitor in these proceedings (the "**Second Report**").

3.      On October 6, 2023, the Honourable Justice Cavanagh of this Court granted an Order extending the Stay Period to December 8, 2023. The Applicants' motion with respect to the remaining relief was adjourned to October 13, 2023.

4.      The Monitor files this Supplement to the Second Report (the "**Supplemental Report**") in response to the Responding Motion Record of the Respondent, LHIMP (ABC), LLC (the "**Respondent**") dated October 11, 2023 (the "**Responding Motion Record**"), in connection with the Applicants' motion, to be heard by this Honourable Court on October 13, 2023 (the "**October 13 Hearing**").

5.      The Monitor has reviewed the Responding Motion Record and concludes that much of the evidence provided therein relates to a settled dispute between the Applicants and Impact Museums, Inc. and is irrelevant for the purposes of this Court's consideration of the SISP. The Applicants have advised the Monitor that they disagree with many of the allegations set out in the Responding Motion Record, however, as they are irrelevant to the decision before the Court, we have not addressed them in detail in this Supplemental Report.

**TERMS OF REFERENCE**

6.     In preparing this Supplemental Report, the Monitor has relied upon the Applicants' unaudited financial information, certain other information and financial projections of the Applicants, and discussions with the Applicants' management ("**Management**") (collectively, the "**Information**").

7.     The Monitor has not audited or otherwise attempted to verify the accuracy or completeness of the Information in a manner that would wholly or partially comply with Canadian Auditing Standards ("**CAS**") pursuant to the Chartered Professional Accountants Canada Handbook, and, accordingly, the Monitor expresses no opinion or other form of insurance contemplated under CAS in respect of the Information. Any party wishing to place reliance on the Information should perform its own due diligence.

8.     Future oriented financial information referred to in this Second Report was prepared based on Management's estimates and assumptions. Readers are cautioned that, since projections are based upon assumptions about future events and conditions that are not ascertainable, the actual results may vary from the projections, even if the assumptions materialize, and those variances could be significant.

9.     Unless otherwise stated, all references to monetary amounts in this Second Report are expressed in U.S. dollars (**$USD**). Capitalized terms not otherwise defined herein have the meaning given to them in the Affidavit of Corey Ross dated July 27, 2023 ("**Ross Affidavit**"), the second report of the Monitor (the "**Second Report**") dated October 5, 2023, the Amended and Restated Initial Order, and the October 3 Endorsement.

10.    This Supplemental Report should be read in conjunction with the Second Report.

**THE MONITOR'S ENHANCED POWERS**

11.    The Respondent claims that there is a lack of transparency with respect to the Monitor being provided enhanced powers by way of the October 3 Endorsement.

12.    As stated in the Second Report, the Monitor was provided enhanced powers to permit the Applicants to instruct counsel to bring the Motion before this Court.

- 5 -

13.    The Applicants each have two named directors, being Corey Ross and Svetlana Dvoretsky. Each director has an equal number of votes.

14.    The October 3, 2023, case conference was the Applicants' scheduling case conference to seek time to hear a motion by the Applicants to extend the stay of proceedings granted in these proceedings.  At that time, the directors were unable to reach a consensus as to whether the Applicants should proceed with the SISP or whether the business should instead be liquidated.

15.    Given the divergence in the views of the directors, the Monitor was concerned that counsel could not be adequately instructed. At the scheduling case conference, the Monitor alerted the Court of this issue and suggested that the only economic and timely way to resolve the issue was by expanding the powers of the Monitor to include the powers properly exercised by the boards of directors of the Applicants.

16.    Following a brief adjournment of the scheduling case conference, as parties did not have notice of this relief sought by the Monitor, the Applicants and their directors each consented to the expanded powers set out in the October 3 Endorsement.

17.    The powers granted to the Monitor in no way prejudice the stakeholders of the Applicants but have allowed the Motion to be brought before this Honourable Court.  Further, the October 3 Endorsement was sought with a view of the best interest of the stakeholders of the Applicants, and in order ensure the Applicants would be able to proceed with the CCAA Proceedings.

18.    Although the directors of the Applicants ultimately resolved their difference of opinion, the Applicants and the directors have agreed with the Monitor that the expanded powers set out in the October 3 Endorsement should remain given the Stalking Horse Agreement is from a related party.

**THE DEVELOPMENT OF THE SISP**

19.     As discussed in the Second Report, since the issuance of the ARIO, the Applicants and the Monitor engaged in discussions with liquidators in order to determine if a liquidation would be in the best interest of the stakeholders of the Applicants.

20.     Further, the Applicants and the Monitors reached out to certain strategic investors who may be interested in a restructuring transaction with respect to the Applicants.  Unfortunately, no potential transaction materialized from those discussions.

