**Exhibit A**

Court File No.:  CV-23-00703509-00CL

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C., 1985, c.C-36 AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF LIGHTHOUSE IMMERSIVE INC. AND LIGHTHOUSE IMMERSIVE USA, INC. (THE "APPLICANTS")

**THIRD REPORT OF THE MONITOR**

**NOVEMBER 16, 2023**

## TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................................................... 3

II.   TERMS OF REFERENCE ............................................................................................. 5

III.  BACKGROUND .............................................................................................................. 6

IV.  ACTIVITIES OF THE MONITOR ............................................................................... 6

V.    SALE AND INVESTMENT SOLICITATION PROCESS ...................................... 8

VI.  THE STALKING HORSE AGREEMENT TRANSACTION ..................................... 11

VII. MONITOR'S RECOMMENDATION ON THE STALKING HORSE AGREEMENT ........... 11

VIII. RELEASES ..................................................................................................................... 12

IX.  UPDATE ON THE ANALYSIS OF SCS SECURED DEBT ...................................... 13

X.    MONITORING OF RECEIPTS AND DISBURSEMENTS ........................................ 14

XI.  CONCLUSION AND RECOMMENDATIONS ........................................................... 16

## APPENDICES

APPENDIX "A" – US BANKRUPTCY COURT SALE APPROVAL ORDER

APPENDIX "B" – TEASER LETTER, NDA AND ACKNOWLEDGMENT LETTER

APPENDIX "C" – ADVERTISEMENT OF SISP IN INSOLVENCY INSIDER

APPENDIX "D" – ADVERTISEMENT OF SISP IN NATIONAL POST

APPENDIX "E" – FORECAST VS. ACTUAL VARIANCE ANALYSIS FOR THE 6 WEEKS ENDED NOVEMBER 12, 2023

## I.    INTRODUCTION

1.    On July 27, 2023, Lighthouse Immersive Inc. ("**Lighthouse**") and Lighthouse Immersive USA, Inc. ("**Lighthouse USA**") (collectively, the "**Applicants**") commenced proceedings (the "**CCAA Proceedings**") under the *Companies' Creditors Arrangement Act*, R.S.C., 1985, c. C-36 (the "**CCAA**") pursuant to the Order of the Honourable Madam Justice Kimmel of the Ontario Superior Court of Justice (Commercial List) (the "**Court**") dated July 27, 2023 (the "**Initial Order**").

2.    On August 3, 2023, the Honourable Madam Justice Kimmel of the Court issued an amended and restated initial order (the "**Amended and Restated Initial Order**" or "**ARIO**"), that, among other things:

(a)    extended the stay of proceedings in favour of the Applicants through October 6, 2023;

(b)    increased the authorized borrowings under the DIP Facility from the principal amount of $1,100,000 to $3,500,000 (plus interest, fees and expenses); and

(c)    increased the amount of the Court-ordered Charges as follows:

(i)    increased the quantum of the Administration Charge from $275,000 to $500,000; and

(ii)    increased the quantum of the Directors' Charge from $250,000 to $500,000.

3.    The Initial Order and ARIO were recognized in the United States Bankruptcy Court for District of Delaware (the "**US Bankruptcy Court**") under Chapter 15 of Title 11 of the United States Code, 11 U.S.C. § 101-1532 (the "**US Bankruptcy Code**"). The Applicants obtained a final order from the US Bankruptcy Court granting recognition of the CCAA proceedings on August 28, 2023.

4.    On October 3, 2023, the Monitor appeared before the Court and obtained an endorsement that expanded the scope of the Monitor's powers pursuant to ss. 11 and 23(1)(k) of the *Companies' Creditors Arrangement Act*, RSC 1985, c C-36 (the "**October 3 Endorsement**").

5.    On October 6, 2023, the Honourable Justice Cavanagh of the Court issued an order extending the stay of proceedings in favour of the Applicants through December 8, 2023 (the "**Stay Extension Order**").

6.    On October 13, 2023, the Honourable Justice Cavanagh of the Court issued an order (the "**SISP Order**") that, among other things:

    (a)    approved the sale and investment solicitation process (the "**SISP**"); and

    (b)    approved the stalking horse agreement executed by SCS Finance, Inc. (the "**Stalking Horse Bidder**") dated as of October 5, 2023 (the "**Stalking Horse Agreement**").

7.    On October 13, 2023, the Honourable Justice Cavanagh of the Court issued an ancillary order (the "DIP Increase Order") that, among other things:

    (a)    increased the authorized borrowings under the DIP Facility from the principal amount of $3,500,000 to $4,000,000 (plus interest, fees and expenses); and

    (b)    approved the Monitor's activities set out in the First Report and Second Report.

8.    On October 27, 2023, Lighthouse Immersive Inc., as authorized Foreign Representative, brought a motion to, among other things, recognize and enforce the SISP Order, the DIP Increase Order, and the Stay Extension Order (the "**Recognition Motion**"), and recognize and enforce the CCAA Sale Approval Order and Approve the Sale of the Debtors' Assets (the "**U.S. Sale Approval Motion**"), that was filed in the Chapter 15 proceedings in the United States Bankruptcy Court for the District of Delaware ("**U.S. Court**"). On the same date, the US Court granted the relief related to the Recognition Order. Attached hereto as **Appendix "A"** is a copy of the issued order. The U.S. Sale Approval Motion is scheduled to be heard by the U.S. Court on December 4, 2023.

9.    The Monitor files this report (the "**Third Report**") in connection with the Applicants' motion, to be heard by this Honourable Court on November 22, 2023 (the "**November 22 Hearing**"), for:

    (a)    an Order (the "**Approval and Vesting Order**") which, among other things:

(i)      approves the sale transaction (the "**Transaction**") contemplated by the Stalking Horse Agreement; and

(ii)     authorizes and empowers the Applicants to take all necessary and desirable steps to conclude the Transaction contemplated by the Stalking Horse Agreement; and

(iii)    approving certain third party releases ("**Releases**") in favour of certain parties as defined in the Approval and Vesting Order (the "**Released Parties**").

10.    This Third Report provides information to this Honourable Court in respect of the following:

(a)     the activities of the Monitor since the Second Report, including the administration of the SISP and facilitating discussions between the Applicants, Eccentriche SRLS ("**Visioni**") and Massimiliano Siccardi ("**Siccardi**");

(b)     the Applicants' actual receipts and disbursements for the six (6) week period ended November 12, 2023, as compared with the Revised Cash Flow Forecast appended as Appendix "C" to the Second Report; and

(c)     the Monitor's conclusions and recommendations with respect to the Applicants' motion as set out above.

## II.    TERMS OF REFERENCE

11.    In preparing this Third Report, the Monitor has relied upon the Applicants' unaudited financial information, certain other information and financial projections of the Applicants, and discussions with the Applicants' management ("**Management**") (collectively, the "**Information**").

12.    The Monitor has not audited or otherwise attempted to verify the accuracy or completeness of the Information in a manner that would wholly or partially comply with Canadian Auditing Standards ("**CAS**") pursuant to the Chartered Professional Accountants Canada Handbook, and, accordingly, the Monitor expresses no opinion or other form of insurance contemplated under CAS in respect of the Information. Any party wishing to place reliance on the Information should perform its own due diligence.

13.    Future oriented financial information referred to in this Third Report was prepared based on Management's estimates and assumptions. Readers are cautioned that, since projections are based upon assumptions about future events and conditions that are not ascertainable, the actual results may vary from the projections, even if the assumptions materialize, and those variances could be significant.

14.    Unless otherwise stated, all references to monetary amounts in this Third Report are expressed in U.S. dollars (**$USD**). Capitalized terms not otherwise defined herein have the meaning given to them in the Affidavit of Corey Ross dated July 27, 2023 ("**Ross Affidavit**"), the first report of the Monitor (the "**First Report**") dated August 1, 2023, the second report and supplemental second report of the Monitor dated October 5, 2023 and October 12, 2023 respectively (together, the "**Second Report**"), the ARIO, and the October 3 Endorsement.

15.    Further information regarding the CCAA Proceedings, including all filed motion materials, reports of the Monitor, and Court Orders, is available on the Monitor's website at https://brileyfarber.com/engagements/lighthouse-immersive/ (the "**Monitor's Website**").

## III.    BACKGROUND

16.    The Applicants are in the business of producing immersive show exhibits in Canada, the United States, and various cities around the world, through their multiple affiliated entities and their Subsidiaries (as defined in the ARIO).

17.    Detailed background information in respect of the Applicants has been provided in the Monitor's previous reports to the Court, and the Ross Affidavit, available on the Monitor's Website.

## IV.    ACTIVITIES OF THE MONITOR

18.    Since the date of the Second Report (October 5, 2023), the Monitor's primary activities have included the following:

*General*

(a)    conducting meetings and discussions with Management, the Applicants' legal counsel and the Monitor's legal counsel regarding the Applicants' business and financial

affairs, including its cash flow forecast, financing requirements, operational restructuring activities, SISP; and other matters relating generally to the CCAA Proceedings,

### Cash Management

(b)     collecting DIP advances in the amount of USD $600,000 and CAD $900,000 from the DIP Lender to be advanced to the Applicants to fund operating and professional fee disbursements. The total advances under the DIP as of the date of this Third Report is $2,874,000. As discussed further below, the Monitor understands that the projected DIP balance will be $4,000,000 at closing of the Transaction (as defined below);

(c)     monitoring and approving the Applicants' receipts and disbursements on a regular basis including monitoring bank transactions, DIP Facility advances and vendor payments, among other things;

(d)     reviewing with Management the Applicants' ongoing cash flow forecast and weekly variances from forecast as well as assisting the Applicants in the preparation of ongoing cash flow forecasting;

### Stakeholder Communications

(e)     attending several virtual meetings with the principals and legal counsel of the Applicants, Visioni and Siccardi in an attempt to find a tripartite resolution to their dispute;

(f)     responded to information requests from stakeholders;

(g)     corresponding and discussing with various stakeholders including interested parties in the SISP, secured and unsecured creditors and directors of the Applicants;

### Obtaining Legal Opinions

(h)     obtaining legal opinions regarding the Applicants' secured creditors' security; and

### Sales and Investor Solicitation Process

(i)      conducting the Sales and Investment Solicitation Process as more fully detailed below.

## V.    SALE AND INVESTMENT SOLICITATION PROCESS

19.    Pursuant to the SISP Order, the Monitor was authorized and directed to take such steps, on behalf of the Applicants, as it deemed necessary or advisable to carry out and perform its obligations under the SISP. Capitalized terms used in this section not otherwise defined have the meaning ascribed to them in the SISP Order.

### *Summary of the SISP*

20.    As set out in the Second Report and the SISP, the SISP's purpose was to generate interest in, and solicit offers for one or more transactions involving the restructuring, recapitalization or other form of reorganization of the Business as a going concern or a sale of all, substantially all or one or more components of the Property and the Business as a going concern or otherwise, or some combination thereof.

21.    As the Stalking Horse Bidder is a related party to the Applicants, the Monitor implemented and conducted all aspects of the SISP to maintain the integrity of the SISP. The Monitor did not share any confidential information of the other interested parties engaged in the SISP with the Applicants and did not provide the identify of the other interested parties to the Applicants.

22.    The SISP was structured as a one-stage process that involved the submission by interested parties of binding offers by the Bid Deadline.

23.    The following table summarizes the key milestones under the SISP:

| Milestone | Deadline |
|---|---|
| SISP Approval | October 13, 2023 |
| Recognition of SISP in US Bankruptcy Court | October 27, 2023 |
| Bid Deadline | November 15, 2023 at 5:00 p.m. (EST) |
| Auction Date (if required) | November 17, 2023 at 5:00 p.m. (EST) |

| Hearing of the Sale Approval Motion | November 22, 2023 |
|---|---|
| Sale Approval Motion in US Bankruptcy Court | December 4, 2023 |
| Closing of the Transaction | Immediately following the recognition of the Sale Approval Order by the US Bankruptcy Court |

24. With the assistance of the Applicants, the Monitor developed a sale or investment opportunity teaser (the "**Teaser Letter**") to invite potential interested parties to participate in the SISP.

25. In preparation for the SISP Approval, the Monitor prepared a list of potential bidders ("**Known Potential Bidders**") who may have an interest in a transaction. The Monitor continuously updated the Known Potential Bidders list following the SISP Approval.

26. To identify Known Potential Bidders, the Monitor:

(a) researched financial databases including S&P Capital IQ and PitchBook for potential strategic buyers in industries in which the Applicants conduct its business and other similar industries;

(b) reviewed a list of parties who, during the CCAA Proceedings, contacted the Monitor and expressed interest in a potential acquisition of the Applicants' property and/or business;

(c) reviewed a list of liquidators and auctioneers who may have interest in the Applicants' physical assets;

(d) contacted investment banking and restructuring professionals at the Monitor's affiliate, B. Riley Financial, Inc. in the United States and globally through BTG Global Advisory to expand the scope of the SISP to a global audience of potential interested parties; and

(e) obtained from the Applicants the information of further potential interested parties.

27.    On October 16, 2023, an initial offering summary in the form of an email was sent to 33
Known Potential Bidders of the SISP. The email invited Known Potential Bidders to express
their interest in participating in the SISP, and attached a copy of the Teaser, a non-disclosure
agreement ("**NDA**") and a letter acknowledging receipt of the SISP and agreeing to be bound
by the terms of the SISP (the "**Acknowledgement Letter**", and collectively with the Teaser
and the NDA, the "**SISP Offering Documents**"). A copy of the SISP Offering Documents
has been attached as **Appendix "B"**.

28.    The SISP Offering Documents were subsequently sent to an additional 11 Known Potential
Bidders, raising the total number of recipients of the SISP Offering Documents to 44 Known
Potential Bidders.

29.    A secure virtual data room was established by the Monitor which contained confidential
information pertaining to the Applicants, their property, their business and the SISP, and was
available to all Qualified Bidders.

30.    An advertisement of the SISP was posted in the "Assets for Sale" section of the regular weekly
email updates from Insolvency Insider, a go-to source for restructuring professionals in
Canada commencing on October 16, 2023, a copy of which is attached hereto as **Appendix
"C"**.

31.    An advertisement of the SISP was published in the Financial Post (business section of the
National Post), a copy of which is attached hereto as **Appendix "D"**.

32.    The Monitor is of the view that the market was strategically and sufficiently canvassed for
potential purchasers by the steps outlined above.

### *SISP Bid Results*

33.    At the Bid Deadline of November 15, 2023, the Monitor received executed NDAs from nine
(9) interested parties. Four (4) of these parties were granted access to the virtual data room.
The other five (5) interested parties were not granted access to the virtual data room as they
were not able, or willing, to sufficiently show financial wherewithal to close a transaction in
accordance with the SISP. The Monitor did not involve the Applicants in assessing the
financial wherewithal of the interested parties.

34.    At the Bid Deadline, no interest was expressed by any party to be considered a Qualified Bidder, nor were any Qualified Bids received by the Monitor. As such, and pursuant to the SISP, the Stalking Horse Agreement is deemed to be the Successful Bid. There was no need to consider holding an auction.

## VI.    THE STALKING HORSE AGREEMENT TRANSACTION

35.    The key terms and conditions of the Stalking Horse Agreement are set out in paragraphs 33 through 35 of the Second Report.

36.    A summary of the Transaction contemplated in the Stalking Horse Agreement is as follows:

(a)    the purchase price being the aggregate of:

(i)    an amount required to satisfy the Priority Payables, which amount shall be subject to adjustment as at the Closing Time; *plus*

(ii)    the Credit Bid Amount, meaning the amount equivalent to all amounts owing under the DIP Term Sheet as of the Closing Time, which is estimated to be $4,000,000; *plus*

(iii)    The aggregate amount of the Assumed Liabilities, the Contract Assumed Liabilities and any cure costs arising from the assignment of a Consent Required Contract under any Assignment Order granted by the Court;

(b)    there are no break fees or other fees payable pursuant to the Stalking Horse Agreement; and

(c)    the Transaction does not provide for a recovery to the unsecured creditors of the Applicants; however, it preserves the asset value for the benefit of the Applicants' stakeholders, preserves ongoing employment of the existing employees and ensures no disruption of services to the Applicants' customers.

## VII.    MONITOR'S RECOMMENDATION ON THE STALKING HORSE AGREEMENT

37.    The Monitor recommends that the Court approve the Stalking Horse Agreement for the following reasons:

(a)    the SISP was the product of extensive consultation, including with the Monitor, and was previously approved by the Court;

(b)     the SISP was well structured and resulted in a broad canvassing of the market for potential purchasers of the Applicants' business;

(c)     the SISP was facilitated by the Monitor, which has extensive experience in marketing businesses and assets, and included consultation with the Applicants;

(d)     the Stalking Horse Agreement is the product of a fair, transparent and reasonable SISP, and will result in the highest realization for the Applicants' assets available in the circumstances;

(e)     the terms of the Stalking Horse Agreement are commercially reasonable, and the Monitor is of the view that the purchase price is fair and reasonable;

(f)     the Transaction provides greater recovery for the Applicants' secured creditors than could be obtained in a bankruptcy or liquidation; and

(g)     the Stalking Horse Agreement benefits many of the stakeholders (including customers, employees and suppliers) through a Transaction that results in a going-concern outcome for the Applicants's business; and

(h)     while the Purchaser is not unrelated to the Applicants, good faith efforts were made to sell or otherwise dispose of the Applicants' assets to persons who were not related to the Applicants, and the Monitor is of the opinion that the consideration to be received is superior to the consideration that would be received under any other offer, which in this case, there were none.