*Potential Liquidation*

21.     As set out above, the Applicants and the Monitor engaged with discussions with three liquidators with respect to the Applicants to determine if a liquidation would be the best alternative for the stakeholders.  Those liquidators were Gordon Brothers, Hilco Global and B. Riley Wholesale & Industrial (formerly Great American). As part of this engagement, and as set out in the Second Report at paragraph's 12(e) to (g), the engagement with the liquidators included a possible "desk-top" appraisal.

22.     One of the liquidators declined to participate in process with respect to the potential liquidation and did not provide the Monitor with any indication of value.  The remaining two liquidators reviewed the various detailed asset lists for all of the merchandise and equipment and provided information with respect to both potential recoveries and timelines to complete such liquidation.

23.     The timeline contemplated by both liquidators to complete a liquidation was estimated at three to five months, far exceeding the timeline with respect to a SISP.  Further, the estimates for recovery from a orderly liquidation were lower than originally anticipated.

24.     The Monitor thoroughly analyzed the information provided by the liquidators.  A summary of the Monitor's findings has been appended as Confidential Appendix "A" to this Report. The Confidential Appendix contains financially sensitive information that could chill the market with respect to the SISP, so it has not been disseminated. The Monitor intends to ask this Court for a sealing Order in respect of Confidential Appendix "A" until the closing of a transaction under the SISP.

25.     Based on this analysis undertaken by the Monitor, the Monitor outlined at paragraph 38 of the Second Report that the Monitor believes that the financial terms of the Stalking Horse Purchase Agreement was greater than a liquidation of the Applicants' assets. Further, the SISP process and proposed stalking horse bid, facilitates the prospect of a going concern outcome, which is in the best interests of stakeholders generally including employees, ticketholders, creditors and other business partners.

26.     As of the date of this Supplemental Report, the Monitor remains of the view that the SISP and the Stalking Horse Purchase Agreement are reasonable in the circumstances and in the best interest of all the stakeholders.

***Negotiation of the SISP and the Stalking Horse Purchase Agreement***

27.     Upon the issuance of the October 3 Endorsement, the Monitor promptly began negotiating with SCS with respect to the Stalking Horse Purchase Agreement. As set out above, though other parties were initially canvassed for interest in the Applicants, a transaction did not materialize from those discussions.  As such, the Monitor proceeded to negotiate and finalize an agreement with SCS.

28.     The Respondent incorrectly states that the Stalking Horse Bidder (SCS) and the Applicants are all controlled by the same three individuals.  Since October 3, 2023, the powers of the boards of directors of the Applicants lie with the Monitor.

29.     The negotiations with respect to the terms of the Stalking Horse Purchase Agreement all occurred following the issuance of the October 3 Endorsement. As such, the Monitor exercised control over the Applicants in negotiating the Stalking Horse Purchase Agreement and used its business judgment in determining that the Stalking Horse Purchase Agreement was in the best interest of all the stakeholders of the Applicants.

30.     As stated within the Second Report, the Stalking Horse Purchase Agreement provides stability to the Applicants' business and is designed to give confidence to stakeholders that a going-concern outcome of the CCAA proceedings will be achieved. Notably, the Stalking Horse Purchase Agreement will offer continued employment to the approximately 100 full and part time employees of the Applicants.

*Analysis of SCS Secured Debt*

31.    The Respondent submits that it does not appear as though an analysis occurred as to whether the secured debt owed to SCS is legitimate. This is incorrect and the Respondents were advised by the Monitor accordingly.

32.    The pre-filing secured debt owing to the secured creditors of the Applicants is not relevant to the Motion sought before the court. Nevertheless, the Monitor can advise the Court as follows:

(a)    the Monitor has reviewed all the advances recorded by the secured creditors of the Applicants.  The Monitor can confirm that the advances recorded by the secured creditors have all been advanced by the secured creditors to the Applicants to fund their ongoing operations;

(b)    with respect to the secured creditors of Lighthouse, the Monitor has engaged Thornton Grout Finnigan LLP ("**TGF**") to review the security interests granted to Lighthouse's secured creditors.  TGF has delivered a security opinion to the Monitor that confirms that the security agreements granted by Lighthouse to its secured creditors create valid and enforceable security interests in Lighthouse's personal property that secures payment and performance of Lighthouse's obligations to its secured creditors. Further, the security interests have been perfected through registration under the *Personal Property Security Act*; and

(c)    in addition to the opinion from TGF, the Monitor has engaged US counsel to review the security interests granted by Lighthouse USA to its secured creditors. As of the date of this Supplemental Report, the security opinion from US counsel has not been completed.