38.     The Monitor is supportive of the Court approving the Transaction contemplated in the Stalking Horse Agreement and granting the Applicants' requested Approval and Vesting Order.

## VIII.   RELEASES

39.     The proposed Approval and Vesting Order includes Releases in favour of the Released Parties which is defined to include: (i) the current and former directors, officers, employees, legal counsel and advisors of the Applicants, (ii) the Monitor and its legal counsel; and (iii) the Purchaser and its current and former directors, officers, employees, legal counsel and advisors.

40.     The full scope of the release provisions is set out in the proposed Approval and Vesting Order and should be read in conjunction with this Third Report. The Releases explicitly do not release or discharge any claim that is not permitted to be released pursuant to section 5.1(2) of the *CCAA*.

41.     In the Monitor's view, having considered the facts of the situation, each of the Released Parties have, in some meaningful way, contributed to the Transaction and the successful restructuring of the Applicants. Further, it is the Monitor's understanding, based on advice of counsel, that it is customary to include such releases in Orders approving such a transaction.

42.     Accordingly, the Monitor is of the view that the proposed releases are reasonable and not overly broad in the circumstances, and it supports the relief requested by the Applicants.

## IX.     UPDATE ON THE ANALYSIS OF SCS SECURED DEBT

43.     Further to the Monitor's Second Report, the Monitor has obtained a formal security opinion from Ballard Spahr LLP ("**US Counsel**") engaged to review the security interests granted by Lighthouse USA to its secured creditors.

44.     The opinion received from US Counsel confirms that the security interests granted by Lighthouse USA to its secured creditors in the collateral of Lighthouse USA is valid and enforceable and a type in which a security interest can be created under Article 9 of the Uniform Commercial Code as in effect of the State of New York (the "**UCC Collateral**"), and has been perfected to the extent such interest in the UCC Collateral can be perfected by the filing of a financial statement under the Uniform Commercial Code as in effect in the State of Delaware.

45.     As stated in the Monitor's Second Report, the security interests granted to Lighthouse's secured creditors were reviewed by Thornton Grout Finnigan LLP ("**TGF**"). TGF's security opinion to the Monitor confirms that the security agreements granted by Lighthouse to is secured creditors create valid and enforceable security interests in Lighthouse's personal property that secures payment and performance of Lighthouse's obligations to its secured creditors. Further, the security interests have been perfected through registration under the *Personal Property Security Act*.

- 14 -

## X.    MONITORING OF RECEIPTS AND DISBURSEMENTS

46.    The Applicants' actual cash receipts and disbursements for the six (6) week period ended November 12, 2023 (the "**Reporting Period**") as compared with the Revised Cash Flow Forecast may be located within **Appendix "E"** (the "**Variance Analysis**"). The Variance Analysis has been summarized below:

**LIGHTHOUSE IMMERSIVE INC. ("LHI") & LIGHTHOUSE IMMERSIVE USA, INC. ("LHI USA")**
**Actual Cash Flow vs. Revised Forecast - Cumulative Variance Analysis**
**For the 6 weeks ended November 12, 2023**
*In USD*

| 6-week period ending | Forecast 11/12/2023 | Actual 11/12/2023 | Variance - B/(W) 11/12/2023 |
|---|---|---|---|
| **Cash Receipts** | | | |
| Box Office Ticket Sale Collections | $ 120,000 | $ 107,038 | $ (12,962) |
| Other Income | - | 926,154 | 926,154 |
| Divestiture of Surplus Inventory and Capital Assets | $ - | - | - |
| Transfer from Affiliated Companies | | - | - |
| Rate Card Reimbursements from LHI Studios | $ 260,698 | 326,487 | 65,788 |
| **Total Receipts** | $ 380,698 | $ 1,359,679 | $ 978,981 |
| **Cash Disbursements** | | | |
| Visioni Royalties | $ 6,000 | $ - | $ 6,000 |
| LHI Payroll & Payroll Remittances | 343,238 | 312,999 | 30,238 |
| LHI USA Payroll & Payroll Remittances | 135,000 | 150,080 | (15,080) |
| Contract Payroll From Related Party | 192,000 | 25,695 | 166,305 |
| LHI Rent | 162,789 | 134,927 | 27,862 |
| LHI Utilities and Other Occupancy Costs | 32,040 | 11,673 | 20,367 |
| LHI Corporate Overhead | 179,738 | 144,553 | 35,185 |
| LHI USA Corporate Overhead | 120,283 | 107,577 | 12,706 |
| Load out costs | 318,750 | 42,949 | 275,801 |
| Transfer to LHI USA Wholly Owned Subsidiaries | 700,000 | 964,144 | (264,144) |
| LHI Cowboy Production Costs | - | 227,083 | (227,083) |
| Foreign exchange (gain) / loss | - | (1,700) | 1,700 |
| **Total Operating Disbursements** | $ 2,189,838 | $ 2,119,980 | $ 69,858 |
| LHI & LHI USA Legal Counsel Fees | $ 190,000 | $ 289,831 | $ (99,831) |
| Monitor Fees | 180,000 | 193,178 | (13,178) |
| Monitor's Legal Counsel Fees | 85,000 | 48,832 | 36,168 |
| DIP Lender Legal Fees | - | 55,002 | (55,002) |
| **CCAA Professional Fees** | $ 455,000 | $ 586,842 | $ (131,842) |
| **Total Disbursements** | $ 2,644,838 | $ 2,706,822 | $ (61,984) |
| **Net Receipts** | $ (2,264,140) | $ (1,347,143) | $ 916,997 |
| **Opening Cash Position** | $ 710,054 | $ 710,054 | $ - |
| DIP Financing Advances to Companies | $ 2,426,000 | $ 1,280,803 | $ (1,145,197) |
| **Cash Ending Balance** | $ 871,914 | $ 643,714 | $ (228,200) |
| **Total DIP Financing Advances** | | $ 2,854,803 | |

47.    The Applicants reported a cash flow shortfall of approximately $1.3 million before DIP Financing Advances; however, this was approximately $900,000 better than projected up to that time.  The major variances are summarized below:

(a)    a favourable variance of approximately $926,000 in Other Income receipts. An advance of $500,000 was received as a deposit for licensing fees for a new show. In addition, a state income tax refund of approximately $363,000 was received and certain other immaterial amounts were received. These receipts were not projected in the Revised Cash Flow Forecast;

(b)    an aggregate favourable variance of approximately $181,000 in payroll expenses for the Applicants and a related party, which is a timing difference as the related party has not been fully reimbursed;

(c)    an unfavourable variance in the total transfers to the LHI USA wholly owned subsidiaries for approximately $264,000 which partially offsets a previously reported favourable timing difference;

(d)    an unfavourable variance of approximately $227,000 for pre-production show expenses, which was funded by the deposit noted above in Other Income;

(e)    an unfavourable variance of approximately $132,000 in professional fee payments; and

(f)    an unfavourable variance of approximately $1,145,000 of DIP Financing advances, which is a timing difference. Up to week 16 of the CCAA administration, the DIP Lender has advanced $2,854,803, including $1,280,803 in the Reporting Period. On November 15, 2023 (which is during week seven of the cash flow period), the DIP Lender advanced approximately $1,050,000 to the Monitor for future DIP Advances to the Applicants.

48.    The Applicants currently have a stay of proceedings to December 8, 2023, and the Revised Cash Flow Forecast covered this time period. Based on the current liquidity position and projected funding requirements of the Applicants, it is the Monitor's view that the Revised

Cash Flow Forecast continues to be relevant and no amendments to the DIP Facility or Charges are necessary at this time.

## XI.    CONCLUSION AND RECOMMENDATIONS

49.    The Monitor's conclusions and recommendations on the relief sought by the Applicants are as follows:

(a)    In the Monitor's opinion, the Applicants are acting in good faith and with due diligence to further their restructuring efforts and nothing has come to the attention of the Monitor which would require the Monitor to report that a material adverse change has occurred; and

(b)    The Monitor recommends the approval of the proposed Approval and Vesting Order.

All of which is respectfully submitted this 16th day of November, 2023.

**B. RILEY FARBER INC.**
**IN ITS CAPACITY AS THE COURT APPOINTED MONITOR OF**
**LIGHTHOUSE IMMERSIVE INC. AND**
**LIGHTHOUSE IMMERSIVE USA, INC.**
**AND NOT IN ITS PERSONAL OR CORPORATE CAPACITY**.

*B. Riley Farber Inc.*
_____

**APPENDIX "A"**

**US BANKRUPTCY COURT SALE APPROVAL ORDER**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 15 |
| | ) | |
| Lighthouse Immersive Inc., *et al.*, | ) | Case No. 23-11021 (LSS) |
| | ) | |
| | ) | Jointly Administered |
| Debtors in a Foreign Proceeding. [1] | ) | |
| | ) | **Re D.I. 27** |

### ORDER (I) RECOGNIZING AND ENFORCING
### (A) THE CCAA SISP ORDER, (B) THE CCAA DIP INCREASE ORDER,
### (C) THE CCAA SEALING ORDER AND (D) THE CCAA STAY
### EXTENSION ORDER AND (II) GRANTING RELATED RELIEF

Upon the motion (the "<u>Motion</u>") of Lighthouse Immersive Inc., in its capacity as foreign representative (the "<u>Foreign Representative</u>") to the above-captioned debtors (the "<u>Debtors</u>"), for entry of an order under sections 105, 363, 1507, 1520, and 1521 of the Bankruptcy Code, (a) recognizing and enforcing the CCAA SISP Order, attached hereto as **Exhibit 1**, approving, among other things, (i) the Sales Procedures and (ii) the Debtors' entry into the Stalking Horse Purchase Agreement, (b) recognizing and enforcing the CCAA DIP Increase Order, attached hereto as **Exhibit 2**, (c) recognizing and enforcing the CCAA Sealing Order, attached hereto as **Exhibit 3**, (d) recognizing and enforcing the CCAA Stay Extension Order, attached hereto as **Exhibit 4**, and (e) granting such other relief as the Court deems just and proper, all as more fully set forth in the Motion; and upon the (a) *Declaration of Corey Ross in Support of (I) Chapter 15 Petitions for Recognition of Foreign Main Proceeding; (II) Motion of the Foreign Representative for Entry of Provisional and Final Relief in Aid of Foreign Main Proceeding; and (III) Certain*

---

[1] The Debtors and the last four digits of its U.S. Federal Employer Identification Numbers or other unique identifier are as follows: Lighthouse Immersive Inc. (9411) (Ontario Corporation No.) and Lighthouse Immersive USA Inc. (2401) (FEIN). The Debtors' mailing address is 640 Briar Hill Avenue, Toronto, Ontario, Canada, M5N 1N2.

*Related Relief* (the "Ross Declaration"), (b) *Second Report of the Monitor*, (the "Second Monitor's Report"), and (c) *Supplemental Second Report of the Monitor* (the "Supplemental Second Report"); and this Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. § 1334 and 11 U.S.C. §§ 109 and 1501; and venue being proper before this Court pursuant to § 1410; and the Motion being a core proceeding pursuant to 28 U.S.C. § 157(b); and adequate and sufficient notice of the filing of the Motion having been given by the Foreign Representative; and it appearing that the relief requested in the Motion is necessary and beneficial to the Debtors; and this Court having held a hearing to consider the relief requested in the Motion; and there being no objections or other responses filed that have not been overruled, withdrawn, or otherwise resolved; and after due deliberation and sufficient cause appearing therefor, it is hereby

**FOUND AND DETERMINED THAT**:

A.      On October 6, 2023, the Canadian Court entered the CCAA Stay Extension Order. On October 13, 2023, the Canadian Court entered (i) the CCAA SISP Order, approving among other things, (a) the Sales Procedures and (b) the Debtors' entry into the Stalking Horse Purchase Agreement and (ii) the CCAA DIP Increase Order.  On October 16, 2023, the Canadian Court entered the CCAA Sealing Order.

B.      The relief granted hereby is necessary and appropriate to effectuate the objectives of chapter 15 of the Bankruptcy Code to protect the Debtors and the interests of their creditors and other parties in interest, is consistent with the laws of the United States, international comity, public policy, and the policies of the Bankruptcy Code, and will not cause any hardship to any party in interest that is not outweighed by the benefits of the relief granted because the parties in interest in these cases are sufficiently protected by the provisions in the CCAA Orders, and this Order.

C.      Absent the requested relief, the efforts of the Debtors, the Canadian Court, and the Foreign Representative in conducting the Canadian Proceedings and effectuating the restructuring under Canadian law may be frustrated, a result contrary to the purposes of chapter 15 of the Bankruptcy Code.

D.      Based on the affidavits of service filed with, and representations made to, this Court:  (i) notice of the Motion was proper, timely, adequate, and sufficient under the circumstances of these chapter 15 cases and these proceedings and complied with the various applicable requirements of the Bankruptcy Code and the Bankruptcy Rules; and (ii) no other or further notice of the Motion, the Sale Hearing, the Sale, or the entry of this Order is necessary or shall be required.

E.      All creditors and other parties in interest, including the Debtors, are sufficiently protected by the grant of relief ordered hereby.

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT**:

1.      The Motion is GRANTED.

2.      The CCAA SISP Order is recognized in full and given full force and effect in the United States.

3.      The Sales Procedures, including all deadlines and requirements therein as set forth in the CCAA SISP Order, are hereby fully recognized and given full force and effect in the United States, including as bidding procedures for the sale of assets and/or equity of the Debtors located in the territorial jurisdiction of the United States, and shall apply with respect to parties located in the United States.

4.      The provisions of the CCAA SISP Order that authorized and approved the Debtors' entry into the Stalking Horse Purchase Agreement, on the terms set forth in the CCAA

SISP Order, is recognized by this Court and is enforceable within the territorial jurisdiction of the United States.

5.     The Debtors and any party to the Stalking Horse Purchase Agreement may exercise the respective rights and remedies available to them under the Stalking Horse Purchase Agreement in the territorial jurisdiction of the United States, respectively and as applicable, in accordance with the terms thereof and the CCAA SISP Order, but only to the extent approved by the CCAA SISP Order.

6.     The failure specifically to include any particular provision of the CCAA SISP Order in this Order shall not diminish or impair the effectiveness of such provision.

7.     Nothing in this Order ratifies, approves, and/or recognizes the sale and/or vesting of any property pursuant to the Stalking Horse Purchase Agreement, and all rights, claims, objections, and interests of any interested party, at law or in equity, with respect to the proposed sale and vesting of property pursuant to the Stalking Horse Purchase Agreement or Successful Bid (as defined in the Sales Procedures) are not waived and are expressly preserved and may be asserted in the Canadian Proceedings in accordance with the applicable rules and procedures applicable in the Canadian Court.

8.     The Sale Hearing shall be held in this Court on **December 4, 2023 at 10:30 a.m. (ET)**, unless otherwise determined by this Court.  The Sale Hearing may be adjourned by the Foreign Representative, from time to time without further notice to creditors or other parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing, or by filing a hearing agenda or notice on the docket of the above-captioned cases.

9.      The CCAA DIP Increase Order is recognized in full and given full force and effect in the United States.

10.     The CCAA Sealing Order is recognized in full and given full force and effect in the United States.

11.     The CCAA Stay Extension Order is recognized in full and given full force and effect in the United States.

12.     All persons and entities subject to the jurisdiction of the United States are permanently enjoined and restrained from taking any actions inconsistent with, or interfering with the enforcement and implementation of, the CCAA Orders or any documents incorporated by the foregoing.

13.     The Foreign Representative is authorized to take all actions it deems necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion and the CCAA Orders.

14.     All objections to the entry of this Order that have not been withdrawn, waived, or settled, or otherwise resolved pursuant to the terms hereof, are denied and overruled on the merits, with prejudice.

15.     Notwithstanding any provision in the Bankruptcy Rules to the contrary, the terms of this Order shall be immediately effective and enforceable upon its entry.

16.     Other than as explicitly set forth herein, this Court shall retain jurisdiction with respect to any and all matters, claims, rights, or disputes arising from or related to the implementation or interpretation of this Order.

Dated: October 27th, 2023
Wilmington, Delaware

LAURIE SELBER SILVERSTEIN
UNITED STATES BANKRUPTCY JUDGE

5

# **EXHIBIT 1**

CCAA SISP Order and Endorsement

Electronically issued / Délivré par voie électronique : 16-Oct-2023
Toronto Superior Court of Justice / Cour supérieure de justice

**Court File No./N° du dossier du greffe :** CV-23-00703509-00CL



Court File No. CV-23-00703509-00CL

## ONTARIO
## SUPERIOR COURT OF JUSTICE
## COMMERCIAL LIST

THE HONOURABLE            )                    FRIDAY, THE 13TH

JUSTICE CAVANAGH          )                    DAY OF OCTOBER, 2023

                         )

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c.C-36 AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF LIGHTHOUSE IMMERSIVE INC. AND LIGHTHOUSE IMMERSIVE USA, INC.

## ORDER
(Approval of Sale and Investment Solicitation Process and Stalking Horse Agreement)

**THIS MOTION,** made by the Applicants, pursuant to the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended, (the "**CCAA**") for an order, among other things, (i) approving the sale and investment solicitation process (the "**SISP**") described in **Schedule "A"** hereto, including the Stalking Horse Agreement; and (ii) authorizing B. Riley Farber Inc., in its capacity as Monitor of the Applicants (the "**Monitor**") to conduct the SISP, was heard this day by Zoom video conference.