33.    With respect to the Stalking Horse Purchase Agreement, while SCS is credit bidding as part of its Stalking Horse Bid, this credit bid is strictly with respect to any amounts owing to SCS under the DIP Term Sheet approved in the ARIO granted in theses proceedings, as amended assuming this Court authorizes the increase to the authorized limit of the DIP Facility, and does not involve any pre-filing advances to the Applicants.  The Monitor can confirm that the DIP Financing Advances recorded in the variance report attached as

Appendix "B" to the Second Report are valid advances that have been made by SCS to fund the ongoing operations of the Applicants.

**THE RESPONDENT'S REQUEST FOR INFORMATION**

34.    The Respondent's submit that the Monitor has not been forthcoming with information they requested concerning the Applicants' business. This is not true.

35.    As described in the Affidavit of Paul Neitzel, sworn October 11, 2023 (the "**Neitzel Affidavit**"),[1] counsel to the Respondent and counsel to the Monitor discussed general updates about these CCAA proceedings on September 6, 2023. As part of that discussion, the Monitor requested that the Respondent provide the Monitor with its information requests in writing so that the Monitor and the Applicants could properly respond to such requests.  A letter detailing such requests was not received by the Monitor or its counsel until September 28, 2023, one week before the expiry of the Stay Period.

36.    As explained by the Monitor's counsel in the October 5, 2023, response letter (attached as Exhibit "D" to the Responding Motion Record"), several of the requests of the Respondent do not relate to Lighthouse USA (the only Applicant that the Respondent has an interest in) and in some cases do not even relate to Applicants in these proceedings. Given the timing of the requests and the time sensitive issues faced by the Applicants, the Monitor was unable to respond to detailed requests nor did it think that they were all relevant. This remains the case.

**CONCLUSION AND RECOMMENDATIONS**

37.    The Monitor concludes that the issues raised by the Respondent in respect to the Orders sought by the Applicants should not serve as a barrier to the issuance of the requested Orders.

---

[1] A copy of the Neitzel Affidavit may be located at Tab 1 of the Responding Motion Record

- 10 -

38.     In the Monitor's opinion that the Applicants are acting in good faith and with due diligence to further their restructuring efforts and that the proposed SISP and Stalking Horse Purchase Agreement should be approved by this Court.

39.     In the Monitor's opinion, the SISP is reasonable in the circumstances and appropriately balances the Applicants' liquidity constraints and market value of the Opportunity. The Monitor believes that the SISP, although condensed, is targeted and appears to provide prospective purchasers with sufficient time to complete due diligence and submit flexible competitive bids. Additionally, the approval of the Stalking Horse Purchase Agreement within the SISP Order provides a baseline purchase price and deal certainty, which does not negatively impact the conduct of the SISP (in particular there being no break fee or other no other monetary consequences arising out of the approval of the Stalking Horse), and which benefits all stakeholders; and

40.     The Monitor continues to recommend the approval of the Amended DIP Term Sheet and the Second DIP Lender's Charge (and its corresponding priority) as this is the only funding available to the Applicants and the liquidity is required to maximize value for all of the Applicants' stakeholders. The alternative would be a liquidation which will result in a less favourable outcome.

All of which is respectfully submitted this 12th day of October, 2023.

**B. RILEY FARBER INC.**
**IN ITS CAPACITY AS THE COURT APPOINTED MONITOR OF**
**LIGHTHOUSE IMMERSIVE INC. AND**
**LIGHTHOUSE IMMERSIVE USA, INC.**
**AND NOT IN ITS PERSONAL OR CORPORATE CAPACITY**.

*B. Riley Farber Inc.*

_____

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c.C-36 AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF LIGHTHOUSE IMMERSIVE INC. AND LIGHTHOUSE IMMERSIVE USA, INC. (collectively, the "**Applicants**")

Court File No.: CV-23-00703509-00CL

|  |  |
|---|---|
|  | ***ONTARIO*** <br> **SUPERIOR COURT OF JUSTICE** <br> **COMMERCIAL LIST** <br><br> Proceedings commenced at Toronto |
|  | **SUPPLEMENT TO THE SECOND REPORT OF THE MONITOR** <br> **Dated October 12, 2023** |
|  | **Thornton Grout Finnigan LLP** <br> Barristers and Solicitors <br> Toronto-Dominion Centre <br> 100 Wellington Street West <br> Suite 3200, P.O. Box 329 <br> Toronto, ON  M5K 1K7 <br> Fax:        416-304-1313 <br><br> **Rebecca Kennedy (LSO# 61146S)** <br> Tel:  (416) 304-0603  /  Email:  rkennedy@tgf.ca <br><br> **Rachel Fielding (LSO# 72211S)** <br> Tel:  (416) 304-0971  /  Email:  rfielding@tgf.ca <br><br> **Marco Gaspar (LSO# 84199A)** <br> Tel:  (416) 306-5825  /  Email:  mgaspar@tgf.ca <br><br> Lawyers for the Court-Appointed Monitor, B. Riley Farber Inc. |