**ON READING** the Motion Record of the Applicants dated October 5, 2023, the Responding Motion Record of LHIMP (ABC), LLC ("**ABC**")., dated October 11, 2023, the first report of the Monitor dated August 1, 2023 (the "**First Report**"), the second report of the Monitor dated October 5, 2023 (the "**Second Report**"), and upon hearing the submissions of counsel for the Applicants, counsel for SCS Finance, Inc. (the "**DIP Lender**"), counsel for ABC, counsel for Massimiliano Siccardi, counsel for the Monitor, and counsel for the shareholders of

Electronically issued / Délivré par voie électronique : 16-Oct-2023
Toronto Superior Court of Justice / Cour supérieure de justice

**Court File No./N° du dossier du greffe :** CV-23-00703509-00CL

the Applicants, no one appearing for any other party although duly served as appears from the

affidavit of service of Gina Rhodes dated October 5, 2023, filed.

## SERVICE AND DEFINITIONS

1.     **THIS COURT ORDERS** that the time for service of the Notice of Motion and Motion

Record is abridged and validated such that this Motion is properly returnable today, and further

service of the Notice of Motion and the Motion Record is hereby dispensed with.

2.     **THIS COURT ORDERS** that capitalized terms used in this Order and not otherwise

defined herein shall have the meaning ascribed to them under the SISP.

## APPROVAL OF THE SISP AND STALKING HORSE AGREEMENT

3.     **THIS COURT ORDERS** that the SISP attached hereto as **Schedule "A"** to this Order

and the procedures contemplated therein be and are hereby approved.

4.     **THIS COURT ORDERS** that the Monitor is authorized and directed to take such steps,

on behalf of the Applicants, as it deems necessary or advisable to carry out and perform its

obligations under the SISP.

5.     **THIS COURT ORDERS** that the SISP may be amended and the timelines prescribed

therein may be extended by the Monitor with the approval of the Applicants.

6.     **THIS COURT ORDERS** that the Monitor and its respective affiliates, partners,

employees, representatives and agents shall have no liability with respect to any and all losses,

claims, damages or liabilities, of any nature or kind, to any person in connection with or as a

result of the SISP, except to the extent such losses, claims, damages or liabilities result from the

Electronically issued / Délivré par voie électronique : 16-Oct-2023
Toronto Superior Court of Justice / Cour supérieure de justice

**Court File No./N° du dossier du greffe :** CV-23-00703509-00CL

gross negligence or willful misconduct of the Monitor in performing its obligations under the SISP as determined by this Court.

7. **THIS COURT ORDERS** that the Monitor and the Applicants and their respective counsel be and are hereby authorized but not obligated, to serve or distribute this SISP Order, any other materials, orders, communication, correspondence or other information as may be necessary or desirable in connection with the SISP to any Person (as defined in the Initial Order dated July 27, 2023, as amended and restated) or interested party that the Monitor or the Applicants considers appropriate. For greater certainty, any such distribution, communication or correspondence shall be deemed to be in satisfaction of a legal or juridical obligation, and notice requirements within the meaning of clause 3(c) of the Electronic Commerce Protection Regulations, Reg. 81000-2-175 (SOR/DORS).

8. **THIS COURT ORDERS** that, pursuant to clause 7(3)(c) of the Canada *Personal Information Protection and Electronic Documents Act*, the Monitor and the Applicants are hereby authorized and permitted to disclose and transfer to each potential bidder (collectively, the "**Potential Bidders**") and to their advisors, if requested by such Potential Bidders, personal information of identifiable individuals, including, without limitation, all human resources and payroll information in the Applicants' records pertaining to its past and current employees, but only to the extent desirable or required to negotiate or attempt to complete a sale of the Property ("**Sale**") or investment in the Business ("**Investment**"). Each Potential Bidder to whom such personal information is disclosed shall maintain and protect the privacy of such information and limit the use of such information to its evaluation of the Sale or Investment, and if it does not complete a Sale or Investment, shall return all such information to the Monitor and the Applicants, or in the alternative destroy all such information. The Successful Bidder(s) shall

LA PRÉSENTE ATTESTE QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE À TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

Electronically issued / Délivré par voie électronique : 16-Oct-2023
Toronto Superior Court of Justice / Cour supérieure de justice

**Court File No./N° du dossier du greffe :** CV-23-00703509-00CL

maintain and protect the privacy of such information and, upon closing of the transaction contemplated in the Successful Bid(s), shall be entitled to use the personal information provided to it that is related to the Property or Business acquired pursuant to the Sale or invested in pursuant to the Investment in a manner which is in all material respects identical to the prior use of such information by the Applicants, and shall return all other personal information to the Monitor and the Applicants, or ensure that all other personal information is destroyed.

9.    **THIS COURT ORDERS** that the Stalking Horse Agreement executed by SCS Finance, Inc. (the "**Stalking Horse Bidder**") dated as of October 5, 2023, substantially in the form attached to the Second Report (the "**Stalking Horse Agreement**") be and is hereby approved.

**GENERAL**

10.    **THIS COURT ORDERS** that the Applicants or the Monitor may from time to time apply to this Court for advice and directions in the discharge of their powers and duties hereunder.

11.    **THIS COURT HEREBY REQUESTS** the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada, the United States or elsewhere, to give effect to this Order and to assist the Applicants, the Monitor and their respective agents in carrying out the terms of this Order. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Applicants and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Applicants and the Monitor and their respective agents in carrying out the terms

of this Order.

68690309.1

THIS IS TO CERTIFY THAT THIS
DOCUMENT, EACH PAGE OF
WHICH IS STAMPED WITH THE
SEAL OF THE SUPERIOR COURT
OF JUSTICE AT TORONTO, IS A
TRUE COPY OF THE DOCUMENT
ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE
DOCUMENT, DON'T CHACUNE
DES PAGES EST REVETUE DU
SCEAU DE LA COUR SUPERIEURE
DE JUSTICE A TORONTO, EST UNE
COPIE CONFORME DU DOCUMENT
CONSERVE DANS CE BUREAU

DATED AT TORONTO THIS _____ DAY OF _October_ 20 _23_
FAIT A TORONTO LE                    JOUR DE

REGISTRAR                              GREFFIER

Electronically issued / Délivré par voie électronique : 16-Oct-2023
Toronto Superior Court of Justice / Cour supérieure de justice

**Court File No./N° du dossier du greffe :** CV-23-00703509-00CL

12.     **THIS COURT ORDERS** that each of the Applicants and the Monitor be at liberty and is

hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative

body, wherever located, for the recognition of this Order and for assistance in carrying out the

terms of this Order, and that the Monitor is authorized and empowered to act as a representative

in respect of the within proceedings for the purpose of having these proceedings recognized in a

jurisdiction outside Canada.

13.     **THIS COURT ORDERS** that this Order is effective from the date that it is made and is

enforceable without any need for entry and filing.

Digitally signed
by Mr. Justice
Cavanagh

THIS IS TO CERTIFY THAT THIS
DOCUMENT, EACH PAGE OF
WHICH IS STAMPED WITH THE
SEAL OF THE SUPERIOR COURT
OF JUSTICE AT TORONTO, IS A
TRUE COPY OF THE DOCUMENT
ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE
DOCUMENT, DONT CHACUNE
DES PAGES EST REVÊTUE DU
SCEAU DE LA COUR SUPERIEURE
DE JUSTICE A TORONTO, EST UNE
COPIE CONFORME DU DOCUMENT
CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS ___ DAY OF _October_ 20 __
FAIT À TORONTO LE          JOUR DE

REGISTRAR                              GREFFIER

Electronically issued / Délivré par voie électronique : 16-Oct-2023
Toronto Superior Court of Justice / Cour supérieure de justice

**Court File No./N° du dossier du greffe :** CV-23-00703509-00CL

## SCHEDULE A
### (Sale and Investment Solicitation Process)

THIS IS TO CERTIFY THAT THIS
DOCUMENT, EACH PAGE OF
WHICH IS STAMPED WITH THE
SEAL OF THE SUPERIOR COURT
OF JUSTICE AT TORONTO, IS A
TRUE COPY OF THE DOCUMENT
ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE
DOCUMENT, DONT CHACUNE
DES PAGES EST REVÊTUE DU
SCEAU DE LA COUR SUPÉRIEURE
DE JUSTICE A TORONTO, EST UNE
COPIE CONFORME DU DOCUMENT
CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS _____ DAY OF _____ 20 ___
FAIT À TORONTO LE            JOUR DE

REGISTRAR                                    GREFFIER

Electronically issued / Délivré par voie électronique : 16-Oct-2023
Toronto Superior Court of Justice / Cour supérieure de justice

**Court File No./N° du dossier du greffe :** CV-23-00703509-00CL

## Sale and Investment Solicitation Process
## Lighthouse Immersive Inc. and Lighthouse Immersive USA Inc.

### Introduction

1.  On July 27, 2023, Lighthouse Immersive Inc. and Lighthouse Immersive USA Inc. (together, the "**Applicants**") were granted an initial order (as amended or amended and restated from time to time, the "**Initial Order**") under the *Companies' Creditors Arrangement Act* (the "**CCAA**" and the "**CCAA Proceedings**") by the Ontario Superior Court of Justice (the "**CCAA Court**"). The Initial Order (which was amended and restated on August 3, 2023), among other things:

    (a)  stayed all proceedings against the Applicants, their assets and their respective directors and officers;

    (b)  appointed B. Riley Farber Inc. as the monitor of the Applicants (in such capacity, the "**Monitor**");

    (c)  authorized the Applicants to enter into a debtor-in-possession financing facility with SCS Finance, Inc. ("**SCS**") pursuant to a Term Sheet dated July 26, 2023 (the "**DIP Term Sheet**"), as well as the related charge in favour of the DIP Lender (the "**DIP Charge**") over all of the Applicants' present and future assets, property and undertakings of every nature and kind whatsoever, and wherever situate including all proceeds thereof to secure the amounts outstanding under or in connection with the DIP Facility; and

    (d)  authorized the Applicants to pursue all avenues of sale or investment of their assets or business, in whole or in part, subject to prior approval of the Court before any material sale or refinancing.

2.  Pursuant to proceedings (the "**Chapter 15 Proceedings**", and together with the CCAA Proceedings, the "**Insolvency Proceedings**") commenced in the United States Bankruptcy Court for the District of Delaware (the "**US Bankruptcy Court**", and together with the CCAA Court, the "**Insolvency Courts**") under Chapter 15, Title 11, of the United States Code (the "**US Bankruptcy Code**"), the Applicants obtained, among other things, recognition of the CCAA Proceedings.

3.  Further to the Applicants' restructuring efforts and the terms of the DIP Facility, the Monitor will conduct the sale and investment solicitation process (the "**SISP**") described herein, with the assistance of the Applicants, and pursuant to the Order of the CCAA Court dated [**October ●, 2023**] (the "**SISP Order**"). The SISP is intended to solicit interest in an acquisition or refinancing of the business or a sale of the assets and/or the business of the Applicants by way of merger, reorganization, recapitalization, primary equity issuance or other similar transaction. The Monitor intends to provide all qualified interested parties with an opportunity to participate in the SISP.

4.  The SISP Order also approves the stalking horse agreement between the Applicants and SCS Finance, Inc. (in such capacity, the "**Stalking Horse Bidder**") dated October 5, 2023 (as may be amended from time to time, the "**Stalking Horse Agreement**"), under

Electronically issued / Délivré par voie électronique : 16-Oct-2023
Toronto Superior Court of Justice / Cour supérieure de justice

**Court File No./N° du dossier du greffe :** CV-23-00703509-00CL

which the Stalking Horse Bidder agreed to purchase substantially all of the Applicants' assets and business operations, and act as the stalking horse bid in the SISP (the "**Stalking Horse Bid**"). The Stalking Horse Bid shall automatically be considered a Qualified Bid (as defined herein) for the purposes of the Auction (as defined herein).

## Opportunity

5.     The SISP is intended to solicit interest in, and opportunities for, a sale of, or investment in, all or part of the Applicants' assets and business operations (the "**Opportunity**"). The Opportunity may include one or more of a restructuring, recapitalization or other form or reorganization of the business and affairs of the Applicants as a going concern or a sale of all, substantially all or one or more components of the Applicants' assets (the "**Property**") and business operations (the "**Business**") as a going concern or otherwise, or some combination thereof (each, a "**Transaction**").

6.     This document describes the SISP, including the manner in which individuals, corporations, limited and unlimited liability companies, general and limited partnerships, associations, trusts, unincorporated organizations, joint ventures, governmental organizations or other entities (each, a "**Person**") may gain access to or continue to have access to due diligence materials concerning the Applicants, the Property and the Business, how bids involving the Applicants, the Property or the Business will be submitted to and dealt with by the Monitor and how Court approval will be obtained in respect of a Transaction.

7.     The SISP contemplates a one-stage process that involves the submission by interested parties of binding offers by the Bid Deadline (as defined below).

8.     Except to the extent otherwise set forth in a definitive sale or investment agreement with a successful bidder, any Transaction will be on an "as is, where is" basis and without surviving representations or warranties of any kind, nature, or description by the Monitor, the Applicants, or any of their respective agents, advisors or estates, and, in the event of a sale, all of the right, title and interest of the Applicants in and to the Property to be acquired will be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options, and interests therein and thereon pursuant to Court orders, to the extent that the Court deems it appropriate to grant such relief and except as otherwise provided in such Court orders.

9.     In the SISP, (i) "**Business Day**" means any day (other than Saturday or Sunday) that banks are open for business in Toronto, Ontario. If any deadline date referred to in the SISP falls on a day that is not a Business Day, then such date shall be extended until the next Business Day; and (ii) the words "include", "includes" and "including" shall be deemed to be followed by the phrase, "without limitation".

## Timeline

10.     The following table sets out the key milestones under the SISP:

LA PRÉSENT ATTEST QUE CE
DOCUMENT, EACH PAGE OF          DOCUMENT, DONT CHACUNE
WHICH IS STAMPED WITH THE       DES PAGES EST REVÊTUE DU
SEAL OF THE SUPERIOR COURT      SCEAU DE LA COUR SUPÉRIEURE
OF JUSTICE AT TORONTO, IS A     DE JUSTICE A TORONTO, EST UNE
TRUE COPY OF THE DOCUMENT       COPIE CONFORME DU DOCUMENT
ON FILE IN THIS OFFICE          CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS _____ DAY OF _____ 20 ___
FAIT À TORONTO LE                JOUR DE

REGISTRAR                              GREFFIER

Electronically issued / Délivré par voie électronique : 16-Oct-2023
Toronto Superior Court of Justice / Cour supérieure de justice

**Court File No./N° du dossier du greffe :** CV-23-00703509-00CL

| Milestone | Deadline | |
|-----------|----------|---|
| Commencement Date | Immediately following the granting of the SISP Order | |
| Recognition of SISP in US Bankruptcy Court | Immediately following the granting of the SISP Order, subject to availability of the US Bankruptcy Court | |
| Bid Deadline | November 15, 2023 at 5:00 p.m. (EST) | |
| Auction Date | November 17, 2023 at 5:00 p.m. (EST) | |
| Sale Approval Motion (as defined below) in CCAA Court | No later than November 24, 2023, subject to the availability of the CCAA Court | |
| Sale Approval Motion in US Bankruptcy Court | Immediately following the granting of the Sale Approval Motion, subject to availability of the US Bankruptcy Court | |
| Closing of the Transaction | As soon as reasonably practicable following the granting of the Sale Approval Motion in the US Bankruptcy Court | |

11.    Subject to any order of the Court, the dates set out in the SISP may be extended by the Monitor with the consent and approval of the Applicants.

**Solicitation of Interest: Notice of the SISP**

12.    As soon as reasonably practicable:

(a)    the Monitor, in consultation with the Applicants, will prepare a list of potential bidders, including (i) parties that have approached the Applicants or the Monitor indicating an interest in the Opportunity, and (ii) local and international strategic and financial parties who the Applicants, in consultation with the Monitor, believe may be interested in a Transaction pursuant to the SISP, in each case whether or not such party has submitted a letter of intent or similar document (collectively, "**Known Potential Bidders**");

(b)    the Monitor will arrange for a notice of the SISP (and such other relevant information which the Monitor, in consultation with the Applicants, considers appropriate) (the "**Notice**") to be published in Insolvency Insider, the Monitor's website, and any other newspaper or journal as the Applicants, in consultation with the Monitor, consider appropriate, if any; and

(c)    the Monitor, in consultation with the Applicants, will prepare: (i) a process summary (the "**Teaser Letter**") describing the Opportunity, outlining the process under the SISP and inviting recipients of the Teaser Letter to express their interest

Electronically issued / Délivré par voie électronique : 16-Oct-2023
Toronto Superior Court of Justice / Cour supérieure de justice

**Court File No./N° du dossier du greffe :** CV-23-00703509-00CL

pursuant to the SISP; and (ii) a non-disclosure agreement in form and substance satisfactory to the Applicants and the Monitor, and their respective counsel (an "**NDA**").

13.     The Monitor will send the Teaser Letter and NDA to each Known Potential Bidder and to any other Person who requests a copy of the Teaser Letter and NDA or who is identified to the Applicants or the Monitor as a potential bidder as soon as reasonably practicable after such request or identification, as applicable.

**Potential Bidders and Due Diligence Materials**

14.     Any party who wishes to participate in the SISP (a "**Potential Bidder**"), other than the Stalking Horse Bidder, must provide to the Monitor an NDA executed by it, and which shall inure to the benefit of any purchaser of the Business or Property, or any portion thereof, and a letter setting forth the identity of the Potential Bidder, the contact information for such Potential Bidder and full disclosure of the direct and indirect principals of the Potential Bidder.

15.     The Monitor, in consultation with the Applicants, shall in their reasonable business judgment and subject to competitive and other business considerations, afford each Potential Bidder who has signed and delivered an NDA to the Monitor and provided information as to their financial wherewithal to close a transaction such access to due diligence material and information relating to the Property and Business as the Applicants or the Monitor deem appropriate. Due diligence shall include access to an electronic data room containing information about the Applicants, the Property and the Business, and may also include management presentations, on-site inspections, and other matters which a Potential Bidder may reasonably request and as to which the Applicants, in their reasonable business judgment and after consulting with the Monitor, may agree. The Monitor will designate a representative to coordinate all reasonable requests for additional information and due diligence access from Potential Bidders and the manner in which such requests must be communicated. Neither the Applicants nor the Monitor will be obligated to furnish any information relating to the Property or Business to any person other than to Potential Bidders. Furthermore and for the avoidance of doubt, selected due diligence materials may be withheld from certain Potential Bidders if the Applicants, in consultation with and with the approval of the Monitor, determine such information to represent proprietary or sensitive competitive information. Neither the Applicants nor the Monitor is responsible for, and will bear no liability with respect to, any information obtained by any party in connection with the Sale of the Property and the Business.

16.     Potential Bidders must rely solely on their own independent review, investigation and/or inspection of all information and of the Property and Business in connection with their participation in the SISP and any transaction they enter into with the Applicants.

**Formal Binding Offers**

17.     Potential Bidders that wish to make a formal offer to purchase or make an investment in the Applicants or their Property or Business (a "**Bidder**") shall submit a binding offer (a

Electronically issued / Délivré par voie électronique : 16-Oct-2023
Toronto Superior Court of Justice / Cour supérieure de justice

**Court File No./N° du dossier du greffe :** CV-23-00703509-00CL

"**Bid**") that complies with all of the following requirements to the Monitor and Applicants' counsel at the addresses specified in Schedule "1" hereto (including by e-mail), so as to be received by them not later than **5:00 PM (EST) on November 15, 2023** or as may be modified in the Bid process letter that may be circulate by the Monitor to Potential Bidders, with the approval of the Applicants (the "**Bid Deadline**"):

(a)     the Bid must be either a binding offer to:

    (i)     acquire all, substantially all or a portion of the Property (a "**Sale Proposal**"); and/or

    (ii)     make an investment in, restructure, reorganize or refinance the Business or the Applicants (an "**Investment Proposal**"); or

    (iii)     carry out any combination of a Sale Proposal and an Investment Proposal;

(b)     the Bid (either individually or in combination with other bids that make up one bid) is an offer to purchase or make an investment in some or all of the Applicants or their Property or Business and is consistent with any necessary terms and conditions established by the Applicants and the Monitor and communicated to Bidders;

(c)     the Bid includes a letter stating that the Bidder's offer is irrevocable until the selection of the Successful Bidder (as defined below), provided that if such Bidder is selected as the Successful Bidder, its offer shall remain irrevocable until the closing of the transaction with the Successful Bidder;

(d)     the Bid includes duly authorized and executed Transaction agreements, including the purchase price, investment amount and any other key economic terms expressed in US dollars (the "**Purchase Price**"), together with all exhibits and schedules thereto;

(e)     the Bid is accompanied by a deposit (the "**Deposit**") in the form of a wire transfer (to a trust account specified by the Monitor), in an amount equal to ten percent (10%) of the Purchase Price, investment amount or other consideration to be paid in respect of the Bid, to be held and dealt with in accordance with this SISP;

(f)     the Bid includes written evidence of a firm, irrevocable commitment for financing or other evidence of ability to consummate the proposed transaction, that will allow the Applicants and the Monitor to make a determination as to the Bidder's financial and other capabilities to consummate the proposed transaction;

(g)     the Bid is not conditioned on (i) the outcome of unperformed due diligence by the Bidder, or (ii) obtaining financing, but may be conditioned upon the Applicants receiving the required approvals or amendments relating to the licences required to operate the business, if necessary;

(h)     the Bid fully discloses the identity of each entity that will be entering into the transaction or the financing, or that is otherwise participating or benefiting from such bid;

(i)     for a Sale Proposal, the Bid includes:

LA PRESENT ATTEST QUE CE
DOCUMENT, DONT CHACUNE
DES PAGES EST REVETUE DU
SCEAU DE LA COUR SUPERIEURE
DE JUSTICE A TORONTO, EST UNE
COPIE CONFORME DU DOCUMENT
CONSERVE DANS CE BUREAU

THIS IS TO CERTIFY THAT THIS
DOCUMENT, EACH PAGE OF
WHICH IS STAMPED WITH THE
SEAL OF THE SUPERIOR COURT
OF JUSTICE AT TORONTO, IS A
TRUE COPY OF THE DOCUMENT
ON FILE IN THIS OFFICE

DATED AT TORONTO THIS
FAIT A TORONTO LE

DAY OF
JOUR DE

REGISTRAR
GREFFIER

Electronically issued / Délivré par voie électronique : 16-Oct-2023
Toronto Superior Court of Justice / Cour supérieure de justice

**Court File No./N° du dossier du greffe :** CV-23-00703509-00CL

(i)    the purchase price in US dollars and a description of any non-cash consideration, including details of any liabilities to be assumed by the Bidder and key assumptions supporting the valuation;

(ii)    a description of the Property that is expected to be subject to the transaction and any of the Property expected to be excluded;

(iii)    a specific indication of the financial capability of the Bidder and the expected structure and financing of the transaction;

(iv)    a description of the conditions and approvals required to complete the closing of the transaction;

(v)    a description of those liabilities and obligations (including operating liabilities) which the Bidder intends to assume and which such liabilities and obligations it does not intend to assume; and

(vi)    any other terms or conditions of the Sale Proposal that the Bidder believes are material to the transaction.

(j)    for an Investment Proposal, the Bid includes:



(i)    a description of how the Bidder proposes to structure the proposed investment, restructuring, recapitalization, refinancing or reorganization, and a description of any non-cash consideration;

(ii)    the aggregate amount of the equity and/or debt investment to be made in the Business or the Applicants in US dollars;

(iii)    the underlying assumptions regarding the pro forma capital structure;

(iv)    a specific indication of the sources of capital for the Bidder and the structure and financing of the transaction;

(v)    a description of the conditions and approvals required for to complete the closing of the transaction;

(vi)    a description of those liabilities and obligations (including operating liabilities) which the Bidder intends to assume and which such liabilities and obligations it does not intend to assume; and

(vii)    any other terms or conditions of the Investment Proposal.

(k)    the Bid includes acknowledgements and representations of the Bidder that the Bidder:

(i)    is completing the Transaction on an "as is, where is" basis;

(ii)    has had an opportunity to conduct any and all due diligence regarding the Property, the Business and the Applicants prior to making its Bid;

(iii)    has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Property in making its Bid; and

(iv)    did not rely upon any written or oral statements, representations, warranties, or guarantees whatsoever, whether express, implied, statutory or otherwise, regarding the Business, the Property, or the Applicants or the

Electronically issued / Délivré par voie électronique : 16-Oct-2023
Toronto Superior Court of Justice / Cour supérieure de justice

**Court File No./N° du dossier du greffe :** CV-23-00703509-00CL

> completeness of any information provided in connection therewith, except as expressly stated in the definitive transaction agreement(s) signed by the Applicants;

    (l)    the Bid is received by the Bid Deadline; and

    (m)    the Bid contemplates closing the Transaction set out therein immediately following the granting of the Sale Approval Order.

18.    Following the Bid Deadline, the Monitor will assess the Bids received. The Monitor, in consultation with the Applicants, will designate the most competitive bids that comply with the foregoing requirements to be "**Qualified Bids**". No Bids received shall be deemed not to be Qualified Bids without the approval of the Monitor. Only Bidders whose bids have been designated as Qualified Bids are eligible to become the Successful Bidder(s).

19.    The Stalking Horse Bid shall be deemed to be a Qualified Bid.

20.    The Monitor may only designate a Bid as a Qualified Bid where the proposed purchase price is equal to or greater than that contained in the Stalking Horse Bid, and includes a cash purchase price in an amount equal to or greater than the Stalking Horse Bid, *plus* \$50,000 US.

21.    The Monitor, in consultation with the Applicants, may waive strict compliance with any one or more of the requirements specified above and deem such non-compliant Bids to be a Qualified Bid. The Monitor and the Applicants will be under no obligation to negotiate identical terms with, or extend identical terms to, each Bidder.

22.    The Monitor shall notify each Bidder in writing as to whether its Bid constituted a Qualified Bid within two (2) business days of the Bid Deadline, or at such later time as the Monitor deems appropriate.

23.    The Monitor may, in consultation with the Applicants, aggregate separate Bids from unaffiliated Bidders to create one Qualified Bid.

**Evaluation of Competing Bids**

24.    A Qualified Bid will be evaluated based upon several factors including, without limitation: (i) the Purchase Price and the net value provided by such bid, (ii) the identity, circumstances and ability of the Bidder to successfully complete such Transactions, (iii) the proposed Transaction documents, (iv) factors affecting the speed, certainty and value of the Transaction, (v) the assets included or excluded from the bid, (vi) any related restructuring costs, and (vii) the likelihood and timing of consummating such Transaction, each as determined by the Applicants and the Monitor.

**Auction**

25.    If the Monitor receives at least one additional Qualified Bid in addition to the Stalking Horse Bid, the Monitor will conduct and administer an Auction in accordance with the

Electronically issued / Délivré par voie électronique : 16-Oct-2023
Toronto Superior Court of Justice / Cour supérieure de justice

**Court File No./N° du dossier du greffe :** CV-23-00703509-00CL

terms of this SISP (the "**Auction**"). Instructions to participate in the Auction, which will take place via video conferencing, will be provided to Qualified Parties (as defined below) not less than 24 hours prior to the Auction.

26.     Only parties that provided a Qualified Bid by the Bid Deadline, as confirmed by the Monitor, including the Stalking Horse Bid (collectively, the "**Qualified Parties**"), shall be eligible to participate in the Auction. No later than 5:00 p.m. (EST) on the day prior to the Auction, each Qualified Party must inform the Monitor whether it intends to participate in the Auction. The Monitor will promptly thereafter inform in writing each Qualified Party who has expressed its intent to participate in the Auction of the identity of all other Qualified Parties that have indicated their intent to participate in the Auction. If no Qualified Party provides such expression of intent, the Stalking Horse Bidder shall be the Successful Bid (as defined below).

## Auction Procedure

27.     The Auction shall be governed by the following procedures:

(a)     **Participation at the Auction.** Only the Applicants, the Qualified Parties, including the Stalking Horse Bidder, the Monitor and each of their respective advisors will be entitled to attend the Auction, and only the Qualified Parties will be entitled to make any subsequent Overbids (as defined below) at the Auction. The Monitor shall provide all Qualified Bidders with the details of the lead bid by 5:00 PM (EST) two (2) Business Days after the Bid Deadline. Each Qualified Bidder must inform the Monitor whether it intends to participate in the Auction no later than 5:00 PM (EST) on the Business Day prior to the Auction;

(b)     **No Collusion.** Each Qualified Party participating at the Auction shall be required to confirm on the record at the Auction that: (i) it has not engaged in any collusion with respect to the Auction and the bid process; and (ii) its bid is a good-faith *bona fide* offer and it intends to consummate the proposed transaction if selected as the Successful Bid;

(c)     **Minimum Overbid.** The Auction shall begin with the Qualified Bid that represents the highest or otherwise best Qualified Bid as determined by the Monitor, in consultation with the Applicants (the "**Initial Bid**"), and any bid made at the Auction by a Qualified Party subsequent to the Monitors announcement of the Initial Bid (each, an "**Overbid**"), must proceed in minimum additional cash increments of $100,000 US;

(d)     **Bidding Disclosure.** The Auction shall be conducted such that all bids will be made and received in one group video-conference, on an open basis, and all Qualified Parties will be entitled to be present for all bidding with the understanding that the true identity of each Qualified Party will be fully disclosed to all other Qualified Parties and that all material terms of each subsequent bid will be fully disclosed to all other Qualified Parties throughout the entire Auction; provided, however, that the Monitor, in its discretion, may establish separate video conference rooms to permit interim discussions between the Monitor and

LA PRÉSENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE À TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVE DANS CE BUREAU

GREFFIER

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

DATED AT TORONTO THIS _____ DAY OF _____
FAIT À TORONTO LE _____ JOUR DE _____

REGISTRAR

Electronically issued / Délivré par voie électronique : 16-Oct-2023
Toronto Superior Court of Justice / Cour supérieure de justice

**Court File No./N° du dossier du greffe :** CV-23-00703509-00CL

individual Qualified Parties with the understanding that all formal bids will be delivered in one group video conference, on an open basis;

(e) **Bidding Conclusion.** The Auction shall continue in one or more rounds and will conclude after each participating Qualified Party has had the opportunity to submit one or more additional bids with full knowledge and written confirmation of the then-existing highest bid(s); and

(f) **No Post-Auction Bids.** No bids will be considered for any purpose after the Auction has concluded.

(g) **Auction Procedures.** The Monitor shall be at liberty to set additional procedural rules at the Auction as it sees fit.

**Selection of Successful Bid**

28. Before the conclusion of the Auction, the Monitor, in consultation with the Applicants, will:

(a) review and evaluate each Qualified Bid, considering the factors set out in paragraph 17 and any other factor that the Applicants or the Monitor may reasonably deem relevant, provided that each Qualified Bid may be negotiated among the Monitor in consultation with the Applicants and the Qualified Bidder, and may be amended, modified or varied to improve such Qualified Bid as a result of such negotiations; and

(b) identify the highest or otherwise best bid received at the Auction (the "**Successful Bid**" and the Qualified Party making such bid, the "**Successful Party**").

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

DATED AT TORONTO THIS ___ DAY OF ___
FAIT À TORONTO LE

REGISTRAR

LA PRESENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVETUE DU SCEAU DE LA COUR SUPERIEURE DE JUSTICE A TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVE DANS CE BUREAU

GREFFIER

Electronically issued / Délivré par voie électronique : 16-Oct-2023
Toronto Superior Court of Justice / Cour supérieure de justice

**Court File No./N° du dossier du greffe :** CV-23-00703509-00CL

29.     The Successful Party shall complete and execute all agreements, contracts, instruments or other documents evidencing and containing the terms and conditions upon which the Successful Bid was made within one business day of the Successful Bid being selected as such, unless extended by the Monitor, in consultation with the Applicants, subject to the milestones set forth in paragraph 10.

**Sale Approval Motion Hearing**

30.     At the hearing of the motion to approve any transaction with a Successful Party (the "**Sale Approval Motion**"), the Monitor or the Applicants shall seek, among other things, approval from the Court to consummate any Successful Bid. All the Qualified Bids other than the Successful Bid, if any, shall be deemed to be rejected by the Monitor and the Applicants on and as of the date of approval of the Successful Bid by the Court.

**Confidentiality and Access to Information**

31.     All discussions regarding a Sale Proposal, Investment Proposal, or Bid should be directed through the Monitor. Under no circumstances should the management of the Applicants be contacted directly without the prior consent of the Monitor. Any such unauthorized contact or communication could result in exclusion of the interested party from the SISP process.

32.     Participants and prospective participants in the SISP shall not be permitted to receive any information that is not made generally available to all participants relating to the number or identity of Potential Bidders, Bidders, Qualified Bids, the details of any Bids submitted or the details of any confidential discussions or correspondence between the Applicants, the Monitor and such other bidders or Potential Bidders in connection with the SISP, except to the extent the Applicants, with the approval of the Monitor and consent of the applicable participants, are seeking to combine separate bids from Qualified Bidders.

**Supervision of the SISP**

33.     The Monitor shall oversee and conduct the SISP, in all respects, and, without limitation to that supervisory role, the Monitor will participate in the SISP in the manner set out in this SISP Procedure, the SISP Order, the Initial Order and any other orders of the Court, and is entitled to receive all information in relation to the SISP.

34.     This SISP does not, and will not be interpreted to create any contractual or other legal relationship between the Applicants or the Monitor and any Potential Bidder, any Qualified Bidder or any other Person, other than as specifically set forth in a definitive agreement that may be entered into with the Applicants.

35.     Without limiting the preceding paragraph, the Monitor shall not have any liability whatsoever to any person or party, including without limitation any Potential Bidder, Bidder, the Successful Bidder, the Applicants, the DIP Lender, or any other creditor or other stakeholder of the Applicants, for any act or omission related to the process contemplated by this SISP Procedure, except to the extent such act or omission is the result from gross negligence or wilful misconduct of the Monitor. By submitting a bid,

Electronically issued / Délivré par voie électronique : 16-Oct-2023
Toronto Superior Court of Justice / Cour supérieure de justice

**Court File No./N° du dossier du greffe :** CV-23-00703509-00CL

each Bidder, or Successful Bidder shall be deemed to have agreed that it has no claim against the Monitor for any reason whatsoever, except to the extent that such claim is the result of gross negligence or wilful misconduct of the Monitor.

36. Participants in the SISP are responsible for all costs, expenses and liabilities incurred by them in connection with the submission of any Bid, due diligence activities, and any further negotiations or other actions whether or not they lead to the consummation of a Transaction.

37. The Monitor, in consultation with the Applicants, shall have the right to modify the SISP (including, without limitation, pursuant to the Bid process letter) if, in their reasonable business judgment, such modification will enhance the process or better achieve the objectives of the SISP; provided that the Service List in these CCAA proceedings shall be advised of any substantive modification to the procedures set forth herein.

## Deposits

38. All Deposits received pursuant to this SISP shall be held in trust by the Monitor. The Monitor shall hold Deposits paid by each of the Bidders in accordance with the terms outlined in this SISP. In the event that a Deposit is paid pursuant to this SISP and the Monitor elects not to proceed to negotiate and settle the terms and conditions of a definitive agreement with the Person that paid such Deposit, the Monitor shall return the Deposit to that Person. In the event that the Successful Bidder defaults in the payment or performance of any obligations owed to the Monitor or the Applicants pursuant to any Final Agreement, the Deposit paid by the Successful Bidder, as applicable, shall be forfeited as liquidated damages and not as a penalty.

THIS IS TO CERTIFY THAT THIS
DOCUMENT, EACH PAGE OF
WHICH IS STAMPED WITH THE
SEAL OF THE SUPERIOR COURT
OF JUSTICE AT TORONTO, IS A
TRUE COPY OF THE DOCUMENT
ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE
DOCUMENT, DON'T CHACUNE
DES PAGES EST REVETUE DU
SCEAU DE LA COUR SUPERIEURE
DE JUSTICE A TORONTO, EST UNE
COPIE CONFORME DU DOCUMENT
CONSERVE DANS CE BUREAU

DATED AT TORONTO THIS ___ DAY OF ___ 20 __
FAIT À TORONTO LE ___ JOUR DE ___

REGISTRAR                                    GREFFIER

Electronically issued / Délivré par voie électronique : 16-Oct-2023
Toronto Superior Court of Justice / Cour supérieure de justice

**Court File No./N° du dossier du greffe :** CV-23-00703509-00CL

**Schedule "1"**

**Address of Monitor**

**To the Monitor:**
**B. Riley Farber Inc.**
150 York Street, Suite 1600
Toronto, ON, Canada, M5H 3S5
Attention:     Allan Nackan, Hylton Levy, Rob Biehler
Email:          anackan@brileyfin.com
                  hlevy@brileyfin.com
                  rbiehler@brileyfin.com

with a copy to:
**Miller Thomson LLP**
**Scotia Plaza**
40 King Street West, Suite 5800
P.O. Box 1011
Toronto, Ontario  M5H 3S1

Attention:     Kyla Mahar and Gina Rhodes
Email:          kmahar@millerthomson.com
                  grhodes@millerthomson.com

THIS IS TO CERTIFY THAT THIS
DOCUMENT, EACH PAGE OF
WHICH IS STAMPED WITH THE
SEAL OF THE SUPERIOR COURT
OF JUSTICE AT TORONTO, IS A
TRUE COPY OF THE DOCUMENT
ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE
DOCUMENT, DONT CHACUNE
DES PAGES EST REVÊTUE DU
SCEAU DE LA COUR SUPÉRIEURE
DE JUSTICE A TORONTO, EST UNE
COPIE CONFORME DU DOCUMENT
CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS _16_ DAY OF _October_ 20 _23_
FAIT À TORONTO LE          JOUR DE

REGISTRAR                                    GREFFIER

72632984_2.docx



SUPERIOR COURT OF JUSTICE

# COUNSEL SLIP/ENDORSEMENT

| | |
|---|---|
| **COURT FILE NO.:**    CV-23-00703509-00CL | **DATE:**   October 13[th,] 2023 |
| | **REGISTRAR:**            Tiana Khan |

**NO. ON LIST:**      1

**TITLE OF PROCEEDING:**        LIGHTHOUSE IMMERSIVE INC. AND
LIGHTHOUSE IMMERSIVE USA, INC. v SICCARDI et al

**BEFORE:**      Justice Cavanagh

---

**PARTICIPANT INFORMATION**

**For Plaintiff, Applicant, Moving Party, Crown:**

| Name of Person Appearing | Name of Party | Contact Info |
|---|---|---|
| MAHAR, KYLA | Counsel for the applicants | kmahar@millerthomson.com |
| RHODES, GINA | Counsel for the applicants | grhodes@millerthomson.com |
| MANN, TAMMY | US counsel to the Applicants | tmann@morrisnichols.com |
| | | |

**For Defendant, Respondent, Responding Party, Defence:**

| Name of Person Appearing | Name of Party | Contact Info |
|---|---|---|
| KENNEDY, REBECCA | Counsel for the Monitor | Rkennedy@tgf.ca |
| GASPAR, MARCO | | MGaspar@tgf.ca |
| ULLMAN, DAVID | Dvoretsky Holdings Inc. | Dullmann@blaney.com |
| CHAITON, HARVEY | Massimiliano Siccardi | Harvey@chaitons.com |
| LARRY, JEFFREY | LHIMP (ABC), LLP | Jeff.larry@paliareroland.com |
| SHAH, RYAN | | Ryan.shah@paliareroland.com |

**For Other, Self-Represented:**

| Name of Person Appearing | Name of Party | Contact Info |
|---|---|---|
| NACKAN, ALLAN | Monitor | anackan@brileyfin.com |
| BIEHLER, ROB | Monitor | rbiehler@brileyfin.com |
| | | |

**ENDORSEMENT OF JUSTICE CAVANAGH**

[1]      Lighthouse Immersive Inc. ("Lighthouse") and Lighthouse Immersive USA, Inc. ("Lighthouse USA" and together with Lighthouse, the "Applicants") were granted creditor protection under the CCAA on July 27, 2023.

[2]      The Applicants bring this motion seeking approval of a sale and investment solicitation process ("SISP") with a stalking horse agreement. The Applicants seek (a) approval of the SISP; (b) approval of a Stalking Horse Agreement dated October 5, 2023 entered into between the DIP Lender, SCS Finance, Inc. ("SCS") and the Applicants (the "Stalking Horse Agreement"); and (c) approval of an increase of the authorized borrowings under the DIP Facility from the principal amount of U.S. $3,500,000 to U.S. $4,000,000 (plus interest, fees and expenses).

[3]      Lighthouse is a private corporation formed under the laws of Ontario for the purpose of carrying on the business of producing and operating exhibits that use light and projection technology to allow visitors to immerse themselves in the exhibit and experience the exhibit in a novel way. Lighthouse USA is a private corporation formed under the laws of Delaware that carries on the same business as Lighthouse for exhibits located in the United States.

[4]      LHIMP (ABC), LLC ("ABC") is a Delaware limited liability company formed on June 23, 2023. On August 18, 2023, ABC took a general assignment for the benefit of creditors of LHIM Productions LLC's (LHIM) assets, including LHIM's USD $16.6 million claim against Lighthouse USA. ABC is the largest arm's-length creditor of Lighthouse USA. LHIM is a Delaware limited liability company formed in 2021 to carry out a joint venture between Lighthouse USA and Impact Museums, Inc. a/k/a Impact Museums, LLC ("Impact").

[5]      ABC opposes the Applicant's motion for approval of the SISP and approval of the Stalking Horse Agreement. ABC takes no position on the request for an increase in the DIP facility.

**Should the SISP and the Stalking Horse Agreement be approved?**

[6]      The remedial nature of the CCAA confers broad jurisdictional courts to approve a SISP, including a "stalking horse" sale process, in respect of the business or assets of an applicant, prior to or in the absence of a plan of compromise or arrangement.

[7]      The Monitor reports that since the granting of the Amended and Restatement Initial Order, the Applicants have worked with the Monitor to develop the SISP to canvass the market for an investment in, or a sale of, all or substantially all of the Applicants' property and business operations as a going concern or otherwise. The Monitor reports that the SISP was developed in consultation with the Monitor, taking into account the financial circumstances of the Applicants and the amount of financing available under the DIP Term Sheet (if the authorized borrowing limit is approved by the Court).

[8]      The SISP contemplates a one-phase process which will be administered by the Monitor, in consultation with the Applicants, with the following milestone dates: (1) Commencement Date - immediately following the granting of the SISP Order; (2) Recognition of SISP in U.S. Bankruptcy Court - immediately following the granting of the SISP Order, subject to availability of the U.S. Bankruptcy Court; (3) Bid Deadline - November 15, 2023 at 5:00 PM (EST); (4) Auction Date - November 17, 2023 at 5:00 PM (EST); (5) Sale Approval Motion in CCAA Court - No later than November 24, 2023, subject to availability of the CCAA Court; (6) Sale Approval Motion in U.S. Bankruptcy Court - Immediately following the granting of the Sale Approval Motion, subject to availability of the U.S. Bankruptcy Court; (7) Closing of the transaction - As soon as reasonably practicable following the granting of the Sale Approval Motion in the U.S. Bankruptcy Court.

[9]      If the SISP is approved, the Monitor will send a teaser document and a non-disclosure agreement to all known potential bidders and any other interested parties upon request. The Monitor will also post the SISP Order and SISP on the Monitor's website and will publish a notice of the SISP in Insolvency Insider, along with any other appropriate newspaper or journal. All interested persons that have executed an NDA will have access to an electronic data room containing information about the Applicants and the business.

[10]     By the bid deadline, potential bidders must submit a binding offer to purchase or make an investment in the Applicants or their property or business to the Monitor. To be considered a Qualified Bid, the bid must be either a binding offer for: (a) a sale proposal; (b) investment proposal; or (c) a combination of a sale proposal and an investment proposal.

[11]     A bid must also be accompanied by a deposit in an amount equal to 10% of the purchase price, investment amount or other consideration to be paid. The Monitor may only designate a bid as a Qualified Bid if the proposed purchase price is equal to or greater than that contained in the Stalking Horse Bid, and includes a cash purchase price in an amount equal to or greater than the Stalking Horse Bid, plus $50,000.

[12]     If the Monitor receives at least one additional Qualified Bid, in addition to the Stalking Horse Bid, the Monitor will conduct and administer an auction to determine the successful bid, in accordance with the terms of the SISP. The closing of any sale of or investment in the Applicants' business will be conditional on Court approval.

[13]     The Monitor, on behalf of the Applicants, negotiated and authorized the entering into of the Stalking Horse Agreement between the Applicants and SCS (in such capacity, the "Stalking Horse Bidder"), subject to Court approval. Pursuant to the Stalking Horse Agreement, the Stalking Horse Bidder has agreed to acquire substantially all of the assets of the Applicants.

[14]     Under the proposed Stalking Horse Agreement, the purchase price will be made up of (i) an amount required to satisfy priority payables, subject to adjustment at closing; (ii) a credit bid amount, estimated to be $4 million as at the closing time; (iii) the aggregate amount of assumed liabilities. The closing date is targeted for the third business day following the issuance of an Approval and Vesting Order with respect to the Stalking Horse Bid. SCS or its affiliates shall be offering employment to all of the employees of the applicants conditional and effective on the closing and on terms and conditions substantially similar to their respective terms and conditions of their employment with the companies, existing as of the closing date. The Stalking Horse Bid does not include a break fee or expense reimbursement amount.

[15]     In exercising the powers to facilitate restructurings under the CCAA, the Court considers a number of factors in connection with a request for approval of a SISP. These factors are described in *Nortel Networks Corp., Re*, [2009] OJ No. 3169, at para. 49. I address these factors:

   a.   *Is a sale transaction warranted at this time?* The Applicants are unable to continue ordinary course of business operations without additional interim financing, as provided under the DIP Term Sheet. A sale or investment transaction is the only available means to obtain value for the Applicants' stakeholders, other than a liquidation.

   b.   *Will the sale benefit the whole "economic community"?* The Applicant submit that the SISP will benefit the whole economic community because it is designed to test the market by soliciting the best bids and providing flexibility with regard to the types of transactions that can be consummated, thereby maximize value for the applicants' stakeholders. The Applicants submit that the process being undertaken by the Monitor will be a fair and transparent one that gives prospective purchasers the opportunity to complete due diligence and submit flexible, competitive bids prior to the bid deadline.

        ABC does not submit that a liquidation of the assets of the Applicants is desirable. Nevertheless, ABC opposes the SISP on the ground that the bid deadline is too soon for potential bidders to conduct due diligence and put together a bid. ABC submits that there is no urgency necessitating an abridged SISP process. ABC submits that the Court must balance the need to move quickly to address the deterioration of the value of the business during a sale process with a realistic timetable that encourages and does not chill the auction process. ABC points to the cash flow forecasts prepared by the Monitor for the Applicants showing that the Applicants will have cash on hand until at least December 10, 2023. ABC submits that if the SISP is to be approved, the Bid Deadline should be extended to 60 days from approval of the SISP.

        ABC submits that the Applicants have failed to meaningfully reduce expenses and, as a result, they are losing out on additional time that could be used to market their business and assets.

        I do not accept ABC's submissions with respect to the Bid Deadline. The Monitor reports that the SISP (including a bid deadline of four weeks) is reasonable given (i) the continuing operating losses that the Applicants are sustaining on a weekly basis; (ii) the Applicant's operations have almost completely halted besides one ongoing show in Lighthouse; (iii) the property and business is straightforward to understand

for potential purchasers; (iv) rent and costs to store redundant inventory and equipment are ongoing; and (v) the Applicant's liquidity constraints as outlined in the revised cash flow forecast. The Monitor reports that the Applicants and the Monitor reached out to certain strategic investors who may be interested in a restructuring transaction with respect to the Applicants and, unfortunately, no potential transaction materialized from those discussions.

The cash flow forecast will not accommodate a longer period for bids to be made. The Monitor's view is that, although the period is a very short one, it is reasonable in the circumstances. I accept that in some other cases where an extremely abbreviated sale process was approved, there was evidence of a robust sale process before the request for approval of a SISP. In my view, each situation needs to be addressed having regard to its particular circumstances.

I do not accept ABC's submission that the Applicants have failed to manage costs and that this should be considered as a ground not to approve the SISP.

When I engage in the balancing exercise of considering the need to move quickly given the financial constrains confronting the Applicants with an alternative of a longer time for bidders to make bids, I must face the fact that a longer period for bids is not a viable option. The Monitor has analyzed the alternative of a liquidation scenario and recommends the SISP as a superior path forward. I accept the Monitor's assessment in this regard.

c. *Do any of the debtors' creditors have a bona fide reason to object to a sale of the business?* Although ABC opposes approval of the SISP, it does not contend that liquidation is a superior alternative or that it or other creditors will be better off in a liquidation. I am satisfied that, where liquidation is the only alternative to approval of the SISP, no creditor has a reasonable basis to object to the SISP as the best way to maximize value for creditors under the circumstances.

d. *Is there a better viable alternative?* There is no better viable alternative.

[16]    Approval for the Stalking Horse Agreement is being sought for the purpose of the SISP. Courts have determined that stalking horse bids are often a reasonable and useful element of the SISP. See, for example, *Mustang GP Ltd. (RE)*, 2015 ON SC 6562, at paragraph 39.

[17]    The Monitor reports that the Stalking Horse Agreement will provide stability to the Applicants' business and give confidence to stakeholders (including customers, employees and suppliers) that a going concern outcome of the CCAA proceedings will be achieved through the SISP. The Monitor reports that by providing a baseline purchase price and deal certainty, the Stalking Horse Bid will not negatively impact the conduct of the SISP. The Monitor reports that the financial terms of the Stalking Horse Purchase agreement are reasonable in the circumstances and provide a value greater than a liquidation of the Applicants' assets.

[18]    ABC submits that there is an insufficient evidentiary basis to approve the Stalking Horse agreement because there is no record of marketing efforts by the Applicants or the Monitor and, accordingly, neither the Monitor nor the Court can evaluate whether or not the Stalking Horse Bid is fair in the circumstances (either by having another stalking horse bid to serve as a comparison or by demonstrating that there is no other interest to serve as stalking horse bidder). ABC contends that competitors to the Applicants would, potentially, be the best candidates to serve as a stalking horse bidder, however, the motion materials do not disclose evidence of any solicitation of competitors, such as Impact.

[19]    In support of this submission, ABC sites *Boutique Euphoria inc.*, 2007 QCCS 7129. In *Boutique*, Gascon J.S.C. (as he then was) addressed four considerations in assessing whether a stalking horse bid process should be approved.

[20]    The first consideration was whether there had been some control exercised at the first stage of the competition (to become the stalking horse bidder) and to what extent. Justice Gascon, in addressing this consideration, noted that the stalking horse bid establishes the benchmark to attract other bids and its accuracy is key to the integrity of the whole process. He noted that the stalking horse bid is normally subject to a breakup fee and, therefore, it is even more important

that it be accurate as calls for over bids will have to exceed a certain margin over and above the stalking horse bid. In this case, the Monitor reports that upon issuance of the October 3, 2023 endorsement granting it expanded powers, it began negotiating with SCS with respect to the Stalking Horse Agreement. The Monitor exercised control over the Applicants following this endorsement and used its business judgment in negotiating it as being in the best interests of stakeholders of the Applicants. As part of this process, the Monitor assessed at a high level the realizable value of the assets of the Applicants in a liquidation scenario. In the circumstances, I am satisfied that the Monitor acted reasonably because to undertake a longer process would have been practically impossible given the cash constraints confronting the Applicants. In addition, the Stalking Horse Agreement does not include a break fee, so this is not a relevant consideration.

[21]    The second consideration identified by Gascon J. was whether there is a need for stability within a very short timeframe for the debtor to continue operations and the restructuring contemplated to be successful. I am satisfied that this consideration supports the Applicants' request for approval of the Stalking Horse Agreement.

[22]    The third consideration identified by Gascon J. is whether the economic incentives for the stalking horse bidder, in terms of breakup fee, topping fee and over bid increments protection, are fair and reasonable. There are no economic incentives for the Stalking Horse Bidder, so this consideration does not need to be addressed on this motion.

[23]    The fourth consideration identified by Gascon J. Is whether the timelines contemplated are reasonable to ensure a fair process at the second stage, namely, to become the successful over bidder. As I have noted, the Monitor reports that the fairness of the process has been considered.

[24]    In my view, the considerations in *Boutique* as they apply in the circumstances of this motion, support approval of the Stalking Horse Agreement.

[25]    ABC also cites the decision of Fitzpatrick J. in *Freshlocal Solutions Inc. (Re)*, 2022 BCSC 1616. In *Freshlocal*, the application judge approved a SISP save and except for approval of the stalking horse agreement. The secured lenders strenuously objected to approval of the stalking horse agreement. The application judge considered that the secured lenders stood to bear the brunt of the consequences of approval of the stalking horse agreement and their views were not sufficiently taken into account by the monitor. The application judge also noted that there were troubling aspects of the stalking horse agreement in terms of the financial compensation that is sought by the stalking horse bidder. The application judge observed that marketing efforts had been undertaken and bidders were already conducting their own diligence, such that little or no benefit would result from the stalking horse agreement. In my view, the facts in *Freshlocal* are distinguishable from those on this motion.

[26]    ABC objects to inclusion in the property to be made available for sale of the Applicants' claims against their directors. ABC contends that to include these assets is unfair to arm's length creditors and unnecessary. There is no evidence that there are grounds for any such claims. It would be pure conjecture to attempt to assign a value to any such claims. I do not decline to approve the SISP and the Stalking Horse Agreement for this reason.

[27]    I am satisfied that the Stalking Horse Agreement should be approved.

[28]    ABC asks for an order that it be granted access to all of the due diligence materials of the Applicants without providing the Monitor with "financial wherewithal to close a transaction. The Monitor objects to ABC, which has connections with Impact, a competitor of the Applicants, being given special access to confidential documents in the data room. I am not satisfied that ABC has shown that it should be granted this special access. I decline to grant this access.

[29]    If ABC wishes to object to approval of a sale transaction after completion of the SISP, the proper time to do so is at the hearing of such a motion.

**Should approval be given to an increase in the DIP facility?**

[30]    I am satisfied that approval should be given. The Monitor supports the request. No one opposes.

**Disposition**

[31]     For these reasons, Orders to issue in forms of Orders signed by me today.




October 13th, 2023

# **EXHIBIT 2**

CCAA DIP Increase Order

Electronically issued / Délivré par voie électronique : 16-Oct-2023
Toronto Superior Court of Justice / Cour supérieure de justice

**Court File No./N° du dossier du greffe :** CV-23-00703509-00CL



Court File No. CV-23-00703509-00CL

## ONTARIO
## SUPERIOR COURT OF JUSTICE
## COMMERCIAL LIST

THE HONOURABLE ) FRIDAY, THE 13ᵀᴴ

)

JUSTICE CAVANAGH ) DAY OF OCTOBER, 2023

)

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985,
c.C-36 AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
LIGHTHOUSE IMMERSIVE INC. AND LIGHTHOUSE IMMERSIVE USA, INC.

### ORDER
### (DIP Increase and Approval of Monitor's Conduct)

**THIS MOTION,** made by the Applicants, pursuant to the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended, (the "**CCAA**") for an order (i) increasing the authorized borrowings under the DIP Term Sheet (as defined in the Initial Order); and (ii) approving the activities, conduct and decisions of B. Riley Farber Inc., in its capacity as the Monitor of the Applicants (the "**Monitor**"), was heard this day by Zoom videoconference.

**ON READING** the Motion Record of the Applicants dated October 5, 2023, the Responding Motion Record of LHIMP (ABC), LLC ("**ABC**")., dated October 11, 2023, the first report of the Monitor dated August 1, 2023 (the "**First Report**"), the second report of the Monitor dated October 5, 2023 (the "**Second Report**"), and upon hearing the submissions of counsel for the Applicants, counsel for SCS Finance, Inc. (the "**DIP Lender**"), counsel for ABC, counsel for Massimiliano Siccardi, counsel for the Monitor, and counsel for the shareholders of the Applicants,

Electronically issued / Délivré par voie électronique : 16-Oct-2023
Toronto Superior Court of Justice / Cour supérieure de justice

**Court File No./N° du dossier du greffe :** CV-23-00703509-00CL

no one appearing for any other party although duly served as appears from the affidavit of service
of Gina Rhodes dated October 5, 2023, filed.

## SERVICE AND DEFINITIONS

1. **THIS COURT ORDERS** that the time for service of the Notice of Motion and Motion
Record is abridged and validated such that this Motion is properly returnable today, and further
service of the Notice of Motion and the Motion Record is hereby dispensed with.

2. **THIS COURT ORDERS** that capitalized terms used in this Order and not otherwise
defined herein shall have the meaning ascribed to them in the Amended and Restated Initial Order
dated July 27, 2023 (the "**ARIO**") and the Second Report.

## DIP FINANCING INCREASE

3. **THIS COURT ORDERS** that the maximum authorized borrowings under the DIP Term
Sheet is hereby increased from the principal amount of US$3,500,000 to US$4,000,000 (plus
interest, fees, and expenses).

## APPROVAL OF MONITOR REPORTS AND ACTIONS

4. **THIS COURT ORDERS** that the First Report, Second Report and the activities, conduct
and decisions of the Monitor as set out therein are hereby ratified and approved, provided that only

THIS IS TO CERTIFY THAT THIS
DOCUMENT, EACH PAGE OF
WHICH IS STAMPED WITH THE
SEAL OF THE SUPERIOR COURT
OF JUSTICE AT TORONTO, IS A
TRUE COPY OF THE DOCUMENT
ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE
DOCUMENT, DONT CHACUNE
DES PAGES EST REVÊTUE DU
SCEAU DE LA COUR SUPÉRIEURE
DE JUSTICE A TORONTO, EST UNE
COPIE CONFORME DU DOCUMENT
CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS _16_ DAY OF _October_ 20 _23_
FAIT A TORONTO LE _____ JOUR DE

REGISTRAR                     GREFFIER

72632530_2.docx

Electronically issued / Délivré par voie électronique : 16-Oct-2023
Toronto Superior Court of Justice / Cour supérieure de justice

**Court File No./N° du dossier du greffe :** CV-23-00703509-00CL

the Monitor, in its personal capacity and only with respect to its own personal liability, shall be entitled to rely upon or utilize in any way such approval.

## GENERAL

5. **THIS COURT ORDERS** that the Applicants or the Monitor may from time to time apply to this Court for advice and directions in the discharge of their powers and duties hereunder.

6. **THIS COURT HEREBY REQUESTS** the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada, the United States or elsewhere, to give effect to this Order and to assist the Applicants, the Monitor and their respective agents in carrying out the terms of this Order. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Applicants and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Applicants and the Monitor and their respective agents in carrying out the terms of this Order.

7. **THIS COURT ORDERS** that each of the Applicants and the Monitor be at liberty and is hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order, and that the Monitor is authorized and empowered to act as a representative in respect of the within proceedings for the purpose of having these proceedings recognized in a jurisdiction outside Canada.

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE A TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS ___ DAY OF _____ 20 __
FAIT À TORONTO LE ___ JOUR DE

REGISTRAR                                    GREFFIER

72632530_2.docx

Electronically issued / Délivré par voie électronique : 16-Oct-2023
Toronto Superior Court of Justice / Cour supérieure de justice

**Court File No./N° du dossier du greffe :** CV-23-00703509-00CL

8.    **THIS COURT ORDERS** that this Order is effective from the date that it is made and is

enforceable without any need for entry and filing.

Digitally signed
by Mr. Justice
Cavanagh

THIS IS TO CERTIFY THAT THIS
DOCUMENT, EACH PAGE OF
WHICH IS STAMPED WITH THE
SEAL OF THE SUPERIOR COURT
OF JUSTICE AT TORONTO, IS A
TRUE COPY OF THE DOCUMENT
ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE
DOCUMENT, DONT CHACUNE
DES PAGES EST REVÊTUE DU
SCEAU DE LA COUR SUPÉRIEURE
DE JUSTICE A TORONTO, EST UNE
COPIE CONFORME DU DOCUMENT
CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS ___ DAY OF _____ 20 ___
FAIT À TORONTO LE               JOUR DE

REGISTRAR                                              GREFFIER

72632530_2.docx

# EXHIBIT 3

CCAA Sealing Order

Electronically issued / Délivré par voie électronique : 16-Oct-2023
Toronto Superior Court of Justice / Cour supérieure de justice

**Court File No./N° du dossier du greffe :** CV-23-00703509-00CL



Court File No. CV-23-00703509-00CL

## ONTARIO
## SUPERIOR COURT OF JUSTICE
## COMMERCIAL LIST

| | | |
|---|---|---|
| THE HONOURABLE | ) | MONDAY, THE 16TH |
| | ) | |
| JUSTICE CAVANAGH | ) | DAY OF OCTOBER 2023 |

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985,
c.C-36 AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
LIGHTHOUSE IMMERSIVE INC. AND LIGHTHOUSE IMMERSIVE USA, INC.

### ORDER
### (Sealing Confidential Appendix)

**THIS MOTION,** made by B. Riley Farber Inc., in its capacity as the Monitor of the

Applicants (the "**Monitor**"), pursuant to the *Companies' Creditors Arrangement Act*, R.S.C. 1985,

c. C-36, as amended, (the "**CCAA**") for an order sealing the confidential appendix ("**Confidential**

**Appendix**") to the second report of the Monitor, including the supplement thereto (the "**Second**

**Report**") until further order of this Court, was heard this day by Zoom videoconference.

**ON READING** the Motion Record of the Applicants dated October 5, 2023, the

Responding Motion Record of LHIMP (ABC), LLC ("**ABC**"), dated October 11, 2023, the first

report of the Monitor dated August 1, 2023 (the "**First Report**"), the second report of the Monitor

dated October 5, 2023 and the supplement thereto dated October 12, 2023 (the "**Second Report**"),

and upon hearing the submissions of counsel for the Applicants, counsel for SCS Finance, Inc.

(the "**DIP Lender**"), counsel for ABC, counsel for Massimiliano Siccardi, counsel for the Monitor,

Electronically issued / Délivré par voie électronique : 16-Oct-2023
Toronto Superior Court of Justice / Cour supérieure de justice

**Court File No./N° du dossier du greffe :** CV-23-00703509-00CL

and counsel for the shareholders of the Applicants, no one appearing for any other party although duly served as appears from the affidavit of service of Gina Rhodes dated October 5, 2023, filed and the affidavit of service of Marco Gaspar dated October 12, 2023.

## SERVICE AND DEFINITIONS

1.    **THIS COURT ORDERS** that the time for service is abridged and validated such that this motion is properly returnable today, and hereby dispenses with further service thereof.

2.    **THIS COURT ORDERS** that capitalized terms used in this Order and not otherwise defined herein shall have the meaning ascribed to them in the Second Report.

## SEALING PROVISION

3.    **THIS COURT ORDERS** that the Confidential Appendix to the Monitor's Second Report is hereby sealed and shall not form part of the public record until further Order of this Court.

## GENERAL

4.    **THIS COURT HEREBY REQUESTS** the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada, the United States or elsewhere, to give effect to this Order and to assist the Applicants, the Monitor and their respective agents in carrying out the terms of this Order. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Applicants and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Applicants and the Monitor and their respective agents in carrying out the terms of this Order.

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE A TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS 16 DAY OF October 20 23
FAIT À TORONTO LE        JOUR DE

REGISTRAR                                GREFFIER

Electronically issued / Délivré par voie électronique : 16-Oct-2023
Toronto Superior Court of Justice / Cour supérieure de justice

**Court File No./N° du dossier du greffe :** CV-23-00703509-00CL

5. **THIS COURT ORDERS** that each of the Applicants and the Monitor be at liberty and is hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order, and that the Monitor is authorized and empowered to act as a representative in respect of the within proceedings for the purpose of having these proceedings recognized in a jurisdiction outside Canada.

6. **THIS COURT ORDERS** that this Order is effective from the date that it is made and is enforceable without any need for entry and filing.

Digitally signed by
Mr. Justice Cavanagh

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

DATED AT TORONTO THIS 16 DAY OF October 20 23

REGISTRAR

LA PRÉSENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE A TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

FAIT À TORONTO LE JOUR DE

GREFFIER

# **EXHIBIT 4**

CCAA Stay Extension Order

Electronically issued / Délivré par voie électronique : 06-Oct-2023
Toronto Superior Court of Justice / Cour supérieure de justice

**Court File No./N° du dossier du greffe :** CV-23-00703509-00CL



Court File No. CV-23-00703509-00CL

## ONTARIO
## SUPERIOR COURT OF JUSTICE
## COMMERCIAL LIST

| | | |
|---|---|---|
| THE HONOURABLE | ) | FRIDAY, THE 6ᵀᴴ |
| | ) | |
| JUSTICE CAVANAGH | ) | DAY OF OCTOBER, 2023 |

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c.C-36 AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF LIGHTHOUSE IMMERSIVE INC. AND LIGHTHOUSE IMMERSIVE USA, INC.

### ORDER
### (Stay Extension)

**THIS MOTION,** made by the Applicants, pursuant to the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended, (the "**CCAA**") for an order extending the stay of proceedings (the "**Stay Period**") in these CCAA proceedings, was heard this day by Zoom videoconference.

**ON READING** the Motion Record of the Applicants and the second report of the Monitor dated October 5, 2023 (the "**Second Report**"), and upon hearing the submissions of counsel for the Applicants, counsel for the Monitor, counsel for the shareholders of the Applicants, no one appearing for any other party although duly served as appears from the affidavit of service of Gina Rhodes dated October 5, 2023, filed,

72043578_1.docx

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

LA PRESENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE A TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVE DANS CE BUREAU

DATED AT TORONTO THIS _____ DAY OF October 20 23
FAIT À TORONTO LE _____ JOUR DE

REGISTRAR                    GREFFIER

**SERVICE AND DEFINITIONS**

1.      **THIS COURT ORDERS** that the time for service of the Notice of Motion and Motion Record is abridged and validated such that this Motion is properly returnable today, and further service of the Notice of Motion and the Motion Record is hereby dispensed with.

2.      **THIS COURT ORDERS** that capitalized terms used in this Order and not otherwise defined herein shall have the meaning ascribed to them in the Amended and Restated Initial Order dated July 27, 2023 (the "**ARIO**") and the Second Report.

**STAY EXTENSION**

3.      **THIS COURT ORDERS** that the Stay Period is hereby extended from October 6, 2023 to and including December 8, 2023.

**GENERAL**

4.      **THIS COURT ORDERS** that the Applicants or the Monitor may from time to time apply to this Court for advice and directions in the discharge of their powers and duties hereunder.

5.      **THIS COURT HEREBY REQUESTS** the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada, the United States or elsewhere, to give effect to this Order and to assist the Applicants, the Monitor and their respective agents in carrying out the terms of this Order. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Applicants and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Applicants and the Monitor and their respective agents in carrying out the terms of this Order.

6. **THIS COURT ORDERS** that each of the Applicants and the Monitor be at liberty and is hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order, and that the Monitor is authorized and empowered to act as a representative in respect of the within proceedings for the purpose of having these proceedings recognized in a jurisdiction outside Canada.

7. **THIS COURT ORDERS** that this Order is effective from the date that it is made and is enforceable without any need for entry and filing.

Digitally signed by
Mr. Justice
Cavanagh

THIS IS TO CERTIFY THAT THIS
DOCUMENT, EACH PAGE OF
WHICH IS STAMPED WITH THE
SEAL OF THE SUPERIOR COURT
OF JUSTICE AT TORONTO, IS A
TRUE COPY OF THE DOCUMENT
ON FILE IN THIS OFFICE

LA PRESENT ATTEST QUE CE
DOCUMENT, DONT CHACUNE
DES PAGES EST REVÊTUE DU
SCEAU DE LA COUR SUPÉRIEURE
DE JUSTICE A TORONTO, EST UNE
COPIE CONFORME DU DOCUMENT
CONSERVE DANS CE BUREAU

DATED AT TORONTO THIS _____ DAY OF _October_ 20 _23_
FAIT À TORONTO LE          JOUR DE

REGISTRAR                              GREFFIER



SUPERIOR COURT OF JUSTICE

## COUNSEL SLIP

**COURT FILE NO.:**     CV-23-00703509-00CL          **DATE:**  **6 October 2023**

**NO. ON LIST:**    1

**TITLE OF PROCEEDING:**     LIGHTHOUSE IMMERSIVE INC. AND LIGHTHOUSE
IMMERSIVE USA, INC. v. SICCARDI et al

**BEFORE JUSTICE:**     MR JUSTICE CAVANAGH

---

**PARTICIPANT INFORMATION**

**For Plaintiff, Applicant, Moving Party, Crown:**

| Name of Person Appearing | Name of Party | Contact Info |
|---|---|---|
| Kyla Mahar | Counsel for Applicants | kmahar@millerthompson.com 416-597-4303 |
| Gina Rhodes | S/A | grhodes@millerthompson.com 416-597-4321 |

**For Defendant, Respondent, Responding Party, Defence:**

| Name of Person Appearing | Name of Party | Contact Info |
|---|---|---|
| Harvey Chaiton | Massimiliano Siccardi | harvey@chaitons.com 416-218-1129 |
|  |  |  |
|  |  |  |
|  |  |  |

**For Other, Self-Represented:**

| Name of Person Appearing | Name of Party | Contact Info |
|---|---|---|
| Rebecca Kennedy | Counsel for Monitor | rkennedy@tgf.ca 416-304-0971 |
| Rachel Fielding | S/A | rfielding@tgf.ca 416-304-0971 |
| Jeff Larry | Counsel for LHIMP (ABC), LLP | jeff.larry@paliareroland.com 415-646-4330 |

| Steven Weisz | Counsel for SCS Finance | sweisz@cozen.com<br>641-417-5334 |
| Hylton Levy | Monitor | hlevy@brileyfin.com<br>416-496-3070 |
| Allan Nackan | Monitor | |

**ENDORSEMENT OF JUSTICE CAVANAGH:**

At the hearing today, the Applicants request an extension of the stay of proceedings in this CCAA proceeding. On the evidence before me, I am satisfied that the Applicants are acting in good faith and that the request should be granted. I am satisfied that it is in the interests of stakeholders as a whole to extend the stay until December 8, 2023, as requested, to give the Applicants needed stability during this process. It is open to any party to move to vary the stay of proceedings.

The Applicants' motion for an order (i) increasing the maximum borrowings under the DIP Term Sheet; and (ii) approving a sale and investment solicitation process and approving a stalking horse agreement dated October 5, 2023 is adjourned to October 13, 2023 at 9:00 a.m. for 90 minutes.

If counsel for any interested party needs to seek directions with respect to the timetable for this motion, counsel is given leave to seek an urgent appointment with me through the Commercial List Office and I will accommodate the request.

Order to issue in form of Order signed by me today.

**APPENDIX "B"**

**TEASER LETTER, NDA AND ACKNOWLEDGMENT LETTER**

**TEASER LETTER**





### ACQUISITION / INVESTMENT OPPORTUNITY
### LIGHTHOUSE IMMERSIVE INC. AND LIGHTHOUSE IMMERSIVE USA, INC.

On July 27, 2023, Lighthouse Immersive Inc. ("**Lighthouse**") and Lighthouse Immersive USA, Inc. ("**Lighthouse USA**"), (together, the **"Companies"**) were granted an initial order (as amended and restated, the "**Initial Order**") under the *Companies' Creditors Arrangement Act* ("**CCAA**") by the Ontario Superior Court of Justice (Commercial List) (the **"Court"**). The Court appointed B. Riley Farber Inc. as Monitor of the Companies (the "**Monitor**"). The Companies commenced and obtained recognition of the CCAA proceedings in the United States Bankruptcy Court under Chapter 15, Title 11, of the United States Code (the "**Chapter 15 Proceedings**").

On October 13, 2023, the Court granted an order (the "**SISP Order**"), approving the Companies' sale and investment solicitation process (the "**SISP**"), to solicit interest in a restructuring, recapitalization or other form of reorganization of the business operations and affairs of the Companies (the "**Opportunity**"). The Court also approved the Stalking Horse Agreement between the Companies and SCS Finance, Inc., dated October 5, 2023 (the **"Stalking Horse Bidder"**).

The Monitor will be conducting the SISP. Recipients should direct all questions or requests for additional information to the Monitor and not to anyone at the Companies.

### HIGHLIGHTS OF THE COMPANIES' BUSINESS

- The Companies produce and deliver immersive entertainment experiences incorporating art, music, and state-of-the-art technology to the public in Toronto and various markets in the United States.

- The Companies' immersive exhibits highlight brushstrokes, colour and detail to bring art "to life" and is paired with music to create a full immersive experience.

- Commencing in 2020 in Toronto, Lighthouse's Immersive Van Gogh show projected artwork in 360 degrees on 500,000 cubic feet of surfaces within the gallery's architecture.

- The Companies' combined revenues in 2022 totaled approximately US$24 million.

- The Companies' combined assets include merchandise inventories, audio/video ("**AV**") and production equipment, and intellectual property, including a customer database.

150 York St. Suite 1600
Toronto, ON M5H 3S5

1

**FarberGroup.com**





## TRANSACTION PROCESS

The Opportunity may include one or more of a restructuring, recapitalization or other form or reorganization of the business and affairs of the Companies as a going concern or a sale of all, substantially all or one or more components of the Companies' assets (the "**Property**") and business operations (the "**Business**") as a going concern or otherwise, or some combination thereof (each, a "**Transaction**").

Parties who are interested in participating in the SISP (a "**Potential Bidder**") must provide to the Monitor: (i) a non-disclosure agreement in the form and substance satisfactory to the Companies and the Monitor, and their respective counsel ("**NDA**"); and (ii) information satisfactory to the Monitor as to their financial wherewithal to close a Transaction.

The Stalking Horse Bidder is related to the Companies. A copy of the Stalking Horse Agreement is available on the Monitor's website and within the electronic data room ("**Data Room**"). Access to the Data Room for due diligence materials will be granted only to Potential Bidders who comply with the above requirements.

Potential Bidders who wish to make a formal offer to purchase or make an investment in the Companies or their Property or Business shall submit a binding offer ("**Bid**") addressed to the Monitor and Companies' counsel that complies with <u>all</u> the requirements in the SISP.

The Bid must be either a binding offer to: (i) acquire all, substantially all or a portion of the Property (a "**Sale Proposal**"); or (ii) make an investment in, restructure, reorganize or refinance the Business or the Companies (an "**Investment Proposal**"); or (iii) carry out any combination of a Sale Proposal and an Investment Proposal.

In order for the Monitor to designate a Bid as a "**Qualified Bid**", the Bid must comply with the requirements of the SISP, including proposing a cash purchase price equal to or greater than the purchase price contemplated in the Stalking Horse Agreement *plus* US$50,000.

If the Monitor receives at least one additional Qualified Bid in addition to the Stalking Horse Bid, the Monitor will conduct and administer an Auction in accordance with the terms of the SISP. If there is an Auction, the Monitor, in consultation with the Companies, will review each Qualified Bid and identify the highest or otherwise best bid received (the "**Successful Bid**").

The Companies will seek Court approval of the Successful Bid.

Potential Bidders are encouraged to submit their offers in accordance with the terms of the SISP. Bidders must rely solely on their own independent review, investigation and/or inspection of all information and of the Property and Business in connection with their participation in the SISP and any transaction they enter into with the Companies.

Visit the Monitor's website (Lighthouse Immersive BRF link) for relevant information on the Companies and the CCAA and Chapter 15 Proceedings.

*Capitalized terms not defined in this teaser letter are defined in the SISP Order, including Schedule "A" attached thereto.*

150 York St. Suite 1600
Toronto, ON M5H 3S5

FarberGroup.com

2





## BID DEADLINE

**For a Bid to be considered, it must be received by the Monitor and the Companies' counsel no later than 5:00PM EST on November 15, 2023.**

## ADDITIONAL INFORMATION

For further information, potential purchasers may contact Rob Biehler or James Sacoransky by telephone or by email (below):

**B. Riley Farber Inc.**
**In its capacity as Court-Appointed Monitor**

**Rob Biehler**
Managing Director
Email: rbiehler@brileyfin.com
Tel: +1 (905) 749 - 4694

**James Sacoransky**
Senior Manager
Email: jsacoransky@brileyfin.com
Tel: +1 (647) 962 - 5384

150 York St. Suite 1600
Toronto, ON M5H 3S5

3

**FarberGroup.com**



**NDA**

# NON-DISCLOSURE AGREEMENT

**THIS AGREEMENT** made as of October _____, 2023

**BETWEEN:**

_____
("**Counterparty**")

**AND**

Lighthouse Immersive Inc. and Lighthouse Immersive USA, Inc.
(together, the "**Companies**")

The following terms and conditions of this Non-Disclosure Agreement (the "**Agreement**") apply to Confidential Information disclosed by Submitting Party to Receiving Party in connection with a sale and investment solicitation process (the "**SISP**") conducted by B. Riley Farber Inc., in its capacity as court-appointed Monitor of the Companies (the "**Monitor**") of the Companies' proceedings under the *Companies' Creditors Arrangement Act* (the "**CCAA**"), and pursuant to the Order of the Court dated October 13, 2023 (the "**SISP Order**").

Counterparty and the Companies are each referred to within as a "Party" and collectively as the "Parties". The Party providing the Confidential Information is deemed the "**Submitting Party**" and the Party receiving the Confidential Information is deemed the "**Receiving Party**". In connection with their consideration of one or more possible transactions ("**Transactions**") between Counterparty and the Companies in accordance with the SISP and SISP Order, each Party has received or may receive non-public, proprietary information containing valuable, proprietary and confidential trade secrets and other technical, business, strategic, financial and marketing data about the Submitting Party and/or its subsidiaries and affiliates ("**Confidential Information**"). The Confidential Information may include specific information about financial operations, details of certain of the Companies' immersive shows, as well as other opportunities under consideration and pursuit. The Confidential Information may be delivered orally, in writing or by other media.

As between the Parties, the Submitting Party exclusively owns its Confidential Information and all proprietary rights in or associated with its Confidential Information. Unauthorized use or disclosure of Confidential Information may cause substantial and irreparable damage to the Submitting Party's business and competitive position. Confidential Information is being provided by Submitting Party to Receiving Party in confidence in accordance with the following terms and conditions:

1. Confidential Information is being provided solely for the purpose of enabling Receiving Party to make an evaluation of possible participation in one or more of the Transactions.

Without the prior written consent of Submitting Party, Receiving Party will not (a) disclose to any third party the fact that any Confidential Information has been provided to Receiving Party or that either Party is exploring the possibility of participating in the Transactions or that such Transactions are the subject of consideration; (b) disclose to any third party any or all Confidential Information; or (c) use Confidential Information for any purpose other than evaluating the potential Transactions. Receiving Party will only disclose Confidential Information to those of its affiliates, employees, officers, directors, agents, representatives, advisors, shareholders (and their respective affiliates, employees, officers, directors, agents, representatives and advisors), financing sources, lenders or potential lenders, partners or potential partners and consultants (collectively "**Representatives**") who reasonably need to know such information and who agree to comply with the terms of this Agreement or who are otherwise bound by duties of confidentiality that are no less stringent than the requirements hereof. Such disclosure by Receiving Party will be made only to the extent necessary in order to prepare the above-mentioned evaluation or to make decisions or render advice in connection therewith. Any unauthorized disclosure or use of Confidential Information by Receiving Party's Representatives will be deemed to have been by Receiving Party, and Receiving Party will be responsible and liable for any breach of this Agreement by its Representatives.

All communications with the Companies regarding the potential Transactions or Confidential Information shall be made solely through the **Monitor**, and Counterparty shall not communicate with any of the Companies' partners, lenders, employees, vendors, customers, labour representatives, consultants, or affiliates without prior written consent from the Monitor unless in the ordinary course of Counterparty's business unrelated to the Transactions contemplated under this Agreement.

The restrictions in Section 1 will not apply to any Confidential Information that Receiving Party can demonstrate:

    a.  is or becomes publicly available without breach of this Agreement; or

    b.  was rightly received without obligation of confidentiality from a third party; or

    c.  was independently developed by Receiving Party.

Notwithstanding the above, nothing herein will prevent Receiving Party from disclosing Confidential Information pursuant to requirement by law, valid court order, subpoena or government inquiry; provided, however, that prior to any such disclosure Receiving Party will, as applicable, (i) unless prohibited by law from doing so, notify Submitting Party promptly in writing of the order or subpoena and of the facts and circumstances surrounding such order or request so that Submitting Party may seek an appropriate protective order; (ii) cooperate with Submitting Party in any proceeding to obtain an appropriate protective order; and (iii) to the extent disclosure is still required, take all reasonable steps to make the disclosure on a confidential basis.

2. In the event the Counterparty produces work product for the Companies that is paid for by the Companies, the work product shall become the property of the Companies and the intellectual property contained therein will belong to the Companies.

3. Receiving Party agrees to use the same care and discretion to avoid disclosure of Confidential Information as it uses with its own similar information it does not wish to disclose, but in no event less than a reasonable standard of care. Receiving Party will promptly provide Submitting Party with notice of any actual or

threatened breach of the terms of this Agreement or unauthorized disclosure or use of Confidential Information.

4. Receiving Party agrees to indemnify the Companies for losses, damages, costs and expenses arising from any breach of this Agreement caused by Receiving Party or its Representatives. In addition to any and all remedies available at law or in equity, Receiving Party agrees to take all reasonable measures, including court proceedings at Receiving Party's own expense, to restrain current or future Representatives from unauthorized use or disclosure of Confidential Information.

5. Except as may otherwise by expressly set forth in a definitive written agreement between the Parties, neither Party shall be deemed to have made any representation or warranty as to the accuracy or completeness of Confidential Information, or any item or items thereof. Without limitation of the foregoing, Receiving Party acknowledges that financial information provided to Receiving Party must be independently verified by Receiving Party prior to consummating any Transaction. It is understood that this Agreement does not obligate either Party to enter into any further definitive agreement or to disclose any particular information to the other Party and, other than as contemplated in section 2 herein, does not grant any intellectual property rights to Receiving Party.

6. Upon request from the Submitting Party, Receiving Party will promptly destroy or return to Submitting Party all Confidential Information, any copies thereof, and all notes, correspondence, documents or other records relating to the Confidential Information or the above-mentioned Transactions then in Receiving Party's possession. Notwithstanding anything to the contrary in this Agreement, (i) Receiving Party and its Representatives may retain copies of Confidential Information to the extent Receiving Party or its Representatives are required to do so by applicable law or internal record keeping policies (subject to this

Agreement's confidentiality obligations), and (ii) Receiving Party and its Representatives shall not be required to delete electronically-stored Confidential Information to the extent such deletion would be technologically impracticable or inconsistent with the archival records retention policy of Receiving Party or its Representatives (subject to this Agreement's confidentiality obligations).

7. The Parties expressly acknowledge that monetary damages alone may not be an adequate remedy for any breach of this Agreement and that, in addition to any other remedies which the Parties may have, Submitting Party will be entitled to seek injunctive relief, including specific performance, in any court of competent jurisdiction with respect to any actual or threatened breach by Receiving Party of this Agreement without the necessity of proving actual damages or posting a bond.

8. In addition to its other obligations under this Agreement, Receiving Party will comply with all applicable privacy laws regarding its collection, use, protection and disclosure of personal information contained in the Submitting Party's Confidential Information.

9. This Agreement will remain in effect for a period of two (2) years from the date that either Party terminates negotiations with respect to the potential Transactions.

10. The substantive laws of the Province of Ontario will govern this Agreement, without reference to provisions relating to conflict of laws.

11. Nothing in this Agreement is intended to grant any rights under any copyright or trademark of either Party, nor will this Agreement grant any rights in or to Confidential Information, except as expressly permitted hereunder.

12. This Agreement will be binding upon and inure to the benefit of the Parties and their respective successors, agents and assigns. If any provision of this Agreement is deemed void

3

by law, the remaining provisions will continue in full force and effect. Failure to enforce any provision of this Agreement will not constitute a waiver of any term hereof. This Agreement may be executed in counterparts, each of which will be deemed an original and each of which together will constitute one and the same instrument.

13. The prevailing party in any litigation relating to the enforcement, interpretation and/or breach of this Agreement will be entitled to recover (in addition to any damages or other relief granted) reasonable legal fees and other expenses in connection with such litigation (both at trial and on any appeals therefrom).

14. Receiving Party hereby acknowledges that it is aware, and Receiving Party shall advise its Representatives who are informed of the matters that are the subject of this Agreement, that applicable United States and Canadian securities laws place certain restrictions on any person who has material, non-public information concerning an issuer, with respect to purchasing or selling securities of such issuer or from communicating such information to any other person, and with respect to United States securities laws, under circumstances in which it is reasonably foreseeable that such other person is likely to purchase or sell such securities.

15. Non-Solicit. Counterparty shall not, and shall cause its affiliates (together with Counterparty, the "**Covered Entities**") not to, for a period of one (1) year from the date hereof, solicit, employ or retain, any officer or employee of the Companies or its affiliates without the prior written consent of the Companies; provided, that the Covered Entities shall not be precluded from hiring any person (a) who responds on his or her own volition, without any overt or tacit encouragement by the Covered Entities, to a general solicitation or advertisement not targeted specifically at employees of the Companies or its affiliates; (b) who contacts the Covered Entities on his/her own initiative without any direct or indirect solicitation or encouragement from the Covered Entities, other than any general solicitation or advertisement; (c) whose employment with the Companies or its affiliates is terminated by the Companies or such affiliate; or (d) with whom the Covered Entities have not had any contact with or of whom the Covered Entities have not become aware of in connection with the Transactions.

16. Non-Interference. Counterparty agrees that neither it, nor any of its affiliates will, directly or indirectly, use the Confidential Information of the Companies to solicit, induce, encourage or otherwise cause any of the Companies' customers, suppliers, manufacturers, distribution partners, clients, advertisers, marketing representatives, investors, lenders, advisors or consultants to alter, change, modify, cancel, discontinue, limit or refrain from entering into any commercial or business relationship (contractual or otherwise) with the Companies or its affiliates, without the Companies' express prior written consent; nor will the Counterparty or any of its affiliates use the Confidential Information of the Companies to solicit or attempt to initiate a new business relationship, or modify terms of an existing business relationship, with any such customer, supplier, manufacturer, distribution partner, client, advertiser, marketing representative, investor, lender, advisor or consultant.

**AGREED TO AND ACCEPTED:**

**[COUNTERPARTY'S LEGAL NAME]:**

_____

**Name:** _____

**Title:** _____

**LIGHTHOUSE IMMERSIVE INC., by its Court-appointed Monitor, B. Riley Farber Inc., in its capacity as Monitor of the Companies, and not in its personal capacity**

_____

**Name:** _____

**Title:** _____

**LIGHTHOUSE IMMERSIVE USA, INC., by its Court-appointed Monitor, B. Riley Farber Inc., in its capacity as Monitor of the Companies, and not in its personal capacity**

_____

**Name:** _____

**Title:** _____

**ACKNOWLEDGMENT LETTER**

**Acknowledgement of Sale and Investment Solicitation Process**

The undersigned hereby acknowledges receipt of the sale and investment solicitation process ("**SISP**") as approved by the Order of the Honourable Justice Cavanagh of the Ontario Superior Court of Justice (Commercial List) dated October 13, 2023, and acknowledges that compliance with the terms and provisions of the SISP is required in order to participate in the SISP and for any Bid to be considered by B. Riley Farber Inc., in its capacity as Court-appointed Monitor of Lighthouse Immersive Inc. and Lighthouse Immersive USA, Inc.

Dated this _____ day of October, 2023

By: _____

Name:
Title:

**APPENDIX "C"**

**ADVERTISEMENT OF SISP IN INSOLVENCY INSIDER**

Ethics probe for bankruptcy judge; $1B in opioid debt wiped



Insolvency Insider <editor@insolvencyinsider.ca>
To  James Sacoransky

7:02 AM

ⓘ If there are problems with how this message is displayed, click here to view it in a web browser.
Click here to download pictures. To help protect your privacy, Outlook prevented automatic download of some pictures in this message.

## Assets for Sale

**B. Riley Farber Inc.**, in its capacity as CCAA Monitor of **Lighthouse Immersive Inc.** and **Lighthouse Immersive USA, Inc.** (Collectively "**Lighthouse**"), is conducting a sale and investment solicitation process ("**SISP**") for the business and assets, including intellectual property, of Lighthouse. Lighthouse provides immersive entertainment experiences incorporating art, music, and state-of-the-art technology to its customers in Toronto and the United States. Prospective Bidders must submit a binding offer in the form of a Sale Proposal, Investment Proposal, or a combination, by no later than **November 15, 2023, at 5:00pm EST**. Further information relevant to the SISP is available on the Monitor's website at https://farbergroup.com/engagements/lighthouse-immersive/. To obtain copies of, or access to relevant documentation, please contact James Sacoransky at (647) 962-5384, or by email at jsacoransky@brileyfin.com.

**APPENDIX "D"**

**ADVERTISEMENT OF SISP IN NATIONAL POST**



*FP2* financialpost.com

# FINANCIAL POST

FINANCIAL POST, TUESDAY, OCTOBER 31, 2023

> THE TRANSFORMATION OF THE WORLD'S CITIES IS UNSTOPPABLE BECAUSE TECHNOLOGY LIBERATES MANY FROM OFFICES. THE TRANSITION WILL BE MESSY BECAUSE URBAN RENEWAL WON'T HAPPEN UNTIL RESIDENTIAL CONVERSIONS BECOME MORE ECONOMIC.  — *DIANE FRANCIS*

## COMMENT

# *Residential conversions the key to urban renewal*

### Municipalities feeling weight of empty offices



**DIANE FRANCIS**

China is afflicted with "ghost cities" featuring downtown cores that were overbuilt with government financing and remain empty years later. But the same predicament faces downtowns across North America, as vacancies increase due to remote work and overbuilding.

"Tougher return-to-office policies are no remedy for half-empty buildings," reported the Wall Street Journal. "Office attendance in big cities is still barely half of what it was in 2019, and company get-tough measures are proving largely ineffective at boosting that rate much higher."

Even fast-growing Texas cities like Houston, Dallas and Austin have 25 per cent office vacancy rates, more than New York's 12 per cent and San Francisco's 17 per cent. In Canada, commercial real estate firm CBRE issued a gloomy report noting that Toronto's downtown vacancy rate hit 15.8 per cent earlier this year, the highest since 1996.

This trend was kicked off by COVID lockdowns, which forced everyone to adapt to working at home. Attempts to get employees back to the office have largely failed because working at home reduces the costs of child care, transportation and other expenses.

But the knock-on effects of office vacancies are massive and will hurt municipal governments, which are reliant on commercial taxes, the retail sector, as "foot traffic" dries up and consumers increasingly shop online for convenience, as well as the banks that financed large office developments.

"Traditional downtowns are dead, dying or on life support across the U.S. and elsewhere," wrote John Rennie Short, professor emeritus of public policy at the University of Maryland, in the Conversation. "Today, many cities are confronting the prospect of an urban



North American cities are facing a similar fate to China's "ghost cities" as remote work and overbuilding lead to an increase in building vacancies, writes Diane Francis.
QILAI SHEN / BLOOMBERG FILES

doom loop, with a massive oversupply of office and retail space, fewer commuters and a looming urban fiscal crisis."

An "urban doom loop" is when the loss of workers and businesses leads to a reduction in property taxes and fewer people in

downtown cores, intensifying crime and urban decay. Problems also arise when loan losses cause banks to cut lending, which in turns leads to further drops in property prices and more losses.

Canada's banking regulator, the Office of the Superintendent of Financial Institutions, recently warned that, "The outlook remains difficult as seen through an increasing number of strategic defaults in the office space, falling real estate investment trust values relative to their historical net asset value estimates and rising U.S. commercial mortgage-backed securities delinquency and special servicing rates, especially in the office segment."

City officials and developers are now scrambling for alternatives. Some developers have handed their buildings over to their lenders. Earlier this year, for example, Canadian giant Brookfield Corp. defaulted on more than $750 million in debt involving two office towers in Los Angeles.

Some developers are attempting to convert office buildings into condos, but costs can be prohibitive, as are zoning restrictions. Yet in New York, some developers are building large condo projects that feature co-working spaces, retail and recreational facilities. They are, in essence, remote working residences but are downtown and close to the action, as well as near the city's night and cultural life.

New York City is also converting hotels into housing for its growing population of homeless people, so they are near potential employment and services. One of the first was the conversion of a 30-storey hotel in a wealthy section of Brooklyn. It has 500 units plus amenities such as a gym, workrooms and on-site mental health and social support services.

The only Canadian jurisdiction with expertise in coping with high downtown vacancies is Calgary, due to the boom-and-bust nature of the oil business. In recent years, Calgary had office vacancy rates as high as 30 per cent, and had to create new planning, zoning and government financial schemes to reinvent its city centre. Some residential conversions were subsidized and other changes were made to reduce costs for businesses.

The transformation of the world's cities is unstoppable because technology liberates many from offices. The transition will be messy because urban renewal won't happen until residential conversions become more economic.

*Financial Post*

## NOTICE OF INTENT TO DISSOLVE
*(Business Corporations Act (Alberta))*

### CNR (ECHO) RESOURCES INC.

Notice is hereby given that a Certificate of Intent to Dissolve was issued to **CNR (Echo) Resources Inc.** on October 31, 2023.

Dated at Calgary, Alberta, October 31, 2023.

Stephanie A. Graham,
Corporate Secretary
CNR (Echo) Resources Inc.

**MEDICAL CANNABIS INVESTMENT/ACQUISITION OPPORTUNITY**

**NOTICE** is hereby given that on October 2, 2023, the Court of King's Bench of Alberta granted an order appointing KSV Restructuring Inc. ("**KSV**") as receiver and manager of the current and future assets, undertakings and properties of Pathway Health Corporation and Pathway Health Services Corporation (the "**Companies**"). The Companies operate The Clinic Network, a leading medical cannabis clinic business in Canada.

On October 2, 2023, an Order (the "**SISP Order**") was granted authorizing KSV, to conduct a sales and investment solicitation process (the "**SISP**"). Pursuant to the SISP Order, the Receiver has entered into a Stalking Horse Asset Purchase Agreement. The SISP will solicit interest in, and opportunities for, a sale of, or investment in, all the Companies' Property and undertaking. Qualifying Bids must be submitted to KSV via email or mail by no later than 5:00 PM Calgary time on November 24, 2023, and must exceed in aggregate the total consideration payable pursuant to the Stalking Horse Asset Purchase Agreement (among other conditions).

Information regarding the proceedings is available on KSV's website at www.ksvadvisory.com/experience/case/pathway-health and may also be obtained from Ross Graham of KSV at rgraham@ksvadvisory.com or 587-287-2750.

**KSV RESTRUCTURING INC.**
**RECEIVER**
Suite 1165, 324 – 8th Ave SW
Calgary, Alberta T2P 2Z2

## Imperial

### NOTICE OF DIVIDEND

A quarterly dividend of 50 cents per share has been declared on the outstanding common shares of Imperial Oil Limited to shareholders of record at the close of business on December 1, 2023, payable January 1, 2024.

Ian R. Laing
Vice President,
General Counsel,
and Corporate Secretary

Calgary, Alberta
October 27, 2023

**LIGHTHOUSE IMMERSIVE INC. AND LIGHTHOUSE IMMERSIVE USA, INC.**
**SALE AND INVESTMENT SOLICITATION PROCEDURE**

B. Riley Farber Inc., in its capacity as CCAA Monitor of Lighthouse Immersive Inc. and Lighthouse Immersive USA, Inc. (collectively, "**Lighthouse**" or the "**Companies**"), has commenced a sale and investment solicitation process ("**SISP**") for the business and assets, including intellectual property, of Lighthouse. Lighthouse provides immersive entertainment experiences incorporating art, music, and state-of-the-art technology to the public in Toronto and the United States. As set out in the court approved SISP, a "stalking horse" Asset Purchase Agreement will serve as a floor for potential additional bids.

Interested parties will have until 5:00pm EST on November 15, 2023 to submit a binding offer in the form of a Sale Proposal, Investment Proposal, or a combination of the two. Upon the execution of a non-disclosure agreement, interested parties will be granted access to an electronic data room containing relevant information on the Companies' business, assets and the SISP.

To obtain further information relevant to the SISP, please visit the Monitor's website at https://farbergroup.com/engagements/lighthouse-immersive/.

For additional information, please contact James Sacoransky at (647) 962 - 5384 or by email at jsacoransky@brileyfin.com

DATED AT Toronto, Ontario this 31st day of October 2023.

## B·RILEY FARBER

B. RILEY FARBER INC., LIT
150 York Street, Suite 1600
Toronto, ON M5H 3S5
Tel: (437) 294-4600
Fax: (416) 496-3839
www.farbergroup.com

### NOTICE OF BANKRUPTCY AND FIRST MEETING OF CREDITORS

**IN THE MATTER OF THE BANKRUPTCY OF**
**Eduardo Washington Curbelo**

Notice is hereby given that the bankruptcy of Eduardo Washington Curbelo, occurred on the 24th day of October, 2023; and that the First Meeting of Creditors will be held on the 13th day of November, 2023 at 224-92 Lakeshore Rd. E., Mississauga ON, at 03:00 pm in the City of Mississauga, in the Province of Ontario.

Dated at Scarborough, Ontario this 26th day of October, 2023

**Rusinek & Associates Inc.**
**Licensed Insolvency Trustee**
2401 Eglinton Avenue East
Suite 208
Scarborough, ON M1K 2M5
Tel (416) 288-8048
Fax (416) 288-8429
info@rusinek.ca

### NOTICE OF BANKRUPTCY AND FIRST MEETING OF CREDITORS

In the matter of the bankruptcy of **Acrylic Creations Inc.**

Notice is hereby given that the bankruptcy of **Acrylic Creations Inc.** with registered address of 465 Signet Drive, Toronto, Ontario occurred on the 26th day of October 2023; and that the first meeting of creditors will be held on the 16th day of November 2023, at 2:00 pm. by video/teleconference. To get information on how to obtain an access code for the meeting, please call our office at 416-504-1650 ext 122.

DATED at Toronto, Ontario, this 31st day of October 2023.

## ALBERT GELMAN

SOLVING INSOLVENCY

Albert Gelman Inc.
Head Office:  60 Shaftesbury Avenue, Toronto, Ontario M4T 1A3
www.albertgelman.com

**APPENDIX "E"**

**FORECAST VS ACTUAL VARIANCE ANALYSIS FOR THE 6 WEEKS ENDED NOVEMBER 12, 2023**

**LIGHTHOUSE IMMERSIVE INC. ("LHI") & LIGHTHOUSE IMMERSIVE USA, INC. ("LHI USA")**
**Actual Cash Flow vs. Revised Forecast - Cumulative Variance Analysis**
**For the 6 weeks ended November 12, 2023**
*In USD*

| | Forecast | Actual | Variance - B/(W) |
|---|---|---|---|
| **6-week period ending** | **11/12/2023** | **11/12/2023** | **11/12/2023** |
| **Cash Receipts** | | | |
| Box Office Ticket Sale Collections | $ 120,000 | $ 107,038 | $ (12,962) |
| Other Income | - | 926,154 | 926,154 |
| Divestiture of Surplus Inventory and Capital Assets | $ - | - | - |
| Transfer from Affiliated Companies | - | - | - |
| Rate Card Reimbursements from LHI Studios | $ 260,698 | 326,487 | 65,788 |
| **Total Receipts** | **$ 380,698** | **$ 1,359,679** | **$ 978,981** |
| **Cash Disbursements** | | | |
| Visioni Royalties | $ 6,000 | $ - | $ 6,000 |
| LHI Payroll & Payroll Remittances | 343,238 | 312,999 | 30,238 |
| LHI USA Payroll & Payroll Remittances | 135,000 | 150,080 | (15,080) |
| Contract Payroll From Related Party | 192,000 | 25,695 | 166,305 |
| LHI Rent | 162,789 | 134,927 | 27,862 |
| LHI Utilities and Other Occupancy Costs | 32,040 | 11,673 | 20,367 |
| LHI Corporate Overhead | 179,738 | 144,553 | 35,185 |
| LHI USA Corporate Overhead | 120,283 | 107,577 | 12,706 |
| Load out costs | 318,750 | 42,949 | 275,801 |
| Transfer to LHI USA Wholly Owned Subsidiaries | 700,000 | 964,144 | (264,144) |
| LHI Cowboy Production Costs | - | 227,083 | (227,083) |
| Foreign exchange (gain) / loss | - | (1,700) | 1,700 |
| **Total Operating Disbursements** | **$ 2,189,838** | **$ 2,119,980** | **$ 69,858** |
| LHI & LHI USA Legal Counsel Fees | $ 190,000 | $ 289,831 | $ (99,831) |
| Monitor Fees | 180,000 | 193,178 | (13,178) |
| Monitor's Legal Counsel Fees | 85,000 | 48,832 | 36,168 |
| DIP Lender Legal Fees | - | 55,002 | (55,002) |
| **CCAA Professional Fees** | **$ 455,000** | **$ 586,842** | **$ (131,842)** |
| **Total Disbursements** | **$ 2,644,838** | **$ 2,706,822** | **$ (61,984)** |
| **Net Receipts** | **$ (2,264,140)** | **$ (1,347,143)** | **$ 916,997** |
| **Opening Cash Position** | **$ 710,054** | **$ 710,054** | **$ -** |
| DIP Financing Advances to Companies | $ 2,426,000 | $ 1,280,803 | $ (1,145,197) |
| **Cash Ending Balance** | **$ 871,914** | **$ 643,714** | **$ (228,200)** |
| **Total DIP Financing Advances** | | **$ 2,854,803** | |

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c.C-36 AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF LIGHTHOUSE IMMERSIVE INC. AND LIGHTHOUSE IMMERSIVE USA, INC. (collectively, the "**Applicants**")

Court File No.: CV-23-00703509-00CL

|  |  |
|---|---|
|  | ***ONTARIO***<br>**SUPERIOR COURT OF JUSTICE**<br>**COMMERCIAL LIST** |
|  | Proceedings commenced at Toronto |
|  | **THIRD REPORT OF THE MONITOR**<br>**Dated November 16, 2023** |
|  | **Thornton Grout Finnigan LLP**<br>Barristers and Solicitors<br>Toronto-Dominion Centre<br>100 Wellington Street West<br>Suite 3200, P.O. Box 329<br>Toronto, ON  M5K 1K7<br>Fax:       416-304-1313<br><br>**Rebecca Kennedy (LSO# 61146S)**<br>Tel:  (416) 304-0603  /  Email:  rkennedy@tgf.ca<br><br>**Rachel Fielding (LSO# 72211S)**<br>Tel:  (416) 304-0971  /  Email:  rfielding@tgf.ca<br><br>**Marco Gaspar (LSO# 84199A)**<br>Tel:  (416) 306-5825  /  Email:  mgaspar@tgf.ca<br><br>Lawyers for the Court-Appointed Monitor, B. Riley Farber Inc. |